**LABATON SUCHAROW LLP**
James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
ivasilchenko@labaton.com
nmanningham@labaton.com

*Counsel for Lead Plaintiff and Lead
Counsel for the Proposed Class*

[Additional counsel appears on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLEBRA CAPITAL PARTNERS MASTER FUND LTD, SYLEBRA CAPITAL PARC MASTER FUND, AND SYLEBRA CAPITAL MENLO MASTER FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>EVERBRIDGE, INC., DAVID MEREDITH, PATRICK BRICKLEY, and JAIME ELLERTSON,<br><br>Defendants. | Case No.: 2:22-cv-02249-FWS-RAO<br><br>CLASS ACTION<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION....................................................................... 2

    A.   Everbridge's Pre-Class Period and Pre-Meredith Business Strategy  4

    B.   Meredith Takes Over as CEO and Falsely Assures Investors that the Company's Growth Strategy Remains the Same ............................. 5

    C.   Defendants Falsely Assert that Everbridge Acquired Numerous Companies to Enhance Everbridge's CEM Suite ............................. 6

    D.   Defendants' Failure to Integrate the Acquisitions Undermined Everbridge's Long-Term Growth....................................................... 7

    E.   Defendants Purposefully Downplay Revenue Contribution from xMatters to Hide Slowing Organic Growth ..................................... 8

    F.   Defendants Mislead Investors About the xMatters Integration ....... 10

    G.   The Truth is Gradually Revealed ................................................. 11

II.  JURISDICTION AND VENUE ................................................................ 13

III. PARTIES ............................................................................................. 14

    A.   Lead Plaintiff .............................................................................. 14

    B.   Defendants.................................................................................. 14

    C.   Relevant Third Parties ................................................................ 16

IV.  SUBSTANTIVE ALLEGATIONS OF FRAUD ......................................... 20

    A.   Overview of the Everbridge's Business ........................................ 20

    B.   Everbridge Goes Public and Explains the Company's Growth Strategy...................................................................................... 24

    C.   Meredith Takes Over as CEO and Falsely Reassures Investors That the Company's Growth Strategy Remains the Same ..................... 28

    D.   Notwithstanding Meredith's Assurances to the Contrary, Defendants Had Already Launched an Aggressive Growth-Through-Acquisition Strategy...................................................................................... 30

        1.   Everbridge Acquires NC4, its Largest Acquisition to Date, and Misleads Investors About Integrating NC4 ...................... 32

        2.   Defendants Acquire Five Companies in 2020 But Do Not Integrate them into Everbridge's CEM Suite, Despite

Claiming that Everbridge Acquired Them "to enhance the Company's CEM suite" ................................................. 35

    a.    The Connexient Acquisition ........................................ 35

    b.    The CNL Software Acquisition.................................. 36

    c.    The one2many Acquisition ........................................ 37

    d.    The Techwan Acquisition .......................................... 38

    e.    The SnapComms Acquisition..................................... 39

  3.  Everbridge Acquires RedSky in January 2021 but Does Not Integrate it into Everbridge's CEM Suite .............................. 40

  4.  Without Knowledge of the Integration Issues, the Market Believed that the Company Had Strengthened its CEM Suite ................................................................. 41

  5.  Everbridge Acquires xMatters, the Company's Largest Acquisition Ever ....................................................... 41

    a.    Defendants Purposefully Downplay the Revenue Contribution from xMatters in Order to Hide Increasingly Stagnant Organic Revenue Growth ........ 42

    b.    Defendants Mislead Investors About Significant Problems Integrating xMatters into Everbridge .......... 53

E.  The Relevant Truth Regarding the Company's Slowing Organic Growth and Unsustainable M&A Strategy Slowly Emerges .......... 59

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............ 62

A.  November 4, 2019 Earnings Call ................................. 63

B.  February 18, 2020 Earnings Call................................. 64

C.  March 23, 2020 Corporate Analyst and Investor Meeting............. 66

D.  May 5, 2020 Earnings Call........................................ 67

E.  The First Quarter 2020 10-Q ..................................... 68

F.  The January 14, 2021 Needham Virtual Growth Conference ......... 69

G.  The February 18, 2021 Earnings Call............................. 71

H.  The April 6, 2021 xMatters Acquisition Press Release................. 72

I.  The May 10, 2021 Form 10-Q and Earnings Call.......................... 74

J.    The June 10, 2021 Bank of America Global Technology Conference ........................................................................... 78

K.    The Second Quarter 2021 10-Q ..................................................... 79

L.    The August 9, 2021 Earnings Call ................................................. 80

M.    The November 9, 2021 Earnings Call ............................................ 82

N.    The November 30, 2021 Credit Suisse Conference ....................... 83

O.    The November 30, 2021 Press Release .......................................... 83

VI.   THE TRUTH EMERGES .......................................................................... 84

A.    The Truth is Partially Revealed on December 9, 2021 When Defendants Disclose Meredith's Abrupt Departure and Lower Revenue Guidance, But Investors Still Question How the Two are Related ............................................................................................ 84

B.    The Full Truth is Fully Revealed on February 24, 2022 When Defendants Lower Revenue Guidance Even Further and Admit the Company had not Integrated its Acquisitions During Meredith's Tenure as CEO .................................................................................. 87

VII.  LOSS CAUSATION .................................................................................. 93

A.    December 9, 2021 – First Partial Corrective Disclosure/Materialization of the Risk ............................................ 95

B.    February 24, 2022 – Final Corrective Disclosure/Materialization of the Risk .................................................................................................. 97

VIII. ADDITIONAL EVIDENCE OF SCIENTER ........................................ 103

A.    Core Operations Allegations: Everbridge's CEM Platform Was Critical to the Company's Growth Plan and Integrating the Acquired Companies was Necessary for CEM's Success ............................ 103

B.    The Abrupt Departure of Meredith Supports Scienter ................. 106

C.    Defendants' Statements Themselves Support Scienter ................. 107

D.    Meredith's Employment Agreement Further Supports Scienter ... 111

E.    Statements by Former Everbridge Employees Corroborate that Defendants Knowingly Downplayed the Revenue Contribution from xMatters to Mask Slowing Organic Growth .................................. 111

IX.   CONTROL PERSON ALLEGATIONS ................................................. 112

X.    CLASS ACTION ALLEGATIONS ....................................................... 114

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-
       THE-MARKET DOCTRINE .................................................................. 116

XII.   NO SAFE HARBOR ............................................................................ 118

XIII.  CAUSES OF ACTION ......................................................................... 119

PRAYER FOR RELIEF ....................................................................................... 122

JURY DEMAND ................................................................................................... 122

Court-appointed Lead Plaintiff Sylebra Capital Partners Master Fund Ltd, Sylebra Capital Parc Master Fund, and Sylebra Capital Menlo Master Fund ("Lead Plaintiff" or the "Sylebra Funds") individually and on behalf of all persons and entities who or which, during the period from November 4, 2019 through February 24, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of Everbridge, Inc. ("Everbridge" or the "Company") and were damaged thereby (the "Class"),[1] bring this Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants Everbridge and several of Everbridge's senior executives and officers—former Chief Executive Officer ("CEO") David Meredith ("Meredith"), current Chief Financial Officer ("CFO") Patrick Brickley ("Brickley"), and former CEO and current Chairman of Everbridge's Board of Directors Jaime Ellertson ("Ellertson" and together with Meredith and Brickley, the "Individual Defendants").

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Everbridge with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Everbridge and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Everbridge, its business, and the Individual Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys, including interviews with former Everbridge employees; and (5) other publicly available information concerning

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Everbridge during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Everbridge's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

---

Everbridge, its business, and the allegations contained herein.   Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     This case is about Defendants' fraudulent misrepresentations, material omissions, and course of conduct surrounding Everbridge's nine acquisitions between 2019 and 2021.  Specifically, Defendants used the ***acquired revenue*** from those target companies to create the false appearance of ***organic revenue*** growth in the minds of the investors comprising the Class.

2.     Moreover, throughout the Class Period, Everbridge and the Individual Defendants also consistently misled the investing public about the ostensible purpose of those acquisitions, claiming they were strategic and engineered solely to enhance the Company's long-term revenue growth.  In stark opposition to what Defendants knew (and in which they were actively engaging), however, they instead disseminated false and misleading statements and omissions of material fact in an attempt to cover up the significant problems Everbridge encountered as a result of Defendants' failure to integrate these acquisitions.

3.     Indeed, Defendants made materially false and misleading statements and omissions of material fact about the extent to which Everbridge was using and allocating the revenue obtained from those acquired companies in order to disguise ***stagnating organic revenue***.  For example, during the Class Period, Defendants lied to investors about how much ***revenue Everbridge acquired*** from xMatters, a $243.3 million acquisition of an IT service platform that, ***if properly integrated***, would allow Everbridge more effectively to sell its single platform suite of products, which in turn, would enhance the Company's long-term growth.

4.     Although Defendants knew xMatters would contribute $20-25 million to Everbridge's 2021 revenue, they instead told investors that xMatters would contribute only $9-11 million.  According to Confidential Witness ("CW") 1, who worked at Everbridge during the xMatters acquisition, *the rationale Meredith provided was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue.*  Defendants' falsehoods led investors to believe that the Company's organic revenue was growing more than it actually was.

5.     As a result, investors remained completely unaware of the Company's slowing organic revenue and failed (and previously undisclosed) acquisition strategy until the truth was revealed.  As a result, investors were left holding the bag to the tune of billions of dollars in losses when Defendants admitted that Everbridge's aggressive acquisition strategy during the Class Period had been intentionally unsustainable and harmful to long term profitability.

6.     Specifically, on December 9, 2021, the Company lowered 2022 revenue guidance to levels well below Everbridge's demonstrated and consistent 30% plus revenue growth, and also announced that Defendant Meredith abruptly resigned as CEO.  On this news, Everbridge's share price plummeted more than *45%* in a single day.  Even at that moment, however, instead of coming clean about the Company's failed acquisition strategy under Meredith's leadership, Defendants continued its misleading narrative by claiming that Meredith's sudden departure was unrelated to the Company's financial position.

7.     On February 24, 2022, investors finally learned the full truth about Everbridge's slowing revenue growth and Meredith's failed (and previously undisclosed) acquisition strategy, when Everbridge announced that it had determined that the flurry of acquisitions during the Class Period created obstacles to sales growth due to incomplete integrations and increased complexity of its offerings, and as a result, the Company was going to focus on integrating the

acquired companies (which Defendants previously said they already did). On this news, Everbridge's common stock cratered an additional ***34%***.

A.     **Everbridge's Pre-Class Period and Pre-Meredith Business Strategy**

8.     Everbridge was founded in 2002.  Initially, the Company had a single product, its Mass Notification software, which sent messages via telephone, text, and email to an entire defined population in the event of a threat or emergency. Though it was originally the Company's only product, Defendants understood that Everbridge needed to expand its offerings beyond Mass Notification in order to continue growing.   As Defendant Brickley explained during the Company Conference on March 5, 2020 in his capacity as CFO, "we knew pre-IPO, that you can't really go public and sustain on just the mass notification opportunity" as it was "not growing super quickly."

9.     To generate long-term growth, the Company developed a Critical Event Management ("CEM") suite, which it described as a collection of various products that enable organizations to assess, manage, and respond to distinct threats and emergencies, ***all on a single platform***.   The Company told investors this CEM suite would drive future growth, as the market for CEM was more than five times larger than the market for Mass Notification.

10.     Importantly, Everbridge's early growth strategy hinged upon building its CEM suite and increasing revenue.  This strategy would necessarily depend on ***organic development of products*** through its own internal development efforts, with ***occasional*** additions from strategic acquisitions.

11.     And that early growth strategy translated well to earnings, as Everbridge reported 35% to 41% revenue growth every year between 2016 and 2018.  Indeed, Everbridge's revenue growth from 2016 to 2018 was largely organic. Organic growth refers only to that which is achieved entirely through a Company's

own resources, in contrast to inorganic growth, which may be attributable to any number of external sources and activities such as mergers and acquisitions ("M&A"). Prior to the Class Period, then CEO Ellertson explained that since going public (in 2016), Everbridge's growth rate consisted of mid-30% organic growth, plus an additional 3% to 7% inorganic growth from acquisitions.

12. Due to this proven, historic track record of achieving revenue growth through nearly entirely organic means, before the Class Period, the Company publicly (and accurately) maintained that any acquisition was strategic and designed to drive *long-term* revenue growth. Indeed, in response to an analyst question about the Company's M&A strategy during a Company Conference Presentation in February 2019, Ellertson assured investors that ***Everbridge did not "buy revenue***," meaning they did ***not acquire companies simply for a short-term revenue boost***. Instead, Ellertson explained that the Company's acquisitions were "thoughtful product decision[s] that [are] strategic" and meant to "create new growth drivers or sustain current drivers."

**B.     Meredith Takes Over as CEO and Falsely Assures Investors that the Company's Growth Strategy Remains the Same**

13. Because the Company's initial strategy led to consistently strong organic revenue growth, investors were curious if, and if so, how it would change under new CEO Meredith, who succeeded Ellertson in July 2019. For example, during the Class Period, an analyst asked Meredith about the Company's M&A strategy after Everbridge closed its largest acquisition to date. Meredith reassured investors that the Company's M&A strategy remained the same, stating that "[o]ur strategy on M&A really hasn't changed since when Jaime [Ellertson] was running the business." But this was not the case.

14. In direct contradiction to those words, and without stating as much publicly, under Meredith's leadership, the Company did exactly what Ellertson and

Everbridge said the Company **would not do**: "buy revenue" for the primary purpose of beating revenue estimates and increasing its share price. Indeed, multiple former Everbridge employees confirm that under Meredith's leadership, the Company's strategy was precisely the opposite of what he and Ellertson said: growth through acquisitions.

15.   Indeed, from the beginning of the Class Period to its end, the Company engaged in a flurry of acquisitions, purchasing nine new companies, all of which, alone or together, enabled the Company to beat analyst consensus estimates and its own revenue guidance because of acquired revenue.

**C.   Defendants Falsely Assert that Everbridge Acquired Numerous Companies to Enhance Everbridge's CEM Suite**

16.   Throughout the Class Period, Defendants misled investors about the Company's acquisition strategy and organic revenue growth. For example, in Everbridge's quarterly reports, Everbridge claimed to have engaged in almost every one of Everbridge's Class Period acquisitions in order "to **enhance the Company's CEM suite of solutions**." In reality, however, Defendants acquired the companies to enhance the Company's revenue, not its CEM suite. In fact, Defendants made little or no effort whatsoever to integrate the vast majority of those companies into Everbridge's CEM suite at all.

17.   For example, Everbridge made no effort to integrate Connexient, which the Company acquired on February 7, 2020. Although Everbridge told investors in Company's Form 10-Q filed on May 2, 2020 that it purchased Connexient "to enhance the Company's CEM suite," according to CW 9, employed by Connexient prior to the acquisition and Everbridge after it, Connexient's wayfinding app **still had not been migrated to or integrated into Everbridge's platform** two years after the acquisition, when she left the company (in March 2022).

18.    The Company also failed to integrate CNL Software and RedSky into its CEM suite, despite telling investors during the Class Period that both companies were purchased to enhance it.  According to CW 5, Everbridge failed to integrate CNL Software, which Everbridge acquired on February 25, 2020, into its CEM suite.  Similarly, CW 3, employed by RedSky before and Everbridge after acquisition (in January 2021), stated she believed RedSky would be incorporated into Everbridge's CEM, but Everbridge showed "no effort" in performing an integration.  According to CW 3, Everbridge just wanted RedSky's customers and revenue.

19.    Defendants' false assurances that the acquisitions "enhance[d] the Company's CEM suite," led investors to believe that Everbridge was integrating the acquired companies into Everbridge's CEM suite, which Defendants repeatedly touted as the only fully integrated solution on the market.  This created the false impression to investors that Everbridge was penetrating the large and growing CEM market and currently on a positive growth trajectory, and based on stated, current facts, would remain there.  This was false.

## D.    Defendants' Failure to Integrate the Acquisitions Undermined Everbridge's Long-Term Growth

20.    Everbridge's failure to integrate the acquired companies hampered its salespeople's ability to sell the CEM suite, as it was not truly the "singular, integrated product" Everbridge claimed it was.  Instead, the CEM suite was disjointed and confusing for customers, making it difficult for Everbridge to generate new business.  For example, according to CW 5, although Everbridge pitched their CEM suite as a fully integrated product, in reality it was not actually one fully integrated system.  CW 5 continued to say that as a result, it was difficult to sell the CEM suite to executives of prospective customers, as CIOs could easily poke holes in Everbridge's CEM platform due to its disconnected state.   CW 5

recalled reviewing the Leadership Dashboard, approximately mid-way through 2021, and observed that approximately half of the sales team was at 0% of their quotas, which CW 5 described as "staggering."

21. Defendants' failure to integrate the Class Period acquisitions overly complicated the Company's internal systems, which also hampered sales efforts. For example, according to CW 2, after the xMatters acquisition in May 2021, Everbridge was now operating four different instances of Salesforce[2] used by all different sales representatives. CW 2 added that in addition to Salesforce, Everbridge was also using two instances of NetSuite[3] in addition to all their European systems. CW 2 explained that the convoluted nature of the systems "really slowed down sales." Similarly, CW 6 noted that bookings had come down "pretty aggressively" during the second and third quarters of calendar year 2021. CW 6 defined bookings as new sales, either to new customers, or "upsells" of additional products to existing customers.

**E.      Defendants Purposefully Downplay Revenue Contribution from xMatters to Hide Slowing Organic Growth**

22. Because Everbridge's publicly available financial statements did not disclose the revenue contribution from each acquired company, investors had no transparency as to the precise extent (if at all, from their perspective) organic growth was lagging. Given this lack of transparency, analysts consistently asked Defendants to provide a revenue contribution from the acquired company, so analysts could determine how much revenue growth was organic and how much

---

[2] Based on Lead Plaintiff's review of publicly available sources, Salesforce is a client relationship management ("CRM") database used for support, sales, and marketing activities. Salesforce allows businesses to track sales and customer activity, market to customers, and many other services.

[3] Based on Lead Plaintiff's review of publicly available information, NetSuite is a technology vendor with applications for customer relationship management (CRM), enterprise resource planning (ERP), financial management, and many others.

1  revenue was acquired.  Despite these questions, Defendants misled investors about
2  the extent to which the revenues it obtained from those acquired companies were
3  being used to mask increasingly stagnant revenue growth.

4       23.    On April 6, 2021, the Company announced it would acquire xMatters
5  for $243.3 million, by far the Company's largest acquisition to date.  For context,
6  the Company's total revenue for the previous year (2020) was $271.1 million—
7  only $27.8 million more than the Company paid for xMatters.  Despite the size of
8  the deal, Everbridge told investors that it expected xMatters to contribute only $9
9  million to $11 million in revenue for the rest of 2021.

10      24.    But this was false.  In truth, the revenue contribution from xMatters
11 for the rest of 2021 was actually $20-25 million—***more than double*** the $9-11
12 million figure Defendants presented to the public.  According to CW 1, a former
13 Everbridge employee who had knowledge about Everbridge's M&A process and
14 transactions, the projected revenue figures relayed to Wall Street for xMatters were
15 an additional approximately $11 million for Everbridge in 2021, however,
16 realistically, the forecasts were presenting figures closer to $20 - $25 million.  CW
17 1 stated that she raised concerns regarding these discrepancies to her immediate
18 superior, which were then passed on to Meredith and Brickley.  CW 1 added that
19 she expressed concerns ***directly*** to Meredith and Brickley as well, in the form of
20 presentations and emails regarding the deal.  According to CW 1, the rationale
21 Meredith provided ***was that the discrepancy in figures was to "buffer" the declines***
22 ***in Everbridge's organic revenue***.

23      25.    Indeed, by telling investors that xMatters would contribute only $9-11
24 million to Everbridge's 2021 revenue, when according to CW 1, the xMatters deal
25 would actually contribute ***$20-25 million*** to 2021 revenue, Defendants effectively
26 hid from the market an extra $11-16 million in "revenue" from xMatters that would
27 be added to the Company's total revenue.  In so doing, of course, Defendants

created the false impression that Everbridge's revenue was growing organically more than it actually was. And because Everbridge's financial statements did not break out revenue from each acquired company, it was impossible for investors to figure out how much revenue came from xMatters and calculate organic revenue on their own. As a result of this misconduct, investors believed that the Company's organic revenue was continuing its strong momentum.

### F.     Defendants Mislead Investors About the xMatters Integration

26.     In addition to misleading investors about xMatters' revenue contribution and the Company's organic revenue growth, Defendants also falsely assured investors that the Company was successfully integrating xMatters without any hint of problems. This was not the case. As detailed by multiple former employees, the xMatters integration was a disaster and caused the departure of more than half of the xMatters sales staff after the acquisition. With less than half of xMatters' experienced sales staff remaining at Everbridge after the acquisition, Everbridge could not effectively sell xMatters' products, which caused a significant drop off in sales—and therefore, in organically-generated revenue—in the second and third quarters of 2021.

27.     Despite losing more than half of xMatters' sales staff, Defendants continuously touted the Company's integration efforts, making it appear as though Everbridge had integrated xMatters' technology into Everbridge's CEM and had integrated xMatters' employees into Everbridge. For example, Defendants described the integration as "***the seamless integration of the Everbridge and xMatters***." Defendants also falsely assured investors that "***[w]e've locked up key hires, and we're retaining them***."

28.     This was nevertheless false. In stark contrast to what Defendants told the market and their investors, most of the xMatters sales staff, including the global sales leader, left the Company within three months of the acquisition. Because

Everbridge, like all companies, depends on its salespeople to sell its products and grow its revenue, the loss of most of xMatters' sales staff caused sales a significant decline in sales midway through 2021.

29.     The poor integration of xMatters' sales staff caused a "dismal" third quarter for xMatters, as xMatters did not come close to achieving their targets. Despite this, Defendants falsely told investors that "based on our internal expectations, what we thought we'd do on sales, [] we're doing better." Defendants' misstatements led investors to believe that Everbridge had successfully integrated xMatters and was poised to continue its growth trajectory as it further strengthened its CEM suite.  This was false, which investors first started learning on December 9, 2021.

### G.     The Truth is Gradually Revealed

30.     On December 9, 2021, Defendants partially revealed the truth through a press release containing two announcements.  First, Everbridge announced, out of nowhere, that Meredith had resigned as CEO and member of the Board of Directors, effective January 30, 2022.  The Company immediately established an Office of the CEO and began transition leadership to Brickley and Chief Revenue Officer, Vernon Irvin, who would serve as Co-CEOs until the Company found a permanent replacement CEO.  Second, Everbridge reduced revenue guidance for 2022 to 20-23%, well below the Company's historical forecasts of 30% plus revenue growth. Nevertheless, at the same time, Defendants continued misleading investors by claiming that the two announcements were unrelated, stating that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results."

31.     Investors were shocked by this news, as Everbridge's stock price plummeted *by more than 45%*, as investors slowly began to understand that the Company's revenue growth was likely not sustainable.  However, analysts still

questioned how Meredith's departure could be related to the revenue growth concerns. For example, in an analyst report on December 13, 2021, J.P. Morgan asked "[w]hy is the CEO really leaving" and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?" For more than two months, no answers were forthcoming to those queries and concerns.

32. On February 24, 2022, however, investors finally learned the full truth about the Company's lack of organic revenue growth and Meredith's failed (and previously undisclosed) acquisition strategy. On that day, the Company issued a press release that, once again, lowered 2022 revenue guidance, this time to 15-17% growth—well below the historical 30% or more growth rate and a significant reduction from the initial forecast provided on December 9, 2021. The press release also explained that the Company was "taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."

33. During the related earnings call, Co-CEO Vernon Irvin explained that following Meredith's departure, management reviewed the Company's strategy during the Class Period and concluded that the flurry of acquisitions created a "*barrier to upsell and cross-sell from increased complexity, and incomplete integrations*." Similarly, Brickley said that the acquisitions "created complexity for the business seen in the product, back office and go-to-market headwinds *that are obstacles to sales growth*." Brickley further explained that "we were well down a path of selling dozens of solutions that *were not always tightly integrated*. We were selling them to multiple buyers. And as [Irvin] said, *that was confusing to customers and to our sellers*."

34. Investors were once again shocked by this revelation. On this news, Everbridge's stock price fell more than *33%*, closing at $30.61 per share on February 25, 2022, as investors finally learned the undisclosed facts about

Everbridge under Meredith's leadership.  The market finally learned that under Meredith's leadership the Company chased acquisitions to bolster its growth numbers, not to bolster its CEM suite, and that this strategy had weakened, not enhanced, the Company's CEM suite and sales efforts.

35.   For the first time, investors learned that the rapid pace of acquisitions and incomplete integrations caused a disjointed, confusing CEM suite—which was contrary to Defendants' repeated statements touting its CEM suite as the only fully integrated CEM solution—and led to a drop off of sales to such an extent that Defendants no longer could camouflage their inability to generate and sustain organic revenues from additional acquisitions.

36.   Less than a month later, on March 17, 2022, activist investor Ancora Holdings Group ("Ancora"), who beneficially owned approximately 4% of the Company's outstanding common stock, issued a letter calling for the sale of Everbridge.  Ancora criticized the recently disclosed M&A strategy under Meredith and Brickley's leadership, stating, among other things, that "we are puzzled by why Everbridge is only now recognizing the need to integrate products after so many years, when a well-disciplined management team and Board would understand the advantages to executing on this as soon as possible." Ancora also recognized that because "Everbridge does not disclose contributions from M&A," it has "seemingly obscure[ed] that the Company has been paying higher prices to acquire growth."

## II.   JURISDICTION AND VENUE

37.   These claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

38.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

39.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Everbridge transacts business in California, including in this District, and the Company's West Coast headquarters are located within this District at 155 North Lake Avenue, Suite 900, Pasadena, California 91101.  Further, Everbridge's securities trade on the NASDAQ stock market under the ticker symbol "EVBG." In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

40.    Lead Plaintiff Sylebra Funds are hedge funds managed by Sylebra Capital Limited, an investment adviser that targets mid-sized technology, media, and telecommunications companies.  Together, the Sylebra Funds have over $6.6 billion in assets under management.  Lead Plaintiff purchased Everbridge common stock during the Class Period and was damaged as the result of Defendants' fraud.

### B.    Defendants

41.    Defendant Everbridge is a Delaware corporation, based in Burlington, Massachusetts with its West Coast headquarters located at 155 North Lake Avenue, Suite 900, Pasadena, California 91101.  The Company's common stock is listed on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "EVBG."

42.    Defendant Meredith served as Everbridge's Chief Executive Officer ("CEO") as of July 15, 2019 and during all relevant times prior to December 9, 2021, on which date he unexpectedly and abruptly resigned from that post.  In his role as CEO of Everbridge, Meredith participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the significant problems Everbridge was

encountering as a result of its multiple acquisitions and the extent to which the revenues it obtained from those acquired companies were being used to mask increasingly stagnant organic growth. Defendant Meredith also signed Everbridge's SEC Form 10-Qs filed on May 8, 2020, May 10, 2021, and August 9, 2021, which contained materially false and misleading facts as detailed below.

43. As part of Meredith's employment agreement, the Company granted Meredith 100,000 performance stock units (the "PSU Grant"), with up to 62.5% of the PSU Grant becoming eligible to vest on September 30, 2021, based on the compound annual growth rate ("CAGR") achieved by the Company during the eight fiscal quarters preceding such date, and up to an additional 62.5% of the PSU Grant becoming eligible to vest on September 30, 2022, based on the CAGR achieved during the 12 fiscal quarters preceding such date. The vesting of the PSU Grant was subject to Meredith's continued service to the Company through each applicable vesting date or event.

44. Defendant Brickley served as the Senior Vice President and Chief Financial Officer ("CFO") of Everbridge as of March 1, 2019, including during the Class Period. After December 9, 2021, he also served as interim Co-CEO. In his role as CFO of Everbridge, Brickley participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the significant problems Everbridge was encountering as a result of its multiple acquisitions and the extent to which the revenues it obtained from those acquired companies were being used to mask increasingly stagnant organic growth. Defendant Brickley also signed Everbridge's SEC Form 10-Q for the quarter ended May 8, 2020, May 10, 2021, and August 9, 2021, which contained materially false and misleading facts.

45. Defendant Ellertson preceded Meredith as the CEO of Everbridge, serving in that position from September 2011 to July 2019, when Meredith

succeeded him as CEO. During the Class Period, Ellertson served as Executive Chairman of the Board of Directors of Everbridge during all relevant times. In his role as Executive Chairman, Ellertson participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the significant problems Everbridge was encountering as a result of its multiple acquisitions and the extent to which the revenues it obtained from those acquired companies were being used to mask increasingly stagnant organic growth. Moreover, in his role as Executive Chairman, Ellertson was responsible for the Company's M&A strategy. During the Class Period, an analyst asked Ellertson about his "day-to-day role in helping support David [Meredith], Patrick [Brickley] and the team," and Ellertson responded that his "day job is M&A" and that he is "just doing the M&A stuff."

46. Defendants Meredith, Brickley, and Ellertson are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, by virtue of their high-level positions at Everbridge, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition, as alleged herein.

47. Everbridge and the Individual Defendants are collectively referred to herein as "Defendants."

C.    Relevant Third Parties[4]

48. CW 1[5] was employed by Everbridge prior to the start of the Class Period and through the xMatters acquisition. In her role, particularly in the lead up

---

[4] All CWs are described in the feminine to protect their identity.
[5] At CW 1's request, Lead Plaintiff has withheld additional details of CW 1's employment at Everbridge. While Lead Plaintiff believes that the details of CW
*(continued)*

to an acquisition, CW 1 regularly communicated with Meredith and Brickley through presentations or email correspondence. CW 1 explained that she was two levels removed from the CEO, Meredith. With respect to the xMatters acquisition, CW 1 explained that she emailed Brickley and Meredith in the lead-up to the acquisition expressing concern about the revenue forecast.

49.     CW 2[6] was employed by xMatters prior to the Class Period and remained at Everbridge in the months following the acquisition. CW 2 had knowledge of the integration team during the xMatters acquisition.

50.     CW 3 was a Business Development Manager at RedSky Technologies from before the Class Period until the acquisition by Everbridge, at which point she was employed by Everbridge until April 2021. CW 3 was involved in the vetting of RedSky during the Winter of 2020 (shortly before the acquisition) as a member of the executive team. During this process, CW 3 recalled Everbridge did a "deep dive" into all the departments at RedSky, but Everbridge still did not understand RedSky's go-to-market strategy.

51.     CW 4 was employed by Everbridge from 2015 until November 2021. CW 4's last position at Everbridge was the Manager of the marketing team who directly supported the sales staff. CW 4 explained that she oversaw the business development team. According to CW 4, the business development team rolled up into the marketing department and was also "very closely aligned" with the sales

---

1's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional information, including CW 1's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request.

[6] At CW 2's request, Lead Plaintiff has withheld additional details of CW 2's employment at Everbridge and xMatters. While Lead Plaintiff believes that the details of CW 2's employment contained herein are sufficient to satisfy the requirements of the PSLRA, Lead Plaintiff can provide additional information, including CW 2's exact title and dates of employment, to the Court for an *in camera* inspection at the Court's request

1  group.  CW 4 reported to former VP Global Inside Sales and Sales Development
2  Randy Craig, who reported to former VP, Marketing Mike Lewis.

3      52.    CW 5 was employed by Everbridge as a Strategic Account Executive
4  from before the Class Period until September 2021.  In this role, CW 5 focused on
5  enterprise clients, which typically had at least 10,000 employees and $2 billion in
6  revenue.  CW 5 explained that her reporting structure went up through Patrick
7  Galvin, Vice President of Sales.

8      53.    CW 6 was employed by Everbridge as a Senior Financial Analyst from
9  approximately November 2020 through February 2022.  She initially reported to
10 Brian Brickley, former Senior Manager, FP&A.  Brian Brickley left shortly after
11 CW 6 joined the Company.  CW 6 then reported to Risa Sparks, then Senior
12 Director of Finance.  When Sparks was promoted to Vice President, M&A
13 Integration, in approximately March 2021, CW 6 reported to Mike McCarthy, the
14 current Senior Manager, FP&A at Everbridge.  CW 6 indicated her supervisors
15 reported to Jay Madhani, then-VP, Strategic Finance.  CW 6 described her job
16 duties as a Finance Analyst as "running the business."  CW 6 explained her primary
17 responsibilities involved developing operational budgets for the services arm of the
18 company, which included post- and pre-sale services and technical support.  In this
19 role, CW 6 had general insight into overall sales, bookings, and overall product
20 performance, although she was not directly involved in managing the budgets for
21 Sales Operations nor for analyzing revenue.

22     54.    CW 7 was employed by Everbridge from approximately February
23 2006 through July 2021 in a variety of roles.  Her last position with the Company
24 was Enterprise Sales Engineer, Strategic Accounts.  In that role, CW 7 reported to
25 Andrew Evangelos, Director of Sales Engineering.  Evangelos reported to Riz
26 Karim, Senior Vice President of Global Customer Success.  Both Evangelos and
27 Karim are still employed at Everbridge. CW 7 explained that, as an Enterprise Sales

28

Engineer, her role was to provide technical support and consulting services to the sales team and customers. CW 7 was paired with Account Executives, who were the primary sales representatives, to assist them in providing technical assistance, advice, and "solutioning" regarding Everbridge's products and how to meet the customers' needs.

55.     CW 8 was employed as a Senior Business Development Representative, or BDR, at Everbridge from February 2019 until the end of April 2020. In this role, CW 8 was responsible for developing and qualifying leads for the Inside Sales Team, which involved making approximately 50 to 100 phone calls per day and qualifying approximately two leads per day, for potential customers. CW 8 noted that by the end of each week, BDRs were required to have a certain number of qualified leads to turn over to the sales reps. CW 8 added that, once the leads were qualified, she worked with the sales reps for the applicable region, helping to schedule demos and initiating the sales cycle for that lead. CW 8 explained that her business development segment was Enterprise businesses, which she explained were entities with 500 or more employees. Her geographic territory was the East Coast and the South, approximately from Maine to Texas, although she also worked with some leads in California and Hawaii.

56.     CW 9 was employed as a Project Manager, Team Lead at Everbridge from February 2020 through March 2022. She joined Everbridge when it acquired her previous employer Connexient, Inc. She joined Connexient in approximately August 2018. CW 9 reported to Rebecca Levleit, then Director of Professional Services at Connexient, and currently Customer Success Manager at Everbridge. Levleit reported to Jim Cabray, Vice President of Client Services. CW 9 explained that Connexient provided "wayfinding" apps. She described the wayfinding app as similar to Google maps, providing directions and maps, but for indoor facilities such as hospitals. CW 9 noted that hospitals were among Connexient's largest

customers.   CW 9 described her role as managing the wayfinding apps on the Everbridge platform.  CW 9 elaborated that she worked with account managers and customers to implement and use the wayfinding app, as well as working to onboard customers for the management tools offered by Connexient and then Everbridge.

57.   CW 10 was employed as an Account Executive at Everbridge from May 2021 through January 2022.  She had previously been employed in the same role at xMatters, Inc., and joined Everbridge when xMatters was acquired.  CW 10 explained that as an Account Executive, she was responsible for generating sales in the Southeast Territory, which included Alabama, Florida, Mississippi, Louisiana, and part of Texas.  CW 10 added that she sold to all categories of potential customers except for government entities.  CW 10 indicated that she initially reported to Adam Cheney, former Senior Director of Enterprise Sales at xMatters; after Cheney left, CW 10 reported to Joe Pappalardo, Sales Director.

58.   CW 11 was employed by xMatters, Inc. in a variety of roles, including Strategic Business Development Representative, Sales Development Representative, and Sales and Operations from February 2019 through the acquisition by Everbridge.  CW 11 explained that she received a promotion from her xMatters role, several months after the acquisition, in August 2021, to Account Executive at Everbridge.  CW 11 held this role until her departure in February 2022.

## IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD

### A.    Overview of the Everbridge's Business

59.   Everbridge is incorporated in Delaware and maintains a West Coast headquarter in Pasadena, California.  The Company is a global software company that provides enterprise software applications designed to automate and accelerate organizations' operational response to "critical events."  Critical events include public safety threats such as severe weather conditions, active shooter situations,

and terrorist attacks, as well as business events like Information Technology ("IT") outages, cyber-attacks, product recalls, or supply-chain interruptions.

60.    The Company was founded in 2002 in response to the September 11 terrorist attacks with the mission of helping keep people safe amid critical situations.  The Company initially focused on one product—its Mass Notification software, which is designed to send messages via telephone, text, and email to an entire defined population in the event of a threat or emergency.

61.    Though the Company's first product was its Mass Notification software, Defendant Brickley stated at a March 5, 2020 Company conference presentation that "we knew pre-IPO, that you can't really go public and sustain on just the mass notification opportunity" as it was "not growing super quickly."  As a result, the Company has since expanded its product offerings, using its Mass Notification platform to build adjacent applications.

62.    Throughout the Class Period and before, the Company's product offerings have been organized into three product segments: (i) Mass Notification applications designed to communicate to an entire defined population in the event of a threat or emergency; (ii) IT and IoT alerting; and (iii) Critical Event Management ("CEM"), which is a collection of the Company's applications designed to allow its customers to assess threats, locate impacted people and assets, and manage and respond to critical events, ***all from one single platform***.

63.    Of these three categories, during the Class Period, the CEM segment had ***by far*** the largest Total Addressable Market ("TAM").  TAM is a term that is used to reference the revenue opportunity available for a product or service. Assessing the TAM is crucial for business because it helps prioritize business opportunities by serving as a metric of a given opportunity's underlying potential. According to a slide from the Company's Analyst Day 2020 meeting presentation

on March 23, 2020, the TAM for CEM was $25.9 billion, whereas the TAM for Mass Notification was $4.8 billion and $10.4 billion for IT and IoT Alerting:



64.     Therefore, the CEM segment provided the greatest growth opportunity, and Everbridge understood that in order to continue growing, it needed to build out Everbridge's CEM suite and further penetrate the CEM market since it was much larger than the Mass Notification—i.e., population alerting—market.

65.     The Company consistently explained that its CEM platform was integral to the Company's growth plan.  As explained in the Company's 2019 10-K, one of the "[k]ey elements of [its] growth strategy" was maintaining Everbridge's leadership in the CEM market since Everbridge was the only fully integrated CEM solution in the market.  Specifically, the 2019 10-K stated:

> ***Maintain Our Technology and Thought Leadership***.[7] We will continue to invest in our core CEM platform and our applications to maintain our technology leadership position. For example, we believe that ***we are the only company today that***

---

[7] Emphasis in original.

> ***provides a full, integrated CEM solution*** and that we provide the first solution to offer dynamic versus static location awareness integrated with analysis and communications for the employee safety and security marketplace. Further, we believe we have a competitive advantage through our commitment to innovation and thought leadership that has enabled us to take market share from our competitors and accelerate our growth.

66. The investing public understood the importance of the CEM suite to Everbridge's future growth. For example, on June 19, 2019, SunTrust Robinson Humphry issued an analyst report stating, "we believe the Critical Event Management (CEM) platform is important in sustaining high growth and supported by an estimated ~$26B TAM." SunTrust Robinson Humphry further stated that they "anticipate CEM to represent one of the highest growth segments of the overall business." Given the importance of the CEM suite to the Company's future growth, investors were extremely interested in the Company's plans for building and growing its CEM platform.

67. In the years before the Class Period, the Company focused on growing organically with some consolidation of adjacent technologies via targeted and strategic "tuck-in" acquisitions. These helped develop the CEM platform into a singular, integrated product designed to assess threats, located impacted people and assets, and manage and respond to critical events.

68. This integrated response separated Everbridge from its competitors, as other solutions relied on fragmented, unintegrated tools from numerous vendors. The Company's 2019 10-K explained this competitive advantage as follows:

> Organizations today typically manage critical events across the organization in silos that use disparate data sources and unintegrated tools, making it difficult to achieve a common operational view of threats and of the status of response. Utilizing a common contact base, consistent rules engines, threat databases that are integrated with information on the

location of an organization's people, assets and suppliers, and a common visualization platform, ***CEM solutions can provide a more integrated solution which can improve management control and visibility and lower costs. The ability to cohesively and rapidly share information and collaborate across the organization underlies creating a common operational approach***.

69.     As explained below, the Company's pre-Class Period growth strategy made sense, as it was focused on sustained organic growth with the occasional, targeted, strategic acquisition.  Through this approach, the Company established a dominant CEM platform that obviated the need for customers to contract with multiple point solution providers.  Investors also responded favorably to this approach, as the Company consistently beat its financial guidance and reported 35% to 41% year-over-year revenue growth every year between 2016 and 2018 and Everbridge's share price increased by approximately 244% between its first day of trading and December 31, 2018.

**B.     Everbridge Goes Public and Explains the Company's Growth Strategy**

70.     Since completing its Initial Public Offering ("IPO") in September 2016, the Company has repeatedly touted its revenue growth and ability to beat financial guidance every quarter.  The Company's total revenue for full year 2017 was $104 million, an increase of 36% compared to 2016; its total revenue for full year 2018 was $147.1 million, an increase of 41% compared to 2017; and its total revenue for 2019 was $200.9 million, an increase of 37% compared to 2018.

71.     Everbridge maintained that this revenue growth was almost entirely organic.  Organic revenue growth is the growth of a company by increasing output and enhancing sales internally through the Company's own resources.  Organic growth stands in contrast to inorganic growth, which is growth related to activities outside a business's own operations, such as growth attributable to mergers and

acquisitions.  Organic growth is often seen as superior and a better indicator of a company's performance.  While inorganic growth can provide a short-term boost, there are disadvantages in that implementation of technology or integration of new employees can be costly and time consuming.  Therefore, the Company's organic growth numbers were extremely important to investors.

72.   Since going public, Defendants consistently explained that Everbridge's revenue growth was almost entirely organic, with a small percentage of revenue growth coming from acquisitions.  Prior to the Class Period, when Defendant Ellertson was still CEO, he told investors that Everbridge "continue[s] to grow at kind of 30%, mid-30% numbers, which we have quoted continuously as our target since we went public, and then we add onto that anywhere from 3% to 7% with M&A in a given year."  In other words, since going public, the Company was growing around 30% organically year-over-year, plus an additional 3-7% inorganic growth from acquisitions, for a total growth rate in mid to high 30% range.

73.   Moreover, Everbridge assured investors that they did **not "buy revenue**," meaning they did **not acquire companies simply for the short-term revenue boost**.  Instead, the Company told investors that any acquisition would be strategic and help drive long-term growth.  For example, during the Company's Conference Presentation on February 28, 2019, in response to an analyst question about the Company's M&A strategy after its April 2018 acquisition of Unified Messaging Systems ASA ("UMS"), then-CEO Ellertson said:

> So all of our acquisitions are – make a person buy. **We don't buy revenue typically**. We're either buying into a market, a new market or a geography, which in some cases, especially internationally, we find more effective to acquire a team that has the culture and a . . . customer base because you remember, the first thing we do with a customer base we buy is we replatform onto our platform because we could sell them 8 other products,

9 other products. So there's enormous upside and synergy when we get them on. So UMS, 500 enterprise customers in mass notification. *In the first year, our goal is to convert 100% of those customers and not only capture that revenue on our platform but then double or triple that revenue over the next 2 or 3 years by cross-selling 2 or 3 new products*. And so that's one thing we do. And then the other is a conscious decision to look at what products do we have to own at the core and what products would we accelerate entrance into a market if we had -- or expand our addressable market if we acquired. *And so that's a thoughtful product decision that's strategic, and those tend to be more time-consuming and more strategic long term*. But that's what gets us – because we're constantly thinking 2 to 3 years out what gets us to $500 million and onto $1 billion is the strategic acquisition of components that would either open new markets or expand the set. *And in almost all of those cases, we're trying to identify things that create new growth drivers or sustain current drivers*. So it's a pretty straightforward process. We have been fortunate that over all the deals we did last year, small, large or since we've been public, for instance, I think 5 deals, we actually had paid around 3x, so it's been very accretive to our shareholders as well.

74.     Prior to the Class Period, Everbridge acquired only six companies in the nearly three years between the Company's September 2016 IPO and Meredith's succession of Ellertson as CEO in July 2019.  These acquisitions were small relative to those once Meredith took over as CEO, were strategic, and fit within the Company's mission.

75.     For example, according to CW 7, who worked at Everbridge from February 2006 until July 2021, Everbridge helped create the critical communications / emergency alert market from "scratch," and that the founders were motivated by the need they saw in the aftermath of the 9/11 terrorist attacks. CW 7 described how Everbridge expanded its solution offerings to expand its

market, and that, at least initially, that strategy is what drove the company's acquisitions.

76.     CW 7 discussed the acquisition of IDV Solutions, and its key product, Visual Command Center, which occurred well before the Class Period, in approximately 2017.[8]  She described that acquisition as "abrupt," but that the strategy to expand Everbridge's capabilities made sense.  CW 7 explained that the Visual Command Center product was a rapid, crisis communications tool, so while it was a dramatic addition to Everbridge, it was "organic" to the company's "mission" of providing emergency communication services.  CW 7 described other acquisitions as following the same model, which was intended to expand the total addressable market for the company.  Most of those acquisitions, she noted, seemed like sensible additions to the company.

77.     But certain Class Period acquisitions were not sensible or strategic additions.   For example, CW 7 stated that other acquisitions were "kind of visionary," meaning that they were not an obvious fit for Everbridge or its market. As an example, CW 7 detailed a product and company which provided "wayfinding solutions."  CW 7 could not recall the name of the product or company,[9] which provided roadmaps for users to find their way to safe spaces.  As a service, she commented that the product made sense, but it was a "stretch," and it needed a lot of "tech," meaning engineering work, to make it function.  CW 7 described other acquisitions as "tangential" or "bolt-ons," meaning they were not as strategic or as aligned with the company's core mission and structure.  CW 7 could not recall the

---

[8] According to a Form 8-K filed by Everbridge on January 31, 2017, Everbridge acquired IDV Solutions, LLC ("IDV") on January 27, 2017.
[9] It is possible that CW 7 was referring to Connexient, which Everbridge acquired in February 2020.  According to a blog on Everbridge's website discussing the Connexient acquisition, "Everbridge and Connexient have combined forces to provide an innovative wayfinding solution—a digital mapping and navigation product designed to help people navigate their way around a hospital campus with ease and reliability." *See* https://www.everbridge.com/blog/digital-wayfinding-and-covid-19-response-for-hospitals/

names of those acquisitions but described them as emergency/911 types of communication products for law enforcement.[10]  CW 7 did not see those products as fitting in with Everbridge's core mission of helping companies and individuals respond to, and communicate during, crises.

78.   The Connexient and RedSky acquisitions described above occurred once Meredith took over as CEO and are emblematic of the Company's undisclosed M&A strategy during the Class Period.  As explained below, once Meredith took over, the Company's M&A strategy was to grow through acquisitions and use the acquired revenue to mask Everbridge's increasingly stagnant organic growth and overall performance.  Despite this massive shift in strategy, Defendants misled investors into believing that the Company's growth strategy remained the same.

**C.   Meredith Takes Over as CEO and Falsely Reassures Investors That the Company's Growth Strategy Remains the Same**

79.   On June 18, 2019, Everbridge announced that Meredith had been appointed as CEO and a member of the Board of Directors of the Company, to be effective July 15, 2019.  Meredith succeeded Ellertson, who transitioned to the role of Executive Chairman of the Board of Directors.

80.   As part of Meredith's employment agreement, the Company granted Meredith 100,000 performance stock units (the "PSU Grant"), with up to 62.5% of the PSU Grant becoming eligible to vest on September 30, 2021, based on the compound annual growth rate ("CAGR") achieved by the Company during the eight fiscal quarters preceding such date, and up to an additional 62.5% of the PSU Grant becoming eligible to vest on September 30, 2022, based on the CAGR

---

[10] Lead Plaintiff believes, based on its investigation, that CW 7 is referring to Everbridge's acquisition of RedSky, which occurred during the Class Period on January 15, 2021.  According to the Company's 10-K for the fiscal year 2021, "RedSky is a provider of E911 incident response solutions."

achieved during the 12 fiscal quarters preceding such date.  The vesting of the PSU Grant was subject to Meredith's continued service to the Company through each applicable vesting date or event.

81.     After taking over as CEO, in response to specific analyst questions about Everbridge's acquisitions, growth, and business model, Meredith reassured investors that the Company's M&A strategy remained the same as when Ellertson was CEO—namely that the Company remained focused on ***organic growth*** and did ***not "buy revenue***," but instead, acquired companies that were strategic fits to help drive long term growth and build the Company's integrated CEM platform.

82.     Analysts questioned the Company's M&A strategy after the xMatters acquisition, which was the Company's largest acquisition to date and its eight acquisition in the less than two years since Meredith took over as CEO.  During the June 10, 2021 Bank of America Technology Conference, just one month after the xMatters acquisition closed, one analyst asked:

> So I guess moving on, but a little bit related to xMatters. So the M&A strategy. You guys are not afraid to acquire businesses. You just completed one of the biggest acquisitions to date in the company's history. I mean, I guess, how should we be thinking about M&A strategy just going forward from here?

83.     Meredith shut down any concerns that the Company's M&A strategy had changed.  Meredith went into great detail about the Company's CEM growth strategy, but unequivocally reassured investors that "***[o]ur strategy on M&A really hasn't changed since when [Ellertson] was running the business***, which is we look at our long-term strategic road map around CEM."

84.     Unfortunately for investors and the Class, none of this was true.

**D.      Notwithstanding Meredith's Assurances to the Contrary, Defendants Had Already Launched an Aggressive Growth-Through-Acquisition Strategy**

85.      Unbeknownst to investors and as explained more fully below, the Company's M&A strategy changed under Meredith.  Under Meredith's leadership, the Company's strategy was growth-through-acquisition.  From the beginning of the Class Period to its end, Defendants engaged in a flurry of acquisitions, purchasing nine new companies for their revenue, not their strategic fit.  And it was this acquired revenue, as opposed to any kind of organic revenue, that enabled the Company to beat analyst consensus estimates and its own revenue guidance.  In other words, under Meredith's leadership, and in sharp contradiction to what Ellertson previously said and upon which Meredith doubled down, the Company started to "buy revenue" for the primary purpose of beating revenue estimates and increasing its share price.

86.      Multiple CWs confirm as much.  For example, CW 6, who worked at Everbridge as a Senior Financial Analyst from approximately November 2020 through February 2022, explained that the company's business model was based on growth-through-acquisitions, and Everbridge "outgrew themselves" in applying that model.  CW 6 noted that the growth-through-acquisitions model was part of the company culture, which she understood from "day one."  CW 6 added that that the target was five to six acquisitions per year and that this strategy was discussed widely during the company's Quarterly Business Review meetings, or QBRs.  She explained that, during the QBRs, the question of "Can we buy that product?" always came up; it was the company culture to always be looking for new acquisitions. CW 6 indicated that Meredith, Brickley, and the "budget owner" for any acquired company (in addition to the applicable departmental budget owner) participated in the QBRs.  CW 6 added that she and her colleagues sat in on the QBR calls in order

to take notes and use the information discussed to prepare for the budgetary needs of their areas of responsibility.

87.     Similarly, CW 7, who worked at Everbridge from 2006 through 2021, indicated that Meredith did not exhibit the same "gut-level" commitment to Everbridge's mission of keeping people safe that his predecessors did.  CW 7 articulated that Meredith did not seem to get the mission the way Ellertson or the company's founders did; Meredith was focused less on keeping people safe, and more on the value of the Company's stock.  CW 7 further described that the "view around the watercooler" at the company was that Meredith had a "war chest" that he wanted to spend to grow the company's bottom line, without adhering to company's mission of service.

88.     Moreover, as explained in ¶¶ 77-78 above, certain acquisitions during the Class Period, such as the Connexient and RedSky acquisitions, were not strategic or aligned with the Company's core mission and structure.

89.     As explained below, starting with the acquisition of NC4 and continuing throughout the Class Period, Everbridge engaged in an unusual buying spree, purchasing nine separate companies, all of which, alone or together, enabled the Company to continue its streak of beating its own revenue guidance.

90.     However, Defendants misled investors about the Company's organic growth by downplaying the revenue contribution from the acquired companies, making it appear that the Company's organic revenue was growing more than it actually was.  Because Everbridge's publicly available financial statements did not break out revenue from each acquired company, there was a lack of transparency as to the extent to which organic growth was lagging.  Despite several analyst questions about the legitimacy of the Company's organic growth numbers, Defendants misled investors about the extent to which the revenues it obtained from those acquired companies were being used to mask increasingly stagnant growth.

91.     Moreover, Defendants mislead investors when they were specifically asked whether in fact the Company was experiencing any integration problems with respect to its acquisition of numerous companies during the Class Period.   For example, as to the xMatters acquisition, Defendants claimed that Everbridge had "locked up key hires" and was "retaining" xMatters employees.   But in fact, Everbridge was unable to effect complete integration of the acquired companies as their products required multiple, different systems, running on different internal databases, with dedicated legacy sales staffs trained and operating differently than those originally with Everbridge, leading many to leave the Company.

### 1.     Everbridge Acquires NC4, its Largest Acquisition to Date, and Misleads Investors About Integrating NC4

92.     Shortly after Meredith took over as CEO, the Company made its largest acquisition ever to that point.   On August 1, 2019, Everbridge entered into a purchase agreement with NC4 Inc., NC4 Public Sector LLC, and Celerium Group Inc., pursuant to which Everbridge purchased all the outstanding membership interests of NC4 Inc. and NC4 Public Sector LLC (collectively, "NC4") for total consideration of approximately $84.5 million.   The Company paid approximately $51.7 million in cash at closing and paid the remaining purchase price with 320,998 newly issued shares of our common stock.

93.     NC4 offers threat intelligence solutions that empower businesses, government organizations, and communities to assess and disseminate risk data and information to manage and mitigate the impact of critical events.   According to the Form 10-Q filed on November 8, 2019, the "Company's acquisition of NC4 was made primarily to expand the Company's customer base and to a lesser extent to complement some of the existing facets of NC4's business with the Company's existing products."

94.     On November 4, 2019, the first day of the Class Period, Everbridge issued a press release announcing its financial results for the third quarter ended September 30, 2019.  During the related earnings call, also on November 4, 2019, analysts were trying to understand how the NC4 acquisition would affect the Company's overall revenue growth.  One analyst asked Meredith the following question about the NC4 acquisition:

> You made multiple mentions to sort of rightsizing that business. And I guess, if we looked at the 8-K with the financials, this was about an $18 million business when you brought it over. Can you just help us understand, when you talk about rightsizing, what pieces of the business are not coming over to you and then what areas of the risk intelligence solution set market do you want to invest more money in?

95.     In response, Meredith assured investors that Everbridge was focused on the strategic value of NC4, stating:

> So **as we unpack that acquisition and we integrate it, we're focused on the strategic value of it**. There are great folks that come with the business and great products. And some of those fit very seamlessly into what we do. There are other aspects of the business that may or may not get discontinued over time if we don't perceive the same degree of strategic value. So between the haircut to deferred revenue and the—**when I say rightsizing, really optimizing for the strategic value of the business**, we anticipate that it'll be a bit smaller than what you might have seen in financials that reflect the past**.** So we encourage you to think of it as a $10 million to $12 million revenue contribution going forward, and that's really directly from the business. We think of it as a really key and core part of our CEM go-to-market going forward.

96.     Also during the November 4, 2019 earnings call, Brickley stated that "[n]ow that we've closed the acquisition of NC4 and are **well down the path of** . . .

*integrating that business*, we are updating our expectations for the revenue contribution from NC4 this year to be approximately $4.5 million."

97.     Brickley's statement was false and misleading because it led investors to believe that the Company was integrating NC4 into its business when it was not. According to CW 8, she and her colleagues in sales were expected to sell NC4 and its products before they were integrated into Everbridge.  CW 8 added that it takes a certain amount of time to fully integrate a new product and its systems, and that time was not provided after the acquisition of NC4.  CW 8 elaborated that the sales team was ordered to sell NC4 and its products before any time had been taken for it to be integrated.  According to CW 8, it seemed too short a time between acquisition and efforts to sell its products.

98.     Brickley's statement about integrating NC4 was false and misleading for the additional reason that it led investors to believe that the integration was going smoothly when it was not.  As detailed by several CWs, the Company's integration efforts were far from smooth.  According to CW 5, there were "issues with the integration" of NC4, which provided risk intelligence.  CW 5 continued to say that there were certain contextual layers and different ways of identifying risk compared to Everbridge's legacy equivalent.  CW 5 explained that there was a "different look and feel" between the platforms and likened the user experience to the difference between using Apple and Android products.  CW 5 continued to say that ultimately Everbridge elected to "sunset" or discontinue their legacy risk intel platform and migrated everything to NC4.

99.     Moreover, CW 1 stated that Everbridge was "struggling with attrition" and integration of its acquisitions. CW 1 explained that there were too many new people being integrated into Everbridge after numerous acquisitions beginning in 2019.  CW 1 added that these employees were spread across all different time zones, which made it difficult to get everyone on the same page and then, once progress

was being made, another company would be acquired and Everbridge would have to go through the process all over again. CW 1 also cited problems integrating the acquired companies themselves into Everbridge's business.

100. After the NC4 acquisition, the Company engaged in a flurry of acquisitions without fully integrating them into Everbridge. With each new acquisition, the integration problems intensified, leading to a boiling point after the xMatters acquisition.

**2.    Defendants Acquire Five Companies in 2020 But Do Not Integrate them into Everbridge's CEM Suite, Despite Claiming that Everbridge Acquired Them "to enhance the Company's CEM suite"**

101. The Company engaged in five acquisitions in the first eight months of 2020. The Company claimed that most of these acquisitions were designed to enhance Everbridge's CEM suite, which as explained above, the Company touted as a significant growth opportunity for Everbridge. Moreover, the Company repeatedly claimed that their CEM suite was superior to competitors because Everbridge is "the only company today that provides a full, ***integrated CEM solution***." Therefore, investors paid close attention to these acquisitions and how they were integrated into Everbridge's CEM solution.

**a.    The Connexient Acquisition**

102. The first acquisition of 2020 occurred on February 7, 2020, when the Company entered into a Stock Purchase Agreement with Connexient, Inc. ("Connexient") pursuant to which the Company purchased all issued and outstanding shares of stock of Connexient for a base consideration of $20.2 million. The Company paid $11.5 million in cash at closing and paid the remaining purchase price with 96,611 newly issued shares of the Company's common stock. According to the Company's Form 10-Q filed on May 2, 2020, Everbridge "acquired

Connexient to expand the Company's customer base and for its strategic technology assets *to enhance the Company's CEM suite of solutions* to broaden support for Internet of Things ("IoT") applications."

103.   However, this statement was false and misleading because, despite claiming it acquired Connexient to "enhance the Company's CEM suite of solutions," Everbridge made no effort to integrate Connexient into its CEM suite. The lack of intent to integrate Connexient demonstrates that Defendants acquired Connexient to boost revenue, not to enhance its CEM suite.

104.   CW 9, who worked at Connexient and then at Everbridge after the acquisition, explained that the intent was to migrate Connexient's wayfinding app into Everbridge's platform.  CW 9 noted, however, that two years after the acquisition, when she left the company (in March 2022), the *wayfinding app had still not been migrated or integrated into Everbridge's platform*.  CW 9 indicated the reason for the failure to integrate the wayfinding tech into Everbridge's platform was because the company provided "zero resources" to do so.  CW 9 added that Everbridge had no long-term plan to further develop, improve, and integrate the wayfinding software, or to integrate the wayfinder into Everbridge's platform.

105.   This lack of integration caused many Connexient employees to leave Everbridge.  For example, CW 9 noted that she worked on the app-engineering and implementation side of the business, not sales, but she observed that, after the acquisition, many of Connexient's salespeople left.  CW 9 attributed their departure to problems integrating Connexient into Everbridge.

### b.   The CNL Software Acquisition

106.   The second acquisition of 2020 took place on February 25, 2020, when Everbridge acquired CNL Software Limited ("CNL Software") for a base consideration of approximately $35.6 million.  The Company paid approximately $19.6 million in cash at closing and paid the remaining purchase price with 153,217

newly issued shares of the Company's common stock.  According to the Company's Form 10-Q filed on May 2, 2020, Everbridge "acquired CNL Software to expand the Company's customer base and for its strategic technology assets **to enhance the Company's CEM suite of solutions** to broaden support for IoT applications."

107.  However, this statement was false and misleading because, despite claiming it acquired CNL Software to "enhance the Company's CEM suite of solutions," Everbridge made did not integrate CNL Software into its CEM suite. The lack of intent to integrate CNL Software demonstrates that Defendants acquired CNL Software to boost revenue, not to enhance its CEM suite.

108.  According to CW 5, a Strategic Account Executive at Everbridge during this acquisition, Everbridge failed to integrate CNL Software into its CEM suite.  CW 5 described CNL Software as a PSEM[11] or physical security platform. According to CW 5, an example of the downside of not integrating CNL Software into Everbridge's CEM was that monitoring and sending risk notifications required toggling between multiple systems.  In other words, Everbridge customers could not use one product, Everbridge's CEM suite, to both monitor physical threats— such as monitoring an office for intruders—and send notifications to the relevant people.  Instead, customers had to use one system to monitor threats and another system to send notifications.  This is contrary to Defendants' statements that its CEM suite was a "singular, integrated product."

### c.    The one2many Acquisition

109.  The third acquisition of 2020 occurred on March 19, 2020, when the Company acquired One2Many Group B.V. ("one2many") for a base consideration of $13.0 million. The Company paid $5.5 million in cash at closing, acquired purchase liabilities of $2.0 million, and paid the remaining purchase price with

---

[11] Upon information and belief, PSEM stands for Physical Security, Emergency Management, and Safety.

52,113 newly issued shares of the Company's common stock.  According to the Company's Form 10-Q filed on May 2, 2020, Everbridge "acquired one2many to expand the Company's customer base and for its cell broadcast technology to enhance the Company's public warning applications."

110.   During the Company's earnings call on May 5, 2020, Brickley told investors that "[f]or the remainder of 2020, we expect the revenue contribution from one2many to be relatively immaterial, less than $1 million."

111.   During the same call, Brickley re-affirmed what Ellertson told investors before the Class Period—that Everbridge did not buy revenue. Specifically with respect to the one2many acquisition, Brickley explained that "one2many was an important strategic acquisition for us, extending our population warning capabilities, and ***we did not acquire them to drive near-term revenue contribution***, but rather for that longer-term strategic potential."

112.   This was false and misleading because Defendants did exactly the opposite—they purchased one2many to boost short-term revenue.   Under Meredith's leadership, the Company engaged in a flurry of acquisitions throughout the Class Period in order to boost revenue.   Furthermore, Defendants did not purchase one2many for "longer-term strategic potential," as Defendants failed to integrate its Class Period acquisitions, demonstrating Defendants were only concerned with acquiring the revenue and not driving long term growth.

### d.   The Techwan Acquisition

113.   The fourth acquisition of 2020 occurred on May 27, 2020, when the Company acquired Techwan SA ("Techwan") for a base consideration of $15.5 million. The Company paid $9.4 million in cash at closing, acquired purchase liabilities of $0.1 million, and paid the remaining purchase price with 38,425 newly issued shares of the Company's common stock.

114.   According to the Company's Form 10-Q filed on August 7, 2020, Everbridge "acquired Techwan to expand the Company's customer base and for its strategic technology assets *to enhance the Company's CEM suite of solutions*."

115.   This statement was false and misleading because Everbridge did not purchase Techwan to "enhance the Company's CEM suite" but rather to boost its revenue.   Under Meredith's leadership, the Company engaged in a flurry of acquisitions throughout the Class Period in order to boost revenue.

### e.   The SnapComms Acquisition

116.   The fifth and final acquisition of 2020 occurred on August 4, 2020, when Company acquired SnapComms Limited ("SnapComms") for a base consideration of $34.2 million.   Everbridge paid $13.2 million in cash and issued 121,858 newly issued shares of the Company's common stock at closing. According to the Company's Form 10-Q filed on August 7, 2020, Everbridge "acquired SnapComms for its internal communications software strategic technology assets *to enhance the Company's CEM suite of solutions*."

117.   This statement was false and misleading because Everbridge did not purchase SnapComms to "enhance the Company's CEM suite" but rather to boost its revenue.   Under Meredith's leadership, the Company engaged in a flurry of acquisitions throughout the Class Period in order to boost revenue.

118.   Moreover, although never disclosed to investors, Everbridge experienced difficulties integrating SnapComms.   CW 7 described the acquisition and integration of SnapComms, which was a company and product that provides screen pop-up communication channels for alerts.   CW 7 noted that the acquisition seemed like a good idea, meaning it fit within Everbridge's core mission.   CW 7 added, however, that the integration of the product went slower than she liked, from a sales engineering or customer facing perspective.   CW 7 expressed that the difficulty integrating SnapComms stemmed from technological challenges.

### 3. Everbridge Acquires RedSky in January 2021 but Does Not Integrate it into Everbridge's CEM Suite

119.   On January 15, 2021, Everbridge acquired Red Sky Technologies Inc. ("RedSky") for a base consideration of $55.4 million, net of cash acquired.  The Company paid $32.4 million in cash, net of cash acquired, and issued 162,820 newly issued shares of the Company's common stock at closing.  The Company did not disclose historical financial statements or pro forma financial information about Red Sky, nor did it disclose expected revenue contribution from RedSky.

120.   According to the Company's Form 10-Q filed on May 10, 2021, Everbridge "acquired RedSky for its E911 incident response solutions *platform to enhance the Company's CEM suite of solutions* as well as market penetration and customer reach."  This statement was false and misleading because, although Defendants told investors that RedSky was acquired to "enhance the Company's CEM suite," in reality, Everbridge acquired RedSky for its revenue, and Defendants made *no effort* to integrate RedSky into the Company's CEM Suite.

121.   This was confirmed by CW 3, who was employed by RedSky and then Everbridge after acquisition and was involved in the vetting of RedSky during the Winter of 2020 (shortly before the acquisition) as a member of the executive team. According to CW 3, she believed RedSky would be incorporated into Everbridge's CEM, but Everbridge showed "no effort" in performing an integration.  According to CW 3, Everbridge just wanted RedSky's customers and revenue.  Following the acquisition, CW 3 recalled colleagues saying to one another, "why did they buy us?"  CW 3 stated that it appeared that Everbridge "did not know what [to] do with us [RedSky]."  This, according to CW 3, contributed to the integration process being difficult.

**4.     Without Knowledge of the Integration Issues, the Market Believed that the Company Had Strengthened its CEM Suite**

122.    As explained in ¶¶ 97-100, 103-05, 107-08, and 120-21, Defendants did not integrate the above acquisitions into Everbridge's CEM suite.

123.    Defendants' false assurances that they were acquiring companies to "enhance the Company's CEM suite," led investors to believe that Everbridge was poised to continue its growth trajectory as it penetrated the large and growing CEM market.   For example, on February 19, 2021, Stephens issued an analyst report stating that improving the Company's CEM suite highlighted Everbridge's strong fourth quarter 2020.  Specifically, Stephens stated that:

> Overall, a strong finish to 2020 for EVBG and we like the catalysts ahead as Everbridge capitalizes on the EU Directive opportunity and uses its top-down sales approach to win additional CEM deals. Additionally, ***we expect Everbridge to continue to*** execute on its long runway for Mass Notification wins, ***grow the CEM pipeline***, and expand internationally.

124.    Also on February 19, 2021, William Blair issued an analyst report reiterating it's outperform rating on Everbridge stock and highlighting the Company's CEM opportunity.  Specifically, William Blair noted that "Everbridge also saw ***continued strength in CEM customer additions and multiproduct deals***." William Blair noted that "[w]hile we view this progress positively, we note that this result still represents very low penetration of the company's overall installed base and ***we continue to see a large up-sell opportunity ahead***."

**5.     Everbridge Acquires xMatters, the Company's Largest Acquisition Ever**

125.    On April 6, 2021, Everbridge filed a Form 8-K announcing a definitive agreement for the acquisition of xMatters Holdings, Inc. ("xMatters") and the private placement of approximately $80.0 million in shares of Everbridge's

common stock to certain stockholders of xMatters as partial consideration for the Acquisition. The closing of the xMatters acquisition took place on May 7, 2021. On that day, the Company filed an amendment to the Form 8-K to provide the total number of shares of common stock issued in connection with the acquisition. At closing, the Company acquired xMatters for a base consideration of $242.3 million, consisting of $177.8 million in cash and 555,332 newly issued shares of the Company's common stock.

126. xMatters is an IT service reliability platform that helps rapidly deliver products at scale by automating workflows and ensuring digital infrastructure and applications are always working.

127. According to the Company's Form 10-Q filed on August 9, 2021, Everbridge "acquired xMatters for its service reliability platforms to **enhance the Company's CEM suite of solutions** as well as market penetration and customer reach." As explained in ¶¶ 129-37 below, this statement was false and misleading because Defendants acquired xMatters to boost the Company's revenue and to hide the Company's slowing organic revenue.

      **a.    Defendants Purposefully Downplay the Revenue Contribution from xMatters in Order to Hide Increasingly Stagnant Organic Revenue Growth**

128. After the Company announced the xMatters acquisition, Defendants misled investors about how much revenue xMatters would contribute to Everbridge's overall revenue for the rest of 2021. The April 6, 2021 Form 8-K disclosed that the Company "anticipates **the partial year contribution to 2021 revenue will be approximately $9-11 million**." Brickley confirmed this figure a month later, during the May 10, 2021 earnings call, when he said that "[o]ur expectations for the financial contribution from xMatters for the remainder of the year **have not changed from the view we provided about a month ago**."

129.   These statements were false and misleading because xMatters was going to contribute much more than $9-11 million to the Company's 2021 revenue. The true revenue contribution from xMatters for the rest of 2021 was **$20-25 million—more than double** the $9-11 million figure Defendants presented to the public.

130.   As explained below, Defendants **knew** that the Company's internal forecasting models showed that xMatters would contribute **$20-25 million for the rest of 2021**, but Defendants nonetheless told investors that it would **contribute only $9-11 million**.  Defendants did this so they would have an extra $11-16 million in "hidden," undisclosed revenue from xMatters to add to the Company's overall revenue, making it appear as though the Company's organic revenue was growing more than it actually was.

131.   CW 1, an Everbridge employee since before the Class Period who had knowledge of Everbridge's M&A process and transactions, recalled that the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021.  According to CW 1, however, realistically, the forecasts were presenting figures closer to **$20 - $25 million**.

132.   CW 1 stated that she raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley.  CW 1 added that she expressed concerns **directly** to Meredith and Brickley as well, in the form of presentations and emails regarding the deal.  CW 1 explained that she sent Meredith and Brickley emails in the lead up to the acquisition.  CW 1 added that she was not the only person to express concerns about the xMatters acquisition.

133.   According to CW 1, the rationale Meredith provided **was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue**.  According to CW 1, the difference in revenue reported versus what was

projected was to allow Everbridge to use the discrepancy to cover up for their overall performance.

134.   CW 1 added that based on the actual forecasts, it was "clear" that xMatters was not necessarily going to grow, which was contrary to what was being presented to the public.  Indeed, Defendants purchased xMatters to boost revenue and not to drive future growth, which was contrary to the Company's publicly stated M&A strategy.

135.   The xMatters acquisition was not the first time Defendants used acquired revenue to make up for slowing organic revenue growth.  From speaking with other Everbridge employees who had worked on acquisitions before xMatters, CW 1 was aware that the treatment of the xMatters acquisition was "not isolated" and other acquisitions had been made for "similar reasons," to "boost" revenue figures.  CW 1 explained that it was her understanding that in addition to xMatters, the other acquisitions during her tenure possessed "similar issues" and that Everbridge had a history of "underselling" the projected revenues of acquired companies to "cover up" declines in Everbridge's organic revenue growth.

136.   Defendants were able to mislead investors about revenue contributions from xMatters and other Class Period acquisitions because Everbridge's financial statements do not break out revenue from its acquisitions.  Thus, it was impossible for investors to determine how much revenue came from xMatters in the Company's annual and quarterly reports.

137.   Moreover, at the time of the acquisition, Everbridge did not disclose historical financial statements or pro forma financial information for xMatters because, according to the Company, the acquisition was "not material and neither the investment in the assets nor the results of operations of th[is] acquisition[] w[as] significant to the Company's consolidated financial position or results of

operations."   Thus, there was no transparency into xMatters' historical yearly revenue such that an investor could forecast xMatters' future revenue on their own.

138.   Given the size and importance of the acquisition to the Company's growth, several analysts tried to get an update on the revenue contribution. For example, during the Company's May 10, 2021 earnings call, an analyst from J.P. Morgan Chase & Co. asked for clarification, stating:

> Can you remind us more specifically, what was the expectation that you gave about a month ago for xMatters? Because if I take the beat and kind of add it to kind of the midpoint of what you had, it looks like you're including about $9 million for xMatters. Is that the right way to think about it? And that the guidance was really taking the beat, flowing it through to the full year and then adding xMatters to it?

139.   Brickley responded by avoiding the question and highlighting other parts of the business that Defendants were "excited" about.   Specifically, Brickley's "answer" to the question was:

> So as David said, we did have a little bit of pull in. Our guidance for Q2 and for the full year, we're doing our usual, we're factoring in uncertainties that impact both revenue and profitability. And we were happy to see implementation success at certain Public Warning projects that results in some additional revenue in Q1. But really, the strength of Q1 and what we're excited about for the rest of the year reflects a reacceleration of non-COVID-related CEM and Public Warning activity, the increasing number of large deals that you saw. And in fact, subscription revenue grew more than 30%, both at Q end and on a trailing 12-month basis. And our current RPO grew 34%.
>
> So these, on top of the existing backlog, which I referenced of signed-but-not-yet-invoiced contracts, which is still measured in the mid-teens of millions of dollars, and which we hope to recognize each revenue into upcoming quarters. These give us a lot of momentum as we look out towards the rest of the year. But as usual, when we're providing guidance as we've been doing for the past many quarters now, we're just – we're trying

> to provide a prudent outlook, and we hope to be able to continue our track record of outperforming expectations.

140. Shortly after this cryptic response, a separate analyst followed up on the J.P. Morgan Chase analyst's question and tried to get a straight answer from Brickley regarding the revenue contribution from xMatters. Specifically, the analyst asked, "Could you just help parse out the impact from the acquisition and the deferred revenue haircut versus just increasing growth investments?"

141. Brickley responded in vague terms again, stating that:

> Well, it's hard to do. We just closed the deal last Friday. We're certainly giving ourselves a wide birth here in the first quarter post-acquisition on the bottom line. And – but you did see that for the full year, we raised a little bit. We do think that net-net, this acquisition is going to be accretive – squarely accretive to adjusted EBITDA in 2022.
>
> So we just want to be prudent as we put the acquired company's financials through public accounting and—but we're optimistic that we're going to do this year what we said we were going to do, which is continue to make incremental improvements on the bottom line, whether that's adjusted EBITDA or non-GAAP net income or free cash flow. We anticipate gradual improvement versus last year, despite any purchase accounting impact to this acquisition.

142. Similarly, at the Company's next earnings call, on August 9, 2021, one analyst asked about how the acquired revenue from xMatters would impact the Company's total revenue for 2021. Specifically, the analyst asked:

> Got it. And just one follow-up, if I may. On the xMatters acquisition, is it possible to get the xMatters contribution to the revenue for the quarter? And really given the positive commentary throughout the call, I mean, I guess, *are you expecting much more than the $9 million to $11 million in total revenue that you guided for xMatters earlier this year*.

143.  Meredith refused to directly answer the analyst's questions, thereby falsely maintaining the misimpression that the prior $9-11 million estimate remained intact, and instead touted the smooth integration of xMatters and the strong sales of its products:

> Yes, Koji, it's a great question. So let me just give an update on what's going on with xMatters. One is, we are probably ahead of schedule on getting them integrated with the organization and we acquired a really tremendous team. They understand our space and the strategic fit of digital plus physical is resonating well with customers. And so based on our internal expectations, what we thought we'd do on sales, like we're doing better. And so we certainly are going to try to continue that.
>
> *We are integrating*. We did have an ITA business previously. *So we're integrating those teams. They've already been integrated*. So it is interesting in terms of which deals were already in the funnel, would we have won them anyway, not won them. So we're really not – *and it's probably impossible to kind of break out going forward because we're putting the teams together*. But our overall guidance reflects our view of the consolidated view going forward. And overall, we're very bullish on the acquisition and the results exceeded what we thought prior to having gone through Sarbanes-Oxley and closing the deal and all that.

144.  The above statements were false and misleading because they failed to correct the prior material misstatement that revenue contribution from xMatters for the remainder of the year would be $9-11 million.  *See* ¶¶ 128-34, *supra*.  The statements about the xMatters integration were false and misleading because, unbeknownst to investors, Everbridge was experiencing significant integration problems in connection with the xMatters acquisition, including losing a "tremendous" number of xMatters legacy employees.  *See* ¶¶ 165-75, *infra*.

145.  Analysts were also trying to figure out how the xMatters acquisition changed the Company's M&A strategy.  During the May 10, 2021 earnings call, an

analyst asked about the Company's M&A strategy since it appeared that it might have changed with the xMatters acquisition.  Specifically, the analyst asked:

> I guess I'll just start off with kind of one on the broader M&A front. Obviously, congrats on the xMatters acquisition. A bunch of other ones here this year. It seems like on one hand, M&A has always been a core part of the Everbridge product strategy, right? I think, historically, it's been kind of low 30% organic growth and a few points from acquisitions. ***But it seems like the appetite definitely has picked up on both a frequency and size perspective***.
>
> ***So I'd love to understand kind of the factors that are driving this adjustment strategy***. You obviously always been looking at where the puck is going, if we're looking at multiple years down the road. But just kind of a temporary dislocations around COVID and being opportunistic? Or is this more of a permanent shift relative to what we used to historically?

146.  Meredith responded by reiterating, once again, that the Company's M&A strategy remained the same as when Ellertson was CEO—namely, that the purpose behind these acquisitions was not to "buy revenue" but instead to engage in strategic, thoughtful acquisitions to drive long term growth.   Specifically, Meredith explained:

> Matt, thanks for the question. So M&A has always been part of the strategy for Everbridge. ***And I think [Ellertson] always talked about something in the mid- to high single digit of the growth rate coming from acquisition and the rest coming from non-acquisition. And what really drives those decisions are the strategic fit of the products.*** So if you look at one to many, that was an area where we were the leader in location-based SMS. And we really felt like we could transform that industry by having a hybrid solution where you could do cell broadcast or location-based SMS.
>
> So acquiring a leader in cell broadcast just made sense. I think, similarly, with xMatters, seeing that – and we're seeing even over the weekend, a lot of media around cyberattacks and just

the need for an enterprise to be secure on the digital side with all the digital transformation, employees being remote, future of work, the opportunity to take the growth we were seeing on the ITA side and put it with the leader on enterprise ITA, we feel is very strong.

Because when you put the digital CEM for digital along with physical and we can really own the Fusion Center for the enterprise where they can have one single pane of glass and look across all their digital and physical risks. ***And so we think that was a really compelling strategic fit from a product road map perspective, and that's why we did it.***

***So I don't think the strategy has really changed from what [Ellertson] was doing for years, which is targeted tuck-ins that allow us to strengthen or accelerate our technology road map or to help us get into geographies, particularly internationally that we're not in currently. So we don't really see it as a big strategy shift***. I think the law of large numbers supplies as we get bigger, the percentage, the numbers will look bigger, but we don't view it as a strategy shift.

147.   A month later, Meredith reiterated that the Company's M&A strategy had not changed.  During the June 10, 2021 Bank of America Global Technology Conference, an analyst asked the following question about the xMatters acquisition and the Company's M&A strategy:

Got it. Got it. Got it. So I guess moving on, but a little bit related to xMatters. So the M&A strategy. You guys are not afraid to acquire businesses. You just completed one of the biggest acquisitions to date in the company's history. I mean, I guess, how should we be thinking about M&A strategy just going forward from here?

148.   Meredith repeated that the Company's M&A strategy remained the same, stating:

***Yes. Our strategy on M&A really hasn't changed since when [Ellertson] was running the business***, which is we look at our

long-term strategic road map around CEM. There are some adjacencies where we see hyper growth and opportunities. And so where we have those adjacencies, we look at, do we build it, do we partner to fill it, or do we acquire something? And most of the time, we're going to build or partner. And in some cases, if there's an opportunity to accelerate our product road map by a couple of years, by doing a technology tuck-in and adding some capabilities, we'll look at doing that and look at paying a good price.

149.   The statements in ¶¶ 146 and 148 were false and misleading because they led investors to believe that the Company's M&A strategy was the same as before the Class Period, namely that the Company engaged in strategic acquisitions to drive long term growth and build the Company's CEM platform, not to boost the Company's revenue.  The statements in ¶¶ 146 and 148 were false and misleading for the additional reason that they failed to correct Ellertson's previous statement that the Company did not "buy revenue," which investors understood was a central principle of the Company's M&A strategy.

150.   In reality, the Company's M&A strategy changed when Meredith took over as CEO.   Under Meredith's leadership, Everbridge engaged in a flurry of acquisitions for the sole purpose of boosting revenue.  Multiple CWs confirm as much.  According to CW 1, the xMatters deal was "forced through" to "boost" revenue figures.  Similarly, CW 3—who worked at RedSky from July 2007 until the acquisition, and then at Everbridge from January 2021 until April 2021—explained that Everbridge just wanted RedSky's customers and revenue and "did not know what [to] do with [RedSky]."

151.   The Company's undisclosed growth-through-acquisition strategy was widely discussed during meeting attended by Meredith and Brickley, among others. CW 6 explained that the company's business model was based on growth-through-acquisitions.  CW 6 added that that the target was five to six acquisitions per year

and that this strategy was discussed widely during the company's Quarterly Business Review meetings, or QBRs. CW 6 indicated that Meredith, Brickley, and the "budget owner" for any acquired company (in addition to the applicable departmental budget owner) participated in the QBRs.

152. Armed with an additional $9-16 million in "hidden" revenue from xMatters, Defendants raised guidance for the full year 2021. Defendants had previously projected 2021 revenue at $342.1 million to 344.1 million. But after the xMatters acquisition, Defendants raised full year guidance to $358 million to $359.6 million, which would represent revenue growth of 32% to 33%. Thus, after the xMatters acquisition, the Company raised overall revenue guidance by approximately $15 million, of which they claimed only $9-11 million could be attributed to xMatters, meaning the Company claimed it was projecting an additional $4-6 million in organic revenue after the xMatters acquisition.

153. What investors did not know, however, is that xMatters was going to contribute $20-25 million in revenue—meaning *organic revenue actually was decreasing*, not increasing by $4-6 million. Had investors known the true xMatters revenue contribution number, they would have understood that the Company's organic revenue growth was decreasing, not increasing.

154. But without this knowledge, analysts were comforted by Defendants' updated guidance, specifically its organic revenue guidance, and believed Everbridge's updated guidance reflected an increase in organic revenue. For example, on May 11, 2021, William Blair issued an analyst report which stated:

> Everbridge guided revenue for 2021 in the range of $358.0 million to $359.6 million, representing an increase of 32.3% year-over-year at the midpoint. The updated guidance was above the Street mean estimate of $345.0 million, or 27.2% growth, and represents a raise relative to management's prior outlook of $342.1 million to $344.1 million. *At the midpoint, this revised guidance reflects the upside generated in the first*

*quarter as well as expected contribution from the recently closed xMatters acquisition, which is expected to generate between $9 million and $11 million in revenue in 2021. Excluding xMatters, the updated guidance implies roughly 29% organic growth at the midpoint compared to the midpoint of the company's prior outlook at 26.6% growth*.

155.   Analysts were also comforted by Defendants' false assurances regarding how well the xMatters acquisition was going.  For example, on August 10, 2021, Stephens issued an analyst report titled "2Q Beat & Raise; Record CEM Winds Highlight Increasing Enterprise Momentum."   The report reiterated Stephen's overweight rating—meaning Stephens expected the stock's total return to be greater than the total return of the company's industry sector, on a risk adjusted basis, over the next 12 months—based on "a strong 2Q beat across the board and increased 2021 guidance."

156.   Stephens explained that they "were encouraged to hear that *xMatters is exceeding expectations* and resonating well w[ith] customers.  Looking ahead, *we expect CEM momentum to continue into [second half of 2021]/2022* and see potential upside from xMatters/Public Warning activity."   As a result, Stephens increased their price target for Everbridge's stock from $165 to $180 per share. Similarly, Everbridge issued an analyst report on the same day stating that Everbridge's "strong revenue performance was driven by solid net adds, strong international performance, and *another quarter of records strength in CEM* and large deal wins."

157. However,   as   explained   in   ¶¶   165-75   *infra*,   Everbridge   was experiencing significant integration challenges that caused sales to drop off by mid-2021.

b. **Defendants Mislead Investors About Significant Problems Integrating xMatters into Everbridge**

158. Defendants also misled investors about the Company's efforts to integrate xMatters into Everbridge. Despite significant integration challenges described below, Defendants continuously touted the Company's integration efforts, making it appear as though the Company had not experienced any issues when they had. For example, shortly after the xMatters acquisition, on June 10, 2021, Meredith and Brickley attended the Bank of America Global Technology Conference. In response to an analyst about the xMatters acquisition, Meredith explained that "[t]he integration is just starting, but it's *already going great*." Later on, Meredith claimed that historically, "we've *been really good* about getting the capabilities integrated."

159. Then, during the Company's August 9, 2021 earnings call, Meredith provided more details on how well the xMatters integration was going:

> So let me just give an update on what's going on with xMatters. One is, we are probably ahead of schedule on getting them integrated with the organization and we acquired a really tremendous team. They understand our space and the strategic fit of digital plus physical is resonating well with customers. And so based on our internal expectations, what we thought we'd do on sales, like we're doing better. And so we certainly are going to try to continue that.
>
> *We are integrating*. We did have an ITA business previously. *So we're integrating those teams. They've already been integrated*.

160. During the Company's November 9, 2021 earnings call, Meredith once again touted the xMatters integration, stating:

> Obviously, with the xMatters platform, it was many years of development, really nice system, interface, functionality use cases, digital operations. It's – it really adds a lot of capability

to what we were doing with our IT Alerting. And we're already doing integrations, right? ***So we've got that integrated now with our crisis management module, we've got it integrated with our employee communications module, integrated with our Visual Command Center***. So people are seeing the value of it coming together over time and giving us really positive feedback.

161.   Brickley also touted the xMatters integration during the November 9, 2021 earnings call.  During the earnings call, Brickley reiterated that the xMatters integration went well, stating, "it's performing as expected. ***We've integrated the people. We've integrated the sales. We've integrated the funnels. We're integrating the technology***. So we don't break it out. But so far, so good."

162.   On November 30, 2021, Brickley attended the Credit Suisse Technology, Media & Telecom Conference.  During the conference, Brickley responded to a question as to the status of the xMatters integration using similar language to what he had said during the November 9, 2021 Earnings Call, claiming that "[w]e've begun that technological integration. ***We've locked up key hires, and we're retaining them. And so, so far, so good***."

163.   On November 30, 2021, the Company issued a press release "announc[ing] the launch of [Everbridge's] new Digital Operations Platform, helping organizations to save time and money, deliver continuous service uptime and maintain revenue streams. The new platform extends Everbridge's market-leading CEM for Digital solution to further support customers' digital transformation efforts."  According to the press release, "Everbridge's new Digital Operations Platform represents ***the seamless integration of the Everbridge and xMatters enterprise IT and cyber resilience solutions (following Everbridge's acquisition of xMatters in May 2021***)."

164.   Meredith and Brickley's statements about the xMatters integration were false and misleading because, unbeknownst to investors, Everbridge was experiencing significant integration problems in connection with the xMatters acquisition, including losing a "tremendous" number of xMatters' legacy employees. Moreover, because Defendants spoke about the xMatters integration, including the retention of xMatters' employees, they had a duty to disclose information about the Company's integration challenges and reasonable investors would find that losing most of xMatters sales' staff would significantly alter the mix of available information about the Company.

165.   Multiple former employees described the xMatters integration as a disaster.  For example, CW 2—who worked at xMatters before the acquisition and remained at Everbridge after it, and who had knowledge of the integration team during the xMatters acquisition—described the integration of xMatters by Everbridge as a "[expletive] show."  Similarly, CW 4 described the integration process as "sloppy."  According to CW 4, the handling of the acquisition was a "disaster." CW 11, who worked at both xMatters and Everbridge, described the integration process of xMatters as "kind of a total [expletive] show" and a "cluster [expletive]."  Similarly, CW 10, who also worked at both xMatters and Everbridge, described the integration of xMatters into Everbridge after the acquisition as "horrible."

166.   CW 2 further explained that xMatters was Everbridge's largest acquisition to date and Everbridge failed to account for or consider how sophisticated a company of xMatters' size could be.  CW 2 added that this contributed to the poor integration and redundant systems, [and] not only slowed down sales, but visibility became a "huge challenge," and it was necessary to manually consolidate reports.

167.   The xMatters integration was a disaster for several reasons.  To start, Everbridge was primarily concerned with acquiring xMatters' revenue.  According to CW 1, the xMatters deal was "forced through" to "boost" revenue figures.

168.   Moreover, Defendants' failure to integrate xMatters, along with the other Class Period acquisitions, overly complicated the Company's internal operating systems.  For example, according to CW 2, after the xMatters acquisition, Everbridge was now operating four different instances of Salesforce[12] used by all different sales representatives.   CW 2 added that in addition to Salesforce, Everbridge was also using two instances of NetSuite[13] in addition to all their European systems.  Similarly, CW 10 confirmed that both xMatters and Everbridge used Salesforce as its customer management tool.  CW 10 noted, however, that Everbridge used a different version of Salesforce as well as a program called Groove. CW 10 indicated that she could not see or access information regarding Everbridge's sales numbers or revenue.

169.   CW 2 explained that the convoluted nature of the systems "really slowed down sales."  Other CWs confirm that Everbridge's sales declined after the xMatters acquisition.  For example, CW 6 noted that bookings had come down "pretty aggressively" during the second and third quarters of calendar year 2021. According to CW 6, bookings were distinct from annual recurring revenues, which were derived from existing product subscription revenues. CW 6 defined bookings as new sales, either to new customers, or "upsells" of additional products to existing customers.

---

[12] Based on Lead Plaintiff's review of publicly available sources, Salesforce is a client relationship management ("CRM") database used for support, sales, and marketing activities.   Salesforce allows businesses to track sales and customer activity, market to customers, and many other services.

[13] Based on Lead Plaintiff's review of publicly available information, NetSuite is a technology vendor with applications for customer relationship management (CRM), enterprise resource planning (ERP), financial management, and many others.

170.   Similarly, according to CW 5, the performance of the sales staff was readily available in Salesforce through the "Leadership Dashboard," which included a salesperson's name and how they were performing relative to their quotas, performance that month to date, and performance year to date.  CW 5 that all sales staff could see the performance of their peers and that Irvin and former CEO David Meredith had macro or admin level access and were able to see all of the figures as well.  CW 5 added that the system captured at least all of Everbridge's North American sales staff.  CW 5 recalled reviewing the Leadership Dashboard approximately mid-way through 2021 and observed that approximately 50% of the sales team was at 0% of their quotas, which CW 5 described as "staggering."  According to CW 5, Everbridge's issue was their struggling legacy business and generating new business, where much more substantial growth can be derived from.  CW 5 recalled speaking with colleagues and noting that "nobody is selling [expletive]."

171.   Another factor contributing to the Company's poor sales performance was the fact that Everbridge failed to integrate xMatters' teams and people—most importantly, xMatters' sales staff.  Indeed, Everbridge made no effort to integrate xMatters' salespeople into Everbridge.  CW 11 explained that she worked out of Everbridge's Utah office, which was almost entirely made up of former xMatters employees.  CW 11 explained that between March 2021 and August 2021, she worked in an "autonomous xMatters silo," continuing to sell exclusively xMatters products.  Similarly, CW 10 indicated that xMatters and its employees were "left stranded," and that they were not brought in—i.e., integrated—to be successful. CW 2 added that certain groups and teams at Everbridge were "not amenable" and did not care to observe best practices and elected to use a "my way or the highway" approach.

172.   As a result, most of xMatters' sales staff left after the acquisition. According to CW 2, who worked at both xMatters and Everbridge, Everbridge lost a "***tremendous***" number of legacy xMatters sales representatives, including the global sales leader.[14]   CW 2 had heard that the legacy xMatters staff was treated "poorly" and that some of the conduct resulted in lawsuits.  CW 2 continued to say that xMatters was a "very familial" organization, a sentiment that Everbridge did not share.

173.   According to CW 2, there was "attrition" from the xMatters side following the acquisition as a result, and the quarter ending in September 2021 was "dismal" from an xMatters perspective.  CW 2 added that xMatters' "didn't come close" to achieving their targets that quarter.  Because the attrition caused a dismal third quarter, the majority xMatters' sales staff had already left Everbridge by September 30, 2021 (the last day of the third quarter).  Similarly, CW 4 said that the xMatters acquisition put stress on the Business Development team to learn yet another new product and contributed to ***most*** of the "great" sales staff at xMatters departing after the acquisition.

174.   Although the xMatters integration issues were severe, Everbridge had been experiencing similar integration challenges since the start of the Class Period. For example, CW 1 described Everbridge as "struggling with attrition" and integration of acquisitions.  CW 1 explained that there were too many new people being integrated into Everbridge after numerous acquisitions beginning in 2019.

175.   Everbridge's failure to integrate the Class Period acquisitions made it difficult to sell the Company's CEM suite, since it was not actually the fully integrated system that Defendants claimed.  According to CW 5, although Everbridge pitched their CEM suite as a fully integrated product, in reality it was

---

[14] Based on Lead Plaintiff's investigation, this may refer to former Senior Vice President of Sales David Reardon, who departed in July 2021.

not actually one fully integrated system. CW 5 explained that the integration process was difficult at Everbridge and ideally a great product could be created by incorporating all of Everbridge's acquisitions into a single system, but unfortunately such a complete integration had not occurred, and the products required multiple, different systems. CW 5 continued to say that as a result, it was difficult to sell the CEM suite to executives of prospective customers, as CIOs could easily poke holes in Everbridge's CEM platform due to its disconnected state. CW 5 explained that the inability to pitch a single, coherent system to CIOs of prospective customers caused her to lose confidence in the ability to effectively pitch Everbridge's products.

E. **The Relevant Truth Regarding the Company's Slowing Organic Growth and Unsustainable M&A Strategy Slowly Emerges**

176. On December 9, 2021, Defendants partially revealed the true state of Everbridge through a press release containing two equally unexpected announcements. First, Everbridge announced that Defendant Meredith had resigned from his position as CEO and member of the Board of Directors. Second, Everbridge reduced revenue guidance for 2022 to 20-23%, well below the Company's history forecasts of 30% plus revenue growth.

177. At the same time, however, Defendants insisted that the two announcements were unrelated, stating that "Meredith's resignation *[wa]s not related to any matter regarding the Company's financial condition* [or] reported financial results."

178. On this news, Everbridge's stock price plummeted by more than *45%*, as investors began to understand the Company's revenue growth was unsustainable. Indeed, multiple analysts subsequently downgraded their rating of Everbridge stock, with Northland Capital Markets, for example, noting that the revenue guidance was "a *notable change*" from "the company's historic guidance . . . that

they should grow ***30%+ organically***."  Similarly, Barclays explained that they had "less confidence in growth visibility ahead" and noted that "[i]nvestors ***will focus even more on organic growth going forward***, and are ***unlikely to give EVBG the benefit of the doubt on future acquisitions***."

179.    However, Defendants did not disclose the full truth, and investors were left to wonder about Meredith's abrupt departure and its possible relation to the Company's slowing, unexpected, and therefore worrisome organic revenue growth. For example, on December 13, 2021, J.P. Morgan issued an analyst report stating, "there remain a lot more questions than answers at the moment."  Chief among those questions was "[w]hy is the CEO really leaving," and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?"

180.    After two more months of "more questions than answers," on February 24, 2022, investors finally learned the full truth about the Company's slowing revenue growth and Meredith's failed acquisition strategy.   On that date, Defendants issued a press release announcing Everbridge was lowering its full year 2022 guidance once again, this time to 15-17%, nearly half the usual 30% plus revenue growth.

181.    Moreover, the press release also explained that Defendants were "taking decisive actions to streamline, integrate and reduce complexity in [Everbridge's] key offerings, which we expect to drive sustainable growth in the years ahead."

182.    Co-CEO Vernon Irvin clarified this statement during the Company's earnings call on the same day, stating that "beginning in December," i.e., when the Company announced Meredith's abrupt departure as CEO, "our management team, together with the Board, conducted a comprehensive review of our strategy and

1    operations" which looked at "the number of acquisitions completed in 2020 and
2    2021" and how those acquisitions were integrated into Everbridge.

3        183.    Indeed, according to Irvin, that comprehensive Everbridge
4    management review concluded that "certain **acquired technologies**" created a
5    "barrier to upsell and cross-sell **from increased complexity, and _incomplete_**
6    **_integrations_**."  He further stated that "the number of **acquisitions completed in 2020**
7    **and 2021**," along with their products and businesses, "created incremental product
8    line **complexity that _produce integration challenges_** and have complicated our go-
9    to-market efforts."

10       184.    Based on this incomplete integration, Irvin explained that it was
11   "harder for . . . [Everbridge's] enterprise sales organization to execute on [its] land,
12   adopt and expand sales strategies."  Similarly, Brickley stated during the earnings
13   call that the flurry of acquisitions "created complexity for the business seen in the
14   product, back office and go-to-market headwinds **that are obstacles to sales**
15   **growth**."  Brickley further explained that "we were well down a path of selling
16   dozens of solutions that **were not always tightly integrated**.  We were selling them
17   to multiple buyers.  And as [Irvin] said, **that was confusing to customers and to**
18   **our sellers**."

19       185.    As a result, Irvin explained that the Company was taking immediate
20   action to "paus[e] material new M&A and instead prioritiz[e] development efforts
21   to **focus on accelerating product integrations across our existing acquired assets**."

22       186.    On this news, Everbridge's stock price fell more than **33%,** closing at
23   $30.61 per share on February 25, 2022, as investors finally understood that, under
24   Meredith's leadership, the Company chased acquisitions to bolster its growth
25   numbers but failed to integrate them, causing a drop off of organic sales to such an
26   extent that it could no longer be camouflaged with the revenues from additional
27   acquisitions.

28

187.   Shortly after the full truth was revealed, Barclays noted that "*some investors were holding out hope that the CEO departure was separate from growth concerns*."  But this could no longer be denied.  Indeed, as William Blair noted, the "*aggressive acquisition strategy* over the course of the prior two years had *created complexity* in the Everbridge product portfolio, which was *driving significant inefficiencies* in both the back-office and go-to-market organizations" and that the "*incomplete integrations* and the accumulated portfolio of somewhat disjointed point solutions that *resulted from this rapid pace of M&A* was creating difficulties in the company's land-and-expand motion from the perspective of both sellers and buyers."

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

188.   Lead Plaintiff alleges that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing.  As alleged herein, such statements artificially inflated or maintained the price of Everbridge publicly trade common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

189.   Throughout the Class Period, Defendants made a series of false and misleading statements regarding: (i) the Company's M&A strategy; (ii) the extent to which the revenues it obtained from those acquired companies were being used to hide increasingly lower organic revenue growth; and (iii) the significant problems Everbridge was facing as a result of Defendants' failure to integrate the acquired companies.  At the same time, Defendants omitted material facts indicating that the Company's revenue growth was unsustainable and would be short-lived due to the fact that the Company's aggressive acquisition strategy created obstacles to sales growth due to the incomplete integrations and increased complexity.

## A.  November 4, 2019 Earnings Call

190.  The Class Period begins on November 4, 2019, when Everbridge issued a press release announcing its financial results for the third quarter ended September 30, 2019.  The same day, Everbridge held an earnings calls discussing the Company's third quarter 2019 financial results (the "November 4, 2019 Earnings Call").  During the earnings call, Ellertson stated, "[o]ur Q3 results exceeded the high end of our guidance ranges."  Following up on that statement, Meredith emphasized the point, saying "[a]s Jaime indicated, we beat our financial guidance for the third quarter, continuing the track record we've achieved every quarter since our IPO over 3 years ago. Revenue was $52.5 million, representing growth of 35%, including contribution from our NC4 acquisition."

191.  During the November 4, 2019 Earnings Call, Defendants misled investors about the Company's efforts to integrate NC4 into its business.  During the call, Brickley stated that "[n]ow that we've closed the acquisition of NC4 and are ***well down the path of rightsizing and <u>integrating</u> that business***, we are updating our expectations for the revenue contribution from NC4 this year to be approximately $4.5 million."

192.  This statement was false and misleading because it led investors to believe that the Company was integrating NC4 into its business when it was not.  According to CW 8, she and her colleagues in sales were expected to sell NC4 and its products right after the acquisition before NC4 was integrated into Everbridge.  CW 8 elaborated that the sales team was ordered to sell NC4 and its products before any time had been taken for it to be integrated.  According to CW 8, it seemed too short a time between acquisition and efforts to sell its products.

193.  According to CW 5, there were "issues with the integration" of NC4, which provided risk intelligence.  CW 5 continued to say that there were certain contextual layers and different ways of identifying risk compared to Everbridge's

legacy equivalent. CW 5 explained that there was a "different look and feel" between the platforms and likened the user experience to the difference between using Apple and Android products. CW 5 continued to say that ultimately Everbridge elected to "sunset" or discontinue their legacy risk intel platform and migrated everything to NC4.

194. Starting with NC4, the rapid pace of acquisitions during Meredith's tenure, and Defendants' failure to integrate them, caused significant integration challenges throughout the Class Period. For example, CW 1 explained that there were too many new people being integrated into Everbridge after numerous acquisitions beginning in 2019. CW 1 added that these employees were spread across all different time zones, which made it difficult to get everyone on the same page and then, once progress was being made, another company would be acquired and Everbridge would have to go through the process all over again. CW 1 also cited problems integrating the acquired companies themselves into Everbridge's business.

**B.     February 18, 2020 Earnings Call**

195. On February 18, 2020, Everbridge held an earnings call to discuss the Company's fourth quarter and full year ended December 31, 2019 (the "Fourth Quarter and Full Year 2019 Earnings Call"). During that call, one analyst expressed uncertainty about the Company's organic revenue growth, asking Ellertson the following question:

> But if I look at your revenue guidance, it seems like you're guiding below the 30% mark organically, which will be below the commentary that Jaime spoke about earlier for sustainable 30% growth with M&A in addition to that. Are there any one-timers that we should be thinking about or just timing of revenue recognition that are impacting fiscal '20?

196.   Ellertson responded by obscuring the difference between organic growth and contributions from recently acquired companies and stated that the Company had already integrated NC4 into its product offering.   Specifically, Ellertson stated:

> So when you look at the second half of Q4 and what we said to expect from NC4 [acquisition] and you adjust for that, you'll see that **we've had strong organic growth**.

> And as I said earlier, as we head into 2020, **_we've really integrated NC4 and Risk Center into our entire product offering._** And so it's difficult to break that out.

197.   Ellertson's statement about integrating NC4 into Everbridge's product offering was false and misleading for the reasons described in ¶¶ 192-94, *supra*. Ellertson's statement about the Company's organic growth was false and misleading because it did not disclose that the Company's organic revenue growth was unsustainable given the Company's undisclosed growth-through-acquisition strategy.   Because Ellertson spoke about the Company's financial success and organic growth, Defendants had a duty to disclose information concerning the source of the Company's success and reasonable investors would find that Everbridge's growth-through-acquisition strategy—which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit—would significantly alter the mix of available information about the Company.

198.   Indeed, the Company's undisclosed growth-through-acquisition strategy was widely discussed during meeting attended by Meredith and Brickley, among others.   CW 6 explained that the company's business model was based on growth-through-acquisitions.   CW 6 added that that the target was five to six acquisitions per year and that this strategy was discussed widely during the

company's Quarterly Business Review meetings, or QBRs.  CW 6 indicated that
Meredith, Brickley, and the "budget owner" for any acquired company (in addition
to the applicable departmental budget owner) participated in the QBRs.

### C.    March 23, 2020 Corporate Analyst and Investor Meeting

199.   On March 23, 2020, Everbridge hosted its Corporate Analyst and
Investor Meeting, which was attend by several Everbridge officers and employees,
including the Individual Defendants.  During the conference, Meredith touted the
growth of the Company's CEM platform with the addition of the recent Connexient
and CNL Software acquisitions.  Meredith stated:

> Secondly, we're continuing to innovate around Critical Event
> Management with significant new capabilities in CEM,
> specifically related to IoT.  ***And if you look at the acquisitions
> that we have done with Connexient, one2many and others, we
> now have over 225 out-of-the-box integrations.***  So we ***now
> truly can be that <u>unified</u> enterprise-wide operating system*** to
> allow you to operate across your business, your organization
> globally, and that's very powerful and that's very sticky.

200.   Meredith's statement was false and misleading because it created an
impression that the Company had integrated the acquired companies, including
Connexient and CNL Software, into the Company's CEM platform when they had
not.  Although Defendants claimed that they acquired Connexient "to enhance the
Company's CEM suite," according to CW 9, two years after the acquisition, when
she left the company (in March 2022), the ***wayfinding app had still not been
migrated or integrated into Everbridge's platform***.  Similarly, CW 5 explained that
Everbridge failed to integrate CNL Software into its CEM suite.

201.   Meredith's statement was also false and misleading because it failed
to disclose the full truth about the Company's growth-through-acquisition strategy.
Because  Meredith  touted  the  Company's  acquisitions—and  specifically,
Defendants' ability to integrate the acquisitions and make Everbridge a "unified"

system with hundreds of out-of-the-box integrations—Defendants had a duty to disclose information concerning the true nature of the Company's growth-through-acquisition strategy and reasonable investors would find that Everbridge's failure to integrate its acquired companies would significantly alter the mix of available information.

202.   During the Class Period, Defendants engaged in a flurry of acquisition to boost their revenue but failed to integrate these acquisitions.  Thus, contrary to Meredith's statements, the recent acquisitions did not make Everbridge a "unified enterprise-wide operating system."  As CW 5 explained, the integration process was difficult at Everbridge and ideally a great product could be created by incorporating all of Everbridge's acquisitions into a single system, but unfortunately *such a complete integration had not occurred*, and the products required multiple, different systems.  According to CW 5 although Everbridge pitched their CEM suite as a fully integrated product, in reality it was not actually one fully integrated system.  CW 5 continued to say that as a result, it was difficult to sell the CEM suite to executives of prospective customers, as CIOs could easily poke holes in Everbridge's CEM platform due to its disconnected state.

### D.     May 5, 2020 Earnings Call

203.   On May 5, 2020, the Company held an earnings call discussing the Company's first quarter 2020 financial results.  During that call, which was shortly after the Company's one2many acquisition, an analyst asked Brickley about one2many's revenue model.  In response, Brickley re-affirmed what Ellertson told investors before the Class Period—that Everbridge did not buy revenue—explaining that "*we did not acquire [one2many] to drive near-term revenue contribution*, but rather for that longer-term strategic potential."

204.   This statement was false and misleading because Defendants did exactly the opposite—they purchased one2many to boost short-term revenue.  As

explained in § IV.D, *supra*, under Meredith's leadership, the Company engaged in a flurry of acquisitions throughout the Class Period in order to boost revenue. Furthermore, Defendants did not purchase one2many for "longer-term strategic potential," as Defendants failed to integrate its Class Period acquisitions, demonstrating Defendants were only concerned with acquiring the revenue and not driving long term growth.

### E.   The First Quarter 2020 10-Q

205.   On May 8, 2020, the Company filed its Form 10-Q for the quarterly period ended March 31, 2020 (the "First Quarter 2020 10-Q"), which was signed by Meredith and Brickley.  In the First Quarter 2020 10-Q, Everbridge claimed that it "acquired Connexient to expand the Company's customer base and *for its strategic technology assets to enhance the Company's CEM suite of solutions* to broaden support for Internet of Things ("IoT") applications."

206.   This statement was false and misleading because Defendants did not acquire Connexient to enhance its CEM suite, but rather, to boost the appearance of organic revenue.  Despite Defendants' statement that it was acquiring Connexient to "enhance the Company's CEM suite of solutions," the Company made no effort to integrate Connexient into its CEM suite.  CW 9 noted that two years after the acquisition, when she left the company (in March 2022), the *wayfinding app had still not been migrated or integrated into Everbridge's platform*.  CW 9 indicated the reason for the failure to integrate the wayfinding tech into Everbridge's platform was because the company provided "zero resources" to do so.  CW 9 added that Everbridge had no long-term plan to further develop, improve, and integrate the wayfinding software, or to integrate the wayfinder into Everbridge's platform.  The lack of intent to integrate Connexient demonstrates that Defendants acquired Connexient to boost revenue, not to enhance its CEM suite.

207.   The statement was also false and misleading because it failed to disclose the full truth about the Company's growth-through-acquisition strategy. Because Defendants touted the acquisition as "enhanc[ing]" the Company's CEM suite, they had a duty to disclose information about the Company's growth-through-acquisition strategy and reasonable investors would find that Everbridge's growth-through-acquisition strategy—which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit into the CEM suite—would significantly alter the mix of available information about the Company.

208.   Also in the First Quarter 2020 10-Q, Everbridge claimed that it "acquired CNL Software to expand the Company's customer base and for its strategic technology assets **to enhance the Company's CEM suite of solutions** to broaden support for IoT applications."

209.   This statement was false and misleading because Defendants did not acquire CNL Software to enhance its CEM suite, but rather, to boost the appearance of organic revenue.  *See* ¶¶ 107-08, *supra*.  This statement was false and misleading for the additional reason described in ¶ 207, *supra*.

**F.     The January 14, 2021 Needham Virtual Growth Conference**

210.   On January 14, 2021, Meredith and Brickley participated in the Needham Virtual Growth Conference (the "January 14, 2021 Conference").  During that conference, Meredith was asked about the Company's M&A strategy.   An analyst asked, "[a]re you getting an itch to do another [acquisition] anytime soon? Or do you feel like the platform is fairly built out at this point?"   Meredith responded, without any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, as follows:

So we have a strategic product road map. And in the vast majority of the time, we're going to build that out organically with our engineering team. In some cases, we will partner to get the—fill in those pieces. And then in some cases, it makes sense to do a technology tuck-in that allows us to accelerate that road map.

*          *          *

In terms of going forward, I don't think it's going to be different. I think we're going to continue to evaluate the landscape. We have a very strong balance sheet.  And so we say no to a lot more things, people bringing this us, we're very picky. And I think [Ellertson has] had a great track record of getting really good terms. And even if you go back to the UMS acquisition, I think the company bought UMS, and then shortly after that, the EU mandate came out. So I think the company has had a great track record, and we're going to continue to leverage this**.** It's another tool in our toolkit. ***So—but we're not going to do [an acquisition] unless we think it's a nice strategic fit, and primarily focused on organic [growth]***.

211.   Meredith's statement was false and misleading because it led investors to believe that the Company was primarily focused on growing the CEM platform organically and would only acquire companies "in some cases" if it was a "strategic fit," when in reality, the Company was focused on growing through acquisitions during Meredith's tenure as CEO.  To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward looking, these statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ.

212.   Meredith's statement was also false and misleading because it failed to disclose the full truth about the Company's growth-through-acquisition strategy. Because Meredith spoke about the Company's growth strategy, Defendants had a duty to disclose information concerning the source of the Company's success and

reasonable investors would find that Everbridge's growth-through-acquisition strategy—which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit—would significantly alter the mix of available information about the Company

213. Indeed, CW 6, who worked at Everbridge as a Senior Financial Analyst from approximately November 2020 through February 2022, explained that the company's business model was based on growth through acquisitions, and Everbridge "outgrew themselves" in applying that model. CW 6 noted that the growth-through acquisitions model was part of the company culture, which she understood from "day one." CW 6 added that that the target was five to six acquisitions per year and that this strategy was discussed widely during the company's Quarterly Business Review meetings, or QBRs, which were attended by Meredith and Brickley, among others. She explained that, during the QBRs, the question of "Can we buy that product?" always came up; it was the company culture to always be looking for new acquisitions.

**G.     The February 18, 2021 Earnings Call**

214. On February 18, 2021, the Company announced record setting fourth quarter and full year 2020 financial results. According to a press release issued on the same day, the Company's fourth quarter revenue exceeded the high-end of guidance by a record $2.9 million. On the same day, the Company held an earnings call discussing its fourth quarter and full year 2020 financial results (the "February 18, 2021 Earnings Call"). Analysts were interested in the reason for the record-setting revenue beat. One analyst asked, "Trying to understand what drove the large revenue beat in the quarter? Was it maybe some linearity in the quarter that happened earlier than expected or maybe some of this perpetual revenue that came in? Any color there would be helpful."

215.   In response, Brickley stated "***No, just continued strong performance***. I mean, the onetime revenue that we have been recognizing it's only about 3% for the full year. You'll see that when we file our 10-K. ***So just strong performance in the quarter***."

216.   Brickley's statement was misleading because it portrayed the Company's revenue growth as ***only*** the result of strong performance and omitted any discussion of one of the main drivers of Everbridge's financial success: the Company's undisclosed growth through acquisition strategy.  Moreover, because Brickley spoke about the Company's financial success, Defendants had a duty to disclose information concerning the source of the Company's success and reasonable investors would find that Everbridge's growth-through-acquisition strategy—which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit—would significantly alter the mix of available information about the Company.

**H.   The April 6, 2021 xMatters Acquisition Press Release**

217.   On April 6, 2021, the Company issued a press release on Form 8-K announcing that Everbridge had acquired xMatters for a purchase price of approximately $240 million in cash and stock.  The press release stated:

> ***Everbridge anticipates the partial year contribution to 2021 revenue will be approximately $9-11 million***, after considering the material impact of purchase accounting and the associated deferred revenue haircut. Everbridge expects that the xMatters acquisition will have minimal impact to the company's adjusted EBITDA in 2021 and will become accretive to the company's adjusted EBITDA in 2022. The company will provide an update to its full-year guidance on its next earnings call.

218.   This statement was false and misleading because the revenue contribution from xMatters for the rest of 2021 was actually $20-25 million—the high end of which was ***nearly triple*** the $9-11 million figure Defendants presented

to the public.  Defendants knew that xMatters would contribute $20-25 million for the rest of 2021, but purposefully downplayed the revenue contribution from xMatters to mask the Company's slowing organic revenue.  By claiming xMatters would contribute $9-11 million, when it would actually contribute $20-25 million, Defendants had an extra $11-16 million in "hidden," undisclosed revenue from xMatters that they could add to the Company's overall revenue, making it appear as though the Company's revenue was growing organically far more than it actually was.

219.  CW 1, who had knowledge of Everbridge's M&A process and transactions, stated that Everbridge ended up paying 4.0 – 4.5x the revenue for xMatters, in a deal that **was "forced through" to "boost" revenue figures**. Specifically, CW 1 recalled that the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021. According to CW 1, however, realistically, the forecasts were presenting figures closer to **$20 - $25 million**. CW 1 added that based on the actual forecasts, it was "clear" that xMatters was not necessarily going to grow, which was contrary to what was being presented to the public.

220.  CW 1 stated that she raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley.  CW 1 added that she expressed concerns **directly** to Meredith and Brickley as well, in the form of presentations and emails regarding the deal.  CW 1 explained that she sent Meredith and Brickley emails in the lead up to the acquisition.  CW 1 added that she was not the only person to express concerns about the xMatters acquisition.

221.  According to CW 1, the rationale Meredith provided **was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue**.  According to CW 1, the difference in revenue reported versus what was

projected was to allow Everbridge to use the discrepancy to cover up for their overall performance.

## I.   The May 10, 2021 Form 10-Q and Earnings Call

222.   On May 10, 2021, the Company filed its Form 10-Q for the quarterly period ended March 31, 2021 (the "2021 First Quarter Form 10-Q"), which was signed by Meredith and Brickley.  With respect to the RedSky acquisition, the 2021 First Quarter Form 10-Q stated, "The Company acquired RedSky for its E911 incident response solutions platform *to enhance the Company's CEM suite of solutions* as well as market penetration and customer reach."

223.   This statement was false and misleading because Everbridge did not acquire RedSky to enhance its CEM suite, but rather, to boost the appearance of organic revenue.  Although Defendants told investors that RedSky was acquired to "enhance the Company's CEM suite," in reality Defendants made *no effort* to integrate RedSky into the Company's CEM Suite.  The lack of intent to integrate RedSky into its CEM suite demonstrates that Everbridge did not acquire RedSky to enhance the Company's CEM suite, but rather simply to enhance the Company's revenue.

224.   According to CW 3—who was employed by RedSky and then Everbridge after acquisition, and was involved in the vetting of RedSky during the Winter of 2020 (shortly before the acquisition) as a member of the executive team— she believed RedSky would be incorporated into Everbridge's CEM, but *Everbridge showed "no effort" in performing an integration*.  According to CW 3, *Everbridge just wanted RedSky's customers and revenue*.

225.   The statement in ¶ 222 was also false and misleading because it failed to disclose the full truth about the Company's growth-through-acquisition strategy. Because Defendants touted the acquisition as "enhanc[ing]" the Company's CEM suite, they had a duty to disclose information about the Company's growth-through-

acquisition strategy and reasonable investors would find that Everbridge's growth-through-acquisition strategy—which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit into the CEM suite—would significantly alter the mix of available information about the Company.

226.   During the May 10, 2021 Earnings Call, Brickley provided updated guidance for the rest of 2021 based on the recent xMatters acquisition.  The updated guidance raised the Company's full year revenue estimate to represent growth of 32% to 33%.  Specifically, Brickley explained:

> Our updated guidance for 2021 considers the impact of our acquisition of xMatters. Having just completed the transaction on Friday, ***Our*** [*sic*] **expectations *for the financial contribution from xMatters for the remainder of the year have not changed from the view we provided about a month ago*** . . . .
>
> For the second quarter, we anticipate revenue of between $83.7 million and $84.1 million, representing growth of 28% to 29% . . . .
>
> "For the full year, we now expect revenue to be in the range of $358 million to $359.6 million, representing growth of 32% to 33%."

227.   This statement was false and misleading because it failed to correct the prior material misstatement that revenue contribution from xMatters for the remainder of the year would be $9-11 million.  *See* ¶¶ 217-21, *supra*.

228.   Defendants also misled investors about the Company's M&A strategy following the xMatters acquisition.  During the May 10, 2021 earnings call, an analyst asked about the Company's M&A strategy since it appeared that it had changed with the xMatters acquisition.  Specifically, the analyst asked:

I guess I'll just start off with kind of one on the broader M&A front. Obviously, congrats on the xMatters acquisition. A bunch of other ones here this year. It seems like on one hand, M&A has always been a core part of the Everbridge product strategy, right? I think, historically, it's been kind of low 30% organic growth and a few points from acquisitions. ***But it seems like the appetite definitely has picked up on both a frequency and size perspective***.

***So I'd love to understand kind of the factors that are driving this adjustment strategy***. You obviously always been looking at where the puck is going, if we're looking at multiple years down the road. But just kind of a temporary dislocations around COVID and being opportunistic? Or is this more of a permanent shift relative to what we used to historically?

229.    Meredith responded by reiterating, once again, that the Company's M&A strategy remained the same as when Ellertson was CEO—namely, that the purpose behind these acquisitions was not to "buy revenue" but instead to engage in strategic, thoughtful acquisitions to drive long term growth.    Specifically, Meredith explained:

Matt, thanks for the question. So M&A has always been part of the strategy for Everbridge. ***And I think [Ellertson] always talked about something in the mid- to high single digit of the growth rate coming from acquisition and the rest coming from non-acquisition***. ***And what really drives those decisions are the strategic fit of the products.*** So if you look at one to many, that was an area where we were the leader in location-based SMS. And we really felt like we could transform that industry by having a hybrid solution where you could do cell broadcast or location-based SMS.

So acquiring a leader in cell broadcast just made sense. I think, similarly, with xMatters, seeing that – and we're seeing even over the weekend, a lot of media around cyberattacks and just the need for an enterprise to be secure on the digital side with all the digital transformation, employees being remote, future of work, the opportunity to take the growth we were seeing on the

ITA side and put it with the leader on enterprise ITA, we feel is very strong.

Because when you put the digital CEM for digital along with physical and we can really own the Fusion Center for the enterprise where they can have one single pane of glass and look across all their digital and physical risks. ***And so we think that was a really compelling strategic fit from a product road map perspective, and that's why we did it.***

***So I don't think the strategy has really changed from what [Ellertson] was doing for years, which is targeted tuck-ins that allow us to strengthen or accelerate our technology road map or to help us get into geographies, particularly internationally that we're not in currently. So we don't really see it as a big strategy shift.*** I think the law of large numbers supplies as we get bigger, the percentage, the numbers will look bigger, but we don't view it as a strategy shift.

230.    Meredith's statements about the Company's M&A strategy were false and misleading because Defendants did not acquire xMatters for its "strategic fit" but rather to boost revenue.  According to CW 1, the xMatters acquisition was "forced through" to "boost" revenue figures.  Moreover, because Meredith spoke about the Company's M&A strategy, Defendants had a duty to disclose information concerning the true nature of the Company's M&A strategy and reasonable investors would find that Everbridge's growth-through-acquisition strategy— which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit into the CEM suite—would significantly alter the mix of available information.

231.    Analysts were comforted by Defendants' updated guidance, specifically its organic revenue guidance, and believed that the Company could continue its strong trajectory.  For example, on May 11, 2021, William Blair issued an analyst report reiterating its outperform rating on Everbridge's stock.  In the

report, William Blair noted that, "[e]xcluding xMatters, the updated guidance implies roughly 29% organic growth at the midpoint compared to the midpoint of the company's prior outlook at 26.6% growth."  On June 3, 2021, William Blair issued another analyst report stating "[t]he Company has been putting up strong numbers post-pandemic and we believe this trajectory will continue in the coming quarters."

**J.    The June 10, 2021 Bank of America Global Technology Conference**

232.   On June 10, 2021, Meredith and Brickley attended the Bank of America Global Technology Conference (the "June 10, 2021 Conference").  During the conference, in response to an analyst about the xMatters acquisition, Meredith explained that "[t]he integration is just starting, ***but it's already going great***."

233.   Later during the June 10, 2021 Conference, another analyst asked about the xMatters acquisition and how investors should "be thinking about M&A strategy [] going forward from here?"  Meredith reiterated that the Company's "***strategy on M&A really hasn't changed since when [Ellertson] was running the business***" and "most of the time, we're going to build or partner.  And in some cases, if there's an opportunity to accelerate our product road map by a couple of years, by doing a technology tuck-in and adding some capabilities, we'll look at doing that and look at paying a good price."  Meredith then claimed that historically, "***we've been really good about getting the capabilities integrated***."

234.   The statements in ¶¶ 232-33 about the Company's integration efforts were false and misleading because, unbeknownst to investors, Everbridge was experiencing significant integration issues in connection with the numerous acquisitions starting in 2019 and continuing through the recent xMatters acquisition.  These issues included: (1) redundant, convoluted internal databases that significantly slowed down sales; (2) a disjointed CEM suite that made it

difficult to pitch a single, coherent system to CIOs of prospective customers, which also impacted sales; and (3) the loss of **most** of the great sales staff from xMatters after the xMatters acquisition.  *See* ¶¶ 165-75 *supra*.

235.   Further, Meredith's statement in ¶ 233 about the Company's M&A strategy were false and misleading because they led investors to believe that the Company's M&A strategy was the same as before the Class Period—namely that the Company engaged in strategic acquisitions to drive long term growth and build the Company's CEM platform, not to boost the Company's revenue—when in reality, the Company's M&A strategy was dramatically different under Meredith's leadership.  *See* § IV.D *supra*.  Finally, the statements in ¶ 233 was false and misleading for the additional reason that it failed to correct Ellertson's previous statement that the Company did not "buy revenue," which investors understood was a central principle of the Company's M&A strategy.

### K.   The Second Quarter 2021 10-Q

236.   On August 9, 2021, the Company filed its Quarterly Report for the Quarter ended June 30, 2021 with the SEC on Form 10-Q (the "Second Quarter 2021 10-Q").  The Second Quarter 2021 10-Q, which was signed by Meredith and Brickley, stated that Everbridge "acquired xMatters for its service reliability platforms to **enhance the Company's CEM suite of solutions as well as market penetration and customer reach**."

237.   This statement was false and misleading because Everbridge did not acquire xMatters to enhance its CEM suite, but rather, to boost the appearance of organic revenue.  According to CW 1, who had knowledge of Everbridge's M&A process and transactions, xMatters possessed a good core business, but it was "not particularly growing," noting that xMatters had flat revenue figures over the three years prior to the acquisition.  CW 1 continued to say that Everbridge ended up paying 4.0 – 4.5x the revenue for xMatters, **in a deal that was "forced through" to**

***"boost" revenue figures***.  Moreover, because Meredith spoke about the Company's M&A strategy, Defendants had a duty to disclose information concerning the true nature of the Company's M&A strategy and reasonable investors would find that Everbridge's growth-through-acquisition strategy—which was unsustainable and detrimental to long term growth because it relied on acquiring companies for their revenue and not their strategic fit into the CEM suite—would significantly alter the mix of available information.

### L.    The August 9, 2021 Earnings Call

238.    On August 9, 2021, the Company held an earnings call discussing the Company's second quarter 2021 financial results (the "August 9, 2021 Earnings Call").  During the call, an analyst asked about the xMatters acquisition and how the acquired revenue would impact the Company's total revenue moving forward. Specifically, the analyst asked:

> Got it. And just one follow-up, if I may. On the xMatters acquisition, is it possible to get the xMatters contribution to the revenue for the quarter? And really given the positive commentary throughout the call, I mean, I guess, are you expecting much more than the $9 million to $11 million in total revenue that you guided for xMatters earlier this year.

239.    In response, Meredith refused to give a revenue contribution number from xMatters, but instead touted the integration of xMatters and the strong sales of its products:

> Yes, Koji, it's a great question. So let me just give an update on what's going on with xMatters. One is, we are probably ahead of schedule on getting them integrated with the organization and ***we acquired a really tremendous team***. They understand our space and the strategic fit of digital plus physical is resonating well with customers. And so based on our internal expectations, what we thought we'd do on sales, like we're doing better. And so we certainly are going to try to continue that.

***We are integrating***. We did have an ITA business previously. ***So we're integrating those teams. They've already been integrated***. So it is interesting in terms of which deals were already in the funnel, would we have won them anyway, not won them. So we're really not – and it's probably impossible to kind of break out going forward because we're putting the teams together. But our overall guidance reflects our view of the consolidated view going forward. And overall, we're very bullish on the acquisition and the results exceeded what we thought prior to having gone through Sarbanes-Oxley and closing the deal and all that.

240.   The statements in ¶ 239 were false and misleading because they led investors to believe that the xMatters integration was going well and that Everbridge had already integrated xMatters' teams and employees, when in reality, the xMatters integration was not going well and Everbridge had lost a "tremendous" number of xMatters employees.  Contrary to Meredith's statement that the xMatters teams had "already been integrated," most xMatters employees left Everbridge after the acquisition.  According to CW 2, who worked at both xMatters and Everbridge, Everbridge lost a "***tremendous***" number of legacy xMatters sales representatives, including the global sales leader.  Similarly, CW 4, who worked at Everbridge beginning in 2015 until November 2021, said that the xMatters acquisition put stress on the Business Development team to learn yet another new product and contributed to ***most*** of the "great" sales staff at xMatters departing after the acquisition.

241.   The statements in ¶ 239 were false and misleading for the additional reason that they led investors to believe that the Company was already integrating xMatters when they were not.  According to CW 11, between March 2021 and August 2021, she worked in an "autonomous xMatters silo," continuing to sell exclusively xMatters products.  CW 11 recalled that the "plan" for integration was for xMatters to operate independently for approximately nine months and that the ***integration process began in December 2021***.  Thus, Defendant's statement in

*August 2021* that they were integrating xMatters was false.  Similarly, CW 10, who worked at xMatters before the acquisition and remained at Everbridge after it, indicated that xMatters and its employees were "left stranded," and that they were not brought in—i.e., integrated—to be successful.

### M.  The November 9, 2021 Earnings Call

242.  On November 9, 2021, the Company held an earnings call discussing the Company's third quarter 2021 financial results (the "November 9, 2021 Earnings Call").  During the call, Meredith represented that, "[t]here's an increased awareness of the importance of CEM.  And we're doing a better job of bundling together our different CEM capabilities into deals, and that's manifesting itself in the ASPs [average selling prices] and the large deals."

243.  Specifically addressing the xMatters acquisition, Meredith further represented:

> Obviously, with the xMatters platform, it was many years of development, really nice system, interface, functionality use cases, digital operations. It's – it really adds a lot of capability to what we were doing with our IT Alerting. And we're already doing integrations, right? ***So we've got that integrated now* with our crisis management module, *we've got it integrated* with our employee communications module, *integrated with* our Visual Command Center**. So people are seeing the value of it coming together over time and giving us really positive feedback.

244.  During the November 9, 2021 Earnings Call, Brickley reiterated that the xMatters integration went well, stating, "it's performing as expected.  ***We've integrated the people. We've integrated the sales.  We've integrated the funnels. We're integrating the technology***.  So we don't break it out. But so far, so good."

245.  Meredith and Brickley's statements in ¶¶ 242-44 about the xMatters integration were false and misleading because, unbeknownst to investors,

Everbridge was experiencing significant integration problems in connection with the xMatters acquisition, including losing a "tremendous" number of xMatters legacy employees by August 2021. *See* ¶¶ 165-75, *supra*. Moreover, because Defendants spoke about the xMatters integration, including the retention of xMatters employees, they had a duty to disclose information about the Company's integration challenges and reasonable investors would find that losing most of xMatters' sales staff would significantly alter the mix of available information about the Company.

### N. The November 30, 2021 Credit Suisse Conference

246. On November 30, 2021, Brickley attended the Credit Suisse Technology, Media & Telecom Conference. During the conference, Brickley responded to a question as to the status of the xMatters integration using similar language to what he had said during the November 9, 2021 Earnings Call, claiming that "[w]e've begun that technological integration. ***We've locked up key hires, and we're retaining them.*** And so, so far, so good."

247. This statement was false and misleading because for the reasons set forth in ¶¶ 240-41, 245, *supra*.

### O. The November 30, 2021 Press Release

248. On November 30, 2021, the Company issued a press release "announc[ing] the launch of [Everbridge's] new Digital Operations Platform, helping organizations to save time and money, deliver continuous service uptime and maintain revenue streams. The new platform extends Everbridge's market-leading CEM for Digital solution to further support customers' digital transformation efforts." According to the press release, "Everbridge's new Digital Operations Platform represents ***the seamless integration of the Everbridge and xMatters enterprise IT and cyber resilience solutions (following Everbridge's acquisition of xMatters in May 2021***)."

249. This statement was false and misleading because the xMatters integration was not "seamless" as set forth in ¶¶ 240-41, 245, *supra*.

## VI.   THE TRUTH EMERGES

250. The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized on December 9, 2021.  However, the truth and foreseeable risks were not fully revealed and/or fully materialized until February 24, 2022.

### A.   The Truth is Partially Revealed on December 9, 2021 When Defendants Disclose Meredith's Abrupt Departure and Lower Revenue Guidance, But Investors Still Question How the Two are Related

251. The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized after the markets closed on December 9, 2021, when Defendants issued a press release that contained two unexpected announcements.

252. First, Everbridge announced that Meredith had resigned effective immediately from his position as CEO and member of the Board of Directors. However, the Company provided no explanation for his decision.  The Company announced that it would immediately establish an Office of the CEO and begin to transition leadership to Defendant Brickley and Vernon Irvin, Everbridge's Executive Vice President and Chief Revenue Officer, as interim Co-CEOs pending the appointment of a permanent CEO.

253. The second announcement from the same press release was Everbridge's reduction of revenue guidance for 2022 to 20%-23% growth, well below its historic forecasts of 30% plus revenue growth.

254.   As a direct and proximate result of this partial corrective disclosure, the price of Everbridge's common stock fell $52.37 per share, or more than 45.4%, to close at $63.00 per share on December 10, 2021.

255.   Indeed, analysts were shocked by Meredith's "abrupt" resignation. For example, on December 10, 2021, Bank of America Securities issued an analyst report stating: "We find the resignation of David Meredith as CEO and a board member as ***abrupt and unexpected***, particularly given the business is still working through the large and transformative acquisition of xMatters from earlier this year and the relatively good results in 2021 thus far." Similarly, on the same day, Northland Capital Markets issued an analyst report stating the resignation "was fairly abrupt and without a transition plan."

256.   Analysts were also shocked by the lower revenue guidance for 2022. For example, in their December 10, 2021 analyst report, Bank of America went on to say, "[m]ore concerning to us is the 2022 prelim[inary] revenue guidance ***that suggests a sharp revenue growth deceleration*** in 2022 from 2021 (+20-23% vs. our +36% 2021 forecast)." Northland Capital Markets commented that the revenue guidance was "a ***notable change***" from "the company's historic guidance . . . that they should grow 30%+ organically." Northland Capital Markets also stated that the lower revenue guidance "seems a little at odds with macro trends" that would be expected to benefit Everbridge, "such as a continued barrage of critical events, the uncertainty remaining around Covid, strong public safety investments in other areas, digital transformation plans, and the rise of the CSO within companies."

257.   However, the Company did not disclose the full truth regarding the Company's slowing revenue growth. The Company's December 9, 2021 press release misled investors by claiming that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results." This statement was false and misleading because it led investors to believe

that Meredith's departure was not related to the Company's growth deceleration in 2022.  In reality, Meredith's resignation was directly related to the Company's slowing growth, as under Meredith's leadership, the Company had chased acquisitions to bolster its growth numbers but failed to integrate them, causing a drop off of sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions, leading to a significant growth deceleration in 2022.

258.   As a result of Defendants' false assurances that Meredith's departure was unrelated to lower revenue guidance, investors did not yet understand what caused Everbridge's slowing revenue growth.  As Raymond James explained in their December 16, 2021 analyst report, "investors are still trying to dissect what's driving the organic deceleration in 2022."  J.P. Morgan also questioned whether Meredith's abrupt departure was related to the Company's slowing revenue growth.  On December 13, 2021, J.P. Morgan issued an analyst report stating, "there remain a lot more questions than answers at the moment."  Most importantly, J.P. Morgan asked "[w]hy is the CEO really leaving" and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?"

259.   J.P. Morgan noted that Meredith's abrupt departure was at odds with the continued positive gloss that he and the other Defendants had put on Everbridge's growth potential throughout the Class Period. Moreover, by resigning as CEO, Meredith left on the table approximately 55% of the remaining unvested performance-based compensation. This performance-based compensation was tied to the Company's annual growth rate over the 12 quarters ended on September 30, 2022.  Meredith's departure raises the question of whether he left the compensation on the table because he knew that revenue was declining dramatically and could no longer be propped up with further acquisitions, thereby diminishing the value of the performance-based compensation.  JP Morgan made the cogent observation that,

"[w]hat we found is that [Meredith] is leaving a decent amount on the table with his departure.  If the decision was solely his to make, it does raise the question on whether he was lacking confidence in earning the remaining performance-based incentive."  That Meredith later took the position of CEO of privately held Boomi, an intelligent connectivity and automation company, does not lessen the saliency of that question.

**B.    The Full Truth is Fully Revealed on February 24, 2022 When Defendants Lower Revenue Guidance Even Further and Admit the Company had not Integrated its Acquisitions During Meredith's Tenure as CEO**

260.   Investors finally got answers to their questions on February 24, 2022, when the truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were fully revealed and/or fully materialized.  After the market closed on that day, Everbridge revealed the full truth to investors about its slowing organic growth and failed acquisition strategy.

261.   On February 24, 2022, the Company issued a press release which once again lowered 2022 revenue guidance, this time forecasting full year revenue growth at 15% to 17%.  The press release also contained a statement from Co-CEO Irvin, stating "[w]e are taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."

262.   On the same day, Everbridge held the February 24, 2022 Earnings Call, during which Everbridge officers further explained why these "decisive actions" were being taken, including disclosing for the first time material facts that were completely in opposition with Defendants' representations throughout the Class Period.

263.   Irvin began by saying that "beginning in December," i.e., when Meredith resigned as CEO, "our management team, together with the Board, conducted a comprehensive review of our strategy and operations."  The review, however, was apparently focused on matters that, during the Class Period, Defendants had discussed extensively with investors and analysts, independently and in answer to questions posed to them, and as to which they were already intimately familiar.  For example, the review looked at "the number of acquisitions completed in 2020 and 2021" and how those acquisitions were integrated into Everbridge.

264.   Irvin stated that this review resulted in the conclusion that "certain acquired technologies" had created a "*barrier to upsell and cross-sell from increased complexity, and incomplete integrations* and pushed out demand for travel-related solutions, as well as smaller deal size for international public warning wins that are having adverse impacts on business, our go-to-market strategy and sales organization."  He further stated that "the number of acquisitions completed in 2020 and 2021," along with their products and businesses "have created *incremental product line complexity that produce integration challenges and have complicated our go-to-market efforts*."  With incomplete integration, Irvin explained that it was "harder for . . . [Everbridge's] enterprise sales organization to execute on [its] land, adopt and expand sales strategies."

265.   Defendant Brickley expanded upon these revelations, stating that the acquisitions in 2020 and 2021 "have created complexity for the business seen in product, back office and go-to-market headwinds *that are obstacles to sales growth*. Removing these headwinds by accelerating integration work will be our focus in the first half of this year."  He further elaborated on that complexity caused by the flurry of acquisitions in 2020 and 2021, explaining that "we were well down a path of selling dozens of solutions that *were not always tightly integrated*.  We

were selling them to multiple buyers.  And as Vernon said, ***that was confusing to customers and to our sellers***."

266.   As a result, Irvin explained that the Company was taking immediate action to "paus[e] material new M&A and instead prioritiz[e] development efforts to ***focus on accelerating product integrations across our existing acquired assets***." In addition, Everbridge stated that it intends to "simplif[y] our product offerings, moving from several dozen individual product–point products to focus on 4 strategic CEM solutions."  In particular, the Company will "deemphasize certain smaller, nonstrategic products that don't fit cleanly into our CEM and public warning focus areas.  ***While these products do deliver some stand-alone revenue, they are a distraction to our primary focus and negatively impact our sellers' overall productivity***."

267.   In response to an analyst question about the integration process, Defendant Brickley explained that he and Irvin "jumped on this quickly as an opportunity . . . to drive much more sustainable and profitable growth," ostensibly admitting that the Company's previously undisclosed strategy of growth through acquisition under Defendant Meredith was unsustainable and harmful to the Company's long-term growth.

268.   On this news, Everbridge's common stock price fell an additional $15.68 per share, or approximately 34%, to close at $30.61 per share on February 25, 2022.

269.   Analysts were once again shocked by Everbridge's lower guidance, which was substantially lower than the guidance provided on December 9, 2021. On February 25, 2022, William Blair published an analyst report stating that "Everbridge provided updated full year 2022 guidance, with lower-than-expected revenue" which William Blair explained was "below the Street mean estimate of . . . 21.8% growth" and "***notably below*** the initial outlook provided in December

2021." William Blair further explained that Everbridge's "***aggressive acquisition strategy over the course of the prior two years had created complexity in the Everbridge product portfolio, which was driving significant inefficiencies in both the back-office and go-to-market organizations***" and that the "***incomplete integrations and the accumulated portfolio of somewhat disjointed point solutions that resulted from this rapid pace of M&A was creating difficulties in the company's land-and-expand motion from the perspective of both sellers and buyers***."

270.   Now, for the first time, investors fully understood that the Company's organic revenue had been declining and the only way Defendants could hide that fact and continue posting 30-35% growth year-over-year was to acquire several companies, which was unsustainable and harmful to the Company's long-term growth.  For example, on February 25, 2022, J.P. Morgan issued an analyst report stating that:

> For years the company targeted 30% organic growth plus another 5% plus growth from acquisitions. In order to hit that goal, the company had to work harder and harder at the expense of margins, and in 2021 M&A contribution made up a much bigger portion of revenue than what we traditionally saw from the company.

271.   J.P. Morgan went on to explain that Everbridge "is now looking to focus on durable recurring revenue ***rather than chasing deals that include upfront revenue recognition and acquisitions to bolster top-line growth at the expense of margins and cash flow***."

272.   Moreover, investors finally understood that Meredith's departure was connected to the growth concerns.  Barclays issued an analyst report on February 25, 2022, stating that Everbridge "guided FY22 revenues below expectations again, as we believe ***some investors were holding out hope that the CEO departure was***

*separate from growth concerns*."  These investors could no longer hold out hope—it was clear that Meredith's departure was connected to the growth concerns. Barclays explained that "[w]e are disappointed these activities around past M&A have such a significant impact on revenues ($17 mil. of headwinds in FY22), and we believe xMatters in particular could be holding growth back."

273.   On March 17, 2022, activist investor Ancora, who beneficially owned approximately 4% of the Company's outstanding common stock, issued a letter calling for the sale of Everbridge.  The Ancora letter explained that Ancora was first attracted to Everbridge because it is the market leader in CEM.  Ancora praised the Company for its early vision and strategy, stating:

> Having pioneered the market for critical communications solutions, Everbridge should be commended for its early vision in helping protect people around the world by powering mass notification for both public sector and corporate entities. Building on this leadership position, Everbridge has successfully evolved from a single-product business into a diversified and robust platform selling a portfolio of solutions to address varied needs. In this context, the Company's early strategy of consolidating adjacent technologies via tuck-in acquisitions made enormous sense. Through this approach, Everbridge established a dominant CEM offering by creating a platform that obviates the need for customers to contract with multiple point solution providers. As the markets for managing response to risks converge, we believe Everbridge is in an excellent position to continue winning market share.

274.   But Ancora went on to criticize the Company's M&A strategy under Meredith and Brickley, stating that "M&A has become undisciplined under the leadership of Chief Financial Officer Patrick Brickley, who owns responsibility for the finance department."  Ancora went on to explain that, although M&A was an early strength for the Company, it had become less focused and more expensive under Defendants' leadership.  Specifically, Ancora explained:

> Although successful M&A was an early strength of the Everbridge operating model, *we believe it has become increasingly expensive and less focused in recent years as Everbridge appears to have chased acquisition targets at increasing valuations. In 2021, the Company spent more on M&A in a 12-month period than in its entire history as a public company to date.* Furthermore, the acquisition of Anvil was a large deal that appears to us and industry experts to be curiously off-the-mark: a primarily services-based business that doesn't seem to fit with Everbridge's long-standing focus on recurring revenue software.

275.   Ancora also touched on how the Company had misled investors about its growth by failing to disclose revenue contributions from its acquisitions.  Ancora explained, "Everbridge does not disclose contributions from M&A, *seemingly obscuring that the Company has been paying higher prices to acquire growth*."

276.   With respect to the Company's failure to integrate its acquisitions, Ancora questioned why the Company had not previously realized the need to integrate its acquisitions.  Ancora stated:

> While Everbridge has invested in developing some products organically, *the vast majority of product growth over the years has come through acquisitions.* On the Company's Q4 2021 earnings call, Everbridge called out the need to focus on integrating its acquired technologies. While this initiative makes sense, *we are puzzled by why Everbridge is only now recognizing the need to integrate products after so many years, when a well-disciplined management team and Board would understand the advantages to executing on this as soon as possible*.

277.   Ancora also explained how the Company's Board of Directors enriched Brickley and Irvin at the expense of shareholders:

> According to an 8-K filed on December 9, 2021, co-CEOs Brickley and Irvin were to receive $5 million worth of restricted stock units ("RSUs") "on or about January 1, 2022." Instead, the Board seemingly withheld these share grants for another 60

days, only issuing the grants on March 2, 2022. In our conversation with co-CEO Brickley, he explained this delay was due to the Company being restricted from issuing awards during a blackout period. However, this explanation appears suspicious, considering the Board was nonetheless able to issue RSUs to newly appointed director David Henshall in a Form 4 filing dated January 11, 2022. By delaying the co-CEO grants until after the Company issued disappointing results and guidance, it appears the Board only served to further dilute shareholders by requiring more share grants at lower prices. The optics of this information asymmetry are troubling and suggest the Board has chosen to prioritize enriching company executives at the expense of shareholders.

## VII.   LOSS CAUSATION

278.   During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Everbridge common stock and operated as a fraud or deceit on Class Period purchasers of Everbridge common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

279.   Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Everbridge common stock at artificially inflated prices.   But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff and other Class members would not have purchased Everbridge stock at the artificially inflated prices at which it traded during the Class Period.

280.   The relevant truth regarding Defendants' fraud was revealed in two corrective disclosures and/or materializations of concealed risk that occurred on December 9, 2021 and February 24, 2022.   During this period, Everbridge's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Everbridge's stock price.   It was not until the final partial corrective

disclosure and/or materialization of concealed risk on February 24, 2022, that the full truth was known to the market, such that there was no longer any artificial inflation in Everbridge's stock price attributable to the fraud.

281.   The declines in Everbridge's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

282.   As a result of their purchases of Everbridge common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (i.e., damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Everbridge common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $166.36 per share on August 30, 2021.

283.   By concealing from investors, the adverse facts detailed herein, Defendants presented a misleading picture of Everbridge's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of Everbridge common stock fell significantly.   These declines removed the inflation from the price of Everbridge common stock, causing real economic loss to investors who had purchased Everbridge common stock during the Class Period.

284.   Each decline in the price of Everbridge common stock, as detailed below, was a direct and proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

285.   The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Everbridge common stock and the subsequent decline

in the value of Everbridge common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

286. The market for Everbridge common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 583,652 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Everbridge's common stock traded at artificially inflated prices.  Lead Plaintiff and other Class members purchased Everbridge common stock relying upon the integrity of the market relating to Everbridge common stock and suffered economic losses as a result thereof.

287. The declines in Everbridge's common stock price on December 10, 2021 and February 25, 2022 were a direct and foreseeable result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the market close on December 9, 2022 and February 24, 2022.  The timing and magnitude of Everbridge's stock price declines evidence the impact of Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members were caused by changed market conditions or macroeconomic, industry, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**A.    December 9, 2021 – First Partial Corrective Disclosure/Materialization of the Risk**

288. On December 9, 2021, Defendants partially revealed the true state of its business through a press release that contained two announcements.

289. First, Everbridge announced that Meredith had resigned from his position as CEO and member of the Board of Directors.  However, the Company provided no explanation for his decision.  The Company announced that it would immediately establish an Office of the CEO and begin to transition leadership to

Defendant Brickley and Vernon Irvin, Everbridge's Executive Vice President and Chief Revenue Officer, as interim Co-CEOs pending the appointment of a permanent CEO.

290.   The second shocking announcement from the press release was the fact that Everbridge reduced revenue guidance for 2022 to 20%-23% growth, well below its historic forecasts of 30% plus revenue growth.  However, the Company claimed that the two announcements were unrelated, stating that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results."

291.   As a direct and proximate result of this partial corrective disclosure, the price of Everbridge's common stock fell $52.37 per share, or more than 45.4%, to close at $63.00 per share on December 10, 2021.

292.   Analysts were shocked by Meredith's "abrupt" resignation.  *See* ¶¶ 255, *supra*.

293.   Analysts were also shocked by the lower revenue guidance for 2022. *See* ¶¶ 256, *supra*.

294.   However, the Company did not disclose the full truth regarding the Company's slowing revenue growth.  The Company's December 9, 2021 press release misled investors by claiming that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results."  This statement was false and misleading because it led investors to believe that Meredith's departure was not related to the Company's growth deceleration in 2022.  In reality, Meredith's resignation was directly related to the Company's slowing growth, as under Meredith's leadership, the Company had chased acquisitions to bolster its growth numbers but failed to integrate them, causing a drop off of sales to such an extent that it could no longer be camouflaged with the

revenues from additional acquisitions, leading to a significant growth deceleration in 2022.

295.   Indeed, analysts questioned whether Meredith's abrupt departure was related to the Company's slowing revenue growth.  *See* ¶¶ 258-59, *supra*.  For example, J.P. Morgan asked "[w]hy is the CEO really leaving" and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?"

296.   As explained in ¶ 259, *supra*, J.P. Morgan noted that, "[w]hat we found is that [Meredith] is leaving a decent amount [of performance based compensation] on the table with his departure.  If the decision was solely his to make, it does raise the question on whether he was lacking confidence in earning the remaining performance-based incentive."

**B.     February 24, 2022 – Final Corrective Disclosure/Materialization of the Risk**

297.   On February 24, 2022, Everbridge revealed the full truth to investors about its slowing organic growth and failed acquisition strategy.  On that date, the Company issued a press release which once again lowered 2022 revenue guidance, this time forecasting full year revenue growth at 15% to 17%.  The press release also contained a statement from Co-CEO Irvin, stating "[w]e are taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."

298.   On the same day, Everbridge held the February 24, 2022 Earnings Call, during which Everbridge officers further explained why these "decisive actions" were being taken, including disclosing for the first time material facts that were completely in opposition with Defendants' representations throughout the Class Period.

299.   Irvin began by saying that "beginning in December," i.e., when Meredith resigned as CEO, "our management team, together with the Board, conducted a comprehensive review of our strategy and operations."  The review, however, was apparently focused on matters that, during the Class Period, Defendants had discussed extensively with investors and analysts, independently and in answer to questions posed to them, and as to which they were already intimately familiar.  For example, the review looked at "the number of acquisitions completed in 2020 and 2021" and how those acquisitions were integrated into Everbridge.

300.   Irvin stated that this review resulted in the conclusion that "certain acquired technologies" had created a "***barrier to upsell and cross-sell from increased complexity, and incomplete integrations*** and pushed out demand for travel-related solutions, as well as smaller deal size for international public warning wins that are having adverse impacts on business, our go-to-market strategy and sales organization."  He further stated that "the number of acquisitions completed in 2020 and 2021," along with their products and businesses "have created ***incremental product line complexity that produce integration challenges and have complicated our go-to-market efforts***."  With incomplete integration, Irvin explained that it was "harder for . . . [Everbridge's] enterprise sales organization to execute on [its] land, adopt and expand sales strategies."

301.   Defendant Brickley expanded upon these revelations, stating that the acquisitions in 2020 and 2021 "have created complexity for the business seen in product, back office and go-to-market headwinds ***that are obstacles to sales growth***. Removing these headwinds by accelerating integration work will be our focus in the first half of this year."  He further elaborated on that complexity caused by the flurry of acquisitions in 2020 and 2021, explaining that "we were well down a path of selling dozens of solutions that ***were not always tightly integrated***.  We

were selling them to multiple buyers.  And as Vernon said, ***that was confusing to customers and to our sellers***."

302.   As a result, Irvin explained that the Company was taking immediate action to "paus[e] material new M&A and instead prioritiz[e] development efforts to ***focus on accelerating product integrations across our existing acquired assets***." In addition, Everbridge stated that it intends to "simplif[y] our product offerings, moving from several dozen individual product–point products to focus on 4 strategic CEM solutions.  In particular, the Company will "deemphasize certain smaller, nonstrategic products that don't fit cleanly into our CEM and public warning focus areas.  ***While these products do deliver some standalone revenue, they are a distraction to our primary focus and negatively impact our sellers' overall productivity***."

303.   In response to an analyst question about the integration process, Defendant Brickley explain that he and Irvin "jumped on this quickly as an opportunity . . . to drive much more sustainable and profitable growth," ostensibly admitting that the Company's previously undisclosed strategy of growth through acquisition under Defendant Meredith was unsustainable and harmful to the Company's long-term growth.

304.   On this news, Everbridge's common stock price fell an additional $15.68 per share, or approximately 34%, to close at $30.61 per share on February 25, 2022.

305.   Analysts were once again shocked by Everbridge's lower guidance, which was substantially lower than the guidance provided on December 9, 2021. *See* ¶ 269, *supra*.

306.   Now, for the first time, investors fully understood that the Company's organic revenue had been declining and the only way Defendants could hide that fact and continue posting 30-35% growth year-over-year was to acquire several

companies, which was unsustainable and harmful to the Company's long-term growth.  For example, on February 25, 2022, J.P. Morgan issued an analyst report stating that:

> For years the company targeted 30% organic growth plus another 5% plus growth from acquisitions. In order to hit that goal, the company had to work harder and harder at the expense of margins, and in 2021 M&A contribution made up a much bigger portion of revenue than what we traditionally saw from the company.

307.   J.P. Morgan went on to explain that Everbridge "is now looking to focus on durable recurring revenue *rather than chasing deals that include upfront revenue recognition and acquisitions to bolster top-line growth at the expense of margins and cash flow*."

308.   Moreover, investors finally understood that Meredith's departure was connected to the growth concerns.  Barclays issued an analyst report on February 25, 2022, stating that Everbridge "guided FY22 revenues below expectations again, as we believe *some investors were holding out hope that the CEO departure was separate from growth concerns*."  These investors could no longer hold out hope—it was clear that Meredith's departure was connected to the growth concerns. Barclays explained that "[w]e are disappointed these activities around past M&A have such a significant impact on revenues ($17 mil. of headwinds in FY22), and we believe xMatters in particular could be holding growth back."

309.   On March 17, 2022, activist investor Ancora, who beneficially owned approximately 4% of the Company's outstanding common stock, issued a letter calling for the sale of Everbridge.  The Ancora letter explained that Ancora was first attracted to Everbridge because it is the market leader in CEM.  Ancora praised the Company for its early vision and strategy, stating:

> Having pioneered the market for critical communications solutions, Everbridge should be commended for its early vision

in helping protect people around the world by powering mass notification for both public sector and corporate entities. Building on this leadership position, Everbridge has successfully evolved from a single-product business into a diversified and robust platform selling a portfolio of solutions to address varied needs. In this context, the Company's early strategy of consolidating adjacent technologies via tuck-in acquisitions made enormous sense. Through this approach, Everbridge established a dominant CEM offering by creating a platform that obviates the need for customers to contract with multiple point solution providers. As the markets for managing response to risks converge, we believe Everbridge is in an excellent position to continue winning market share.

310. But Ancora went on to criticize the Company's M&A strategy under Meredith, stating that "M&A has become *undisciplined* under the leadership of Chief Financial Officer Patrick Brickley, who owns responsibility for the finance department." Ancora went on to explain that, although M&A was an early strength for the Company, it had become less focused and more expensive under Defendants' leadership. Specifically, Ancora explained:

Although successful M&A was an early strength of the Everbridge operating model, *we believe it has become increasingly expensive and less focused in recent years as Everbridge appears to have chased acquisition targets at increasing valuations. In 2021, the Company spent more on M&A in a 12-month period than in its entire history as a public company to date.* Furthermore, the acquisition of Anvil was a large deal that appears to us and industry experts to be curiously off-the-mark: a primarily services-based business that doesn't seem to fit with Everbridge's long-standing focus on recurring revenue software.

311. Ancora also touched on how the Company had misled investors about its growth by failing to disclose revenue contributions from its acquisitions. Ancora

explained, "Everbridge does not disclose contributions from M&A, ***seemingly obscuring that the Company has been paying higher prices to acquire growth***."

312.   With respect to the Company's failure to integrate its acquisitions, Ancora questioned why the Company had not previously realized the need to integrate its acquisitions.  Ancora stated:

> While Everbridge has invested in developing some products organically, ***the vast majority of product growth over the years has come through acquisitions.*** On the Company's Q4 2021 earnings call, Everbridge called out the need to focus on integrating its acquired technologies. While this initiative makes sense, ***we are puzzled by why Everbridge is only now recognizing the need to integrate products after so many years, when a well-disciplined management team and Board would understand the advantages to executing on this as soon as possible***.

313.   Ancora also explained how the Company's Board of Directors enriched Brickley and Irvin at the expense of shareholders:

> According to an 8-K filed on December 9, 2021, co-CEOs Brickley and Irvin were to receive $5 million worth of restricted stock units ("RSUs") "on or about January 1, 2022." Instead, the Board seemingly withheld these share grants for another 60 days, only issuing the grants on March 2, 2022. In our conversation with co-CEO Brickley, he explained this delay was due to the Company being restricted from issuing awards during a blackout period. However, this explanation appears suspicious, considering the Board was nonetheless able to issue RSUs to newly appointed director David Henshall in a Form 4 filing dated January 11, 2022. ***By delaying the co-CEO grants until after the Company issued disappointing results and guidance, it appears the Board only served to further dilute shareholders by requiring more share grants at lower prices. The optics of this information asymmetry are troubling and suggest the Board has chosen to prioritize enriching company executives at the expense of shareholders***.

# VIII. ADDITIONAL EVIDENCE OF SCIENTER

314. Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Everbridge's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in § V, *infra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violator of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

## A. Core Operations Allegations: Everbridge's CEM Platform Was Critical to the Company's Growth Plan and Integrating the Acquired Companies was Necessary for CEM's Success

315. The Individual Defendants' knowledge of the integration problems can be inferred from the fact that the Company's CEM suite—which Defendants consistently touted as a market leader because it was the only "fully integrated" CEM—was critically important to the Company's growth strategy moving forward. *See* § IV.A, *infra*. During the Class Period, the Company claimed that its TAM was approximately $41 billion, and that CEM's TAM was approximately $25.9 billion, meaning CEM represented ***63% of the Company's potential revenue and growth***. Because the CEM suite was so important to the Company's future growth, Defendants knew or were reckless in not knowing that they did not properly integrate the Class Period acquisitions into Everbridge's CEM suite.

316. Moreover, throughout the Class Period, analysts consistently asked Defendants about the Company's acquisitions and how they affected the Company's revenue growth and CEM suite. *See, e.g.,* ¶¶ 73, 82, 94, 138, 140, 142, 145, 147, 159, 162, *supra*. This alone supports a strong inference that Defendants

1    knew, or were reckless in not knowing, about the Company's undisclosed growth-

2    through-acquisition strategy and its impact on the Company's organic revenue.

3        317.   Defendants also knew or were reckless in not knowing about the

4    xMatters integration in particular problems because xMatters was Everbridge's

5    largest acquisition ever and critical to the Company's CEM platform moving

6    forward.   The Company acquired xMatters' outstanding stock for a total

7    consideration of $242.3 million.   The previous year, 2020, the Company's total

8    revenue was only $271.1 million.  Thus, the xMatters acquisition cost the Company

9    nearly as much as the Company's entire 2020 revenue.

10       318.   The xMatters acquisition was also critical to the Company's CEM.

11   Defendants claimed that Everbridge "acquired xMatters for its service reliability

12   platforms *to enhance the Company's CEM suite of solutions* as well as market

13   penetration and customer reach."   Thus, Defendant knew or should have known

14   about the challenges the Company faced in integrating xMatters into Everbridge's

15   CEM suite.  As described above in ¶¶ 165-75, multiple former employees described

16   the integration a disaster and detailed integration problems.

17       319.   Further evidence that Defendants knew of the significant integration

18   problems is the fact that most of xMatters' salespeople left after the acquisition,

19   which caused a "dismal" third quarter from an xMatters perspective.  See ¶¶ 165-

20   75, *infra*.  Defendants knew or should have known about the "dismal" third quarter

21   2021 because they had access to the Company's Leadership Dashboard.  According

22   to CW 5, the performance of the sales staff was readily available in Salesforce

23   through the "Leadership Dashboard," which included a salesperson's name and

24   how they were performing relative to their quotas, performance that month to date,

25   and performance that year to date.  CW 5 explained that all sales staff could see the

26   performance of their peers and that Irvin and former CEO David Meredith had

27   macro or admin level access and were able to see all of the figures as well.

28

320.     Defendants themselves admitted that they closely monitored the Company's upselling and cross-selling.   For example, on January 14, 2021, Meredith and Brickley participated in the Needham Virtual Growth Conference (the "January 14, 2021 Conference").   During that conference, an analyst asked Meredith and Brickley about the average number of products customers buy from Everbridge.  Brickley responded:

> No, we've been talking a lot about it internally. And with COVID, ***we've really had an opportunity to focus on upsell with our customers because they've been using – our existing base has been using us more and more and more. They've been buying more products, more contacts, more usage.*** And so we've been learning a lot during 2020. And as we look at our penetration of the Fortune 1000, and it's only about 35%, but half of that 35% is just mass notification.
>
> I mean we think of that as a huge opportunity. And so we'll have more intentional focus on that existing base to sell more products in. It's a huge uplift per product for us. So that's going to be more and more intentional for us. ***And we'll be tracking internally, certainly, watching the products per customer go up.*** In particular, for that base. We have to – we want to grow efficiently. We can't spray and pray and try to do everything under the sun at once. But we've got these – we've got this penetration of the Fortune 1000. We think they should all be CEM customers.

321.     Similarly, on March 2, 2021, Meredith explained that "we have an internal metric around what we call growth bookings, which is basically cross sell, upsell. And we really consistently beat our internal growth target – growth bookings targets every quarter last year."

322.     Therefore, in 2021, both Meredith and Brickley monitored the Company's sales and thus knew or should have known of the dismal third quarter

1   from an xMatters perspective, which was caused by significant loss of talented
2   xMatters salespeople.

3   **B.      The Abrupt Departure of Meredith Supports Scienter**

4   323.   The timing and circumstances of the resignation of Meredith, the key
5   executive responsible for overseeing the growth through acquisition strategy and
6   the numerous acquisitions at issue in this case, is highly suspicious.  The fact that
7   this resignation is connected to the alleged corrective disclosures of the Company's
8   fraud further supports that inference.

9   324.   Specifically, on December 9, 2021, the Company announced that
10  Meredith had resigned as CEO *without any succession plan in place*, prompting
11  the Company to temporarily appoint Brickley and Irvin as Co-CEO while the
12  Company searched for a replacement CEO.  Adding to this suspicious departure is
13  the fact that Meredith left on the table approximately one-third of the restricted
14  stock units that were awarded to him that remained unvested, and approximately
15  55% of the remaining unvested performance-based compensation.  As J.P. Morgan
16  observed, "[i]f the decision was solely his to make, it does raise the question on
17  whether he was lacking confidence in earning the remaining performance-based
18  incentive."

19  325.   As discussed above, Meredith was responsible for the Company's
20  unsustainable growth through acquisition strategy.  His departure, which was
21  announced on the same day the Company reduced 2022 revenue guidance to a
22  historically low figure, was highly suspicious and adds to a strong inference of
23  scienter.

24  326.   This inference is even stronger based on the final corrective disclosure
25  on February 24, 2022, when the Company revealed that after Meredith's departure,
26  management conducted a thorough review of the Company's strategy under
27  Meredith, and concluded the numerous acquisitions created integration challenges

28

and created obstacles to the Company's sales growth.  As a result, the Company was pausing all new M&A to focus on integrating the previously acquired technologies.  At this point, it was clear that Meredith's departure was connected to the Company's growth concerns, which further adds to a strong inference of scienter.

### C.   Defendants' Statements Themselves Support Scienter

327.   As discussed above, the Individual Defendants spoke at length during the Class Period about the Company's growth strategy, claiming it was the same as before the Class Period.  The Individual Defendants also continuously touted the Company's revenue growth throughout the Class Period, claiming it was mostly organic and the result of legitimate and lawful factors such as "continued strong performance."   Defendants further spoke directly about the Class Period acquisitions, claiming almost all of them were done to "enhance the Company's CEM suite."

328.   These false and misleading statements, and others like these, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing about the Company's growth through acquisition strategy, which was a severe departure from the Company's pre-Class Period strategy, as well as the Company's slowing organic revenue growth.

329.   Ellertson was heavily involved in Everbridge's M&A strategy both before and during the Class Period.  Before the Class Period, when Ellertson was CEO, an analyst asked Ellertson about the Company's M&A strategy during the Company's Conference Presentation on February 28, 2019.  In response, Ellertson stated that that Everbridge did not "buy revenue," meaning they did not acquire companies simply for a short-term revenue boost, and explained that the Company's acquisitions were "thoughtful product decisions that [are] strategic" and meant to "create new growth drivers or sustain current drivers."

330.   During the Class period, at the Credit Suisse Technology, Media & Telecom Conference on December 4, 2019, an analyst asked Ellertson about his role as Executive Chairman.   The analyst stated, "You've moved from CEO to Chairman of the Board," and asked "[h]ow involved are you with the company now and [what is] your day-to-day role in helping support David [Meredith], Patrick [Brickley] and the team?"   In response, Ellertson explained that he was still responsible for the Company's M&A strategy, stating:

> That transition isn't always smooth in companies. We tried to make it smooth and smooth that by me staying on Board as Executive Chairman, because I have a little more experience with public companies and the nuances that are involved with operating as a public officer, and then the relationships we formed with both customers and key corporate development, M&A strategic partners is one that takes years to develop. So thought it would be valuable. And today, David is the sole operator of the business. There's only one CEO, one guy with hands on the wheel. I have a role as a Board Chairman, which is fundamentally strategic and then ensuring that the people managing the business are delivering value back to shareholders, employees and customers, *as well as my day job is M&A*. I would suggest that I'm not a good – very good manager, because *I'm still working just as hard as I was as a CEO. I'm just doing the M&A stuff, which is a global task for us*. And our model does involve around 5% M&A annually, because we don't believe we can always invent it here. And that's kept me busy, but making it clear that operating management is responsible for our good Q3 results and for the business going forward on an operational basis. There's no lack of clarity or holdover on my side.

331.   During the Class Period, Meredith unambiguously informed investors that the Company's M&A strategy had not changed since he took over as CEO in July 2019.   For example, during a Bank of America Technology Conference on June 10, 2021, Meredith responded to an analyst question about the Company's

M&A by stating that "[o]ur strategy on M&A really hasn't changed since when Jaime [Ellertson] was running the business."

332.   Defendants also unambiguously informed investors that almost all the Class Period acquisitions enhanced the Company's CEM suite.  For example, during the Company's March 23, 2020 Corporate Analyst and Investor Meeting, Meredith touted the growth of the Company's CEM platform after the Connexient and CNL Software acquisitions, stating, "we're continuing to innovate around Critical Event Management . . . [a]nd if you look at the acquisitions that we have done with Connexient, one2many and others, we now . . . truly can be that unified enterprise-wide operating system."

333.   Moreover, during the Company's November 9, 2021 earnings call, which occurred after the xMatters acquisition, Meredith told investors that "we're doing a better job of bundling together our different CEM capabilities."  The Company's public filings also widely touted the Class Period acquisitions as enhancing the CEM suite.  For example, the Company's May 8, 2020 Form 10-Q, which was signed by Meredith and Brickley, stated that the Company acquired Connexient and CNL Software to "enhance the Company's CEM Suite."  Similarly, the Company's May 10, 2021 Form 10-Q, stated that Everbridge acquired RedSky to "enhance the Company's CEM suite."

334.  Furthermore, Ellertson and Brickley touted the Class Period acquisitions for their ability to drive growth.  For example, during the Company's February 28, 2020 earnings call, Ellertson responded to an analyst question about the Company's revenue growth after the NC4 acquisition by stating that when "you adjust for that [the NC4 acquisition], you'll see that we've had strong organic growth."  Similarly, in discussing the one2many acquisition, Brickley told investors during the Company's May 5, 2020 earnings call that "we did not acquire them to

drive near-term revenue contribution, but rather for that longer-term strategic potential."

335.   In addition to concealing the Company's actual growth strategy had changed under Meredith—and that it relied on growth through acquisitions and was not focused on organic growth—throughout the Class Period, Defendants repeatedly dispelled investor concerns that the Company's growth strategy was increasingly relying on M&A.  For example, after the xMatters acquisition, several analysts asked for updates on the Company's M&A strategy since, as one analyst put it, "it seems like the appetite definitely has picked up on both a frequency and size perspective."   Meredith responded by reiterating, once again, that the Company's M&A strategy remained the same as when Ellertson was CEO—namely, that the purpose behind these acquisitions was not to "buy revenue" but instead to only engage in strategic, thoughtful acquisitions—despite the flurry of acquisitions since he took over as CEO.  *See* §IV.D, *supra*.  Meredith's denial in the face of specific questions about the Company's change in M&A strategy further supports a strong inference of scienter.

336.   Similarly, Defendants continuously dispelled investor concerns about the revenue contribution from xMatters.  For example, during the Company's May 10, 2021 earnings call, multiple analysts asked Brickly for an update on the xMatters revenue contribution numbers.  However, Brickley refused to provide an update.  *See* ¶¶ 138-41, *supra*.  Similarly, during the Company's August 9, 2021 earnings call, an analyst asked for an update on the $9-11 million in revenue that Defendants previously guided for xMatters, but Meredith refused to give an update and instead touted the integration of xMatters and the Company's strong sales.  *See* ¶¶ 142-43. *supra*.  Meredith's refusal to provide an update, despite several questions from analysts, further supports a strong inference of scienter.

337.   By repeatedly touting the Company's Class Period acquisitions for their ability to enhance the Company's CEM suite and dispelling investor concerns about the Company's organic revenue growth, Defendants either: (1) knew that the Company was using acquired revenue to hide slowing organic revenue growth, and that this strategy was unsustainable as it relied on acquiring companies without properly integrating them into Everbridge; or (2) were reckless in not knowing that this was the case.  Under either scenario, there is a strong inference that Defendants made these statements with scienter.

### D.   Meredith's Employment Agreement Further Supports Scienter

338.   The structure of Meredith's employment agreement further supports a strong inference of scienter.  As part of Meredith's employment agreement, the Company granted Meredith 100,000 performance stock units (the "PSU Grant"), with up to 62.5% of the PSU Grant becoming eligible to vest on September 30, 2021, based on the compound annual growth rate ("CAGR") achieved by the Company during the eight fiscal quarters preceding such date, and up to an additional 62.5% of the PSU Grant becoming eligible to vest on September 30, 2022, based on the CAGR achieved during the 12 fiscal quarters preceding such date.  The vesting of the PSU Grant was subject to Meredith's continued service to the Company through each applicable vesting date or event.

339.   Therefore, Meredith's employment agreement included bonuses based on the Company's growth rate, which further supports an inference that he knew the Company's growth strategy was to grow through acquisitions.

### E.   Statements by Former Everbridge Employees Corroborate that Defendants Knowingly Downplayed the Revenue Contribution from xMatters to Mask Slowing Organic Growth

340.   The CWs make clear that it was not simply a mistake, or a reasonable estimate based on available data, but that the Defendants knew that xMatters would

contribute much more than $9-11 million in revenue for the rest of 2021 and purposefully downplayed xMatters' revenue contribution to mask the Company's slowing organic growth and cover up for its overall performance.

341.   Both Meredith and Brickley were made aware of the discrepancy in xMatters' revenue contribution numbers.   Specifically, CW 1 recalled that the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021. According to CW 1, however, realistically, the forecasts were presenting figures closer to ***$20 - $25 million***.   CW 1 added that based on the actual forecasts, it was "clear" that xMatters was not necessarily going to grow, which was contrary to what was being presented to the public.   According to CW 1, she raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley.   CW 1 continued to say that she expressed concerns ***directly*** to Meredith and Brickley as well, in the form of presentations and e-mails regarding the deal.   CW 1 explained that she sent e-mails with Meredith and Brickley in the lead up to the acquisition. CW 1 added that she was not the only person to express concerns about the xMatters acquisition.   According to CW 1, the rationale Meredith provided was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue.

## IX.    CONTROL PERSON ALLEGATIONS

342.   The Individual Defendants, by virtue of their high-level and controlling positions at Everbridge, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.   As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

343.   Defendants Meredith, Brickley, and Ellertson, as senior executives and directors of Everbridge—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Everbridge's publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

344.   Defendants Meredith, Brickley, and Ellertson because of their positions of control and authority as senior executive officers and directors of Everbridge, were able to and did control the content of Everbridge's SEC filings, press releases, and other public statements issued by or on behalf of Everbridge during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

345.   The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Everbridge common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Everbridge's business, operations, and management, and the intrinsic value of Everbridge's common stock, and caused Lead Plaintiff and members of the Class to purchase Everbridge common stock at artificially inflated prices.

## X.    CLASS ACTION ALLEGATIONS

346.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Everbridge during the Class Period and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Everbridge during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Everbridge's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

347.    The members of the Class are so numerous that joinder of all members is impracticable.  According to public reports file with the SEC, during the Class Period, Everbridge had over 34 million shares of common stock and was actively trade on the NASDAQ under the ticker symbol "EVBG."  While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically.  Record owners and other members of the Class may be identified from records maintained by Everbridge and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

348.    Lead Plaintiff's claims are typical of the claims of the members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

349.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.   Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

350.   Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

> (a)   Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;
>
> (b)   Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;
>
> (c)   Whether, and to what extent, the market price of Everbridge common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;
>
> (d)   Whether Defendants acted with the requisite level of scienter;
>
> (e)   Whether the Individual Defendants were controlling persons of Everbridge; and
>
> (f)   Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

351.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.   Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

1  redress the wrongs done to them.  There will be no difficulty in the management of

2  this action as a class action.

3  **XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE:**

4         **FRAUD-ON-THE-MARKET DOCTRINE**

5         352.   To the extent that Lead Plaintiff alleges that Defendants made

6  affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance

7  established by the fraud-on-the-market doctrine in that, among other things:

8         (a)    Defendants made public misrepresentations or failed to disclose

9               material facts during the Class Period;

10        (b)    The omission and misrepresentations were material;

11        (c)    The Company's securities traded in an efficient market;

12        (d)    The misrepresentations alleged would tend to induce a

13              reasonable investor misjudge the value of the Company's

14              securities;

15        (e)    Lead Plaintiff and other members of the Class purchased

16              Everbridge's securities between the time Defendants

17              misrepresented or failed to disclose material facts and the time

18              the true facts were disclosed, without knowledge of the

19              misrepresented or omitted facts;

20        (f)    Everbridge's common stock met the requirements for listing and

21              was listed and actively traded on the NASDAQ, a highly

22              efficient and automated market;

23        (g)    As a regulated issuer, Everbridge filed periodic public reports

24              with the SEC and NASDAQ;

25        (h)    Everbridge regularly communicated with public investors via

26              established market mechanisms, including regular

27              dissemination of press releases on the national circuits of major

28

newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)   Everbridge was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, William Blair & Co., Bank of America Global Research, Wells Fargo Securities, LLC, Stephens Inc., Truist Securities, Cannaccord Genuity, and Barclays, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

353.   As a result of the foregoing, the market for Everbridge common stock promptly digested current information regarding Everbridge from publicly available sources and reflected such information in Everbridge's common stock price(s).  Under these circumstances, all purchasers of Everbridge common stock during the Class Period suffered similar injury through their purchase of Everbridge common stock at artificially inflated prices and the presumption of reliance applies.

354.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Everbridge's common stock.

355.   Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Everbridge common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

356.   To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Everbridge's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.   NO SAFE HARBOR

357.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading.   First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

358.   To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

359.   In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement."  15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).   Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

360.   Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected.   To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had

already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Everbridge's organic growth was decelerating and the only way the Company could maintain its prior revenue growth numbers was to acquire companies for their revenue, but Defendants did not properly integrate them into Everbridge, thus leading to a drop off in sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions.

361. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Everbridge who knew that the statement was false when made.

## XIII. CAUSES OF ACTION

<u>**COUNT I**</u>
**For Violations of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Promulgated Thereunder Against Everbridge and the
Individual Defendants**

362. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

363. As alleged herein, throughout the Class Period, Everbridge and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

Everbridge and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the price of Everbridge common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Everbridge common stock at artificially inflated prices.

364. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

365. As set forth above, Everbridge and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Everbridge common stock during the Class Period.

366. In ignorance of the false and misleading nature of Everbridge's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Everbridge common stock, Lead Plaintiff and other members of the Class purchased Everbridge common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Everbridge common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Everbridge common stock declined precipitously, and Lead Plaintiff and members of the Class were

damaged and harmed as a direct and proximate result of their purchases of Everbridge common stock at artificially inflated priced and the subsequent decline in the price of that security when the truth was disclosed.

367.   By virtue of the foregoing, Everbridge and the Individual Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II
### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

368.   Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

369.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

370.   The Individual Defendants had control over Everbridge and made the materially false and misleading statements and omissions on behalf of Everbridge within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive leadership positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

371.   In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

372. By virtue of such wrongful conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Lead Counsel for the Class;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees, and reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  September 16, 2022          Respectfully submitted,


**LABATON SUCHAROW LLP**

*/s/ James W. Johnson*

James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
ivasilchenko@labaton.com
nmanningham@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

Ryan A. Llorens (225196)
Danielle S. Myers (259916)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
ryanl@rgrdlaw.com
dmyers@rgrdlaw.com

*Liaison Counsel for the Class*