**LABATON SUCHAROW LLP**
James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
ivasilchenko@labaton.com
nmanningham@labaton.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*

[Additional counsel appears on signature page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLEBRA CAPITAL PARTNERS MASTER FUND LTD, SYLEBRA CAPITAL PARC MASTER FUND, AND SYLEBRA CAPITAL MENLO MASTER FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EVERBRIDGE, INC., DAVID MEREDITH, PATRICK BRICKLEY, and JAIME ELLERTSON,<br><br>Defendants. | Case No. 2:22-cv-02249-FWS-RAO<br><br><u>CLASS ACTION</u><br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**<br><br>Date:  February 9, 2023<br>Time:  10:00 a.m.<br>Courtroom: 10D<br>Judge:  Hon. Fred. W. Slaughter |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

I.     INTRODUCTION ..................................................................................... 1

II.    STATEMENT OF FACTS .......................................................................... 6

    A.   Company Background and Pre-Class Period Growth Strategy ................ 6

    B.   Defendants Mislead Investors About the Company's Growth
    Strategy ................................................................................................. 7

    C.   Defendants Purposefully Understate Revenue Contributions from
    the Acquisitions to Hide Slowing Organic Revenue Growth ................. 8

    D.   Defendants Mislead Investors About Integration Challenges ................. 9

    E.   The Truth Emerges ................................................................................ 9

III.   ARGUMENT ......................................................................................... 10

    A.   Legal Standards .................................................................................. 10

    B.   Defendants Made Materially False and Misleading Statements ............. 11

        1.   Misstatements Concerning Everbridge's Growth Strategy .......... 12

        2.   Misstatements Concerning Revenue Contributions ..................... 15

            a.   Defendants Did Not Disclose Revenue from
            Acquisitions ................................................................ 16

            b.   Defendants Statements Are Not Protected by the Safe
            Harbor ....................................................................... 17

            c.   The CW Allegations Support a Finding of Falsity ............. 19

        3.   Misstatements Concerning Integration ....................................... 20

            a.   The CW Allegations Demonstrate Falsity ........................ 21

|   |   | b. | Defendants' Post-Class Period Admissions Confirm that Everbridge Suffered Significant Integration Challenges .................................................................................23 |
|---|---|---|---|
|   |   | c. | Defendants' Misstatements Are Not Protected by the Safe Harbor ........................................................................24 |
|   |   | d. | The Integration Statements Were Material ........................25 |
|   |   | e. | Defendants' Misstatements Were Not Mere Puffery .........26 |
|   | C. | The Complaint Pleads a Strong Inference of Scienter ..........................26 |
|   |   | 1. | The CW Statements Plead a Strong Inference of Scienter ...........27 |
|   |   | a. | Basis of Knowledge............................................................27 |
|   |   | b. | Indicative of Scienter.........................................................30 |
|   |   | 2. | The Core Operations Doctrine Supports Scienter ........................32 |
|   |   | 3. | Meredith's Abrupt Departure Supports Scienter ..........................33 |
|   |   | 4. | Defendants' Statements Themselves Support Scienter ................33 |
|   | D. | The Complaint Sufficiently Alleges Loss Causation............................34 |
| IV. | The Complaint Alleges Section 20(a) Claims......................................................35 |
| V. | CONCLUSION .......................................................................................................35 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. 2014) .................................................................................27

*In re Atossa Genetics, Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .......................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................................10

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................ 13, 30

*In re BioMarin Pharm. Inc. Sec. Litig.*,
  2022 WL 164299 (N.D. Cal. 2022) ..............................................................................32

*Boston Ret. Sys. v. Uber Technologies, Inc.*,
  2020 WL 4569846 (N.D. Cal. 2020) ............................................................................17

*In re Capstone Turbine Corp. Sec. Litig.*,
  2018 WL 836274 (C.D. Cal. 2018) ..............................................................................28

*In re Cooper Sec. Litig.*,
  691 F. Supp. 2d 1105 (C.D. Cal. 2010) .......................................................................26

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .......................................................................25

*In re Daou Sys., Inc. Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) .....................................................................................35

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ....................................................................................................34

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
  2021 WL 3748325 (N.D. Cal. 2021) ............................................................................35

*Hatamian v. Adv. Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) ................................................................... 23, 32

*In re Intuitive Surgical Sec. Litig.*,
    65 F. Supp. 3d 821(N.D. Cal. 2014)......................................................................11

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ...................................................................... 10, 28

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011) ...........................................................................26

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) ...........................................................................24

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .........................................................................11

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ..............................................................31

*In re McKesson HBOC, Inc. Sec. Litig.*,
    126 F. Supp. 2d 1248 (N.D. Cal. 2000)..............................................................31

*Mild v. PPG Indus., Inc.*,
    2018 WL 6787351 (C.D. Cal. 2018) ..................................................................33

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...........................................................................35

*Mulligan v. Impax Lab, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014)..................................................................26

*Nguyen v. Radient Pharm. Corp.*,
    946 F. Supp. 2d 1025 (C.D. Cal. 2013)........................................................ 16, 26

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda Cal.*,
    730 F.3d 1111 (9th Cir. 2013) .........................................................................34

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ...........................................................................26

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) .........................................................................26

*Provenz v. Miller*,
    102 F.3d 1478 (9th Cir. 1996) .........................................................................17

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022)...................................................................18

*In re Questcor Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. 2013) ......................................................................13

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003) ..................................................................................24

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ..................................................................................32

*Roberti v. OSI Systems, Inc.*,
  2015 WL 1985562 (C.D. Cal. 2015) ......................................................................34

*Rosenbaum Cap., LLC v. McNulty*,
  549 F. Supp. 2d 1185 (N.D. Cal. 2008)..................................................................23

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ............................................................................13, 26

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ................................................................................20

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996) ..................................................................................16

*Taormina v. Annie's, Inc.*,
  2015 WL 1743585 (N.D. Cal. 2015)......................................................................26

*Tellabs, Inc. v. Makor Issues & Rights*,
  551 U.S. 308 (2007).................................................................................10, 13, 27

*Turocy v. El Pollo Loco Holdings, Inc.*,
  2017 WL 3328543 (C.D. Cal. 2017) .................................................................13, 31

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ..................................................................................33

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................10

*In re WageWorks, Inc. Sec. Litig.*,
    2020 WL 2896547 (N.D. Cal. 2020) ..........................................................33

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ......................................................................11

*Zaghian v. Farrell*,
    675 F. App'x 718 (9th Cir. 2017) ..............................................................18

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ....................................................................30

**Statutes**

15 U.S.C. § 78u–4(b)(1)(B) ............................................................................11

Exchange Act Section 10(b) ....................................................................11, 35

Exchange Act Section Rule 10b-5 ...........................................................11, 33

Exchange Act Section Rule 9(b) ..............................................................10, 28

PSLRA ...................................................................................................*passim*

Lead Plaintiff Sylebra Capital Partners Master Fund Ltd, Sylebra Capital Parc Master Fund, and Sylebra Capital Menlo Master Fund ("Lead Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss the First Amended Complaint (ECF No. 58).[1]

## I.    INTRODUCTION

Defendants face a detailed complaint, replete with particularized facts from multiple sources including 11 confidential witnesses ("CWs"). They also must contend with two separate revelations of previously undisclosed facts, each contradicting their prior public statements, and thereby causing substantial stock drops. Nevertheless, in response to these plausible and particularized allegations, Defendants act as those caught redhanded often do: they simply change the story to one that fits their own (exculpatory) explanation of events. Indeed, Defendants' Motion to Dismiss is a trove of citations to extrinsic documents, alternative explanations, and whole-cloth narratives used to create a tale in which every Defendant spoke honestly and openly, what they said was nevertheless of no importance to investors, and somehow the news that cratered the stock price was both unrelated to the fraud *and* already well-known to the market. This version of the underlying facts bears only occasional resemblance to the Complaint and must be rejected.

The case actually pled in the Complaint, however, presents a quintessential example of securities fraud. Through a deceptively simple scheme, Defendants consistently, publicly, and intentionally understated the Company's *acquired* revenue in order to falsely convince investors that Everbridge's actual *organic* revenue—i.e., revenue directly resulting from the Company's existing operations—and growth was stronger than it actually was. Defendants publicly explained that these highly-touted

---

[1] Capitalized terms herein have the same meaning as set forth in the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 53) (the "Complaint"). Citations to "¶ __" refer to paragraphs of the Complaint. References to "MTD at ___" are to the Memorandum of Law in support of Defendants' Motion to Dismiss the First Amended Complaint (ECF No. 58-1).

acquistions were strategic and engineered solely to enhance the Company's long-term revenue growth. In reality, however, Defendants used these acquired companies as little more than their own corporate ATM. But in the absense of any legitimate efforts by Defendants to integrate the acquired companies, no *organic* revenue beyond that immediate cash infusion was in the offing.

The most shocking example of Defendants' fraud came in connection with Everbridge's acquisition of xMatters. Based on their own detailed, pre-acqusition, internal projections, Defendants *knew* that all of the acquired revenue from the xMatters purchase would immediately contribute *$20-25 million* to Everbridge's own total 2021 revenue. When Defendants publicly announced the purchase to investors and analysts, however, the stated value of the xMatters acquired revenue to the Company's 2021 own revenue dropped to a relatively small *$9-11 million*.

This hidden discrepancy between the stated and actual value of the acquired revenue from the xMatters purchase misled investors and analysts into believing that an extra $9-16 million (the difference between the two figures) was Everbridge's own 2021 *organic* revenue. In reality, yet unknown to the investing public, that $9-16 million was all *acquired* revenue from xMatters. Indeed, CW 1—a former high-level employee who worked directly with Defendants Meredith and Brickley on the Company's acquisitions, including xMatters—learned directly from Meredith that the discrepancy in figures was *intended* to create a "buffer" to *masquerade the declines in Everbridge's organic revenue*.

But the story does not start with xMatters. Indeed, xMatters was not the first time Defendants used acquired revenue to mask slowing organic revenue growth. Throughout the Class Period, Defendants engaged in a flurry of acquisitions for the overwhelming purpose of boosting the Company's revenue. This strategy was a significant departure from the Company's pre-Class Period strategy, when the Company was focused on growing organically and did not "buy revenue." This strategy led to consistent year-over-year organic growth of 30%, plus an additional 3% to 7%

growth from acquisitions, for a total growth rate in the mid to high 30% range.

Once Meredith took over as CEO in July 2021, the Company changed its strategy and started to buy revenue, i.e., purchase companies to meet its revenue growth targets. However, Defendants did not disclose this strategy shift to investors. Rather, Defendants repeatedly told them that the Company's growth strategy remained the same and they were still focused on growing organically. And because Defendants did not disclose any revenue contributions for some acquisitions—and purposefully understated revenue contributions for others—investors had no idea the extent to which the acquired revenue was being used to mask the Company's slowing organic revenue.

The ostensible difference between Everbridge's organic and inorganic revenue was highly material to investors because Defendants consistently touted the Company's strong organic revenue growth. Moreover, investors and industry experts closely monitored all available indicia of the Company's organic growth, as they saw it as a significant indicator of the Company's financial success. Simply put, by manipulating the Company's organic revenue, Defendants denied the Class of the right to make an informed decision on the value of their investments in Everbridge. Indeed, because Everbridge did not publicly break out revenue on an acquisition-by-acquisition basis, the Class had no way of unconvering Defendants' fraud in the moment, believing as it did that the Company's financial growth was organic and sustainable.

Making matters worse, Defendants also misled investors about the purpose of the acquisitions. They told investors that many of the acquisitions would enhance the Company's CEM plaftorm—which Defendants touted as the future of the Company—when in reality, Defendants made *no effort* to integrate the acquired technology into the CEM platform. For other acquisitions, Defendants failed to disclose significant integration challenges that complicated the Company's product offering and caused sales to decline substantially. As a result, investors believed Everbridge had successfully integrated its acquisitions and was poised to continue its growth trajectory as it strengthen its CEM platform. This was wrong.

Nevertheless, and now that the fraud has been revealed through two corrective disclosures and Lead Plaintiff's investigation, Defendants reach back in time and try to recast the story with a parade of alternative facts, irrelevant hypothetical scenarios, and unpersuasive arguments to avoid liability. This is improper, as Defendants use extraneous documents to create an alternative version of the facts that dispute the Complaint's well-pled allegations. *See* Lead Plaintiff's Opposition to Defendants' Request for Judicial Notice ("RJN Opp."), filed concurrently herewith.

For example, Defendants now argue they are not liable for misleading investors because they disclosed **an overall percentage of revenue** that came from **all acquisitions** in the Company's 2021 Annual Report. MTD at 29-30. Even assuming, simply for the sake of argument, that such a high-level and non-granularized summary would be material to investors, Defendants conveniently fail to explain that they filed that 2021 Annual Report **after** the Class Period. Moreover, Defendants do not deny in their MTD that they misstated xMatters revenue contribution or that they manipulated the Company's organic revenue. Rather, Defendants claim that Lead Plaintiff's characterization of organic and inorganic revenue is "arbitrary and self-serving" and "overly simplistic" because it does not account for various contingencies. None of that matters. The simple fact is that industry experts and Defendants themselves discussed the Company's organic revenue and always excluded acquired revenue from the calculation of organic revenue growth (at least in the first year post-acquisition).

Defendants remaining challenges to the Complaint fail. Defendants argue that the Court should disregard the Complaint's allegations establishing falsity because they are based on unreliable testimony from CWs. This argument fails because the Complaint describes each CW with enough specificity to plausibly and reliably determine that each CW was in a position to possess the information alleged. Moreover, their detailed, first-hand allegations are highly indicative of falsity and scienter. For example, CW 1's **first-hand** interactions with Meredith and Brickley establish they intentionally misled investors about the xMatters revenue contribution to make the

Company's organic revenue look stronger than it actually was.

Defendants then argue that Lead Plaintiff "recast[s] allegations . . . about the future as real-time explanations of strategy[] in an attempt to avoid the safe-harbor provision." In other words, Defendants appear to be complaining that Lead Plaintiff carefully alleged as intentionally false and misleading only those statements that are *not* forward-looking; but nevertheless, the Court should treat them as forward-looking so Defendants can avoid liability. Similarly, contrary to Defendants' arguments, the false and misleading statements regarding integration of acquired companies also are not forward-looking (or opinions), but rather, affirmative representations about then-current state of affairs at Everbridge. Nor can Defendants credibly contend that their statements about the Company's strategy and integration efforts were immaterial puffery, as the acquisitions were supposed to enhance the Company's CEM suite, which Defendants touted as the future of the Company.

Defendants' scienter arguments are equally unpersuasive. Although Defendants attempt to attack each allegation separately, when considered holistically as the Supreme Court instructs, each allegation adds a piece to the puzzle establishing a strong inference of scienter. Among other allegations, the Complaint alleges: (i) first-hand CW allegations demonstrating Defendants intended to deceive investors; (ii) Defendants routinely discussed the Company's undisclosed growth-through-acquisition strategy at internal meetings; (iii) the Company's CEM platform was the most important segment for Everbridge's future; (iv) the lack of integration caused significant problems, including convoluted internal operating systems, that made sales difficult; (v) Everbridge lost more than half of the xMatters sales staff after the acquisition, which also harmed sales; and (vi) Defendants admitted to monitoring the Company's sales (and thus would have been aware of the sales challenges caused by the lack of integration).

Finally, the Court should reject Defendants' contention that the Complaint does not allege loss causation for the December 9, 2021 disclosure. Investors eventually

learned the truth through two partial disclosures. First, on December 9, 2021, Everbridge announced that: (1) Meredith had abruptly resigned as CEO; and (2) the Company was substantially lowering revenue guidance for 2022. Then, on February 24, 2022, Everbridge linked the two, explaining that following Meredith's departure, the Company conducted an internal investigation which found that the Company's aggressive acquisition strategy created obstacles to sales growth due, in part, to the lack of integration. Contrary to Defendants' arguments, the December 9, 2021 disclosure revealed the very facts that their misstatements concealed—that the Company's organic revenue growth was unsustainable—and thus, the Complaint adequately alleges loss causation.

## II.    STATEMENT OF FACTS

### A.    Company Background and Pre-Class Period Growth Strategy

Everbridge started in 2002 as a single product company. Its mass notification software sent messages via telephone, text, and email in the event of an emergency. ¶60-61. Everbridge has since expanded its offerings, including by building out a Critical Event Management ("CEM") platform, which is a collection of applications designed to automate and accelerate organizations' response to different "critical events" such as severe weather conditions, terrorist attacks, IT outages, and cyber-attacks. ¶¶59, 61-62. Critical to the success of the CEM platform was the fact that, according to Defendants, it was the ***only*** fully integrated CEM solution on the market (whereas other options required contracting with multiple different companies). ¶¶65, 68-69. Since before the Class Period, Defendants touted the CEM platform as the future and critical to the Company's growth. *See, e.g.*, ¶63. Therefore, the investing public understood the importance of the CEM platform to Everbridge's future and closely monitored the Company's efforts to build and grow it. ¶66.

After going public in 2016, Everbridge saw consistent revenue growth, posting year-over-year growth rates of 36%, 41%, and 37% for fiscal years 2017, 2018, and 2019, respectively. ¶70. Before the Class Period, Everbridge explained that almost all

of this growth was **organic**.[2] Then-CEO Ellertson told investors that since going public, the Company grew around 30% **organically** year-over-year, plus an additional 3-7% **inorganic** growth from acquisitions, for a total growth rate in mid to high 30% range. *Id.* Ellertson also explained that although M&A was a part of the Company's growth strategy, the Company did not "buy revenue" and any acquisition was a "strategic long term" fit designed to drive future growth. ¶73.

### B. Defendants Mislead Investors About the Company's Growth Strategy

After taking over as CEO on June 18, 2019, Meredith assured investors that the Company's M&A strategy remained the same as when Ellertson was CEO—namely that the Company remained focused on **organic growth** and did **not "buy revenue**." ¶¶79, 81. But this was false. Unbeknownst to investors, under Meredith's leadership the Company started to "buy revenue" for the primary purpose of boosting revenue. ¶85. During Quarterly Business Review meetings ("QBRs") attended by Meredith and Brickley, the target of five to six acquisitions **per year** was discussed. ¶86. This was very different than the old strategy. Prior to the Class Period, Everbridge had acquired only six companies in the **three years** since going public. ¶74.

However, Defendants never disclosed this new strategy. Instead, they misled investors by telling them that the strategy was the same and downplaying any concerns about a change. ¶¶228-29. Defendants also misled investors about the purpose of the acquisitions, claiming they were "to enhance the Company's CEM suite of solutions." *See* ¶¶102, 106, 114, 116, and 120. Those statements were false and misleading because the acquisitions were **not** to enhance Everbridge's CEM platform, but rather, boost short-term revenue. According to several former employees, Everbridge made **no**

---

[2] Organic growth is growth related to a company's own operations, which is different than inorganic growth, which is growth from M&A. ¶71. Organic growth is generally seen as superior to inorganic growth because while inorganic growth can provide a short-term boost to revenue, integration of new technology and employees can be costly, time consuming, and lead to unforeseen issues. *Id.* Thus, organic growth is seen as a better indicator of a company's actual performance. *Id.*

*effort* to integrate the acquired companies into the CEM platform. ¶¶ 104, 108, 121.

### C. Defendants Purposefully Understate Revenue Contributions from the Acquisitions to Hide Slowing Organic Revenue Growth

Making matters worse, Defendants also hid from investors the extent to which the acquired revenue was being used to artificially prop up the Company's organic revenue growth. The starkest example of this came from the xMatters acquisition. CW 1—a high-level employee who worked with Meredith and Brickley on the xMatters acquisition—explained that internal forecasts showed that xMatters would contribute between *$20-25 million* in revenue for the rest of 2021. ¶131. However, Defendants told investors xMatters would contribute *only $9-11 million* to the Company's overall revenue. ¶¶217, 226. When CW 1 expressed concerns *directly* to Meredith and Brickley (in the form of emails and presentations), Meredith told CW 1 the discrepancy in figures was to "buffer" declines in organic revenue, i.e., make it appear as if the Company's revenue was growing organically more than it was. ¶¶133, 220-21.

Defendants' false and misleading statements were material to investors because they deceived investors about the Company's organic revenue growth. By claiming xMatters would contribute $9-11 million—when Defendants knew it would contribute $20-25 million—Defendants had an extra $9-16 million in "hidden" revenue from xMatters to add to the Company's overall revenue in 2021 as *organic* revenue. ¶¶130, 218. Defendants then raised revenue guidance for 2021 by approximately $15 million. ¶152. Because Defendants claimed only $9-11 million of the $15 million was from xMatters, Defendants projected an additional $4-6 million in *organic* revenue after the acquisition (when that $4-6 million would actually come from xMatters). ¶152.

Investors were clearly deceived by this fraud. For example, William Blair issued an analyst report stating, "[e]xlcuding xMatters, the updated guidance implies roughly *29% organic growth* . . . compared to . . . the company's *prior outlook at 26.6% growth*." ¶154. In other words, after the xMatters acquisition, investors believed that Everbridge's *organic* growth was 2.7% higher than previous projections. However,

had investors known the truth, they would have understood that the Company's organic revenue growth was decreasing, not increasing. ¶153. Unfortunately, this fraud was not revealed until later, when Defendants could no longer conceal the Company's slowing organic revenue with acquired revenue.

### D.    Defendants Mislead Investors About Integration Challenges

In addition to misleading investors about the Company's organic revenue growth and the purpose behind many of the acquisitions, Defendants failed to disclose significant challenges they faced integrating NC4 and xMatters. ¶¶191, 196, 232-33, 239, 242-44, 246, 248. For example, Defendants told investors that the xMatters team had already been integrated. *See* ¶239, 244, 246. However, these statements were false and misleading because by that point *most* of the xMatters sales staff had left Everbridge, including high level employees like the global sales leader. ¶¶172-74. Similarly, although Defendants portrayed the xMatters integration as "seamless," ¶248, statements from several former employees establish that the integration was a disaster. ¶¶164-74. Moreover, the integration issues cause sales to suffer. *Id.* The rapid pace of acquisitions and lack of integration created a disjointed CEM platform that was not the unified platform Defendants claimed it was, which made it difficult to sell to prospective customers and led to a poor third quarter in 2021. ¶170,173.

### E.    The Truth Emerges

The truth was revealed through two corrective disclosures. First, on December 9, 2021, Everbridge stunned investors when they announced: (1) Meredith had abruptly resigned as CEO without any succession plan in place; and (2) the Company lowered 2022 revenue guidance to 20-23% growth, well below historical forecasts of 30% plus revenue growth. ¶¶176, 251-53. However, Defendants continued misleading investors by stating that Meredith's departure was not related to the Company's financial condition or performance, leaving some investors to "hold[] out hope that [Meredith's] departure was separate from growth concerns." ¶¶257, 272, 287, 308.

However, that hope was lost on February 24, 2022, when investors learned the

full truth. On that date, Defendants lowered revenue guidance again—this time to 15-17% revenue growth (nearly half the number Defendants repeatedly touted during the Class Period)—and finally admitted that the Company's strategy under Meredith's leadership was unsustainable and harmful to long-term growth. ¶¶180-84, 261-65. Defendants also admitted for the first time that the Company experienced several integration challenges during the Class Period. *Id.*

Investors finally understood the falsity of Defendants' Class Period statements. For example, J.P. Morgan issued an analyst report expressing disappointment that "these activities around past M&A have such a significant impact on revenues." ¶¶270-72. Similarly, one of the Company's larger investors, Ancora Holdings Group ("Ancora"), explained they were "puzzled by why Everbridge is only now recognizing the need to integrate products after so many years." ¶276. Ancora also explained that Everbridge was able to "obscure[e] that [it] has been paying higher prices to acquire growth" because "Everbridge does not disclose contributions from M&A." ¶275.

## III. ARGUMENT

### A. Legal Standards

In assessing a motion to dismiss, courts must consider the complaint in its entirety, "accept all factual allegations . . . as true[,]" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights*, 551 U.S. 308, 322 (2007). To withstand a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Securities fraud class actions are subject to the pleading standards of Rule 9(b) and the PSLRA, which require "that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The allegations of fraud must state "the who, what, when, where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, the plaintiff must allege: "(1) a material misrepresentation or omission [i.e., falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Atossa Genetics, Inc. Sec. Litig.*, 868 F.3d 784, 793 (9th Cir. 2017).[3] The Complaint meets these requirements.

### B.    Defendants Made Materially False and Misleading Statements

A complaint pleads falsity when it "specif[ies] each statement alleged to have been false and misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B).[4] A statement is false and misleading if it gives investors the "impression of a state of affairs that differs in a material way from the one that actually exists." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016). A court should dismiss a complaint "only if reasonable minds could not disagree that the challenged statements were not misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

Here, the Complaint's specific allegations plausibly establish that Defendants made intentionally material misstatements and omissions regarding: (i) the Company's growth strategy, including the failure to disclose the Company's growth-through-acquisition strategy, which was unsustainable and harmful to long-term growth (¶¶196,

[3] Defendants challenge only falsity, scienter, and loss causation and, thus, concede the remaining elements.

[4] As an initial matter, Defendants are wrong that the Complaint is a "puzzle pleading." MTD at 8. The Complaint is carefully organized, including a designated section entitled "Defendants' False and Misleading Statements." *See* Complaint at 62. Within that section, the Complaint alleges each specific misstatement and omission (including the associated date, circumstances, and speaker or signatory) that form the basis of Plaintiff's securities fraud claim and, directly after each statement, explains why the statement was materially false or misleading when made. *See* ¶¶188-249. Courts have repeatedly found this style of pleading permissible. *See,e.g., In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831(N.D. Cal. 2014) (holding that the complaint satisfied pleading requirements "by putting defendants on notice of the true substance of the claims against them" when the complaint "detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading").

199, 203, 205, 208, 210, 215, 222, 229, 233, 236); (ii) the extent to which Defendants used revenues from acquired companies to hide slowing organic revenue growth (¶¶217 and 226); and (iii) integration challenges Everbridge faced (¶¶191, 196, 232-33, 239, 242-44, 246, 248).

**1.      Misstatements Concerning Everbridge's Growth Strategy**

Before the Class Period, investors understood that the Company was growing organically—around 30% year-over-year, with around 3% to 7% of **additional** growth from acquisitions, i.e., inorganic growth, for a total growth rate in the mid to high 30% range. ¶¶70-73. Indeed, then-CEO Ellertson told investors that Everbridge did not "buy revenue," i.e., purchase companies to boost revenue, but rather, any acquisition was strategic and designed to drive long-term growth. *Id.* However, once Meredith took over as CEO, the Company's growth strategy changed—without any commensurate public announcement of such a change. Indeed, Everbridge started chasing acquisitions to bolster growth, *i.e.*, "buy revenue," and it was this acquired revenue, as opposed to any kind of organic revenue, that enabled the Company to beat its revenue guidance. ¶¶85-91. Notwithstanding, throughout the Class Period, Defendants repeatedly assured investors that the Company's growth strategy remained the same as before the Class Period—namely that the Company was focused on **organic growth** and would acquire companies only if it was a strategic fit that drove long-term growth (i.e., they did not "buy revenue").

For example, after five acquisitions in 2020, Meredith responded to an analyst's question about the Company's strategy by reassuring investors that "we're . . . **primarily focused on organic [growth]**." ¶210. Similarly, after the xMatters acquisition, an analyst expressed their opinion that "it seems like the appetite [for acquisitions] has picked up on both a frequency and size perspective" and asked Meredith to explain what was "driving this adjustment strategy." ¶228. However, Meredith shut down any hint of a change in strategy, stating that the M&A strategy "has [not] really changed from what [Ellertson] was doing for years . . . [s]o **we don't**

*really see it as a strategy shift*." ¶229; *see also* ¶233 (Meredith repeated that the Company's "***strategy on M&A really hasn't changed since when [Ellertson] was running the business***").

Such statements were false and misleading because they gave an "impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008); *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *9 (C.D. Cal. 2017) (statements were misleading where, like here, the true facts "were being explained away or minimized"). Moreover, Defendants had a duty to disclose the growth-through-acquisition strategy "in order to make the [other] statements made . . . not misleading." *Tellabs*, 551 U.S. at 318. Under Ninth Circuit law, even absent a duty to speak, "once defendants choose to tout positive information," such as ostensibly strong revenue growth, they must "do so in a manner that wouldn't mislead investors." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).; *see also In re Questcor Sec. Litig.*, 2013 WL 5486762, at *14 (C.D. Cal. 2013) (once the cause of financial success is at issue, defendants must "disclose information concerning the source of its success").

Throughout the Class Period, however, Defendants touted the Company's financial success without ever mentioning the Company's new growth-through-acquisition strategy. ¶¶196, 215. For example, on February 18, 2021 (after the seventh Class Period acquisition), an analyst questioned "what drove the large revenue beat in the quarter," and Brickley attributed the Company's financial success to "***just strong performance in the quarter***." ¶¶214-215. This and similar statements were misleading because they led investors to believe the Company's strong revenue numbers were the result of strong performance ***only***, when in reality, the Company's financial success was due in large part to the undisclosed growth-through-acquisition strategy.

Defendants' attempts to avoid liability for these statements fail. MTD at 25-28. First, Defendants claim that the "strategy-related allegations" rely on an "overly simplistic" and "unsupported" characterization of organic and inorganic revenue. MTD

at 25, n.16. Tellingly, Defendants do not argue that Lead Plaintiff's characterization is wrong (because they cannot). Rather, they offer hypothetical scenarios about the uncertainties in how Everbridge categorized revenue. This argument is a red herring. The simple fact is that industry analysts and Defendants themselves routinely discussed the Company's organic revenue growth and clearly excluded acquisitions from their calculation of it. *See, e.g.,* ¶¶72, 154. In any event, the Court should reject Defendants' premature attempt to resolve factual disputes.

Similarly, Defendants improperly cite to several extraneous documents (Exs. 5, 11, 12) to resolve factual disputes in their favor. *See* RJN Opp. at 4-5. Defendants argue that their statements about the Company's growth strategy were not false or misleading because the Company's "stated M&A goals" aligned with the acquisitions. MTD at 26-27. This argument is illogical. For example, Defendants argue that because the Company stated in ***February 2019*** that it saw IoT "as a nice expansion" area, therefore, statements about the CNL Software and Connexient acquisitions—***over a year later***—were neither false nor misleading. MTD at 27. This argument completely distorts the reason why the statements in ¶205 and 208 were false and misleading. The Complaint alleges those statements were false and misleading because Defendants misled investors about the purpose of those acquisitions.[5] ¶¶201, 205, 222, 236. For example, although Defendants told investors that Connexient, CNL Software, and RedSky were acquired to "enhance the Company's CEM suite," in reality, Defendants acquired these companies for their revenue only. These allegations are supported by numerous CW allegations demonstrating that despite public statements to the contrary, Defendants made no effort to integrate these acquisitions into the CEM platform. *See, e.g.,* ¶¶206, 223-24.[6] Thus, Defendants' earlier statement about IoT being a nice expansion area has

---

[5] Contrary to Defendants' argument, the "subjective intent" behind the acquisitions ***was*** material to investors because investors were focused on how the Company would grow its CEM platform, and Defendants told them the acquisitions would enhance it.

[6] Defendants admit that the CW allegations weigh upon Defendants' strategy or intent, but argue that the Court should nonetheless disregard them because they are not

Footnote continued on next page

no bearing on Defendants' later statement about the purpose of the acquisitions. At best, this argument presents an issue of fact better served at summary judgment.

Moving along, in perhaps their most strained assertion, Defendants actually complain that Lead Plaintiff "attempt[s] to recast allegations . . . about the future as real-time explanations of strategy, in an attempt to avoid the safe-harbor provision." MTD at 27, n.23. This is nonsensical. Defendants are essentially complaining that Lead Plaintiff carefully chose statements that were ***not*** forward-looking, but the Court should nonetheless consider them forward-looking so Defendants can avoid liability. The Court should reject this petulant argument.

### 2.    Misstatements Concerning Revenue Contributions

Defendants also misled investors about the extent to which Everbridge used and allocated the revenue obtained from those acquired companies to disguise stagnating organic revenue. In the most shocking example, Defendants misled investors about how much revenue Everbridge acquired from xMatters. When Everbridge announced the xMatters acquisition, Defendants said that it would contribute $9-11 million to Everbridge's total revenue in 2021. ¶217. Similarly, a month later, Defendant Brickley, the Company's Chief Financial Officer, reiterated the $9-11 million number, stating "[o]ur expectations for the financial contribution from xMatters for the remainder of the year have not changed from the view we provided about a month ago." ¶226. These statements were false and misleading because Defendants knew xMatters would actually contribute ***$20-25 million*** to Everbridge's 2021 revenue, more than double the figure presented to investors. ¶¶218-21. According to CW 1, who on the xMatters acquisition, ***Meredith told her directly that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue***. ¶221.

---

sufficiently reliable.  MTD at 28.  In other words, Defendants concede liability for these statements if the Court finds that the CW statements are sufficiently reliable, which the Court should for the reasons discussed Section III(C)(1).

### a.   Defendants Did Not Disclose Revenue from Acquisitions

Defendants were able to mislead investors about the xMatters revenue contribution for two reasons. First, Everbridge did not break out revenue from each acquired company, meaning it was impossible for investors to determine how much revenue came from xMatters in the Company's annual or quarterly reports. ¶136. Second, Everbridge did not disclose xMatters' historical financial information, meaning it was impossible for investors to project xMatters' revenue on their own. ¶137. In other words, investors had to trust that Defendants were telling the truth. Unfortunately, they were not.

Defendants do not dispute that Everbridge did not break out revenue by each acquired company or provide financial statements for xMatters (because they cannot). Instead, Defendants attempt to avoid liability for misleading investors because one line in their annual reports—buried deep in a section about the Company's internal controls assessment—disclosed a percentage of revenue from all acquisitions in a given year. MTD at 29-30. As an initial matter, this argument is improper because it requires using outside evidence to rebut the Complaint's allegations of falsity. RJN Opp. at 4-5.

Moreover, although this argument is framed in terms of falsity, it is no more than a standard truth-on-the-market defense challenging materiality. *Nguyen v. Radient Pharm. Corp.*, 946 F. Supp. 2d 1025, 1035 (C.D. Cal. 2013) (arguing statements "were not misleading in light of other statements Defendants made is an attempt to argue the affirmative defense of truth-on-the-market"). In asserting a truth-on-the-market defense, a defendant claims that even if a particular statement would have been misleading on its own (here, the revenue contribution statements in ¶¶217 and 226), other information credibly entered the market to counteract any misleading effect and, as such, the market is not misled. *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1409 (9th Cir. 1996). Defendants have a "heavy burden" of proving a truth-on-the-market

defense, particularly on a motion to dismiss.[7] *Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996). Before the defense can be applied, "the defendants must prove that the information that was withheld or misrepresented was transmitted to the public ***with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression*** created by . . . [the] representations." *Id.*

Defendants have not come close to meeting their "heavy burden" here. First and foremost, their argument completely crumbles upon a closer look. Defendants attach Exhibit 10, the Company's 2021 Form 10-K, to argue that they disclosed revenue contributions in 2021, including xMatters. MTD at 29-30. But what Defendants (not so) conveniently fail to mention is that the 2021 Form 10-K was filed on February 25, 2021, i.e., ***after the Class Period***. Thus, there is no way this post-Class Period disclosure could have corrected the statements made ***during*** the Class Period.

Even setting aside this glaring shortcoming, Defendants' exhibits add nothing to the Court's analysis of falsity. The purported disclosures merely disclosed a percentage of revenue excluded from the Company's assessment of its internal controls over financial reporting. This said nothing about the true revenue contribution from xMatters or how it affected the Company's organic revenue growth. Indeed, one of Everbridge's large shareholders, Ancora, publicly stated that "Everbridge does not disclose contributions from M&A." ¶¶36, 275, 311. This case is ultimately about ***misleading investors***, and one of Everbridge's largest shareholders clearly did not think Everbridge disclosed revenue contributions from acquisitions. Therefore, Defendants' truth-on-the-market argument fails, as the purported disclosures did not inform the market "with a degree of intensity and credibility." *Provenz*, 102 F.3d at 1492-93.

### b. Defendants Statements Are Not Protected by the Safe Harbor

Defendants argue that their statements misleading investors about the xMatters

---

[7] Indeed, some courts have found that this this defense "is not available at the motion to dismiss stage" as "materiality is a mixed question of law and fact." *Boston Ret. Sys. v. Uber Technologies, Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. 2020).

revenue contribution are nonetheless inactionable because they are protected by the PSLRA's safe harbor for forward-looking statements. MTD at 30-31. Not so. Under the safe harbor, "a defendant will not be liable for a false or misleading statement" only "if it is forward-looking and *either* is accompanied by cautionary language or is made without actual knowledge that it is false or misleading." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017).

Here, Defendants' statements were not forward-looking, but instead statements of historical/current fact. Indeed, representations about "current or past facts," or at the least, "mixed" statements that include such embedded representations, are "not protected" by the safe harbor. *Id.* at 1142. Defendants' statements that xMatters would contribute $9-11 million was a representation about Defendants' then-current view, and therefore not protected. *In re QuantumScape Sec. Class Action Litig.,* 580 F. Supp. 3d 714, 736–37 (N.D. Cal. 2022) (statement that "may seem to be forward-looking because it responds to a question about [] future sustainability advantage . . . in reality, [] contains an express or implied concrete assertion concerning a specific current or past fact").

Moreover, even assuming Defendants' statements were forward-looking—and they are not—they are not protected because they were made with actual knowledge of information establishing falsity. When Defendants told investors that xMatters would contribute $9-11 million, they ***knew*** it would actually contribute between $20 million and $25 million. ¶¶129-34. Thus, their statements find no protection in the PSLRA safe harbor provision. *See Quality Sys.*, 865 F.3d at 1142 ("the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts").[8]

---

[8] Moreover, the safe harbor does not shield Defendants from liability because their supposed "cautionary statements" were boilerplate and not meaningful. *Zaghian v. Farrell*, 675 F. App'x 718, 719-20 (9th Cir. 2017) ("cautionary language also must have consisted of non-boilerplate warnings that were tailored to the forward-looking statements").

### c.   The CW Allegations Support a Finding of Falsity

The Complaint contains several detailed allegations from CW 1 establishing the falsity of the statements regarding xMatters' revenue contribution. ¶¶130-35, 218-21. Defendants admit that these allegations "suggest [the] inaccuracy in the $9-11 million projection." MTD at 31. However, they argue that the Court should still not consider them because the Complaint does not describe CW 1 with enough detail to establish her reliability. This is wrong. *See* Section III(C)(1), *infra*.

The Complaint's allegations about CW 1's interactions with Meredith and Brickley are sufficiently detailed and reliable because they are ***first-hand accounts*** of CW 1's ***direct*** interactions with Meredith and Brickley. In her day-to-day role, CW 1 regularly communicated with Meredith and Brickley. ¶48. For the xMatters acquisition in particular, CW 1 ***communicated directly*** with Meredith and Brickley expressing concern about the discrepancy between the revenue projection and Defendants' public statements. *Id.* During one of these direct communications, Meredith told CW 1 ***directly*** that the discrepancy was to "buffer" the declines in Everbridge's organic revenue. ¶¶133, 221, 341.

Moreover, CW 1 was a high-level employee "two levels removed from the CEO, Meredith" and worked on the xMatters acquisition. ¶48. Thus, she was in a position to possess the information alleged. *See* Section III(C)(1). Defendants respond to these allegations (perhaps facetiously) by asserting that someone two levels removed from the CEO could be a security guard. MTD at 32. Ignoring Defendants' apparent suggestion that security guards are inherently incapable of establishing the falsity of a public statement, it is nevertheless ridiculous to suggest that Meredith emailed one of Everbridge's security guards about revenue projections for xMatters or discrepancies intended to buffer organic revenue declines. The far more plausible inference—and the one with the advantage of being an actual allegation in the Complaint—is that CW 1 had the authority, both because of her seniority and job responsibilities, to communicate with Meredith and Brickley about the revenue projections.

Defendants also argue that Meredith could have meant anything by his supposed "buffer" statement and "the more compelling inference is that Meredith was referring instead to other uncertainties present at that stage of the transaction." MTD at 15, n.9, and 32. This is absurd. Yet again, Defendants are creating their own alternative version of the facts to avoid liability. As alleged in the Complaint, Meredith unequivocally told CW 1 that the purpose of the revenue discrepancy was buffering Everbridge's declining organic revenue. ¶¶133, 221, 341. Not to account for regulatory hurdles. Not to account for "other pre-closing variabilities." Meredith directly stated that Defendants were buffering the declines in Everbridge's organic revenue. In other words, Meredith *intended* to deceive investors about the Company's organic revenue.[9]

### 3.      Misstatements Concerning Integration

Defendants misled investors about significant problems Everbridge experienced as a result of Defendants' failure to properly integrate the Class Period acquisitions.[10]

The integration issues started with NC4, which was acquired shortly before the start of the Class Period. ¶92. Defendants' statements about integrating NC4 were false and misleading because they led investors to believe that the Company was integrating

---

[9] Defendants argue without support that their misstatements are inactionable because they were not material to investors. This is a highly-fact specific question that is improper at the motion to dismiss stage. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009) (materiality is a "fact-specific inquiry" that "should ordinarily be left to the trier of fact"). In any event, Defendants' misrepresentations about xMatters revenue contribution were material to investors given the size and importance of the deal and because it misled investors about the Company's organic revenue growth, which was important to investors. Defendants also claim Lead Plaintiff's allegations are inconsistent, but this misconstrues the allegations. Lead Plaintiff does not allege that xMatters contributed more than anticipated. Rather, Lead Plaintiff alleges Defendants knew xMatters would contributed more than what they told investors. Moreover, the xMatters integration challenges were separate from its revenue projection and thus there is no inconsistency in Lead Plaintiff's theory.

[10] Contrary to Defendants' argument, the Complaint's allegations are not inconsistent. MTD at 16-17. Rather, certain statements were false and misleading because Defendants made no effort to integrate, and others were false and misleading for failing to disclose significant integration challenges (even though some integration efforts were underway). These statements were carefully chosen based on Lead Plaintiff's investigation, which included interviews of former employees with knowledge of the integration process. Defendants appear to take issue with the fact that Lead Plaintiff's investigation and complaint drafting were nuanced and deliberate.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT
CASE NO. 2:22-CV-02249-FWS-RAO

20

NC4 when it was not. ¶¶191 ("well down the path of . . . integrating [NC4]"), 196 (Everbridge had already "integrated NC4 . . . into our product offering"). According to former employees, the integration issues with NC4 were so significant that Everbridge discontinued their own product and migrated everything to NC4, meaning Everbridge had not integrated NC4 into their product offering. ¶¶192-94.

The integration challenges intensified with each additional acquisition. ¶¶99-100. The rapid pace of acquisitions and lack of integration caused a disjointed CEM platform that required multiple different systems. ¶¶108, 187. Despite this, Defendants continued touting the Company's efforts to integrate the acquired companies into the CEM platform. For example, on March 23, 2020, Meredith said "if you look at the acquisitions that we have done . . . *we now have over 225 out-of-the-box-integrations*" and "[s]o *we now truly can be that unified enterprise-wide operating system*." ¶199. This statement was false and misleading because it created an impression that the Company had integrated the acquired companies, including Connexient and CNL Software, into the Company's CEM platform when they had not. ¶¶103-05, 107-08, 200. It was also false and misleading because it created an impression that the CEM platform was a "unified" system, consisting of hundreds of integrations, when in reality such a complete integration had never occurred. ¶202.

The integration issues came to a boiling point after the xMatters acquisition. Defendants described the xMatters acquisition as "seamless," and told investors that they had already integrated xMatters and its people (including the sales team). ¶¶232-33, 239, 242-44, 246, 248. But this was false. In reality, Everbridge had not already integrated the people. In fact, by that point, most of the xMatters sales staff had already left the Company. ¶¶173, 240. Moreover, the integration was a disaster—not "seamless" as Defendants claimed—because significant integration issues caused sales to decline substantially by the midway point of 2021. ¶¶164-75.

### a.    The CW Allegations Demonstrate Falsity

Defendants argue that Lead Plaintiff relies on generalities attributed to former

employees to establish falsity. MTD at 19 n.12. Not so. Defendants cherry-pick allegations that were included either to add context or relate to the Complaint's other theories of fraud. For example, CW 1's statement that Everbridge suffered integration problems throughout the Class Period because of the rapid pace of acquisitions provides context for the other allegations detailing specific integration challenges. So too does CW 7's allegation that the integration of SnapComms went slower than CW 7 liked.[11] These and similar allegations show a pattern of poor integration throughout the Class Period. Moreover, other allegations, such as CW 3's allegations about Defendants' failure to integrate RedSky, relate to the theory that Everbridge misled investors about the purpose of certain acquisitions. *See* Section III(B)(1).

Similarly, Defendants argue that CW 2's description of the xMatters integration as a "[expletive] show" and CW 4's description calling it "sloppy . . . and a disaster" are not specific enough to demonstrate falsity. MTD at 19. This, too, is a red herring. If these were the Complaint's only allegations to establish falsity, Lead Plaintiff might agree with Defendants (and perhaps would not have alleged this theory). But despite Defendants' spin, that is not the case.

Indeed, these allegations provide color and context to the Complaint's parade of particularized allegations explaining *why* the xMatters integration was a disaster, which Defendants ignore. For example, CW 2 explained that after the xMatters acquisition, Everbridge operated at least six different CRM systems, which made visibility into sales a "huge challenge" and "really slowed down sales." ¶¶166-67. Moreover, both CW 2 and CW 4 stated that a majority of xMatters sales staff left by September 30, 2021 at the latest. ¶¶173, 240. These highly corroborative accounts establish the falsity of statements such as "we've integrated the people . . . [and] the sales" and "[w]e've

---

[11] Defendants' argument that CW 7's allegation adds nothing to falsity is a smokescreen. Lead Plaintiff did not allege a single false and misleading statement relating to the Company's efforts (or lack thereof) to integrate SnapComms. *See* ¶¶188-249. It may be that Defendants experienced significant problems integrating SnapComms, but Lead Plaintiff did not believe CW 7's statement on its own was enough to establish the falsity of statements about integrating SnapComms.

locked up the key hires, and we're retaining them," which were made in November 2021, well after Everbridge lost most of the xMatters salespeople. ¶¶244, 246.

Similarly, the Complaint explains how the xMatters integration issues caused a significant decline in sales halfway through 2021. ¶¶170-73. Despite this steep drop off in sales (caused in part by the loss of at least half the xMatters sales staff), Defendants did not disclose *any* negative information about the xMatters integration. In fact, they did the opposite—saying it was "going great," (¶232); "we've been really good about getting the capabilities integrated," (¶233); and describing it as a "seamless integration" (¶248). Defendants' positive statements were "inconsistent" with the significant integration challenges. *Quality Sys.*, 865 F.3d at 1144; *see also Rosenbaum Cap., LLC v. McNulty*, 549 F. Supp. 2d 1185, 1187, 1193 (N.D. Cal. 2008) (statements that "all phases of the integration process are either *on target or ahead of plan*" were false where "Defendants knew of the problems with the integration").[12]

b.    **Defendants' Post-Class Period Admissions Confirm that Everbridge Suffered Significant Integration Challenges**

Contrary to Defendants' argument, MTD at 18-19, Defendants' post-Class Period admissions support the falsity of Class Period statements. *See Hatamian v. Adv. Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1160 (N.D. Cal. 2015) ("later admissions" supported falsity of statements that "issues were *not 'behind' the Company*" when made). During the earnings call on February 24, 2022, the final corrective disclosure, Co-CEO Irvin admitted that the Class Period acquisitions had created a "barrier to upsell and cross-sell from . . . *incomplete integrations*." ¶264. Similarly, Brickley admitted that the acquisitions created "*obstacles to sales growth*" because they "*were not always tightly integrated*." ¶265. Such "later statement[s]" support falsity and scienter as they "directly contradict[] or [are] inconsistent with" Defendants' earlier positive statements implying that the integrations were seamless, without any issues,

---

[12] Defendants challenge the reliability of the CWs. MTD at 20-22. The Court should reject this argument for the reasons discussed in Section III(C)(1).

and complete. *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003).[13]

### c.    Defendants' Misstatements Are Not Protected by the Safe Harbor

Defendants argue that misstatements in ¶¶191 and 205[14] are shielded from liability by the PSLRA Safe Harbor.[15] MTD at 22-23. This is wrong. The statement in ¶205 was not forward looking because it stated that Everbridge "***acquired*** Connexient to . . . enhance the Company's CEM suite." It's hard to imagine how a ***past-tense*** statement about why Defendants acquired Connexient ***months earlier*** could be considered forward-looking. The other challenged statement, ¶191, is also not forward-looking because it contained representations about then-present state of affairs. *See* ¶191 (Company was ***already*** "well down the path of . . . integrating [NC4]"). This led investors to believe that the Company had a plan for integrating NC4 and was "well down the path" of executing on that plan. But in reality, the Company had no plan. For example, CW 5 explained that instead of integrating NC4 into Everbridge, Defendants discontinued their legacy platform and migrated everything to NC4's platform. ¶193. These problems were "inconsistent" with the Defendants' public statements of a successful integration. *Quality Sys.*, 865 F.3d at 1144.

Similarly, Defendants' argument that Everbridge's "risk" disclosures cautioned investors about integration challenges is wrong. MTD at 22, n.14. These risk disclosures do not shield Defendants from liability under the safe harbor or bespeaks caution doctrine because the integration statements were not forward-looking. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir.

---

[13] Defendants' authorities, *see* MTD at 18-19, are distinguishable because here, the Complaint alleges facts demonstrating the statements were false when made. Thus, the later admissions add another piece to the inference that Defendants made the integration misstatements with knowledge of their falsity (or at least were reckless).

[14] Defendants also claim that ¶223 was forward-looking, but that paragraph does not contain a misstatement. To the extent Defendants meant to challenge the misstatement in ¶222, their argument fails for the same reason as ¶205, as both ¶205 and ¶222 discussed the Company's rationale for acquiring the acquisitions.

[15] Defendants thereby concede that the remaining integration related statements—¶¶196, 199, 232, 239, 242-44, 246, 248—are not forward looking.

2005) (bespeaks caution defense applies only to forward-looking statements). Moreover, these disclosures were not meaningful because they warned of "risks" that had already materialized. For example, Exhibit 9, the Form 10-Q filed on November 9, 2021, warned investors about generic integration risks when Defendants already knew of significant integration challenges following the xMatters acquisition. ¶¶164-75. *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

### d. The Integration Statements Were Material

Defendants argue that the integration misstatements are not actionable because they were immaterial to investors for two reasons, both of which fail. First, Defendants claim that the investing public understood that Everbridge would encounter some challenges, as proven by the fact that industry analysts asked questions about it. True, analysts did ask questions about it, but not because they knew of challenges. Rather, analysts asked questions because they understood that there ***might*** be challenges. Defendants' answers in response to those questions—repeatedly assuring investors that everything was going great and failing to disclose ***any*** integration challenges—quieted any concerns. Thus, investors did not understand that Everbridge would "encounter some challenges" since Defendants repeatedly told them there were none.

Second, Defendants argue that the departure of most of the xMatters sales staff was immaterial to investors because there are no allegations regarding the impact of these departures. MTD at 24-25. This argument completely ignores the Complaint's allegations that the loss of the xMatters sales staff caused a significant decline in sales midway through 2021. ¶¶28, 169-73. Because Everbridge, like all companies, depends on its salespeople to sell its products and grow its revenue, the failure to disclose that Everbridge lost a majority of the xMatters sales staff was a material omission. This is especially true since Everbridge paid $243.3 million for xMatters, which was nearly as much as the Company's total revenue in 2020. ¶317. Therefore, these sales shortfalls

were "significan[t] to a particularly important segment of" the Company's business and thus material. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011).

### e. Defendants' Misstatements Were Not Mere Puffery

Defendants contend that the alleged misstatements regarding integration are immaterial puffery. MTD at 17-18. Not so. In assessing puffery, "the context in which the statements were made is key." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014). Because of the fact-intensive nature of the inquiry, "[d]etermining materiality in securities fraud cases should ordinarily be left to the trier of fact." *Taormina v. Annie's, Inc.*, 2015 WL 1743585, at *3 (N.D. Cal. 2015). Thus, a statement can be dismissed as puffery only if it "is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of [its] unimportance." *Mulligan v. Impax Lab, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

Defendants repeatedly made specific representations about the status of integration. For example, Defendants made several statements that they "***already*** [] integrated" xMatters and its sales staff. ¶¶ 239, 244, 246. These statements are not puffery, but specific representations of fact about the current status of integration, "capable of objective verification." *In re Cooper Sec. Litig.*, 691 F. Supp. 2d 1105, 1117 (C.D. Cal. 2010) (statement that integration of acquired entity's salesforce went "beautifully well" and that the salesforces were "fully integrated" was "capable of objective verification and is therefore actionable").

### C. The Complaint Pleads a Strong Inference of Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Nguyen*, 946 F. Supp. 2d at 1038. Thus, plaintiffs may plead scienter by showing "not only [] intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. One "is reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

In assessing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. The scienter inference "need not be irrefutable, i.e., of the 'smoking-gun' genre.'" *Tellabs*, 551 U.S. at 324. Rather, "it must be cogent and **at least as** compelling as any opposing inference." *Id.* at 314. "In other words, **the tie goes to the Plaintiff**." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. 2014). The Complaint readily satisfies these standards.

### 1. The CW Statements Plead a Strong Inference of Scienter

Defendants argue that none of the 11 CWs are reliable or specific enough under the PSLRA and Ninth Circuit standards.[16] This is wrong. A complaint can establish a strong inference of scienter through CW allegations by satisfying a two-part test: (1) the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge;" and (2) their "statements . . . must themselves be indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45. Here, the Complaint satisfies both prongs for all 11 CWs.

### a. Basis of Knowledge

To satisfy the first prong, a complaint must describe the CWs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 1145. The Complaint pleads enough details about the CWs meet this standard. ¶¶48-58.

Defendants spill much ink over the Complaint's description of CW 1. The reason is obvious: CW 1's allegations **on their own** all-but establish Defendants' liability. Despite CW 1's detailed allegations, Defendants ask the Court to disregard all of her allegations because the Complaint does not describe her **exact** job title or **exact** dates of employment. MTD at 13-14. The Court should reject this argument, as there is no bright line rule for describing a CW's job title or dates of employment. In *Quality Sys.*,

[16] Defendants argue that only one of the 11 CWs had "scienter-supporting contacts with defendants." MTD at 13. But this is not the standard and should be disregarded.

865 F.3d at 1145, the Ninth Circuit found that the CWs were reliable where the complaint alleged their "job description and responsibilities, and, *in some instances*, the witness's *exact title* and to which [] executive the witness reported." Thus, Plaintiffs are not required to plead *exact* titles, dates, and the like for all CWs, as Defendants assert. MTD at 13-14.[17]

Here, the Complaint describes CW 1 with "sufficient particularity to support the probability that [she] . . . possess[es] the information alleged." *In re Capstone Turbine Corp. Sec. Litig.*, 2018 WL 836274, at *10 (C.D. Cal. 2018). CW 1 started working at Everbridge before the Class Period and remained there through at least the xMatters acquisition. ¶48. Thus, she was there at all relevant times. She was a high-level employee, only two levels removed from Meredith, and worked on Everbridge's M&A deals, including xMatters. *Id.* As part of her job responsibilities, CW 1 worked on the Company's revenue forecasting. ¶134. CW 1 worked closely with both Meredith and Brickley, particularly in the lead up to an acquisition, and emailed them projections about the revenue forecasts. ¶¶48, 131-32.

Moreover, CW 1 objected to the xMatters revenue forecast *because* it was significantly lower than what the Company's internal projections showed. *Id.* She expressed her disagreement both to her supervisor (who then passed those concerns on to Meredith and Brickley) and directly to Meredith and Brickley. *Id.* CW 1 explained that Meredith responded to her by explaining that the discrepancy created a buffer that masqueraded the Company's slowing organic revenue. ¶133. Indeed, CW 1 explained that she understood Meredith's comment to mean that the difference in revenue reported versus what was projected was to allow Everbridge to add the difference to the Company's overall revenue and make up for the Company's slowing organic

---

[17] Indeed, nothing in the PSLRA nor Rule 9(b) requires securities plaintiffs to describe each CW with so much detail that Defendants know exactly who they are. Rather, all that is required is that the plaintiff allege "the circumstances constituting the alleged fraud" with enough specificity "to give defendants notice of the particular misconduct so that they can defend against the charge." *Kearns*, 567 F.3d at 1124.

growth. *Id.* CW 1 added that the xMatters acquisition was not the first time Defendants used acquired revenue to make up for slowing organic revenue growth. ¶135. She explained that the other acquisitions during the Class Period were done to boost revenue figures. ¶¶135, 167.

These allegations support the probability that CW 1 would possess information about the xMatters revenue projections, especially given her direct communications with Meredith and Brickley about it and the fact that she offered details about Everbridge's internal projections of xMatters. For example, CW 1 explained that she reviewed xMatters' financial statements—which were not public—and saw that xMatters had flat revenue figures over the three years prior to the acquisition. ¶237.

Lead Plaintiff recognizes that aspects of CW 1's description are watered down. However, this was done ***at CW 1's request*** because she is fearful of retaliation from Defendants. CW 1 has come forward with incriminating information—demonstrating Brickley and Meredith ***intended*** to deceive investors—and is rightfully concerned about retaliation if Defendants discover her identity.[18] Given this concern, Lead Plaintiff offered as much detail as possible to show she would possess the information alleged without totally identifying her (although it is possible Defendants already know her identity given her high rank and direct communication with Meredith and Brickley).[19]

Defendants make a similar challenge to CW 2 since, according to Defendants, she is "the most prodigous" source of information related to the xMatters integration struggles. MTD at 20. Like CW 1, CW 2 is also afraid Defendants will retaliate against

---

[18] This is especially true since CW 1 does not have any of the protections against retaliation that whistleblowers have when submitting securities law violations with the SEC. *See, e.g.,* U.S. Securities and Exchange Commission, (Last modified, Nov. 22, 2022), https://www.sec.gov/whistleblower/retaliation.

[19] Therefore, while Lead Plaintiff believes CW 1's descriptions are sufficient, they can provide more information for the Court *in camera* should the Court desire. Contrary to Defendants' argument (MTD at 14), the Complaint's offer to provide additional information to the Court for an *in-camera* inspection does not concede that the Complaint's allegations are insufficient.

her if her identity is revealed.[20] However, the Complaint adequately alleges that CW 2 was in a position to know about the xMatters integration challenges since she worked at xMatters before the acquisition, had knowledge of the integration team at Everbridge, and remained at Everbridge after the acquisition. ¶¶49, 165.[21]

The remaining CWs are described with sufficient particularity. *See* ¶¶49-58. Several of the CWs worked at the acquired company before the acquisition and remained at Everbridge after it, thus demonstrating their basis of knowledge for integration topics relating to their respective pre-acquisition company. ¶50 (CW 3, RedSky); ¶56 (CW 9, Connexient), ¶¶57-58 (CW 10 and CW 11, both xMatters). Moroever, the Complaint pleads enough details about their job descriptions, including their roles, duties, and tenures (and in many cases, exact titles and reporting structure), to show that they were positioned to know the information attributed to them. ¶¶50-58. Thus, given these CWs' roles, Defendants' "quibbl[ing] that these witnesses weren't in a position to see the [information] first-hand" fails. *Berson*, 527 F.3d at 985.

### b.      Indicative of Scienter

In assessing the second prong, courts "look to the level of detail provided by the [CWs], the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Here, multiple CWs offer specific details demonstrating Defendants ***intended*** to deceive investors about the xMatters revenue contribution and slowing organic revenue growth. As explained in detail throughout this brief, CW 1 directly communicated with Meredith and Brickley regarding the

[20] Once again, this is why Lead Plaintiff offered to provide more information *in camera* should the Court request additional information. ¶49, n.6.

[21] Defendants ask the Court to disregard CW 2's allegations because her recounting of "ha[ving] heard that the legacy xMatters staff was treated 'poorly'" is unreliable gossip and innuendo. MTD at 20. However, this allegation merely adds to CW 2's other allegations and helps explain why Everbridge lost a tremendous number of xMatters sales staff after the acquisition. ¶172. Thus, Defendants' cases are inapposite.

xMatters revenue discrepancy. *See, e.g.,* ¶¶133, 221, 341. These facts are highly probative of scienter. *See, e.g., Quality Sys.*, 865 F.3d at 1138, 1145 (scienter where "defendants were aware in real time of QSI's financial information, and knew that their statements . . . were inconsistent with this information"); *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814 (C.D. Cal. 2011) (strong inference of scienter based on defendants' knowledge of facts contradicting their statements); *Turocy*, 2017 WL 3328543, at *9 (same).

Defendants take issue with the fact that the Complaint does not explain the exact form and contents of the concerns CW 1 sent to Meredith and Brickley in emails and presentations. MTD at 15. But Defendants are imposing a higher burden than is required at this stage, as Lead Plaintiff is not required to plead "admissible evidence." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Defendants also argue that Meredith could have meant anything by his supposed "buffer" statement, but for the reasons described in Section III(B)(2), *supra*, this argument is improper and should be rejected.

The Complaint's other CW allegations support a strong inference that Defendants misled investors about the purpose of many acquisitions. ¶¶203, 205, 208, 222, 236. According to CW 9, Defendants provided "zero resources" to integrate Connexient into Everbridge's CEM platform. ¶104. Indeed, Connexient still had not been integrated as recently as March 2022. *Id.* Similarly, CW 3 stated that Everbridge showed "no effort" in integrating RedSky, and instead, only wanted RedSky's revenues. ¶121. The lack of intent to integrate these acquisitions is strong evidence of Defendants' knowledge at the time of the acquisition.

Moreover, the CW allegations support a strong inference that Defendants knew about the undisclosed growth-through-acquisition strategy. According to CW 6, a Senior Financial Analyst at Everbridge, this strategy was widely discussed during the Company's QBRs, which were attended by Meredith, Brickley, and others. ¶86. CW 6 added that the target of five to six acquisitions *per year* was discussed during the QBRs.

*Id.* CW 6's allegations are highly indicative of scienter since she attended these quarterly meetings. *Id.*

### 2.     The Core Operations Doctrine Supports Scienter

Contrary to Defendants argument, the Complaint alleges far more in support of scienter than merely core operations allegations. *See* Section III(C)(1)-(4). Indeed, in addition to, and in context of, the Complaint's many particularized allegations of Defendants knowledge of the integration issues, the Court also may look to additional facts—such as the CEM platform being critical to the Company's growth plan and integrating the acquired companies was necessary for the CEM platform's success—to add another piece to the strong inference of scienter. *Hatamian*, 87 F. Supp.3d at 1163; ¶¶315-22. Given the importance of this segment, which Defendants concede, here "it would be absurd to suggest that management was without knowledge" of the integration challenges, even absent any other scienter allegations. *Reese v. Malone*, 747 F.3d 557, 577 (9th Cir. 2014); *In re BioMarin Pharm. Inc. Sec. Litig.*, 2022 WL 164299, at *14 (N.D. Cal. 2022) ("that valrox **was going to be** a significant and lucrative product" "reinforces" scienter inference).

Nevertheless, the Complaint alleges more to support its core operations argument.[22] Indeed, Meredith and Brickley had access to the Company's sales data and both publicly admitted their close monitoring of the Company's sales efforts. ¶¶170, 320-22. Defendants argue this does not establish that Defendants knew of the reason for the poor sales performance (i.e., the integration related challenges).[23] MTD at 10. This is highly unlikely given that the sales issues coincided with the loss of most of the xMatters sales staff (which surely Defendants would have been aware of given the size and importance of the deal). ¶¶170-72. At a minimum, Defendants were reckless in not

---

[22] Therefore, both *NVIDIA* and *Norfolk Cnt. Ret. Sys.* are inapplicable here.

[23] Defendants also argue that CW 5's allegation that Defendants had access to sales data is insufficient to establish scienter.  MTD at 11.  However, the Complaint also alleges that Defendants admitted to tracking the sales data.  Thus, *City of Dearborn*, is inapposite.

knowing of the integration issues. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("[r]ecklessly turning a 'blind eye' to impropriety is equally culpable conduct under Rule 10b-5"). Moreover, Defendants later statements admitting that integration challenges created "obstacles to sales" further supports a finding of scienter. *See* Section III(B)(3)(b), *supra*.

### 3. Meredith's Abrupt Departure Supports Scienter

Defendants argue that Meredith's departure was not suspicious because he left to accept a CEO position at another company. MTD at 12. This is improper, as once again, Defendants are attaching extraneous documents mentioned nowhere in the Complaint to create an alternative version of the facts where no fraud occurred. RJN Opp. at 5. Nonetheless, unlike the cases Defendants cite, here Meredith's departure was "accompanied by suspicious circumstances" showing he was connected to the fraud, which supports scienter. *See In re WageWorks, Inc. Sec. Litig.*, 2020 WL 2896547, at *6 (N.D. Cal. 2020). Indeed, ***directly after*** Meredith's departure, Everbridge's management team conducted a "comprehensive review" of the Company's strategy and concluded that the acquisitions were not properly integrated, and that the Company's M&A strategy created "obstacles to sales" and complicated the Company's "go-to-market efforts." ¶¶263-65. *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. 2018) (inference of scienter where "timing of [defendant's] termination and PPG's announcement of remedial measures" coincided). Further adding to the suspiciousness of Meredith's departure was the apparent lack of ***any*** succession plan.[24] ¶324.

### 4. Defendants' Statements Themselves Support Scienter

Any doubts about Defendants' scienter is erased by their own statements. For

---

[24] Moreover, Defendants misconstrue why Meredith's employment compensation is indicative of scienter. Meredith's performance stock units were tied to the Company's annual growth rate. The fact that he left a significant portion of that on the table when he left suggests Meredith knew that the Company's growth rate was declining. For example, J.P. Morgan wrote, "it does raise the question o[f] whether he was lacking confidence in earning the remaining performance-based incentive." ¶324.

example, Ellertson explained that his "day job is M&A" and that he is "still working just as hard as I was as a CEO." ¶330. Similarly, Brickley spoke about the Company's acquisitions in relation to its organic growth. ¶334. Meredith likewise routinely spoke about the Company's acquisitions and M&A strategy. ¶¶81-83. Defendants also discussed xMatters revenue contribution, going as far as to dispel investor concerns about it despite several questions from analysts. ¶336. Thus, Defendants either: (1) knew that the Company was using acquired revenue to hide slowing organic revenue growth, and that this strategy was unsustainable; or (2) were reckless in not knowing that this was the case. Under either scenario, there is a strong inference that Defendants made these statements with scienter. *See Roberti v. OSI Systems, Inc.,* 2015 WL 1985562, at *12 (C.D. Cal. 2015) (scienter established where defendants' public statements "touched on the specific issue" that made representations false).

### D.    The Complaint Sufficiently Alleges Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Loss causation exists where a disclosure either reveals the falsity of a defendant's misstatement or reflects the "materialization of [a] risk" that was concealed by the defendant's misstatement. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013).[25]

Here, Defendants only challenge the December 9, 2021 partial corrective disclosure (thereby waiving any challenge as to the February 24, 2022 corrective disclosure). However, Defendants argument fails. Lead Plaintiff alleges a causal connection between the misstatements and the disclosure of disappointing revenue guidance. ¶¶278-96. The lower guidance—which resulted in a shocking 45.5% stock

---

[25] Defendants are wrong that loss causation requires pleading that a "corrective disclosure" revealed defendants' prior statements were false or misleading.  MTD at 33-34.  *See Nuveen*, 730 F.3d. at 1120 ("Disclosure of the fraud *is **not*** a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss.").

price drop—was the lowest revenue guidance in the Company's history as a public company and revealed "the very facts" that Defendants misstatements had concealed—that the Company's strong organic revenue growth was unsustainable (partly because it relied on using acquired revenue to mask slowing organic revenue). This is enough to allege loss causation. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) ("plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss").

Alternatively, such disclosure pleads loss causation under a materialization of the risk theory. Defendants failed to disclose the risk that the Company's growth-through-acquisition strategy was unsustainable and detrimental to long-term growth. This risk materialized on December 9, 2021, when Defendants could no longer mask the Company's slowing organic revenue with acquired revenue. Indeed, analyst commentary confirms that the market was responding to the fraud, as analysts were shocked by the lower guidance and Meredith's "abrupt" departure and questioned whether the two were related (which was not fully revealed until February 24, 2022).[26] ¶¶255-59. Accordingly, the Complaint adequately alleges loss causation. *See In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1026-27 (9th Cir. 2005) (finding loss causation where misstatements were revealed through "disclosures of Daou's true financial health" and where analyst commentary confirmed that market was responding to fraud).

## IV.    THE COMPLAINT ALLEGES SECTION 20(A) CLAIMS

Because the Complaint adequately alleges violations of Section 10(b) and Rule 10(b), the Court should also uphold the Section 20(a) claim.

## V.    CONCLUSION

For all these reasons, Defendants' MTD should be denied in its entirety.

---

[26] Therefore, *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325 (N.D. Cal. 2021) is distinguishable.

Dated:          December 15, 2022          Respectfully submited,

**LABATON SUCHAROW LLP**

By: */s/ James W. Johnson*
James W. Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Irina Vasilchenko (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
ivasilchenko@labaton.com
nmanningham@labaton.com

*Counsel for Lead Plaintiff and
Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

Ryan A. Llorens (225196)
Danielle S. Myers (259916)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
ryanl@rgrdlaw.com
dmyers@rgrdlaw.com

*Liaison Counsel for the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:      December 15, 2022
            New York, New York

                                        /s/ James W. Johnson
                                        James W. Johnson