**LABATON SUCHAROW LLP**
Michael P. Canty (*pro hac vice* pending)
mcanty@labaton.com
Michael H. Rogers (*pro hac vice*)
mrogers@labaton.com
David J. Schwartz (*pro hac vice*)
dschwartz@labaton.com
Nicholas Manningham (*pro hac vice*)
nmanningham@labaton.com
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Proposed Class*

[Additional counsel appears on signature page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLEBRA CAPITAL PARTNERS MASTER FUND LTD, SYLEBRA CAPITAL PARC MASTER FUND, AND SYLEBRA CAPITAL MENLO MASTER FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>EVERBRIDGE, INC., DAVID MEREDITH, PATRICK BRICKLEY, and JAIME ELLERTSON,<br><br>Defendants. | Case No. 2:22-cv-02249-FWS-RAO<br><br>CLASS ACTION<br><br>**LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date:        December 7, 2023<br>Time:        10:00 a.m.<br>Courtroom: 10D<br>Judge:       Hon. Fred. W. Slaughter<br><br>*Date Action Filed: April 4, 2022* |

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................... iii

I. INTRODUCTION ........................................................................................1

II. STATEMENT OF FACTS ..........................................................................5

    A. Background ........................................................................................5

    B. Defendants Misled Investors About Everbridge's Integration of the Class Period Acquisitions into the CEM Platform .............................5

    C. Defendants Misled Investors About the xMatters Acquisition ................6

    D. The Truth is Revealed ........................................................................7

III. ARGUMENT ...............................................................................................7

    A. The SAC's Additional CW Allegations Remedy the Deficiencies Identified in the Court's Order Dismissing the FAC ..............................8

    B. Defendants Made Materially False and Misleading Statements ............13

        1. Defendants Misled Investors About the Company's Growth By Conflating Acquired Revenue and Organic Revenue .............13

            a. CW 1's Allegations Demonstrate Falsity ..........................14

            b. Defendants' Attempts to Avoid Liability for These Misstatements Fail ...........................................................16

        2. Defendants Misled Investors About the Company's Growth by Failing to Disclose its Failure to Integrate xMatters ...............18

        3. Defendants Misled Investors About the Company's Growth by Falsely Stating that the Company Had also Successfully Integrated the Non-xMatters Acquisitions into the CEM Suite ...................................................................................20

    C. The SAC Adequately Alleges a Strong Inference of Scienter ...............24

        1. The SAC's CWs Establish a Strong Inference of Scienter ..........24

i

        2.     Meredith's Abrupt Departure Supports Scienter ...........................27

        3.     The Core Operations Doctrine Supports Scienter ........................28

   D.    The SAC Adequately Alleges Loss Causation .......................................29

   E.    The SAC Adequately Alleges Section 20(a) Claims ..............................32

IV.    CONCLUSION ..........................................................................................32

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 2:22-CV-02249-FWS-RAO

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Amgen Inc. Sec. Litig.*,
  2014 WL 12585809 (C.D. Cal. 2014) ...................................................................24

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...............................................................................31

*Cheng v. Activision Blizzard*,
  2023 WL 2136787 (C.D. Cal. 2023) .....................................................................13

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
  302 F. Supp. 3d 1028 (N.D. Cal. 2018) .................................................................14

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) .................................................................24

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) .............................................................................................30

*E. Ohman J:or Fonder AB v. NVIDIA, Corp.*,
  2023 WL 5496507 (9th Cir. 2023) ..................................................................*passim*

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. 2018) .....................................................................19

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ................................................................................8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs, Inc.*,
  63 F.4th 747 (9th Cir. 2023) .........................................................................12, 28

*Jaeger v. Zillow Grp., Inc.*,
  2022 WL 17486297 (W.D. Wash. 2022) ..........................................................15, 23

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) ..............................................................................27

*Mild v. PPG Indus., Inc.*,
  2018 WL 6787351 (C.D. Cal. 2018) .....................................................................28

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ................................................................................30

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ..................................................................17

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F.Supp.3d 942 (N.D. Cal. 2014) ........................................................................9

iii

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ...................................................................................30

*In re Okta, Inc. Sec. Litig.*,
  2023 WL 2749193 (N.D. Cal. 2023) ...............................................................19, 20

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014) ...................................................................................13

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...........................................................................*passim*

*In re QuantumScape Sec. Class Action Litig.*,
  580 F. Supp. 3d 714 (N.D. Cal. 2022)..............................................................17, 18

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) ...............................................................................24, 29

*Roberts v. Zuora, Inc.*,
  2020 WL 2042244 (N.D. Cal. 2020) .........................................................................12

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ....................................................................................29

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ....................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).............................................................................................7, 24

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ....................................................................................29

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ......................................................................................13

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................................8, 11, 25

**Statutes and Rules**

15 U.S.C.
  § 78u–4(b)(1)(B).........................................................................................................13

Private Securities Litigation Reform Act of 1995 .........................................3, 16, 19

Securities Exchange Act of 1934
  § 10(b)........................................................................................................................32
  § 20(a)........................................................................................................................32

Rule 10b-5.........................................................................................................................32

iv

Lead Plaintiff Sylebra Capital Partners Master Fund Ltd, Sylebra Capital Parc Master Fund, and Sylebra Capital Menlo Master Fund ("Lead Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("SAC") (ECF No. 85).[1]

## I. INTRODUCTION

The Court dismissed the First Amended Complaint ("FAC") largely because the FAC did not provide enough information to establish CW 1's reliability. The Court noted that CW 1 "provides the most relevant and detailed statement of the CWs" (Dkt. No. 79 at 20 (the "Order")), but held "the FAC d[id] not detail the scope of [CW 1's] business duties" to establish that she could reliably "challenge the revenue reporting attributable to the xMatters acquisition." *Id.* The SAC directly addresses the Court's concerns via a wealth of additional details regarding CW 1's employment and duties. For example, CW 1 worked in Everbridge's finance team and was responsible for detailed financial planning and analysis concerning the Company's mergers and acquisitions ("M&A"), including xMatters. ¶52. Indeed, leading up to the xMatters acquisition, through her position working on M&A deals at Everbridge, CW 1 emailed Defendants Meredith and Brickley multiple times, supplying them with presentations and financial models relating to the xMatters deal. *Id.* Thus, CW 1 had knowledge of Everbridge's reporting of xMatters' revenue and Defendants' intentional manipulating of its reporting.

Armed with these specific allegations establishing CW 1's reliability, the SAC demonstrates that Defendants misled investors about the Company's financial growth. Indeed, as CW 1 and others explain, Defendants allocated revenue acquired from xMatters to the Company's total revenue for the express purpose of creating the

---

[1] Capitalized terms herein have the same meaning as set forth in the Second Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 84) (the "SAC"). Citations to "¶ ___" refer to paragraphs of the SAC. References to "MTD at ___" are to the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 85-1).

appearance of *sustainable*, organic revenue growth. Specifically, according to CW 1, Defendants *knew* that xMatters' revenue contribution for 2021 was $20-25 million but nonetheless told investors that xMatters contributed only $9-11 million to the Company's total revenue in 2021. ¶¶147-50. As a result, when Defendants raised their total revenue for 2021, investors (wrongly) believed that revenue growth was sustainable. In the eyes of investors and the financial analysts covering the Company, this presented Everbridge as a safer investment because organic revenue growth is more predictable and sustainable than *acquired* revenue. In reality, however, Everbridge's revenue growth was acquired, making Everbridge a riskier investment since Defendants would have to successfully integrate the acquired company and its technology to deliver sustainable, long-term revenue.

The Ninth Circuit's recent finding of falsity in connection to similar statements in *E. Ohman J:or Fonder AB v. NVIDIA, Corp.*, 2023 WL 5496507 (9th Cir. 2023) is instructive. There, as here, the Ninth Circuit found that defendants misled investors about the *source* of NVIDIA's revenue growth. The defendants there knew the source of NVIDIA's apparently rapid revenue growth was sales of its ostensible flagship product to cryptocurrency miners, an inherently volatile and therefore less sustainable source of revenue. In order to create the appearance, however, of *sustainable* revenue growth, NVIDIA's publicly reported revenue figures showed those sales as part of a segment that was separate from where they reported crypto-related sales. Similarly, Defendants here misled investors about the sustainability of the Company's revenue growth by masking slowing organic revenue with acquired revenue.

Making matters worse, Defendants also misled investors about the Company's integration of several acquisitions between August 2019 and April 2021 (the "Class Period acquisitions"). Defendants told investors that they purchased the Class Period acquisitions to grow the Company's CEM platform, a collection of different technologies they stated they were successfully integrating into a unified, single point of access platform. However, several CWs, including three new CWs (13, 14, and 16),

have stated that Everbridge never integrated the acquired technologies into their CEM platform. Therefore, although Defendants created the impression to investors that they had successfully integrated the Class Period acquisitions into the CEM platform (which would in turn create long-term growth), in reality, the platform was a disjointed and complicated mess, and not the "unified enterprise-wide operating system" Defendants publicly told investors (and therefore was actually detrimental to long-term growth).

Defendants' MTD tries to convince the Court that nothing has changed from the FAC. That is wrong. The SAC bolsters the descriptions not only of CW 1, but of CWs 2 and 3 as well. The SAC therefore establishes their reliability and demonstrates the falsity of Defendants' statements. The SAC also adds five new CWs (12 - 16) who corroborate—and therefore add to the reliability of—the CWs from the FAC. Armed with these additional allegations, Lead Plaintiff's case has a strong foundation upon which the remaining allegations of Defendants' fraud stand.

Defendants' MTD also tries to frame this case as a "standard" integration case, in which Defendants made every effort to integrate the Class Period acquisitions but encountered some challenges along the way. This ignores the CW's allegations in the SAC. Indeed, according to CW 1, Defendants intentionally misled investors about the Company's revenue growth. Moreover, Defendants misled investors about the integration of xMatters, publicly stating they had already completed it and retained the acquired sales teams. In reality though, according to multiple and corroborative CW allegations—CWs 1, 2, and 14—Defendants had utterly failed to integrate xMatters by that point, nor had they retained the sales teams. Quite to the contrary, the *majority* of the acquired xMatters sales staff had already left by the time Defendants publicly insisted otherwise. Thus, Defendants' argument that the xMatters integration statements were protected by the PSLRA safe harbor should be rejected because they were not forward-looking statements. Rather, Defendants unequivocally stated that they had *already* integrated the xMatters' teams, including the sales team, and had

3

*already* retained the key hires, when according to multiple CWs, Everbridge had not integrated the sales teams and lost many key hires by the time Defendants spoke.

Moreover, Defendants argue the SAC does not adequately allege scienter. Not so. CW 1's direct communications with Defendants Meredith and Brickley demonstrate they *knew* their statements regarding the source (and amount) of xMatters revenue were false. The Ninth Circuit recently found similar allegations established scienter in *NVIDIA*. *See NVIDIA*, 2023 WL 5496507, at *16 (CW "personally prepared presentations about sales of [the product in question]" and "had frequent communications with high-ranking NVIDIA executives" regarding same). Moreover, the SAC's other allegations, considered holistically, establish that Defendants acted with scienter. For example, new allegations from CWs 15 and 16 demonstrate that Meredith, Brickley, and others in the C-suite ignored complaints, including those from the Chief Technology Officer, about the inability to integrate all the acquisitions into the CEM platform. Moreover, new allegations from CWs 12 and 13 establish that Everbridge's Board of Directors disagreed with Meredith's undisclosed growth-through-acquisition strategy, and thus add to the inference that Meredith's abrupt departure was related to, and caused by, the failure to integrate.

Finally, in recognition of the SAC's strong allegations of falsity and scienter, Defendants once again mount an attack on loss causation with respect to the first partial corrective disclosure. However, the SAC adequately alleges the causal connection between the misrepresentations and the loss. Specifically, the SAC explains that the December 9, 2021 disclosure—which announced Meredith's abrupt departure and significantly reduced revenue guidance—began to reveal that the Company's revenue growth was not sustainable under Meredith's growth-through-acquisition strategy, but instead relied on buying revenue without properly integrating the acquired companies.

4

## II.    STATEMENT OF FACTS

### A.    Background

Defendant Meredith took over as Everbridge's CEO on June 18, 2019. ¶90. At that time, Everbridge told investors that the Company's Critical Event Management ("CEM") platform was essential to the Company's future growth and success. ¶73. Prior to that point, by contrast, Everbridge utilized a single product, its mass notification software, which sent messages via telephone, text, and email in the event of an emergency. ¶70. However, because that mass notification market was not growing, Everbridge expanded its offerings and created the CEM platform, a collection of applications designed to automate and accelerate responses to various "critical events." ¶¶69, 71-73. Importantly, Defendants stated publicly that Everbridge's CEM platform was the *only* fully-integrated CEM solution on the market. ¶¶75, 78-79.

### B.    Defendants Misled Investors About Everbridge's Integration of the Class Period Acquisitions into the CEM Platform

Shortly after Meredith took over as CEO, Everbridge began acquiring companies in rapid succession, all the while telling investors these acquisitions were designed to enhance the Company's CEM platform and drive long-term growth. It follows then, that Everbridge needed to successfully integrate the acquired technology into the platform in order to realize that growth potential. Indeed, starting with NC4—the first of the Class Period acquisitions—Defendants publicly declared they had *successfully integrated* the acquired technology into Everbridge's CEM platform. For example, near the start of the Class period, on February 18, 2020, Defendants stated that Everbridge had already "*really integrated NC4 and Risk Center into our entire product offering*." ¶236. But according to several CWs, including two new to the SAC (CWs 14 and 16), Everbridge had *not integrated* NC4's technology into Everbridge's platform. ¶¶230-34. Specifically, CW 14 explained that customers needed to run NC4's and Everbridge's products on separate platforms in order to use those tools, creating anything but a fully-integrated experience. ¶233.

5

This continued throughout the Class Period, as Defendants continued to purchase companies without properly integrating them into the CEM platform. For example, CWs 9 and 12 stated that Everbridge did not integrate Connexient's technology into the CEM platform. ¶¶120-21. Similarly, CWs 5 and 13 stated that Everbridge did not integrate CNL Software into the CEM platform. ¶¶125-26.

### C. Defendants Misled Investors About the xMatters Acquisition

In April 2021, Everbridge announced it had acquired xMatters, its largest acquisition to date. ¶144. Defendants used this deal as a chance to further mislead investors about the Company's growth. Specifically, Defendants told investors that Everbridge had acquired $9-11 million in 2021 revenue from xMatters, when according to CW 1, Defendants *knew* they had acquired $20-25 million from xMatters for 2021. ¶¶147-50. CW 1, who was a member of the finance team and responsible for financial planning with respect to the Company's mergers and acquisitions, *directly* expressed her concerns to Defendants Meredith and Brickley about the massive difference between what they reported and what they knew to be the true revenue number. ¶151. Meredith responded to CW 1 that the difference was intended to "buffer" the appearance of Everbridge's actually *declining* revenue. ¶152. Put in its simplest terms, Defendants added *acquired* revenue to the Company's publicly-stated *total* revenue, all the while telling the market the *total* revenue figure reflected *only* sustainable, organic growth. They did this because analysts and investors were deeply concerned *only* about *sustainable* organic revenue. *See* ¶274 (William Blair focusing on organic revenue growth following the xMatters acquisition).

Making matters worse, Defendants knew they were experiencing severe problems integrating xMatters. For example, CWs 2 and 10 explain that Everbridge never integrated xMatters' client relationship management software. ¶189. Moreover, according to CWs 2, 4, 10, 11, and 14, Everbridge did not integrate the xMatters' sales teams, who remained in a separate "silo," and the Company shortly lost *most* of the sales staff, including its global leader, before September 30, 2021. ¶¶192-95. These

problems caused xMatters' sales to suffer in the summer of 2021. ¶¶190-91, 202. Despite these significant challenges, Defendants falsely told investors on November 9, 2021 that "*we've got [xMatters] integrated now*" (¶286) and that the xMatters teams, including the sales teams, had "*already been integrated*." ¶282; *see also* ¶286.

### D.    The Truth is Revealed

Investors learned the truth about the Company's organic revenue growth and lack of integrations through two corrective disclosures. First, on December 9, 2021, the Company announced: (1) Meredith had abruptly resigned as CEO; and (2) the Company lowered 2022 revenue guidance to 20-23% growth, well below historical forecasts of 30% plus revenue growth. ¶¶213, 295-98. In response, Everbridge's stock price declined *more than 45.4% in a single day*. ¶298. Although the market started to understand that the Company's organic revenue growth was unsustainable due to the undisclosed growth-through-acquisition strategy and incomplete integrations, the full truth was not revealed until February 24, 2022, when Everbridge admitted that the growth-through-acquisition strategy was detrimental to long-term growth because the Company had not fully integrated the Class Period acquisitions, which caused sales to suffer because the Company's platform was confusing to customers. ¶¶306-11. Indeed, following this news, analysts finally realized the falsity of Defendants' previous statements. For example, William Blair explained that Everbridge's "*aggressive acquisition strategy over the course of the prior two years had created complexity in the Everbridge product portfolio*" and that the "*incomplete integrations and the accumulated portfolio of somewhat disjointed point solutions that resulted from this rapid pace of M&A was creating difficulties*." ¶315.

## III.    ARGUMENT

In assessing a motion to dismiss, courts must consider the complaint in its entirety, "accept all factual allegations . . . as true[,]" and construe them in the light most favorable to plaintiffs. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Ninth Circuit holds that "a district court ruling on a motion to dismiss

7

is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

As an initial matter, Defendants' MTD once again attaches several exhibits to impermissibly establish a competing universe of facts and inferences to create the appearance of inconsistencies with the SAC. *See* Request for Judicial Notice, Dkt. No. 86. As the Court previously held (*see* Order at 1-3), the Court may consider documents incorporated by reference only for the "limited purpose" that those disclosures were made to the market, "but not for the truth of their contents." Order at 2. However, the Court should deny Defendants' requests to judicially notice Exhibits 1-2, 6, 9-12, 17, and 20 for the same reasons as last time, as "[t]he veracity of the factual assertions made in these materials is disputed by Plaintiffs." Order at 3.

### A.    The SAC's Additional CW Allegations Remedy the Deficiencies Identified in the Court's Order Dismissing the FAC

The Court acknowledged that "CW 1 provides the most relevant and detailed statement of the CWs." Order at 20. However, the Court found that it could not rely on CW 1's statements to establish the falsity of Defendants' statements about the xMatters revenue contribution because the FAC did not meet the requirements for establishing CW 1's reliability as articulated in *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). Under *Zucco*, a complaint relying on confidential witnesses must pass two hurdles. *Id.* First, the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* Then, once the CW's reliability and personal knowledge are established, the CW statements "must themselves be indicative of scienter." *Id.* Because the Court's Order found that the FAC did not meet the first hurdle, it did not consider whether CW 1's statements were indicative of scienter or falsity. Although *Zucco* addresses scienter, the Ninth Circuit has consistently applied *Zucco* to determine a CW's reliability to establish both falsity

8

and scienter. *See, e.g., Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 963 (N.D. Cal. 2014) ("FAC contains sufficient allegations to establish the reliability of the confidential witnesses. Accordingly, the Court properly may consider the CWs and their allegations in determining whether Plaintiffs have properly alleged the statements were false"). Here. the Court found that "the FAC d[id] not detail the scope of [CW 1's] business duties" sufficiently to establish that she could reliably "challenge the revenue reporting attributable to the xMatters acquisition." Order at 20.

Based on the Court's Order, Lead Plaintiff continued its investigation and added details of CW 1's job description and duties to directly address the Court's concerns. The SAC further explains that CW 1 was a member of the finance team—specifically, the Global Financial Planning and Analysis team—and, as part of her responsibilities, CW 1 worked on detailed financial planning for the Company's mergers and acquisitions during the Class Period. ¶52. These new details in the SAC establish that CW 1 has particularized knowledge of xMatters' revenue contribution, especially when considered with the allegations from the FAC. For example, the SAC reiterates from the FAC that in the lead up to the acquisitions, CW 1 regularly sent emails and presentations ***directly*** to Defendants Meredith and Brickley. *Id.* Indeed, with respect to the xMatters acquisition in particular, CW sent weekly or bi-weekly emails directly to Meredith and Brickley with financial modeling. *Id.* These allegations sufficiently show that CW 1 knew about financial metrics for the Class Period acquisitions, including xMatters, given her responsibilities working on M&A deals at Everbridge.

The Ninth Circuit recently found similar CW allegations sufficiently reliable to establish scienter. In *NVIDIA*, the Ninth Circuit found one CW was sufficiently reliable to have knowledge of NVIDIA's sales where the complaint explained how that CW "personally prepared presentations about sales of [the product in question]" and "had frequent communications with high-ranking NVIDIA executives" regarding same. *NVIDIA,* 2023 WL 5496507, at *16. Similarly, here, CW 1 personally prepared and sent financial models to Meredith and Brickley. ¶52. Indeed, CW 1's allegations are

9

further strengthened by her high-level position, as well as her direct and regular communications with both Defendants Meredith and Brickley in the immediate run-up to the xMatters acquisition. *Id.*; *see also NVIDIA*, 2023 WL 5496507, at *16 (CW's "basis for personal knowledge is even stronger" because CW "personally met with [CEO] on a regular basis and reported to VPs who reported directly to [CEO]").

Because the SAC establishes CW 1's reliability and personal knowledge, the Court may consider fully whether Defendants' statements about xMatters revenue contribution are actionably false and misleading. As described in further detail in Section III(B)(1), according to CW 1, Defendants ***knew*** xMatters' revenue contribution for 2021 was $20-25 million but nevertheless told investors it was only $9-11 million. ¶¶147-50. Defendants added the (hidden) difference of $9-16 million to Everbridge's total revenue to create the appearance of long-term, sustainable, and organic revenue growth. *Id.* Indeed, CW 1 frequently emailed Defendants Meredith and Brickley to express her growing concern with this discrepancy. ¶152. In response, Meredith explained that Everbridge used that (hidden) discrepancy to buffer the declines in Everbridge's organic revenue. This explanation of a buffer establishes that Defendants falsely reported the xMatters revenue contribution ***and*** that Defendants made these statements with scienter. *See also* Section III(C)(1).

The SAC also bolsters descriptions of CW 2's title and responsibilities to address deficiencies identified by the Court. *See* Order at 20. Specifically, the SAC explains that CW 2 worked in finance at xMatters from before the Class Period through Everbridge's acquisition (¶53) and that following the acquisition, CW 2 remained in the same finance role at Everbridge from May 2021 until late 2021. *Id.* Moreover, CW 2 worked on the integration team for xMatters during the acquisition. *Id.* Thus, CW 2 was well-positioned to possess relevant knowledge of the xMatters integration failures given her role on the integration team, and had knowledge of xMatters' poor performance from a sales perspective given her finance role.

The SAC also bolsters CW 3's job description, explaining that following the acquisition of RedSky, she was Vice President of Business Development from January 2021, when Everbridge acquired RedSky, until April 2021. ¶54. Thus, CW 3, a member of RedSky's executive team before the acquisition and involved in Everbridge's due diligence leading up to the acquisition—was well positioned to have knowledge of Everbridge's lack of interest in fully integrating RedSky into Everbridge's platform.

Moreover, the SAC adds several additional CWs (CWs 12 - 16) who corroborate the FAC's CW allegations. The SAC pleads details about these CWs' job descriptions, including roles, duties, tenures, and in many cases, exact titles and position in the reporting structure.   These new CWs were positioned to know the information attributed to them. ¶¶63-68.

| CW | Basis to Establish Reliability under *Zucco* |
|---|---|
| 12 | CW 12 worked Everbridge from February 2007 through May 2022 as an Account Executive. ¶63. As an Account Executive, CW 12 tried to cross-sell and up-sell services to major accounts and help those accounts maximize the use of Everbridge's tools across platforms. *Id.* Thus, she was well positioned to know about the Class Period acquisitions—which were supposed to offer cross-selling opportunities and increase Everbridge's tools—and whether Everbridge had successfully integrated the acquisitions' technology into the CEM platform, since her responsibilities including trying to sell these products. |
| 13 | CW 13 was an Account Executive at Everbridge from before the Class Period until she left in the second quarter of 2022 (i.e., April – June 2022). ¶64. CW 13 was responsible for maintaining customer relationships, including customer retention, expansion of services, and customer growth. *Id.* Thus, like CW 12, she was well positioned to know about the Class Period acquisitions and their integration into the CEM platform given her role included trying to get clients to expand their services. |
| 14 | CW 14 was a Strategic Account Executive at Everbridge for the entire Class Period. ¶65. CW 14 was a high-level employee only two levels removed from the former Chief Revenue Office and later Co-CEO Vernon Irvin. *Id.* CW 14 was responsible for targeting Enterprise-level customers and maintaining and managing customer relationships with over 80 accounts, including Microsoft and Accenture. *Id.* Thus, she was in a position to know whether Defendants had integrated the acquisitions into the Company's |

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 2:22-CV-02249-FWS-RAO

| | |
|---|---|
| | CEM platform, as she was responsible for selling these products to large clients like Microsoft. Indeed, when the fraud was revealed, the Company admitted that the incomplete integrations made it "harder for . . . [Everbridge's] enterprise sales organization to execute." ¶310. Thus, CW 14's role as an account executive for enterprise-level customers put her in a position to know about these challenges. |
| 15 | CW 15 was a Senior Director of Business at Everbridge from October 2021 through the end of the Class Period. ¶66. In this role, CW 15 worked with global system integrators, or GSIs, to help cross-sell and integrate Everbridge's products with the products and services of the GSIs. *Id.* Thus, CW 15 was well positioned to know whether the technology from the Class Period acquisitions were integrated into Everbridge's CEM offering. Moreover, CW 15's high-level position, only two levels removed from the C-suite (*id.*), supports the reliability of her statement that she learned that the Company's CTO and Senior VP of Engineering who told the c-suite that much of the acquired technology could not be integrated. |
| 16 | CW 16 was the Director of Operations, Risk Intelligence Monitoring Center, at Everbridge during the entire Class Period. ¶67. CW 16 had previously worked at NC4. *Id.* At Everbridge, CW 16 was responsible for the day-to-day operations and management of the Risk Intelligence Center, which included supervising a team of risk analysts. *Id.* She also received feedback from customers regarding the Company's performance. *Id.* Thus, CW 16 was well positioned to have knowledge of NC4's business after the acquisition, including that most or all of NC4's sales and customer account management team left the Company shortly after the acquisition. Similarly, given CW 16's high-level position overseeing NC4, she would have known about NC4's performance following the acquisition. |

Defendants' assertion that CWs 12 - 16 are unreliable because they had "no interaction with any individual defendant" (MTD at 14-15) creates a standard that Ninth Circuit law neither requires nor recognizes. Indeed, no such *per se* requirement of direct contact exists. *See, e.g.*, *Glazer Cap. Mgmt., L.P. v. Forescout Techs, Inc.*, 63 F.4th 747, 772-74 (9th Cir. 2023) (CWs who did not directly interact with individual defendants still reliable to support a strong inference of scienter); *Roberts v. Zuora,*

12

*Inc.*, 2020 WL 2042244, at \*10-11 (N.D. Cal. 2020) (finding scienter based on CWs with no "direct contact with the defendants").[2]

### B.   Defendants Made Materially False and Misleading Statements

A complaint pleads falsity when it "specif[ies] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). A court should dismiss a complaint "***only if*** reasonable minds could not disagree that the challenged statements were not misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

Here, the SAC's specific allegations—bolstered by CW 1's description and five new, corroborating CWs—establish Defendants made material misstatements and omissions regarding the flurry of acquisitions under the undisclosed "growth-through-acquisition" strategy. Although Defendants make a valiant effort to convince the Court this is a "standard" integration case—where Defendants made good faith efforts to integrate, but ultimately encountered some challenges—the facts of this case do not support that assertion. Indeed, Defendants here did not simply mislead investors about the ***status*** of their integration efforts. Rather, according to several CWs (including CW 1), Defendants misled investors about the ***source of their success***, leading investors to believe the Company's growth was sustainable and organic.  In reality, however, it was fueled by an undisclosed growth-through-acquisition strategy and was therefore far less sustainable than Defendants' public statements led investors to believe.

#### 1.   Defendants Misled Investors About the Company's Growth By Conflating Acquired Revenue and Organic Revenue

In the Ninth Circuit, even absent a duty to speak, "once defendants cho[o]se to tout positive information," such as ostensibly strong revenue growth, they must "do so

---

[2] Defendants' citations to *Cheng v. Activision Blizzard*, 2023 WL 2136787, at \*8 n. 4 (C.D. Cal. 2023) and *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) are inapposite. Both relied on generalized allegations of what Defendants ***must have*** known based on undisclosed reports. Here, however, the SAC specifically links Defendants to the misstatements, *e.g.*, CW 1 had direct contact with Defendants Meredith and Brickley about xMatters' revenue numbers. ¶¶150-52.

13

in a manner that wouldn't mislead investors." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Here, Defendants misled investors about the Company's revenue growth by using revenue acquired from the Class Period acquisitions to create the false appearance of sustainable, organic revenue growth in the minds of investors.

### a.   CW 1's Allegations Demonstrate Falsity

Specifically, after the xMatters acquisition, Defendants stated that xMatters would contribute $9-11 million to the Company's revenue for 2021. ¶¶260, 269. However, according to CW 1, Defendants *knew* xMatters would actually contribute $20-25 million in revenue in 2021. ¶¶148-53. According to CW 1, Defendant Meredith told her the difference between the reported ($9-11 million) and actual ($20-25 million) numbers was to buffer the declines in Everbridge's organic revenue growth. ¶152. In other words, Meredith intentionally allocated acquired revenue into the Company's total revenue to make it appear as if that revenue was organic and sustainable.

In its Order dismissing the FAC, the Court did not directly address the falsity of these statements because it found that the "FAC inadequately demonstrates CW 1's foundation to challenge the revenue reporting attributable to the xMatters acquisition." Order at 20. However, as described in Section III(A), the SAC cures the deficiencies identified by the Court and now adequately establishes CW 1's reliability to challenge the xMatters revenue contribution. *See also* ¶¶52, 151-52. Therefore, the xMatters revenue statements are actionably false and misleading because they led investors to believe the Company's increased revenue was organic and therefore sustainable, when it was not. *See, e.g.*, *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1039-41 (N.D. Cal. 2018) (statements that "led the market to believe the RH's inventory growth was driven by the launch of RH Modern and inventory investments regarding the same" were materially misleading since "inventory growth was actually the result of non-Modern product returns").

The Ninth Circuit recently found similar statements actionable in *NVIDIA,* 2023 WL 5496507. There, as here, plaintiffs alleged defendants misled investors about the

14

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 2:22-CV-02249-FWS-RAO

*source* of NVIDIA's revenue growth. *Id.* at \*2-3. Specifically, the *NVIDIA* plaintiffs alleged that defendants misled investors about their revenue growth by inaccurately reporting sales of their flagship product (which had experienced skyrocketing sales) in the company's gaming segment when they should have reported some of those sales in a different segment that contained sales to cryptocurrency miners. *Id.* at \*3-4. The plaintiffs alleged this was misleading because defendants did not disclose that sales of their flagship product included sales to cryptocurrency miners, which led investors to believe that the gaming segment's growth was untainted by volatile crypto-related sales. *Id.* at \*4-5. Ultimately, the Ninth Circuit held that defendants' statements about their revenue were false and misleading because they led "investors and analysts to believe that NVIDIA's crypto-related revenues were much smaller than they actually were." *Id.* at \*11-13. In other words, defendants intentionally misled investors by secretly reporting crypto-related sales in the company's gaming segment, instead of the other segment with crypto-related sales, to make it appear as if the company's gaming segment's revenue was growing and more sustainable than it actually was.

Similarly, here, Defendants misled investors about Everbridge's revenue growth by funneling acquired revenue to the Company's total revenue to make it appear as if the growth was organic and sustainable. Indeed, analysts' reactions following Defendants' false statements show that investors relied on these misstatements to (wrongly) believe the Company's revenue growth was organic. Specifically, after Defendants falsely disclosed xMatters' revenue contribution and raised total revenue for the year, analysts raised guidance for the Company's stock price. William Blair noted that, after excluding the $9-11 million from xMatters, Defendants' updated message "***implies roughly 29% <u>organic</u> growth*** . . . compared to . . . ***the company's prior outlook at 26.6% growth***." ¶274. In other words, following Defendants' false statements about xMatters' revenue contribution, the market believed the Company's revenue was growing organically, which was not true. *See Jaeger v. Zillow Grp., Inc.,*

2022 WL 17486297, at *7 (W.D. Wash. 2022) ("The perceptions of analysts are an acceptable measure of what reasonable investors would have understood").

**b.    Defendants' Attempts to Avoid Liability for These Misstatements Fail**

Defendants lump the statements in ¶260 and ¶269 together with other misstatements and label them all as "forward-looking," therefore entitling them to the protections of the PSLRA's safe harbor.  MTD at 18-19. But Defendants ignore that these statements are non-forward-looking representations about "current or past facts," or at the least, "mixed" statements that include such embedded representations, which are "not protected." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Applying the safe harbor to such statements would mean companies could knowingly make intentionally false projections, no matter how outlandish, which is not what the safe harbor was designed to allow. *Id.* at 1142 ("the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts"). Indeed, as the Ninth Circuit observed, "[t]he mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *Id.*

Here, Defendants knowingly told investors xMatters would contribute $9-11 million to Everbridge's 2021 revenue ***after already*** "considering the material impact of purchase accounting and the associated deferred revenue haircut." ¶260. In other words, Defendants told investors that, based on ***presently known*** information, xMatters could contribute no more than $9-11 million to the Company's total yearly revenue. However, Defendants ***knew at that time*** xMatters would actually contribute more than twice that amount ($20-25 million) to the Company's total revenue for the rest of the year, misleading investors to think the updated revenue growth numbers were organic (and therefore likely to be sustainable) when they were not. Thus, the statements in ¶260 and ¶269 cannot be protected under the PSLRA's safe harbor provision. *See, e.g.,*

16

*Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1018-21 (N.D. Cal. 2020) (holding misleading financial projections were not protected by the safe harbor because "Defendants failed to disclose the material facts undermining those projections").

Even assuming the statements were forward-looking—they are not—none were accompanied by the "meaningful cautionary language" sufficient to invoke safe harbor protection. "To be adequate under the cautionary-language prong, the caution must 'discredit the [allegedly misleading statements] so obviously that the risk of real deception drops to nil.'" *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (citing *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)). Indeed, when Defendants make "mixed" statements, as here, the "cautionary language must be understood in the light of the non-forward-looking statement." *Quality Sys.*, 865 F.3d at 1146. Thus, "[i]f the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language— short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be 'sufficiently meaningful' to qualify the statement for the safe harbor." *Id.* at 1146-47. Similarly, here, "virtually no cautionary language," short of an outright admission by Defendants that xMatters would contribute $20-25 million, "would have been adequate." *Id.* at 1148.

Defendants also argue that the statements in ¶260 and ¶269 were not false or misleading because Everbridge disclosed revenue from acquired companies in its annual SEC filings. MTD at 26. The Court should reject this argument. As an initial matter, contrary to Defendants' assertion (*id.*), the Court did not address the falsity of xMatters' revenue contribution directly. Instead, it based its holding on the determination that CW 1's statements were inadequately supported (Order at 15 n.4, 20). As discussed in Section III(A) above, the SAC has cured that deficiency. Indeed, the Court should not accept Defendants' self-serving argument that they truthfully disclosed revenue contributions in their annual reports, MTD at 26, because it is contradicted by CW 1's now-bolstered allegations, which demonstrate that Defendants

17

secretly allocated acquired revenue from xMatters into the Company's total revenue to make it appear as if the Company's revenue growth was organic and sustainable. At this stage, the Court must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *QuantumScape*, 580 F. Supp. 3d at 729.

Moreover, and critically, Defendants' argument fails even if one assumes Defendants truthfully disclosed the Company's acquired revenue in the annual reports because the annual report that would have included xMatters' revenue contribution was not released until ***after*** the Class Period. Defendants misled investors about xMatters' revenue contribution on April 6, 2021 and May 10, 2021. ¶¶260, 269. However, they did not supposedly disclose acquired revenue for that year until February 25, 2022, which occurred ***after*** the end of the Class Period. Thus, investors who relied on Defendants' false statements and purchased Everbridge stock based on a new organic revenue outlook were harmed when, on December 9, 2021 and February 24, 2022, the Company revealed the truth about the Company's organic revenue growth. ¶¶334-59. Thus, the statements in ¶260 and ¶269 are actionably false and misleading.

### 2. Defendants Misled Investors About the Company's Growth by Failing to Disclose its Failure to Integrate xMatters

In addition to misleading investors about the Company's organic revenue growth, Defendants also misled investors by touting their integration efforts without disclosing the severe integration problems the Company experienced. For example, according to several CWs (including 1 and 2), Defendants misled investors about the xMatters integration, which was the Company's largest and most important acquisition to date. For example, on August 9, 2021 (just four months after announcing the xMatters acquisition), Defendant Meredith falsely claimed that the xMatters teams had "***already been integrated***." ¶282; *see also* ¶286 (Meredith falsely stating that "***we've got [xMatters] integrated now***"). Similarly, on November 9, 2021, Defendant Brickley falsely stated that Everbridge had already "***integrated the people . . . [and] integrated***

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 2:22-CV-02249-FWS-RAO

*the sales.*" ¶287, and on November 30, 2021, falsely stated that "*[w]e've locked up key hires, and we're retaining them.*" ¶290.

These statements were **knowingly and intentionally false**. In reality, according to several CWs (1, 2, 5, 14, among others) the xMatters acquisition was a failure, and a **majority** of the xMatters sales staff had left the Company by September 30, 2021, which contributed to declining sales of xMatters in the third quarter of 2021. ¶¶185-97.[3] Moreover, CW 14's corroborative allegations confirmed that Defendants did not integrate xMatters technology and platform during her employment. ¶188. Ultimately, according to CWs 5 and 14, the Company's failure to integrate its acquisitions created a disjointed product offering that was all-but impossible to sell since it was not the singular, integrated suite of products Everbridge publicly claimed. ¶¶199, 201. According to CW 5, mid-way through 2021, half the sales team was at **0% of its quotas**, which she described as "staggering." ¶191. This is corroborated by CW 14, who noted that salespeople were not hitting their quotas, specifically in corporate sales, and because the Company's products were complex, the loss of employees with institutional knowledge of the products harmed the Company's sales. ¶202.

Courts within the Ninth Circuit have routinely held similar statements actionable. *See*, *e.g.*, *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193, at *11-12 (N.D. Cal. 2023) (statement "we're getting synergy . . . on the sales side" materially false by failing to disclose integration issues); *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *19 (N.D. Cal. 2018) (statement "**fully integrated** sales and marketing teams" false based on CWs who "paint a vastly different picture" through accounts of "sales force integration problems that still existed" at time of statements).

Defendants improperly lump the xMatters integration statements (¶¶282, 286-87, 290) with others to argue that they are protected by the PSLRA safe harbor (MTD at 18-19; *see also* Section III(B)(1)(b), *supra*). The Court should reject this argument

---

[3] CWs 2 and 10 also explained Everbridge failed to integrate xMatters' client relationship management software, crippling the ability to sell xMatters. ¶¶189-90.

19

for the simple reason these statements are not forward-looking and cannot find protection in the safe harbor. Rather than aspirational goals for integration, Defendants unequivocally stated that they had *already* integrated the xMatters' teams, including the sales team, and had *already* retained the key hires. However, these statements were false at the time Defendants made them, as alleged by CWs 2, 10, and 11, and confirmed by the addition of CW 14, who stated that Everbridge did not integrate the xMatters sales team, as the two companies retained their own sales teams after the acquisition. ¶¶192-94.[4] Therefore, because Defendants "chose[] to publicly tout the integration of the [xMatters] sales team, it was incumbent on defendants to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cut[] against the positive information." *Okta, Inc.*, 2023 WL 2749193, at \*11-12.

Defendants also argue that these statements are immaterial puffery. MTD at 19. Not so. Whether Everbridge retained key employees and whether xMatters teams were already integrated are concrete statements capable of objective verification and thus not merely puffery. *See Okta, Inc.*, 2023 WL 2749193, at \*13 (statements that the integration was "seamless" and implying "that the back office and go-to-market teams have been fully integrated," were actionably false and misleading and not merely corporate puffery because the "statements went beyond mere optimism by providing a concrete description of the sales team integration") (citing *Forescout Techs.*, 63 F.4th at 770).

**3. Defendants Misled Investors About the Company's Growth by Falsely Stating that the Company Had also Successfully Integrated the Non-xMatters Acquisitions into the CEM Suite**

Defendants also misled investors by claiming that the remaining Class Period acquisitions were already integrated into the Company's CEM platform. For example, Defendants claimed on February 18, 2020 (near the start of the Class Period) that they

---

[4] CW 14 explained that keeping the sales teams separate harmed sales because the two different sales teams often wound up competing against each other for the same customers and did not work well together. ¶194.

20

had already "*integrated NC4 and Risk Center into our entire product offering*" (¶236). This statement led investors to believe that Everbridge had *already created* a unified CEM suite and had *already successfully integrated* the NC4 acquisition into the CEM platform in order to drive *sustainable*, long-term revenue for the Company. However, this rosy picture painted by Defendants was far from the truth. In reality, Defendants made little-to-no effort to integrate the NC4 acquisition (or any of those that followed)—which was necessary to realize the benefits of the acquisitions—and instead simply continued "buying revenue" through acquiring more and more companies. This practice of purchasing revenue without fully integrating the previous acquisitions was unsustainable and created a disjointed CEM platform that was actually detrimental to sustainable long-term growth.

These problems began with Everbridge's incomplete integration of NC4. According to CW 14, Defendants never fully integrated NC4's technology into Everbridge's platform and NC4 and Everbridge maintained separate platforms. ¶109. Similarly, CW 16—who worked at NC4 prior to acquisition and remained at Everbridge afterwards—noted that NC4's Risk Intelligence Center struggled after the acquisition. ¶¶67, 111. CW 16 stated that NC4 was very isolated, explaining that Everbridge did not provide much focus or attention to NC4. ¶115. CW 16 also stated that most if not all of NC4's sales and customer account management team left the Company shortly after the acquisition, and Everbridge did not invest the necessary resources into NC4, and as a result legacy NC4 customers were cancelling or not renewing their contracts. ¶¶68, 111-12. These allegations demonstrate that Defendant Ellertson's statement that Everbridge had already "*really integrated NC4 . . . into our product offering*," ¶236, was false and misleading.

The SAC's other detailed, corroborative CW allegations plausibly allege that the integration problems continued throughout the Class Period, as Defendants moved onto the next acquisition without properly integrating the previous acquisitions. *See, e.g.*, ¶121 (CW 9 stating that Connexient's app was not integrated into Everbridge's

21

platform by March 2022); ¶125 (CW 5 stating that Everbridge did not integrate CNL Software into its product platform and, as a result, customers had to use two different systems to monitor threats and send notifications); ¶126 (CW 13 stating that CNL Software continued operating as a separate business after the acquisition); ¶140 (CW 3 stating that Everbridge made no effort to integrate RedSky).

Defendants' failure to integrate the Class Period acquisitions created a disjointed CEM platform that harmed sales and long-term growth. According to CW 5, Everbridge never integrated its acquisitions into a single, unified system. ¶199. Similarly, CW 13 stated that none of the acquisitions were fully accessible from a single login. ¶18. Likewise, CW 14 stated that acquisitions were not integrated during her employment, and as a result, she does not recall Everbridge's products every being accessible through a single platform interface. ¶201. According to CW 14, the Company was incapable of integrating the acquired companies and their technology because Defendants continuously just "moved on to the next" new thing without properly integrating the previous acquisition. ¶204. CW 14 also stated that the Company could not keep up with all the customer product enhancement requests because management was "off buying more companies" instead of allocating sufficient resources and attention to those requests and related integration problems. *Id.*[5] Thus, Defendants' statement that "***if you look at the acquisitions that <u>we have done</u> . . . we now truly can be that unified enterprise-wide operating system***," ¶240, was false and misleading.

---

[5] Defendants argue that CW 14's allegations are not reliable because they are inconsistent. MTD at 17. Specifically, Defendants argue that CW 14's allegation that the products and technology were never integrated is not consistent with her allegation that NC4's technology was "pulled into" Everbridge's products. *Id.* However, Defendants conveniently ignore that CW 14's allegation goes on to say that even though NC4's technology was "pulled into" Everbridge's product, ***the technology was still never fully integrated***. ¶109. Thus, the Court should reject Defendants' challenge to CW 14's reliability. Similarly, CW 14's allegation that Everbridge had integration road maps does not change that Defendants did not meet those road maps or successfully integrate any of the acquisitions.

Therefore, Defendants' statements about their integration efforts were false and misleading because they led investors to believe that Everbridge was successfully enhancing the CEM platform and driving long-term growth, when in reality, Everbridge was not properly integrating its offerings into its CEM platform, which created a complicated product offering that was not actually the "***unified enterprise-wide operating system***" Defendants claimed. ¶240. Indeed, based on Defendants' false and misleading representations, analysts drew the (incorrect) conclusion that Everbridge was growing its CEM platform through its successful integrations. For example, on February 19, 2021, Stephens issued an analyst report stating that it "expect[ed] Everbridge to continue to . . . grow the CEM pipeline." ¶142. Similarly, following the xMatters integration, which was also supposed to enhance the CEM platform, Stephens wrote that they "were encouraged to hear that xMatters is exceeding expectations and . . . [l]ooking ahead, we expect CEM momentum to continue into [second half of 2021]/2022." ¶¶175-76. However, as explained in Section III(C), this momentum was illusory and did not carry into 2022.

Moreover, despite Defendants' arguments (MTD at 18-19), the integration statements are not forward-looking, as they discussed the ***current state*** of integration. *See, e.g.*, ¶236 ("we [ha]ve really integrated NC4 and Risk Center into our entire product offering"). In any event, any cautionary language was inadequate, as the SAC alleges "that Defendants' disclosures were inadequate . . . [because] Plaintiff has alleged that analysts drew from Defendants' public statements the (incorrect) conclusion that Defendants" were successfully integrating the acquisitions and "[t]he perceptions of analysts are an acceptable measure of what reasonable investors would have understood." *Zillow*, 2022 WL 17486297, at *7.

Similarly, Defendants' argument that their generic risk disclosures about ***potential*** integration challenges shield them from liability is unpersuasive because "cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d

23

1132, 1178 n.62 (C.D. Cal. 2008). Here, the SAC adequately alleges that the risks had already transpired. *See*, *e.g.*, ¶¶230-37 (multiple CW allegations stating that NC4 had not been integrated into Everbridge's CEM platform and that Everbridge did not invest in NC4, despite Defendants' statements that they had already integrated it into Everbridge's platform).

Thus, the integration statements were actionably false and misleading because they gave investors an impression of the Company's CEM platform and integration that was materially different from the actual state of Everbridge's CEM platform and integration.

**C.     The SAC Adequately Alleges a Strong Inference of Scienter**

"[P]articularized allegations that defendants had actual access to the disputed information raise a strong inference of scienter." *Quality Sys., Inc.*, 865 F.3d at 1145. Plaintiffs may plead scienter by showing not only an "intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Id.* at 1144. One "is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The scienter inference "need not be irrefutable, i.e., of the 'smoking-gun' genre." *Tellabs*, 551 U.S. at 324. Under this rule, "the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. 2014). In determining scienter, a court must review "all the allegations holistically." *Tellabs*, 551 U.S. at 326. The SAC readily satisfies these standards and cures the deficiencies from the FAC, as identified in the Court's Order.

**1.     The SAC's CWs Establish a Strong Inference of Scienter**

A complaint can establish a strong inference of scienter through CW allegations by satisfying a two-part test: (1) the CWs "must be described with sufficient particularity to establish their reliability and personal knowledge;" (2) their "statements . . . must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995; *see also Quality*

24

*Sys.*, 865 F.3d at 1144-45. As described above, *see* Section III(A), the SAC bolsters the FAC's descriptions of CWs 1, 2, and 3 to further establish their reliability and personal knowledge, and provides similarly detailed descriptions of the SAC's new CWs (CWs 12 - 16) to establish their reliability. Thus, this section addresses only the second prong of the *Zucco* analysis, in which courts "look to the level of detail provided by the [CWs], the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Zucco*, 552 F.3d at 995.

Here, CW 1's direct communications with Defendants Meredith and Brickley demonstrate that they ***knew*** the xMatters revenue statements (¶¶260, 269) were false. Specifically, CW 1 sent emails and financial models directly to Defendants Meredith and Brickley about the discrepancy between the reported xMatters revenue ($9-11 million) and the actual revenue number ($20-25 million), but Meredith responded that the discrepancy was to buffer the declines in Everbridge's organic revenue, meaning Everbridge could use the discrepancy to cover up for their slowing organic revenue growth. ¶¶151-54. Thus, Defendants Meredith and Brickley had actual access to the disputed information and, indeed, even told CW 1 that they knowingly covered up Everbridge's slowing organic revenue growth. *See Quality Sys.*, 865 F.3d at 1145 ("[P]articularized allegations that defendants had ***actual access*** to the disputed information . . . raise a strong inference of scienter").

Moreover, sixteen CWs offer specific, corroborative details of Class Period integration problems, including failure to integrate acquired technology into Everbridge's platform. Indeed, to address the Court's Order dismissing the FAC, the SAC adds several CWs (CWs 12 - 16) that are highly corroborative of the other CW allegations. For example, CWs 9 and 12 both state that Everbridge did not integrate Connexient (¶¶120-21), CWs 5 and 13 both state that Everbridge did not integrate CNL

Software (¶¶125-26), and CWs 10, 11, and 14 state that Everbridge did not integrate xMatters' sales team (¶¶192, 194).[6]

These CW allegations from the SAC reliably allege Defendants knew, or were reckless in not knowing, that their failure to integrate Class Period acquisitions created a disjointed CEM platform that harmed sales. For example, CW 14 explained that Everbridge was not able to keep up with its own integration roadmaps, and that management did not listen to concerns raised by employees about these problems or missed goals.[7] ¶205. Similarly, CW 15 stated that Everbridge's former Chief Technology Officer, John Maeda, and then-Senior VP of Engineering and current CTO Haibei (Happy) Wang, communicated to the C-suite (meaning Individual Defendants) that much of the acquired technology could not be integrated, and Everbridge would need to reduce the numbers of products it offered, but management refused to listen. ¶209. Likewise, CW 16 discussed the problems caused by the lack of resources—and the impact it was having on her team's ability to service their customers—with her supervisors, who sent several emails to management at Everbridge, advising them of the problem and requesting additional resources to improve performance. ¶113. However, one of CW 16's supervisors shared emails with CW 16 to show her that he was doing what he could but, ultimately, management did not take their concerns seriously. *Id.*

---

[6] Defendants argue that CW allegations are inconsistent with each other and the theory of fraud. MTD at 16-17. The Court should reject this, as Defendants conflate integrating the acquired technology into Everbridge's CEM platform with integrating the acquired workforce, including xMatters' sales team. The CWs consistently state that Everbridge never fully integrated the acquired technologies into a single, unified system (as they falsely claimed), ¶¶17-18, 207, and also consistently state that Everbridge struggled to integrate the acquired workforce, including xMatters sales teams, which further harmed the Company's sales. ¶¶185-86,198-99.

[7] Defendants' argument that CW 14's allegations are inconsistent is unpersuasive. MTD at 17. CW 14 stated that even though Everbridge created roadmaps, it could not keep up, and management did not seem to care about hitting the roadmap's goals. ¶¶205-06. Thus, CW 14's allegations that the integrations were a mess is not inconsistent with her allegations that the acquisitions were never fully integrated.

26

Defendants argue that CW 16's statements are hearsay, however, there is no *per se* bar to hearsay allegations at the pleading stage. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (crediting CW hearsay). In any event, CW 16 had personal, first-hand knowledge, as her supervisor directly showed her the emails to management. ¶¶67, 113. At bottom, the CW allegations add to a strong inference of scienter, especially when considered together with the SAC's other allegations. *See NVIDIA*, 2023 WL 5496507, at *16 ("Even if no single [CW] allegation, standing alone, is 'sufficient to give rise to a strong inference of scienter,' a holistic review of all the allegations may 'combine to give rise to a strong inference of scienter'").

### 2.    Meredith's Abrupt Departure Supports Scienter

The Court previously found that Meredith's abrupt departure was "insufficient to support a strong inference of scienter **by itself**." Order at 23 (emphasis added). However, the SAC adds allegations from former employees that strengthen the inference that Meredith's abrupt departure was connected to the integration problems at issue in this case. For example, CW 12 stated that the Company's Board criticized Meredith's growth-through-acquisition strategy because it was not sustainable and not an accurate way to measure the Company's growth. ¶373. Similarly, CW 13 stated that, based on discussions with colleagues, Meredith left because the Board opposed his growth through acquisition strategy. ¶374.

These CW allegations are sufficiently reliable because they are corroborated by the fact that directly after Meredith left, Everbridge's management team conducted a "comprehensive review" of the Company's strategy under Meredith's leadership, which looked at "the number of acquisitions completed in 2020 and 2021." ¶220. This review concluded that the Class Period acquisitions were not fully integrated (despite Defendants' prior false and misleading statements to the contrary), and that the Company's M&A strategy under Meredith had produced integration challenges and created "obstacles to sales" that complicated the Company's "go-to-market efforts" and made it "harder for . . . [Everbridge's] enterprise sales organization to execute on [its]

27

land, adopt and expand strategies." ¶¶221-22. Therefore, CWs 12 and 13 provide reliable allegations demonstrating that Meredith's abrupt departure supports scienter. Defendants argue that CWs 12 and 13 provide speculative opinions, which are insufficient to establish scienter. MTD at 31. However, courts may consider a CW's opinion where, like here, the CW opinions are corroborated by other facts. *See Forescout*, 63 F.4th at 772-74 (among other things, "[h]aving considered . . . the consistency between the CW's statements of subjective opinion and those of verifiable fact, we find that the CWs tell a reasonably plausible story about Forescout's state of affairs.").

Here, CWs 12 and 13's statements that the Board disagreed with Meredith's strategy is corroborated by post-Class Period admissions that the Company had not fully integrated the Class Period acquisitions, which was harmful to sales and long-term growth. ¶¶307-13. As such, the cases relied upon by Defendants are distinguishable because they dealt with "generalized, subjective impressions" and "gossip." *See* MTD at 31. Here, on the other hand, the SAC offer these CWs' first-hand accounts of what they heard—that the Board disagreed with Meredith's undisclosed growth-through-acquisition strategy because it was not sustainable—which are corroborated by independent and undisputed evidence—that the Board conducted a comprehensive review following Meredith's departure that determined Meredith's strategy was unsustainable and detrimental to long-term growth.

Thus, the SAC plausibly alleges that Meredith's departure was connected to his failure to properly integrate the Class Period acquisitions, and thus, Meredith's abrupt departure supports an inference of scienter. *See Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. 2018) (inference of scienter where "timing of [defendant's] termination and PPG's announcement of remedial measures" coincided).

### 3. The Core Operations Doctrine Supports Scienter

Defendants consistently touted Everbridge's CEM platform as critical to the Company's growth, *see* ¶¶73-76, and told investors that the Class Period acquisitions

28

were designed to strengthen the CEM platform. *See*, *e.g.*, ¶¶246, 250, 265, 279. Thus, given the importance of the Class period acquisitions to the Company's CEM platform and its future growth, "it would be absurd to suggest management was without knowledge of" the integration problems. *Reese*, 747 F.3d at 577. Moreover, the SAC specifically alleges other facts that support the core operations allegations. *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (core operations facts support scienter when combined with "specific allegations about management's exposure to factual information").

Here, the SAC details how the Defendants spoke at length about the Company's CEM platform and integration efforts, and answered direct questions about the integrations, which suggests that Defendants either knew their statements were false when made or were deliberately reckless in failing to inform themselves on the subject before speaking. *Reese*, 747 F.3d at 571 ("fact that [defendant] . . . made the statement about corrosion data supports the inference that she made it with scienter"); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("public statements celebrating the merger as an unprecedented success" support scienter). For example, Defendants answered questions about the xMatters integration and told investors that the xMatters teams had "already been integrated," ¶¶282, 286-87, despite several CW statements that xMatters had not been fully integrated and its sales teams remained completely separate. ¶¶192-95, 283-84.

### D.   The SAC Adequately Alleges Loss Causation

Defendants argue the disclosure on December 9, 2021 is not a corrective disclosure because it does not relate to any of the alleged misstatements.[8]  MTD at 33-34. Defendants are wrong. Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Ninth Circuit's test for loss causation boils down to "the familiar test

---

[8] Defendants do not challenge the February 24, 2022 corrective disclosure and thus admit that the SAC alleges loss causation with respect to this disclosure.

29

for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).

Indeed, there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at 754. The materialization of the risk theory is one such way. As the Ninth Circuit explained in *Nuveen Municipal High Income Opportunity Fund v. City of Alameda, California*, this theory "recognizes that a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by [plaintiff]." 730 F.3d 1111, 1120 (9th Cir. 2013).

Lead Plaintiff's theory of loss causation is simple and demonstrates that there are multiple ways to satisfy proximate cause. The final corrective disclosure, on February 24, 2022 (which Defendants do not challenge) revealed the very facts about which Defendants lied—that they had *not* fully integrated the acquisitions into the CEM platform, and that the Company's undisclosed growth-through-acquisition strategy was actually detrimental to long term growth. ¶¶343-50. The first partial corrective disclosure on December 9, 2021—although not revealing the full extent of the fraud—likewise satisfies Ninth Circuit standards for loss causation. *First Solar*, 881 F.3d at 753 ("Disclosure of the fraud is not a sine qua non of loss causation").

On December 9, 2021, Everbridge announced that Meredith was abruptly resigning as CEO and, at the very same time, reduced revenue guidance for the next year to 20-23%, which was well below the Company's historical forecasts of 30% plus revenue growth. ¶¶335-36. Defendants argue that this disclosure is "untethered to any of the SAC's substantive allegations." MTD at 34. Not so. This disclosure partially revealed the circumstances that the fraud concealed—i.e., that the Company's revenue growth was not sustainable due to the Company's undisclosed growth-through-acquisition strategy and incomplete integrations. Put another way, throughout the Class Period, Defendants claimed that they had successfully integrated the acquisitions into the CEM platform, which had purportedly created a unified experience for their

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT
CASE NO. 2:22-CV-02249-FWS-RAO

customers, while hiding from investors the risk that the Company's revenue growth was unsustainable due to Defendants' failure to fully integrate the acquisitions into the CEM platform before moving on to the next acquisition. Thus, the December 9, 2021 disclosure partially revealed the risk that was concealed by Defendants' misstatements and omissions throughout the Class Period. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (loss causation pled where stock drop followed announcement of drop in revenues, even though defendants' fraudulent practices were not revealed, because plaintiffs alleged that the "circumstances that the fraud concealed" caused the drop in revenues).

Indeed, following this disclosure, analysts questioned whether Meredith's departure was related to the significantly lower revenue guidance, as J.P. Morgan wrote "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?" Thus, Everbridge's explanation that Meredith's departure had no relation to the Company's finances is unpersuasive; market analysts immediately questioned the suspicious departure, despite not knowing the truth until February 24, 2022.

Moreover, following this news, the stock price tanked by ***more than 45.4%***, as analysts were shocked by Meredith's abrupt departure, ¶¶298-99, and the Company's substantially lower revenue guidance. ¶302. For example, Bank of America stated that what is "[m]ore concerning to us is the 2022 prelim[inary] revenue guidance ***that suggests a sharp revenue growth deceleration***" and Northland Capital Markets commented that the revenue guidance was "a ***notable change***" from "the company's historic guidance . . . that they should grow 30%+ organically." ¶302. The reaction of the market and these market professionals supports the falsity of Defendants' prior statements. *See NVIDIA*, 2023 WL 5496507, at *13 ("The response of investors and analysts after NVIDIA's disclosures on November 15 make clear that [defendants'] statements during the Class Period were materially false and misleading . . . [because]

31

sophisticated professional analysts were surprised by the November 15 disclosures" and there was "a sudden and substantial fall in NVIDIA's stock price").

### E. The SAC Adequately Alleges Section 20(a) Claims

Because the SAC adequately alleges violations of Section 10(b) and Rule 10b-5 against Defendants, the Court should also uphold the Section 20(a) claim.

## IV. CONCLUSION

For all these reasons, the Court should deny Defendants' MTD in its entirety.

Dated:  September 28, 2023          Respectfully submited,

**LABATON SUCHAROW LLP**

By: */s/ Michael H. Rogers*
Michael P. Canty (*pro hac vice* pending)
Michael H. Rogers (*pro hac vice*)
David J. Schwartz (*pro hac vice*)
Nicholas Manningham (*pro hac vice*)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com
mrogers@labaton.com
dschwartz@labaton.com
nmanningham@labaton.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

Ryan A. Llorens (225196)
Danielle S. Myers (259916)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
ryanl@rgrdlaw.com
dmyers@rgrdlaw.com

*Liaison Counsel for the Class*

32

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:      September 28, 2023
New York, New York

*/s/ Michael H. Rogers*
Michael H. Rogers