MICHAEL C. TU (State Bar No. 186793)
*mctu@cooley.com*
RYAN E. BLAIR (State Bar No. 246724)
*rblair@cooley.com*
JANELLE M. FERNANDES (State Bar No. 322217)
*jfernandes@cooley.com*
COOLEY LLP
355 South Grand Avenue, Suite 900
Los Angeles, California 90071
Telephone: (310) 883-6400
Facsimile: (310) 883-6500

*Attorneys for Defendants*
*Everbridge, Inc., Patrick Brickley,*
*Jaime Ellertson, and David Meredith*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| SYLEBRA CAPITAL PARTNERS MASTER FUND LTD, SYLEBRA CAPITAL PARC MASTER FUND, AND SYLEBRA CAPITAL MENLO MASTER FUND, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>Plaintiffs,<br><br>v.<br><br>EVERBRIDGE, INC., DAVID MEREDITH, PATRICK BRICKLEY, AND JAIME ELLERTSON,<br><br>Defendants. | Case No. 2:22-cv-2249-FWS-RAO<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>Date: December 7, 2023<br>Time: 10:00 a.m.<br>Dept: 10D<br>Judge: Hon. Fred W. Slaughter<br><br>*Date Action Filed: April 4, 2022* |

# TABLE OF AUTHORITIES

**Page(s)**

I.    INTRODUCTION ...................................................................................................1

II.   ARGUMENT ........................................................................................................2

    A.   THE SAC DOES NOT (AND CANNOT) CURE THE CW DEFICIENCIES. ...............................................................................................2

        1.   CW1'S ALLEGATIONS COMPLETELY IGNORE THE COURT'S ORDER. ...........................................................................2

        2.   CW 2–3'S NEW ALLEGATIONS ARE IRRELEVANT. ........7

        3.   CWS 12–16 ADD NOTHING. ...................................................8

    B.   THE SAC STILL FAILS TO ALLEGE ANY FALSE OR MISLEADING STATEMENT. .......................................................... 10

        1.   DEFENDANTS' STATEMENTS REGARDING XMATTERS REVENUE CONTRIBUTIONS ARE INACTIONABLE. ............................................................................ 10

        2.   DEFENDANTS' STATEMENTS ABOUT INTEGRATION EFFORTS ARE INACTIONABLE. ............ 12

        3.   DEFENDANTS' BUSINESS STRATEGY STATEMENTS ARE INACTIONABLE. .............................. 14

    C.   THE SAC DOES NOT ESTABLISH A STRONG INFERENCE OF SCIENTER. ....................................................................................... 15

        1.   THE NEW CWS DO NOT SUPPORT SCIENTER. ............... 15

        2.   MEREDITH'S DEPARTURE ALSO DOES NOT SUPPORT SCIENTER. ........................................................... 16

        3.   THE CORE OPERATIONS THEORY CANNOT SUPPORT SCIENTER. ........................................................... 18

    D.   PLAINTIFFS DO NOT ADEQUATELY PLEAD LOSS CAUSATION. ............................................................................... 19

III.  CONCLUSION ................................................................................................... 20

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

REPLY MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS, CASE NO. 2:22-CV-2249-FWS-RAO

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

**Cases**

*Alaska Elec. Pension Fund v. Adecco S.A.*,
  434 F. Supp. 2d 815 (S.D. Cal. 2006) ........................................................... 10

*Bajjuri v. Raytheon Techs. Corp.*,
  2023 WL 3650554 (D. Ariz. May 25, 2023) .................................................. 17

*Bao v. SolarCity Corp.*,
  2016 WL 54133 (N.D. Cal. Jan. 5, 2016) ........................................................ 2

*Berson v. Applied Signal Tech. Inc.*,
  527 F.3d 982 (9th Cir. 2008) ......................................................................... 20

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020) ......................................................................... 19

*Buttonwood Tree Value Partners, LP v. Sweeney*,
  910 F. Supp. 2d 1199 (C.D. Cal. 2012) ........................................................... 6

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
  2019 WL 6877195 (N.D. Cal. Dec. 17, 2019) ............................................... 10

*Crews v. Rivian Auto., Inc.*,
  2023 WL 3050081 (C.D. Cal. Feb. 16, 2023) .................................................. 4

*In re Downey Sec. Litig.*,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..................................... 3, 8, 15

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
  81 F.4th 918 (9th Cir. 2023) ................................................................. *passim*

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ....................................................................... 20

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. 2018) .............................................................. 14

*In re Facebook, Inc. Sec. Litig.*,
  477 F. Supp. 3d 980 (N.D. Cal. 2020) ............................................................. 5

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ........................................... 5, 15

*In re Fastly, Inc. Sec. Litig.*,
  2021 WL 5494249 (N.D. Cal. Nov. 28, 2021) ............................................... 20

*In re Foundry Networks, Inc. Sec. Litig.*,
  2003 WL 22077729 (N.D. Cal. Aug. 29, 2003) ............................................... 4

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ............................................................................ 11, 18

*Hershewe v. JOYY Inc.*,
    2021 WL 6536670 (C.D. Cal. Nov. 5, 2021) ........................................................ 9

*Hosp. & Med. Ctr. Found. Of Omaha v. Countrywide Fin.*,
    2011 WL 13220509 (C.D. Cal. Aug. 22, 2011) ................................................. 20

*Johnson v. Costco Wholesale Corp.*,
    2020 WL 4816225 (W.D. Wash. Aug. 19, 2020) ................................................ 8

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) .......................................................................... 10

*McGovney v. Aerohive Networks, Inc.*,
    367 F. Supp. 3d 1038 (N.D. Cal. 2019) ......................................................... 3, 10

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) .............................................................. 11

*Nuveen Mun. High Income Opp. Fund v. City of Alameda*,
    730 F.3d 1111 (9th Cir. 2013) .......................................................................... 19

*In re Okta, Inc. Sec. Litig.*,
    2023 WL 2749193 (N.D. Cal. 2023) ................................................................. 14

*Paracor Fin. Inc. v. G.E. Corp.*,
    96 F.3d 1151 (9th Cir. 1996) ............................................................................ 20

*Patel v. Parnes*,
    253 F.R.D. 531 (C.D. Cal. 2008) ...................................................................... 15

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ........................................................... 11, 12, 15, 16

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022) .............................................................. 11

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ............................................................................ 18

*Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) ............................................................ 11

*Roy v. Contra Costa Cnty.*,
    2015 WL 5698743 (N.D. Cal. Sept. 29, 2015) .................................................. 15

*In re VeriFone Holdings*,
    704 F.3d 694 (9th Cir. 2012) ............................................................................ 18

-iii-

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Waterford Twp. Police v. Mattel, Inc.*,
321 F. Supp. 3d 1133 (C.D. Cal. 2018) .............................................................. 8

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ............................................................................ 11

**Statutes**

15 U.S.C.

§78u-5(i)(1) ....................................................................................................... 11

Securities Exchange Act of 1934

§10(b) ................................................................................................................. 20

## I.    INTRODUCTION

Plaintiffs have responded to defendants' motion to dismiss by choosing to ignore the roadmap given by the Court in its Order dismissing the First Amended Complaint.  The Opposition argues that the Court's determination of the sufficiency of the Second Amended Complaint ("SAC") should rest on allegations of CW1's reliability concerning the revenue forecasting attributable to one of Everbridge's acquisitions (*i.e.*, xMatters) during the class period.  But the Opposition avoids entirely the Court's previous instruction that plaintiffs must establish, among other things, "how CW1 came to believe that their valuation was incorrect, the position or duties CW1 held that lends credibility to their conclusion, or the general methodology by which CW1 calculated the projected revenue should have been closer to $20 or $25 million." Dkt. No. 79 ("Order") at 20.  ***Nowhere*** does the SAC or Opposition allege ***any*** of these critical details to support any inference that CW1's xMatters projections were correct while Everbridge's projections were wrong.  In fact, the Opposition ***ignores, and does not even address, that portion of the Court's Order***.  As before, nothing has changed regarding CW1, who remains highly unreliable, and her purported allegations should be disregarded for the same reasons as the Court previously held.

But the SAC is legally insufficient for far more reasons than CW1's continuing lack of reliability.  ***First***, the SAC does nothing to salvage the meager details regarding CWs 2 and 3, which amount to nothing more than job titles.  ***Second***, the "new" CWs are merely superfluous window-dressing on allegations that have already been soundly rejected by this Court; namely, that integrations of acquired companies are not and never will be instantaneous.  ***Third***, nothing in the Opposition provides any basis to disturb the Court's unambiguous holding that the majority of the challenged statements are inactionable or otherwise protected under the PSLRA's Safe Harbor.  And ***finally***, the SAC adds no compelling facts to support the required strong inference that defendants "acted with a fraudulent intent in making optimistic

statements to investors" about integrations and revenue forecasts.  Order at 26.

The SAC is now plaintiffs' *third* unsuccessful attempt to plead an actionable securities fraud claim.  If there were ever any doubt that this lawsuit had any merit, plaintiffs' continued failure to even attempt to address the issues identified in the Court's Order should put such concerns to rest.  It is time for this wasteful and groundless litigation to be dismissed with prejudice.

## II.   ARGUMENT

### A.   The SAC Does Not (and Cannot) Cure the CW Deficiencies.

Plaintiffs' assertion that "sixteen CWs offer specific, corroborative details of Class Period integration problems," Dkt. No. 90 ("Opp.") at 25, incorrectly assumes the SAC properly detailed its CW allegations in the first place.  But the strategy of simply increasing the quantity of CWs does not and cannot compensate for the lack of quality in their allegations.  *See Bao v. SolarCity Corp.*, 2016 WL 54133, at *5 (N.D. Cal. Jan. 5, 2016) ("[p]laintiff argues more than his allegations deliver" despite the addition of eight new CWs).  As such, the SAC must be dismissed because (1) plaintiffs wholly ignored the Court's Order regarding CW1, (2) CWs 2–3 still are not sufficiently reliable, and (3) CWs 12–16 do not disturb the Court's Order.[1]

### 1.   CW1's Allegations Completely Ignore the Court's Order.

Mistakenly believing that CW1 is their best chance to avoid another dismissal, the Opposition focuses almost entirely on CW1's claims.  But for at least three important reasons, CW1 still has *zero* reliability or credibility.

*First*, plaintiffs ignore the expressly identified substantive concerns the Court conveyed in its Order: "[I]t is not clear how CW1 came to believe that their valuation was incorrect, the position or duties CW1 held that lends credibility to their conclusion, or the general methodology by which CW1 calculated the projected revenue should have been closer to $20 or $25 million."  Order at 20.  The SAC does

---

[1] Plaintiffs do not dispute that the SAC includes no *new* allegations regarding CWs 4–11.  Dkt. No. 85 ("Mot.") at 12 n.6.

nothing to address these concerns, and the Opposition does not refer to the Court's directive even once. Of course, without this information, CW1's allegations consist of nothing more than a purported disagreement with management over how to forecast revenue. *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *10–11 (C.D. Cal. Aug. 21, 2009) ("[T]he second-guessing of management decisions by confidential witnesses does not provide a basis for securities fraud.").

Plaintiffs' failure to address the Court's instruction renders their near-exclusive reliance on *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918 (9th Cir. 2023), dramatically misplaced. In *NVIDIA*, the defendants were alleged to have incorrectly reported their crypto-related revenue in NVIDIA's Gaming segment, rather than the Original Equipment Manufacturer segment. *Id.* at 929–30. While the Ninth Circuit partly relied on two highly reliable CWs, the Court principally relied on an independent report by the Prysm Group, which found that NVIDIA understated its crypto-related revenue and corroborated RBC Capital Markets' independent investigation of NVIDIA's revenue reports. *Id.* Notably, "[t]he complaint provided detailed information about Prysm's ***methodology as well as a particularized recitation of facts upon which Prysm relied***." *Id.* at 930.

Here, instead of pleading particularized details regarding CW1's methodology in developing her xMatters projections and why they differed from Everbridge's, the SAC only adds some gratuitous allegations that CW1 had "various titles" at Everbridge (none of which are identified in the SAC, so it is unclear if any are relevant) and did "work related to Everbridge's mergers and acquisition process" (without any elaboration whatsoever). ¶52;[2] Mot. at 12; *McGovney v. Aerohive Networks, Inc.*, 367 F. Supp. 3d 1038, 1053 (N.D. Cal. 2019) ("At a bare minimum, the Ninth Circuit requires that the complaint describe the confidential witnesses with a 'large degree of specificity,' including not just the witnesses' job description, but also his or her 'responsibilities.'"). Indeed, the SAC's new allegations regarding

---

[2] All "¶__" references are to the SAC. Dkt. No. 84.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

CW1 *undermine* her credibility, as the SAC walks back CW1's alleged proximity to Meredith and now alleges that CW1 was actually *three* levels removed from Meredith, ¶52, not "two levels" as the FAC suggests. Dkt. No. 53 at ¶48. Moreover, CW1's guesses that she sent "weekly *or* bi-weekly emails to Brickley and Meredith with modeling" again does not specify what the models were (or what they said), who created the models, or the methodology used. ¶52; Mot. at 12. Finally, the SAC's silence on CW1's methodology is even more glaring here because the alleged misstatements do not pertain to *objective* revenue calculations, but rather *subjective* projections.[3] *See Crews v. Rivian Auto., Inc.*, 2023 WL 3050081, at *15 (C.D. Cal. Feb. 16, 2023) (noting that "*forecasted*" projections are "not *actual*" projections). Without CW1 providing specifics about the inputs for her projections—why hers were allegedly right and the Company's were wrong—CW1's purported second-guessing is woefully insufficient to support a claim for securities fraud. *In re Foundry Networks, Inc. Sec. Litig.*, 2003 WL 22077729, at *9 (N.D. Cal. Aug. 29, 2003) (revenue forecasts were not "false or misleading when made" without "allegations as to the manner in which Foundry's public forecast was derived").

*Second*, the Opposition's purported "wealth of additional details" regarding CW1 are, in fact, a gross overstatement of the SAC's *actual* allegations. Opp. at 1. For example, the Opposition's claim that CW1 "worked on detailed financial planning for the Company's mergers and acquisitions" is *nowhere to be found* in the SAC. *Id.* at 9. The *only* new substantive information the SAC adds about CW1 is

---

[3] *NVIDIA* also involved "*contemporaneous*" sales reports, while the SAC here relies on *subjective, forward-looking estimates*. 81 F.4th at 940. Indeed, the statements at issue in *NVIDIA* related to the total amount of past crypto sales, a number that was certain and involved no subjective assessment. *See id.* at 926. Here, no such certainty existed as the projections were for a company that had not yet been acquired. Further, the Company disclosed the different types of *estimates* used when making xMatters projections, including "the material impact of purchase accounting and the associated deferred revenue haircut," as well as additional considerations such as the timing of the as-of-yet obtained regulatory approval and the future performance of xMatters' business post-acquisition (*e.g.*, key client retention). Dkt. No. 85-15 at 1. The Opposition tries to mitigate those points by claiming the projections already incorporated those unknowns, but that does not change that *these were all unknowns.*

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

that she worked on the "FP&A" team and did "work related to Everbridge's mergers and acquisition [] process." ¶52.  Similarly, the Opposition argues that CW1 emailed Meredith and Brickley about "financial modeling," Opp. at 9, but the SAC says nothing about "financial" modeling, only generically referencing "modeling." *Id.*

Worst of all, the Opposition invents a new alleged "fact," claiming that Meredith and Brickley "even told CW1 that they knowingly covered up Everbridge's slowing organic revenue growth." Opp. at 25.  Plaintiffs provide no citation for this baffling claim—because one does not exist. *See In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1019–20 (N.D. Cal. 2020) (rejecting claim made in the opposition "***for the first time***" that "top management knew about Cambridge Analytica's involvement with the Trump campaign," while "the SAC mentions Trump's campaign . . . only in passing").  To the extent plaintiffs rely on CW1's alleged (and auspiciously quoted) statement from Meredith that "the discrepancy in figures was to 'buffer'" declines in organic revenue, ¶¶151–52, ***this Court already rejected this theory***.  Order at 20 (plaintiffs "inadequately demonstrate[] CW1's foundation to challenge the revenue reporting attributable to the xMatters acquisition").  Moreover, the SAC never alleges that CW1 herself ***directly*** spoke with Meredith or Brickley, when any such meeting took place, or that any defendant actually "told CW 1 that they knowingly covered up Everbridge's slowing organic revenue growth."[4]  Opp. at 25; *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) ("At a minimum, [p]laintiffs needed to have provided information about precisely what was said by the parties in these meetings, which facts the [d]efendants were exposed to, and why this exposure supports an inference of scienter.").

***Finally***, CW1's allegations remain inadequate to establish ***any*** inference of scienter.  This Court has held that the CWs' "vague and hyperbolic assertions" "do not support a strong inference of scienter or demonstrate the falsity of [d]efendants'

---

[4] There is also a plethora of non-finance-related claims attributed to CW1 for which she lacks personal knowledge. *See, e.g.*, ¶¶114, 154, 198, 232.  These allegations are also improperly vague, conclusory, and rely on hearsay.  Mot. at 15–16.

statement[.]" Order at 22.  Nothing in the SAC remedies the problems identified by the Court, and CW1's hazy allegations illustrate the point.  For example, CW1 allegedly emailed Meredith and Brickley with modeling "in the lead up to the acquisitions," Opp. at 9, but there is no indication offered of what this supposed "modeling" consisted of, or that Meredith or Brickley read CW1's email, let alone that they agreed with her calculations.  Moreover, it remains unclear how (or if) CW1 knew about Everbridge's "organic" revenue and whether CW1's amorphous financial forecasts accounted for the various uncertainties relating thereto, including COVID-19, and their impact on the xMatters acquisition.[5]  *See* Mot. at 5–6.  Far from any type of admission, CW1's allegations amount to nothing more than gross speculation that ***cannot*** support scienter.  *See Buttonwood Tree Value Partners, LP v. Sweeney*, 910 F. Supp. 2d 1199, 1207–08 (C.D. Cal. 2012) ("It is simply 'not enough for [p]laintiffs to state facts giving rise to a mere speculative inference of deliberate recklessness, or even a reasonable inference of deliberate recklessness.'").

Once again, CW1's scienter-based allegations (and all other CW allegations, for that matter) are in stark contrast to *NVIDIA*.  There, the CWs were described with sufficient particularity such that the court could determine "how" the CWs "obtained their knowledge."  81 F.4th at 940.  Namely, the CWs' job titles and responsibilities were detailed and their accounts were based on first-hand interactions with the defendant.  *Id.* at 939.  The CWs also had direct contact with the defendant and firsthand knowledge that the defendant "personally reviewed NVIDIA's sales data," which corroborated the defendant's own admission that he routinely monitored sales data.  *Id.* at 938–39.  One CW even personally met with the defendant on a monthly basis and explained that the defendant had an email distribution "requir[ing] senior managers to send their reports by email every Friday" so the defendant could

---

[5] It is unclear whether CW1 was ***at*** presentations with Meredith and Brickley or if she ***made or created*** presentations for them.  ¶52.  The SAC alleges CW1 emailed Meredith and Brickley at some unspecified time, but despite this, CW1 ***still*** cannot detail any specific what the emails or presentation said, nor whether Meredith or Brickley received any emails or attended any presentations.  *Id.*

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

"personally review[] the Top 5 emails sent by these senior managers." *Id.* at 939. Here, the allegations attributed to CW1 come nowhere near *NVIDIA*'s level of particularity, as we still don't know basic information about CW1's responsibilities or whether she had firsthand knowledge of what data and information defendants had access to. Per *NVIDIA*, a CW's allegations that a defendant **could** access contradictory sales data, but not that she **did**, cannot support scienter. *Id.* at 940–41. Thus, CW1's allegations, which at best can only support a finding that Meredith and Brickley potentially had access to Everbridge's revenue numbers (but not that they were in fact aware of contradictory revenue information), cannot satisfy scienter.

### 2. CW 2–3's New Allegations Are Irrelevant.

Plaintiffs emphasize menial additions to CWs 2–3 that amount to nothing more than job titles. Opp. at 9–11. This highlights the CWs' lack of foundation such that CWs 2–3 would be knowledgeable about the allegations attributed to them. As with CW1, the SAC does not allege any of CW2's job responsibilities; rather, it says only generally that CW2 worked in a "[f]inance role," and that CW2 "worked as part of the integration team during the xMatters acquisition." ¶53. But without detailing CW2's job responsibilities, the Opposition's claim that CW2 "possess[ed] relevant knowledge of the xMatters integration failures" has no merit. Opp. at 10. Moreover, it is hard to imagine why someone in finance at xMatters would have any knowledge of the integration of xMatters at Everbridge, particularly when she left only 6 months after the acquisition took place. And it remains a mystery as to how CW2 would have any personal knowledge as to "xMatters' poor performance from a sales perspective," *id.*, let alone why that is relevant. The Opposition's arguments as to CW3 fail for the same reason—the adding of a job title does not establish what CW3's duties were or why she would be personally knowledgeable as to Everbridge's motivation for acquiring RedSky. *Id.* at 11. Independently, the Opposition does not dispute that CWs 2–3 are not alleged to have any personal contact with any defendant. Mot. at 13. Thus, CW 2–3's allegations do not establish

their reliability and have no import here. *Downey*, 2009 WL 2767670, at *10.

### 3.   CWs 12–16 Add Nothing.

Conceding that CW 12–16's allegations are by themselves vague, conclusory, or personal opinions improperly set forth as "fact," Mot. at 14–16, plaintiffs nevertheless argue that CWs 12–16 "corroborate" other allegations. Opp. at 11. ***Even if*** that were true (it is not), CW 12–16's allegations only address the speed with which Everbridge was integrating its acquisitions—a theory this Court already rejected. Order at 17, 25–26. Regardless, the Opposition's attempt to establish a foundation for these new CWs falls woefully short of the PSLRA for four reasons.[6]

***First***, the Opposition does not dispute that CWs 12–16 had no ***direct*** interactions with any defendant. Mot. at 14–16. This dooms their reliability. *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1154 (C.D. Cal. 2018), *aff'd*, 794 F. App'x 669 (9th Cir. 2020) (CWs who had no "meaningful contact with [d]efendants" do not support scienter); *Johnson v. Costco Wholesale Corp.*, 2020 WL 4816225, at *6 (W.D. Wash. Aug. 19, 2020) (new CW who had no "direct contact with" defendants cannot prove defendants "knew but disregarded [] information").

***Second***, the Opposition does not address the numerous reasons why CWs 12–16 lacked personal knowledge. *See* Opp. at 11–12. Particularly given CWs 12–16's low-level positions at Everbridge, it is still unclear:

- How CW12 had any insight into Everbridge's "acquisition strategy," ¶87, or what the Board of Directors told Meredith (if anything), ¶373;
- How CW13's experience with customer growth and the vague "expansion of services" provides her any foundation to opine on Everbridge's multi-faceted integration processes, particularly where CW13's claim that "none of the acquisitions . . . were fully accessible through a single login" does not contradict any alleged misstatement, ¶¶18, 64;
- How CW14 knew about "the company's treatment of revenue" or that "many salespeople at Everbridge were not hitting their sales quotas," ¶¶156, 202;
- How CW15 had any first-hand knowledge of anything that took place in the "c-suite" or what "standard practice due diligence" for acquisitions looked

---

[6] While plaintiffs claim the CW allegations are consistent with their other allegations, Opp. at 22 n.5, 26 n.6–7, the Opposition fails to distinguish any cases holding that inconsistent statements cut against reliability. Mot. at 16–17. Since there are various inconsistencies between and within CW allegations, the CWs are unreliable. *Id.*

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

- like, ¶¶209–10, 289; and
- How CW16 would be aware of NC4's integration problems or declining sales where CW16 only worked "indirectly" with product development, ¶67.

None of these are disputed by the Opposition, thus establishing that no new CWs were "in a position to be personally knowledgeable of the information alleged" in the SAC. *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *6 (C.D. Cal. Nov. 5, 2021).

***Third***, the Opposition's recharacterizations of the SAC's new CW allegations only prompts more questions. The Opposition claims that, because she was two levels removed from Vernon Irvin, CW14 corroborates Irvin's backwards-looking statement at the end of the class period that it was "harder for . . . [Everbridge's] enterprise sales organization to execute" its sales strategies. Opp. at 12 (citing ¶310). But it is unclear what exactly was allegedly "harder" for the "enterprise sales organization to execute." *Id.* This claim also asks the Court to make the unreasonable inference that CW14 can confirm the basis of Irvin's claim, particularly where the allegations regarding Irvin's statement lack any connection to CW14. *See* ¶¶222, 310, 346. This attempt to plead fraud by hindsight should be rejected. Order at 17; Mot. at 23–24. Additionally, CW15's winding tale that "she learned that the Company's CTO and Senior VP of Engineering who told the c-suite that much of the acquired technology could not be integrated" leaves us asking ***which*** acquired technology could not be integrated and ***why*** CW15's chain of hearsay should be trusted. Opp. at 12; *see* Order at 21 (rejecting CW3's hearsay allegations). Also, while CW16 allegedly supervised a nondescript "team of risk analysts," Opp. at 12, and was "indirectly" involved with client relations, ¶¶67–68, none of this supports her alleged knowledge of NC4's performance post-acquisition (or its relevance).

***Lastly***, CWs 12–16 cannot support scienter where the SAC does not explain ***how*** or ***when*** they came to their subjective opinions that Everbridge did not "integrate" Connexient, CNL Software, or xMatters, whether they ever conveyed their subjective views to defendants, and whether defendants agreed with them. Opp. at 25–26. For example, CW16's knowledge is based on her ***supervisor's***

communications with "management," "***most likely*** . . . the company's CTO."  ¶365; *see* Mot. at 28; *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F. Supp. 2d 815, 830 (S.D. Cal. 2006) (CW statements about "what was discussed at the undated meeting" were "too vague and conclusory . . . to impute scienter"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *19 (N.D. Cal. Dec. 17, 2019) (rejecting undated CW allegations).  Further, CW 12–16's subjective opinions are "vague and predicated on hearsay statements of unclear reliability," which cannot satisfy the PSLRA.  *See* Mot. at 29.  Plaintiffs' suggestion that there is "no per se bar to hearsay allegations," Opp. at 27, conveniently omits that a CW's hearsay report must be "sufficiently reliable, plausible, or coherent."  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016).  This Court already found that the prior CWs "recite unattributed or unreliable hearsay."  Order at 22.  Worse, the SAC's new allegations are based on "general office communications and rumors."  Mot. at 2 (citing ¶¶209, 310).  Put simply, the Court should yet again reject CW 12–16's unreliable hearsay statements based on unreliable office gossip.  Mot. at 16.

### B.      The SAC Still Fails to Allege Any False or Misleading Statement.

#### 1.      Defendants' Statements Regarding xMatters Revenue Contributions Are Inactionable.

In support of their already-rejected blunderbuss theory that Everbridge misled investors by "[c]onflating" acquired and organic revenue projections from xMatters, the Opposition challenges Everbridge's (1) April 6, 2021, statement that they "***anticipate[]***" that xMatters will contribute "approximately $9-11 million" in revenue and (2) May 10, 2021, statement that the Company's "***expectations***" for xMatters' financial contribution will not change.  Opp. at 13–14, 23 (citing ¶¶260, 269).  However, as the Court already held, these challenged statements are nothing more than "classic examples of statements protected under the PSLRA's safe harbor." Order at 12–13; Mot. at 18.  *See McGovney*, 2019 WL 8137143, at *17 (dismissing amended complaint that "ma[de] no material" changes to "revenue

forecast" misstatements that are "by definition, forward looking under the PSLRA").

*First*, plaintiffs' self-serving characterization of Everbridge's two revenue projections as "non-forward-looking representations," Opp. at 16, is a non-starter—projections are quite literally statements about the future. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 774 (9th Cir. 2023) (statements about "future economic performance" are forward-looking).

*Second*, plaintiffs claim that the xMatters projections were "mixed" statements that included "embedded representations" of "current or past facts," which are "not protected." Opp. at 16 (citing *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)). But the Ninth Circuit rejected **this very same formulation** of the rule that plaintiffs try to assert here. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190–91 (9th Cir. 2021) (rejecting plaintiffs' argument that "predictive statements contain embedded assertions concerning present facts that are actionable" and finding Tesla's statements that it was "on track" protected by the Safe Harbor). Indeed, all statements of future economic performance are necessarily grounded in current or past facts, but that does not take them outside the realm of the Safe Harbor, which protects both "statement[s] of future economic performance," 15 U.S.C. §78u-5(i)(1), and the "assumptions underlying or relating to" the forward-looking statements. *Wochos*, 985 F.3d at 1192 ("any announced 'objective' for 'future operations' necessarily reflects an implicit assertion that the goal is achievable based on current circumstances"). Here, the challenged statements about future revenue contained no affirmative misstatements of present facts that were severable from the forward-looking statements, so there was no "non-forward-looking statement" to consider.[7]

---

[7] The cases cited by plaintiffs bear no resemblance to the case here. *E.g.*, *Quality Systems* involved affirmative, "concrete description[s]" about current sales and past performance, 865 F.3d at 1146–47, but no such "concrete" descriptions exist here. *See also City of Mia. Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1040 (N.D. Cal. 2018) (involving a misstatement of a **present fact** regarding inventory growth); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1015 (N.D. Cal. 2020) (defendants "used language indicating that the revenue results they were **reporting** were certain, not mere puffery or predictions"); *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (statement

11

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

*Quality Sys.*, 865 F.3d at 1146–48.

**Third**, the Opposition similarly relies on a "mixed statement" theory in attacking the Company's detailed and repeatedly disclosed risks associated with Everbridge's acquisitions, essentially arguing that no cautionary language could ever be meaningful.[8] *See* Opp. at 22; Mot. at 5–6, 19 n.14. But because there was no severable non-forward-looking statement that was materially false or misleading, the mixed statements analysis does not apply. And the cases upon which plaintiffs rely are distinguishable because they all involved **affirmative statements of present facts**. *See supra* n.10. In any event, the cautionary language accompanying the Company's revenue projections was meaningful—Everbridge repeatedly and explicitly disclosed the risks of acquisitions, including the xMatters acquisition, with meaningful cautionary language.[9] *See, e.g.*, Mot. at 19.[10]

### 2. Defendants' Statements about Integration Efforts Are Inactionable.

Nor does anything in the SAC or Opposition change the Court's holding that the integration statements were forward-looking statements under the Safe Harbor. Order at 12–13. The Court also found the bulk of the challenged statements were puffery—and "even if they were not, the statements plaintiffs point to either do not demonstrate a false statement or attempt to plead fraud by hindsight." *Id.* at 16. Still, despite numerous independent bases for dismissal, the Opposition doubles down on **the very same statements**, without meaningfully addressing the Court's findings.

**Forward-Looking Statements.** As the Court has held, every challenged

---

described lower relative cost due to "**current state** of defendant's technology").

[8] Plaintiffs' argument that the disclosure of the "xMatters' revenue contribution was not released until after the Class Period," Opp. at 18, is a **non sequitur** and has no relation to their arguments that the Safe Harbor does not apply. Plaintiffs challenge a revenue projection, but the Company did not know in April and May 2021 what their actual sales figures would be in February 2022. In any event, the Company did disclose the percentage of acquired versus organic revenue.

[9] The SAC further offers no facts showing that defendants had actual knowledge of falsity. *See* Mot. at 19 n.13; *infra* Sec. II.C.

[10] As the Court previously held, there was no duty to disclose the breakout between organic and acquired revenue. Order at 16.

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

statement about integration is forward-looking. Order at 12–13. Yet plaintiffs continue to argue that the xMatters statements are not protected by the Safe Harbor because defendants "unequivocally stated that they had already integrated the xMatters' teams" and "already retained the key hires." Opp. at 20. That assertion is unsupported by any citation—and for good reason, as none of the challenged statements pertaining to xMatters "unequivocally" stated the process was done. *Id.*

Plaintiffs also offer a one-sentence argument as to why other integration statements are not protected. *Id.* at 23 (arguing they were not forward-looking because "they discussed the current state of the integration").[11] But the Court already has rejected this argument. Order at 12 (integration is not "instantaneous," so "statements regarding Everbridge's progress 'down the path' of 'integration'" are protected by the Safe Harbor). At no point did the Company ever confirm or guarantee that integrations of all acquired companies were unequivocally complete.

Finally, plaintiffs claim that the cautionary language regarding integration efforts was "inadequate," claiming that analysts allegedly drew conclusions that Everbridge was successfully integrating acquisitions and because risk disclosures about "potential integration challenges" were not adequate because "the risks had already transpired." Opp. at 23–24. But plaintiffs point to no specific analysts' statements to support this point, and the only "risk" the Opposition points to as having been "already transpired" are vague CW allegations about *one* of the acquisitions: NC4. *Id.* at 24 (citing ¶¶230–37).[12]

---

[11] Plaintiffs effectively concede that integration statements about the non-xMatters acquisitions *are* protected by the Safe Harbor in arguing that defendants' "lump[ing] the xMatters integration statements with others" in the Motion was "improper[] . . . for the simple reason these [xMatters integration] statements are not forward-looking and cannot find protection in the safe harbor." *See* Opp. at 19–20.

[12] Statements that the Company was "***integrating*** that business" indicate a ***process*** with NC4, ¶229, and the CW statements are merely opinions about that process, not that any "risk" had transpired. Opp. at 23. And the SAC alleges that analysts understood these risks. Mot. at 22 ("[T]he SAC details questions on precisely this topic from industry analysts, ¶¶178, 275, demonstrating, together with the aforementioned risk disclosures, that these hazards were communicated to investors.").

***Puffery.*** This Court has already ruled that the bulk of the integration statements are inactionable puffery. Order at 8. Plaintiffs concede this point as to all integration statements other than the xMatters integration. *Compare* Opp. at 20 (arguing xMatters integration statements were not puffery), *with id.* at 20–24 (making no argument all other integration statements were not puffery). As for xMatters, plaintiffs argue that defendants misrepresented that teams were "already integrated" and key employees were "already retained." Opp. at 20. But the context of these statements demonstrates the challenged statements were vague, generalized assertions—not "concrete statements capable of objective verification." *Id.*[13]

***Otherwise Inactionable.*** Regardless, the integration statements are otherwise inactionable. Plaintiffs ignore not only the language of the alleged misstatements, as well as their immediate context (*i.e.*, the surrounding sentences), but they also ignore the role COVID-19 played on the Company's integration efforts, something Everbridge fully disclosed to investors. Mot. at 5–6 (citing Ex. 12 at 17–18). And defendants' statements about integrating xMatters employees are not undermined by the SAC's allegations that a "majority of the xMatters sales staff had left the company by September 30, 2021." Opp. at 19. Even if true, this allegation would show only that that the Company did not need to retain a "majority" of the prior xMatters sales staff; it says nothing about retaining "key hires." *Id.* at 19–20.

### 3. Defendants' Business Strategy Statements Are Inactionable.

The Opposition entirely ignores defendants' arguments related to statements about business strategy. Mot. at 24–26; *see also* Order at 25–26 (rejecting theory that business strategy statements constituted falsehoods under the applicable pleading

---

[13] Plaintiffs rely on *In re Okta, Inc. Sec. Litig.*, 2023 WL 2749193 (N.D. Cal. 2023) and *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129 (N.D. Cal. 2018). But in *Okta*, the defendants said teams were "***fully integrated***" when they actually "had [***no***] ***knowledge of each other's products***." 2023 WL 2749193, at *13. And in *Extreme Networks*, the statement that sales and marketing teams were "***fully integrated***" was actionable where, just days before, the speaker was questioned about the "***lack of a plan to integrate***" and he responded that the integration plan was "***to be determined***." 2018 WL 1411129, at *19. No such allegations exist here.

standards).  Accordingly, the strategy statements should be dismissed with prejudice. *Roy v. Contra Costa Cnty.*, 2015 WL 5698743, at *3 n.7 (N.D. Cal. Sept. 29, 2015) (when an opposition "fails to address the moving party's arguments regarding certain claims, the non-moving party has conceded that those claims fail.").

### C.   The SAC Does Not Establish a Strong Inference of Scienter.

Tacitly acknowledging the SAC's inability to plead an actual intent to deceive, plaintiffs rely upon five new CWs, Meredith's departure, and the core operations inference to argue that defendants were deliberately reckless.  However, as this Court has held, deliberate recklessness is "an ***extreme*** departure from the standards of ordinary care," Order at 18, meaning that plaintiffs must plead "in great detail" facts that show "some degree of intentional or conscious misconduct."  *Patel v. Parnes*, 253 F.R.D. 531, 555 (C.D. Cal. 2008).  The SAC does not meet this high standard.

### 1.   The New CWs Do Not Support Scienter.

None of the newly added CW allegations cure the deficiencies outlined in this Court's previous Order.  The SAC does not remedy the inherent problems with CW1's allegations and the remaining CWs fare no better.  *See supra* Sec. II.A.

Not a single CW allegation has any bearing on any defendant's state of mind because none of them are alleged to have had any reliable direct contact with any defendant.  Indeed, there are ***no*** particularized allegations pled about any defendant's state of mind—a point the Opposition wholly ignores.  Mot. at 27.  "Although [some] [CWs] are described in the [SAC] in more detail than in the [FAC], the descriptions still lack 'sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'"  *Downey*, 2009 WL 2767670, at *10.  That alone warrants dismissal.  *FireEye*, 2016 WL 6679806, at *13 (rejecting CWs lacking "concrete and readily verifiable . . . explanations").

The Opposition's last claim is that scienter can be inferred from individual defendants' access to sales data. Opp. at 24–25.  That theory similarly fails given the

Opposition's reliance on *Quality Systems*. There, the plaintiffs pled facts to show that company executives "were in the habit of 'continually monitoring the Company's revenues and earnings,'" and the executives "themselves told investors they had real-time access to, and knowledge of, sales information." 865 F.3d at 1145.

Not a single CW allegation here mimics (or even gets close to) *Quality Systems*. While CW1 allegedly sent "emails and financial models directly to defendants Meredith and Brickley" regarding the alleged "discrepancy" between xMatters revenue and "the actual revenue number," Opp. at 25, the Opposition stretches CW1's claims to argue that Meredith and Brickley "had actual access to the disputed information" without explaining **what** that information was or whether Meredith and Brickley ever opened and read CW1's emails (or the other unspecified data they allegedly had access to). *Id.* The reason is clear: CW1 has no foundation to know what each defendant knew, especially as CW1 left Everbridge in "summer 2021"—well before anyone, much less Everbridge, knew what revenue ultimately was generated by xMatters. Mot. at 13 n.8; Order at 20. Furthermore, absent CW1's methodology for creating her purported "models," CW1's models are more akin to unfounded **opinions**, not contradictory sales data. As such, the general claim that Meredith and Brickley had "access" to the Company's revenue information, rather than "detailed and contemporaneous knowledge" of misleading statements, cannot withstand dismissal. Mot. at 31; *see also NVIDIA*, 81 F.4th at 941 (CFO's ability to access sales data insufficient to establish that she "personally accessed contradictory information during the class period").

### 2.   Meredith's Departure Also Does Not Support Scienter.

Twisting the Court's Order to suggest that Meredith's departure **could** support scienter, the Opposition argues that this Court "previously found that Meredith's abrupt departure was 'insufficient to support a strong inference of scienter by itself.'" Opp. at 27. But the **rest** of the Order explained that "the circumstances surrounding Meredith's departure are not so uncharacteristic . . . that they support a cogent

inference he resigned on account of purportedly fraudulent representations." Order at 23. This is especially true because the SAC does not (and cannot) allege that Meredith was *forced* to resign; rather, it is undisputed that Meredith accepted a new position as CEO of Boomi and thus his resignation was "not related to any matter regarding the Company's financial condition[.]" Dkt. Nos. 85-18 at 1; 85-19. Since plaintiffs provide *no* new particularized allegations connecting Meredith's departure to a single alleged misstatement, this Court's prior Order controls.

Despite this, the Opposition claims CWs 12–13 "corroborate" that Meredith's departure was connected to his failure to integrate acquisitions. Opp. at 27–28. But that too is insufficient. CW12 merely "expressed her understanding," without citing any basis for her opinion, that "when Meredith was instructed to stop pursuing his growth by acquisition strategy, he chose to quit instead." ¶373. Again, the SAC provides no foundation, let alone particularized facts, for how CW12 came to this understanding or from whom she learned this information. CW13 similarly learned about Meredith's departure "based upon general discussions with her colleagues afterward[.]" ¶374. These speculative opinions based on office gossip and conjecture cannot support any inference of scienter, let alone a *strong* one. *See* Mot. at 30–31; *Bajjuri v. Raytheon Techs. Corp.*, 2023 WL 3650554, at *10 (D. Ariz. May 25, 2023) (CWs who "report unreliable hearsay or make vague and suspiciously rote allegations" do not support scienter, namely where "none allege any interaction with the Officers or that any of the Officers knew about any misconduct"). Moreover, CWs 12–13 do nothing to remedy this Court's finding that "whether Meredith resigned (or was forced to resign) due to asserted missteps in Everbridge's integration of acquired companies is insufficient to" to support scienter without facts supporting that the "resignation was suspicious." Order at 23.[14]

---

[14] Unlike *Forescout*, which credited CWs' subjective opinions that were consistent with "those of verifiable fact," 63 F.4th at 772, no facts here verify CW12's "understanding" that Meredith "chose to quit" when "instructed to stop pursuing his growth by acquisition strategy," or CW13's hearsay-based claims. ¶¶373–74. And in *Mild v. PGG Industries, Inc.*, the defendant was *involuntarily* terminated after an

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

### 3.    The Core Operations Theory Cannot Support Scienter.

The so-called "core operations theory" does not and cannot support scienter because the SAC neither (1) pleads facts to show that Meredith and Brickley "themselves frequently accessed and tracked Everbridge's sales data," nor (2) "clearly connect[s]" the sales data to any alleged misstatement.  Order at 24–25. Rather than addressing these points, the Opposition merely asserts that the core operations applies because "[d]efendants answered questions about the xMatters integration and told investors that the xMatters team had 'already been integrated[.]'" Opp. at 29.  But this Court already has rejected this theory, and the SAC did not include any additional allegations to support the supposed core operations theory. Order at 24–25.  Regardless, as even the Opposition concedes, the core operations theory cannot support scienter without "***specific*** allegations about management's exposure to factual information." Opp. at 29 (quoting *S. Ferry LP, No 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (core operations theory "may" support scienter in "***unusual*** circumstances")).  No such specific allegations exist here.  Mot. at 31–32.[15]

*    *    *

With no response to the Motion's holistic evaluation of scienter, Mot. at 32–33, and plaintiffs' allegations against defendants fundamentally unchanged—aside from more CWs crowding the "watercooler," ¶98—the only cogent inference here is that Everbridge acquired companies in good faith and unexpectedly faced integration

---

internal investigation revealed wrongdoing.  2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018).  No such claims exist here, nor do plaintiffs dispute that Everbridge accurately disclosed that Meredith's departure was related to his new role at Boomi. *See* Mot. at 30–31.

[15] The Opposition's cited case law is inapposite.  In *Reese v. Malone*, 747 F.3d 557, 563 (9th Cir. 2014), the defendant stated that the company's Alaskan oil pipeline had low corrosion levels despite the pipeline's 200,000 gallon oil leak, which leaked again two weeks later.  The court thus inferred scienter because the misstatement was made "[i]n the wake of a crisis that ha[d] the potential to repeat itself[.]" *Id.* at 571. Also, *In re VeriFone Holdings*, 704 F.3d 694, 708–10 (9th Cir. 2012) inferred deliberate recklessness given defendants' roles as "hands-on managers with respect to operational details and financial statements" who "reviewed the internal flash reports . . . on a day-to-day basis."  The SAC ***does not*** plead facts suggesting that defendants habitually reviewed CW1's emails or financial models, nor does the SAC explain what other information defendants had access to.

problems that were further exacerbated by a global pandemic.  Mot. at 5–6, 32–33.

### D.     Plaintiffs Do Not Adequately Plead Loss Causation.

The Opposition's loss causation arguments again rely entirely on speculation and a gross mischaracterization of the facts.  Everbridge's December 9, 2021, press release announced Meredith's resignation and the Company's *initial* fiscal year 2022 revenue guidance.[16]  ¶297.  It gave no explanation for either, except that "Meredith's resignation [was] not related to . . . the Company's financial condition."  ¶303.  These disclosures do not "partially reveal[] the circumstances that the fraud concealed," Opp. at 30, as the press release contained no "new facts" and is thus not a corrective disclosure.  *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir.  2020) (a corrective disclosure must "reveal[] new facts that, taken as true, render some aspect of the defendant's prior statements false or misleading.").

Likely recognizing that neither of these disclosures are connected to the challenged statements, plaintiffs claim that the December 9 disclosure "partially revealed the risk that was concealed by [d]efendants' misstatements."  Opp. at 31.  Not so.  *First*, plaintiffs neither explain how Meredith's departure was an allegedly concealed risk, nor do plaintiffs connect Meredith's departure to anything related to integration or the Company's growth strategy.  *Second,* plaintiffs cannot "show that it was the very facts about which the defendant[s] [allegedly] lied which caused its injuries."  *Nuveen Mun. High Income Opp. Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013).  Rather than linking the *specific* misrepresentations alleged to a drop in stock price, plaintiffs gloss over these details, instead arguing that defendants "hid[] . . . the risk that the Company's revenue growth was unsustainable due to" problems integrating acquisitions.  Opp. at 30–31.  Yet nothing in the alleged corrective disclosures in any way relates to this argument.  Without more, this is little more than conjecture.  *See* Mot. at 34; *Child.'s Hosp. & Med. Ctr. Found. Of Omaha*

---

[16] Plaintiffs do not rebut that the SAC mischaracterized Everbridge's initial guidance as a "reduction."  Mot. at 6 n.2.  Notably, the Company also reiterated its guidance for Q4 and FY2021, both of which it eventually *exceeded*.

MEM. OF POINTS & AUTHORITIES ISO MOTION TO DISMISS, CASE NO. 2:22-CV-2249-FWS-RAO

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES

*v. Countrywide Fin.*, 2011 WL 13220509, at \*7 (C.D. Cal. Aug. 22, 2011) (no materialization of the risk absent "explicit causal linkage between misrepresentation and loss"). ***Finally***, the claim that the alleged risk that the Company's revenue growth was unsustainable is not supported by the record, as Everbridge never once said nor implied that it would maintain a growth rate consistent with the past. Indeed, the Company warned of the very opposite. *See supra* Sec. II.B.1. In other words, ***even if*** the revenue forecast was impacted by integration issues (there are no allegations it was), the resulting forecast would be nothing more than the materialization of a ***disclosed*** risk, which is not securities fraud.[17] *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at \*11 (N.D. Cal. Nov. 28, 2021) (no liability where "[d]efendants disclosed the very risk plaintiff alleges they concealed").[18]

## III.   CONCLUSION

Since the Opposition itself has proven that plaintiffs cannot remedy the myriad deficiencies already identified by the Court, their "'repeated failure to cure deficiencies . . . [the] undue prejudice to [defendants] by virtue of allowance of the amendment, [and the] futility of amendment'" support dismissal with prejudice. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

Dated: October 30, 2023                     Respectfully Submitted,

                                            COOLEY LLP

                                            By: */s/ Michael C. Tu*
                                            Michael C. Tu

                                            Attorneys for Defendants
                                            Everbridge, Inc., Patrick Brickley,
                                            Jaime Ellertson, and David Meredith

---

[17] Tellingly, plaintiffs yet again ignore all of the case law in the motion. And the cases cited in the Opposition are inapposite. In *Berson v. Applied Signal Tech. Inc.*, 527 F.3d 982 (9th Cir. 2008), the plaintiffs alleged with particularity the allegedly concealed stop-work orders directly caused revenue to fall by 25%—no such connection is alleged with particularity (or exists) here. Perplexingly, the Opposition also relies on *NVIDIA*, Opp. at 31, despite the fact that the issue of loss causation was not briefed and the court never discussed the issue.

[18] Without "a primary violation [of Rule 10(b)]," the Section 20(a) claim must also be dismissed. *Paracor Fin. Inc. v. G.E. Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

COOLEY LLP
ATTORNEYS AT LAW
LOS ANGELES