UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

THE HONORABLE FRED W. SLAUGHTER, JUDGE PRESIDING

| | |
|---|---|
| SYLEBRA CAPITAL PARTNERS ) CERTIFIED TRANSCRIPT | |
| MASTER FUND, LTD., et al., ) | |
| Plaintiffs, ) | |
| vs. ) | |
| ) CV-22-02249-FWS | |
| EVERBRIDGE, INC., et al., ) | |
| Defendants. ) | |
| ---------------------------) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Santa Ana, California

January 9, 2024

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

APPEARANCES OF COUNSEL:

For the Plaintiffs:

MICHAEL H. ROGERS
LABATON SUCHAROW, LLP
140 Broadway
New York, NY  10005
(212) 907-0700

For the Defendants:

MICHAEL C. TU
COOLEY, LLP
355 South Grand Avenue, Suite 900
Los Angeles, CA  90071-1560
(310) 883-6550

SANTA ANA, CALIFORNIA; THURSDAY, JANUARY 4, 2024; 10:01 A.M.

THE CLERK: Calling Item No. 1, CV-22-02249-FWS, Sylebra Capital Partners Master Fund, Ltd., et al, versus Everbridge, Inc., et al.

Counsel, please state your appearances for the record beginning with the plaintiff.

MR. ROGERS: Good morning, Your Honor. Michael Rogers from Labaton Sucharow on behalf of the lead plaintiff and the proposed class.

THE COURT: Thank you.

And would you like to introduce your colleague as well?

MR. ROGERS: My colleague is not pro hac in the case. He's just accompanying me, but if he wants to go ahead and introduce himself, is that okay with Your Honor?

THE COURT: Well, if he's not pro hac or not acting counsel, then we won't introduce him. Thank you.

MR. TU: Good morning, Your Honor. Michael Tu on behalf of the defendants Everbridge, David Meredith, Patrick Brickley, and Jamie Ellertson.

THE COURT: Thank you, and good morning to everyone. We're not going to be in trial today, so I want everyone to be very comfortable. Feel free if you'd like to stand while addressing the Court. Feel free if you'd like to sit while addressing the Court. Feel free to address the

Court from counsel table or from the lectern.  It's up to you.  At trial, it may be a little bit different, but I leave it to the parties.

Just have the same common denominator, speak slowly, clearly, and loudly into the microphone.  I'm usually pretty good on two of those.  The slowly, as the court reporter will sometimes look at me, is the area I'm still a work in progress.

So thank you to everyone.  I hope everyone had a great holiday season and a great New Year.

The Court is here today on the Motion to Dismiss. The Court has the filings before it.  Thank you for the written product that the parties have provided.

I do, again, have the filings before the Court, but I would like to ask this question of each counsel just to get an understanding from the parties what their thoughts are.  I'll start first with the plaintiff, and the defense will have a chance also.

How do the new allegations in the Second Amended Complaint at Docket 85 differ materially from the First Amended Complaint at Docket 53?  I'll hear from the plaintiff first.

MR. ROGERS:  Thank you for the question, Your Honor.  As we very clearly stated -- and I think it was paragraph one of our papers.  There is no reason to hide the

ball here -- the most material change -- I'll get to a few others -- is the -- I would call it the recitation or the rehabilitation of CW1's bona fides under prong one of Zucco, and I'll presume that the Court is familiar with what prong one is and what it requires.

THE COURT:  Yes.  And I would ask the parties just remember what the question is.  It's not going beyond asking anything to go into the law or the substance of it.  It's just what are the material differences from the Second Amended Complaint from the First Amended Complaint?  So again, I'm hearing you're talking about paragraph one and talking about the CW.  Please continue.

MR. ROGERS:  Yes.  So CW1 -- as Your Honor knows, in the first Complaint, the confidential witness -- no reason to hide this -- had requested, as we noted in the footnote in the original Complaint -- had requested that we effectively water down her description.  You know, not to go into too much detail, obviously witnesses at times are concerned with retribution or pressure to recant or retract. We dropped the footnote in the first Complaint.  It was briefed, and Your Honor rejected that, which is fine.  It happens.  In the Second Complaint, the material difference is we now have explained that CW1 worked there at a certain time period that encompassed most of the class period.

THE COURT:  I'm going to say it's going really

quick for even me.  Please, if you could slow down.  Think that you're talking to someone that needs to be very -- that is listening and hanging on to every word.  I'm listening, but it's going a little too quickly.

MR. ROGERS:  I apologize, and I certainly apologize to the reporter.  It's not the first time I've been scolded for speaking too quickly.

THE COURT:  Not scolded.  Just we're all a team here, and if I throw a pass too high or a pass too low and you can't catch it, then it's not a good pass.  If you say something and you're going too fast where I -- where it's going too fast, I don't hear it.

Please continue.

MR. ROGERS:  All right.  So we have added the fact that CW1 was employed from early 2019 until the summer of 2021, which notably is after the announcements of the xMatters deal.  We've added the salient details that CW1 was a member of the finance team, specifically the Global Finance Planning and Analysis Group, and that she held various titles during her tenure with the company, and materially, that those responsibilities included work relating to Everbridge's mergers and acquisitions.

Again, it's clear from the papers -- I'm just stating this for context -- the mergers and acquisitions is one of the very major gravamen in the entire case.  She

reported to the vice-president of her group, who accordingly reported to CFO Brickley, one the individual defendants, who reported to Meredith.

And then I think the most material of those differences for CW1 is that she regularly communicated with both Meredith and Brickley either via presentations or e-mails, particularly in the lead up to acquisitions, and that with respect to the xMatter's acquisition, which as Your Honor knows is one of the key acquisitions in this case, she sent weekly and biweekly e-mails, in other words, regular communications to Brickley and Meredith.

Now, I'm prepared to go into the specific allegations that CW1 made and how they relate.  But to answer Your Honor's question by the book, the specific allegations attributed to CW1 are the same as those in the first Complaint, but in the first Complaint, Your Honor rejected them as not meeting the standards of Zucco prong one.

So I would argue to answer your question at the highest level the most material difference is in the new Complaint CW1's bona fides under Zucco should be -- and in my opinion must be -- credited, which will then take all of the allegations, the most important of which of course is that she relayed to Meredith and Brickley that they were improperly undervaluing publicly the contributions of the

xMatters deal.  Therefore, Mr. Meredith explained to her that that was used as a buffer to effectively hide or obfuscate the fact that the organic growth was not going as quickly.

Again, I'm prepared to talk about CW1 at great length, but I'm trying to stick only to the questions Your Honor asked of what is different.

THE COURT:  I appreciate that.  And just keep in mind, Courts can decide cases based only on the record and the papers, so the Court is asking surgical questions.  I'm the audience.  So you may -- both sides -- want to talk about a whole host of things.  I'd ask you to please just respond to the question.  Again, this is in list form.  I have the documents.  I'm just asking for a summary.  So the difference is the detail as to CW1.

Any other material differences that you'd like to add before I turn to your colleague, the defense?

MR. ROGERS:  Yeah, absolutely, Your Honor.

THE COURT:  And list form is fine.  You don't have to go into that much detail.  I have the document.  You can just point to it and say paragraph five has this.  Paragraph 3,000 has this.

MR. ROGERS:  I apologize, Your Honor.

THE COURT:  Oh, there's no need to apologize ever.  This is just conversation.  Again, we're always looking for

solutions.  I always find apologies not needed.  This is a very positive environment.  I'm just -- we're just having a conversation.

MR. ROGERS:  The Court used the analogy earlier of a pass, and, you know, I understand Your Honor has some background in basketball.  I guess what I'm doing is I'm kind of dribbling, kind of doing a couple of crossovers before I take my shot, getting into the rhythm.  But if that rhythm finding is taking too long, I will definitely just take the shot.

THE COURT:  No problem.  Everything is going well.  So please continue with your answer to the Court's question.

MR. ROGERS:  Yes.  As to CW2, we also added a couple of details.  Once again, CW2 like CW1 had specifically requested that we -- and again, I use this term just as a colloquial term -- that we water down her description.  In response to the Court's order of last May, we continued our investigation, and we added details that she was there from May 2021 at xMatters, and then from May 2021 until late 2021 at Everbridge after the acquisition, that she worked with the finance group, and spoke with the -- Everbridge's, quote/unquote, "Integration Office."  That was added.

And again, I think that just goes very much to what we said about CW1 earlier in that the specific

allegations, which I won't go into right now because they are the same as the first Complaint -- now the Court is in a position to credit those allegations.

Then for CW3, we added two smaller facts:  one that she was employed from July until RedSky was acquired by Everbridge, and that she was the Vice-President of Business Development from January of 2021 until April of 2021.

And now I definitely will answer the remainder of your question, Your Honor, in a very summary fashion because it will just take too long to go into details, and as Your Honor has pointed out, the Complaint supplies all the details.  We've added five new witnesses, CWs 12, 13, 14, 15, and 16.  I will posit that all five of them satisfy prong one of Zucco in terms of the particularity to say why they knew of what they were speaking, and why they were in a position to know of what they were speaking.

And we added lots of details.  Again, I won't go into it, but they're about the integration efforts for xMatters and some of the other deals, facts of where the salespeople were, whether Everbridge was indeed integrating or, frankly, had integrated some of the deals that they spoke about.

And I will just say, even though this is in and of itself more interpretation than what's been added, these five witnesses are all highly corroborative of the testimony

and the allegations of the other 11 witnesses.

So to answer your question at a macro level, the Complaint now has two key witnesses who the Court can and should credit because their bona fides have been bolstered. And then we have after that 14 additional witnesses, all of which every single one of them corroborates the general support story, which is that they were purchasing revenue, and that the integration efforts at best were not going well, and in many cases did not proceed at all.

I'm prepared to talk in response to other questions, but since that was the only question posed, I want to pause and hand it back to my colleague if that's all right with the Court.

THE COURT:  Thank you very much.

I'm going to turn to the defense.  Upon your reading of the Second Amended Complaint, what material differences have you observed?

MR. TU:  Thank you, Your Honor.  I'll go ahead and come up to the podium at your invitation.

So just sticking strictly to the question that you've posed about CW1 -- I'll refer to this witness as CW1 -- I don't think there's any dispute between the sides here that the Complaint really alleges only a few additional allegations with respect to this confidential witness.  The Complaint adds only vague and conclusory allegations that

she held various titles without identifying what any of those titles are, and supposedly that the confidential witness did work related to Everbridge's mergers and acquisitions process.  Again, that additional allegation is provided without any explanation or elaboration of what that work supposedly was.

There's also a new allegation that in fact CW1 is now three levels removed from the CEO, not two levels.  So that allegation actually makes I think this witness even less reliable than what was alleged in the first Complaint.

The opposition also -- essentially, in the opposition, it's alleged that Meredith and Brickley supposedly told CW1 that they knowingly covered up Everbridge's slowing organic growth.  But as we noted in our reply, putting aside the clear lack of reliability or personal knowledge of CW1, that allegation does not exist anywhere in the actual Complaint.  It's nothing more than an argument that's made in the opposition brief for the first time.  So for that reason, that's highly improper for purposes of a Motion to Dismiss and should not be considered for that reason.

The other new allegation that was referenced by counsel is that Brickley and Meredith were -- that there were alleged weekly or biweekly e-mails that were sent to Brickley and Meredith.  Of course, you know, with respect to

those e-mails, they fail to allege what was actually communicated in those e-mails.  So those e-mails just in and of themselves really add nothing I think to the reliability and the personal knowledge.

Your Honor just asked us to stick specifically to the question and answer, so that would be my response with respect to CW1.

I'm happy to address the other confidential witnesses that was briefly touched upon by my colleague, but I don't want to do that if that's not within the scope of what you want to hear.

THE COURT:  The Court's questions are surgical. The questions are what material differences are between the Second Amended Complaint and First Amended Complaint because there was an original Complaint as well?

MR. TU:  Okay.

THE COURT:  So any other differences -- material differences that you would want to point out that you see?

MR. TU:  Let me just say I think it's clear from our papers that we don't believe there are any material differences that move the needle whatsoever with respect to the new Complaint.  I think, you know, the Court's order from May provided a very detailed analysis of the allegations regarding the plaintiffs' very lengthy Complaint.  And I think most importantly for us today is the

14

order provided a specific roadmap for the plaintiffs of the multiple reasons why the allegations were insufficient under the law, and considerable precedent within the Ninth Circuit, and what would need to be done in an Amended Complaint in order to address those reasons for dismissal.

What's really happened here is that the Second Amended Complaint has responded to this order by essentially repleading many of the same alleged misstatements, and adding only a few additional allegations of the same types of integration issues that are, you know, indistinguishable from the statements the Court previously analyzed, considered, and rejected.

I know the Court has the materials in front of it. I'll just reference that in Exhibit 22 to my declaration we've provided a red line for the Court's reference which shows the differences. And I think if you look at that red line, it becomes very clear that, first of all, with respect to the alleged false and misleading statements, there's nothing new that was added, and the only new allegations are essentially these additional job titles that were added for CW1, as well as adding these additional confidential witnesses 12 through 16.

So, you know, I'm not going to repeat what the Court held in its order regarding the challenged statements about the integration process or business strategy. There's

nothing new in the Complaint.  Suffice it to say, I think the Court's rulings on those matters are the case and the law, and there's no reason for the Court to take a different analysis.

So just before we even talk about scienter, or we talk about confidential witnesses, or, you know, any of those additional facts that my colleague has raised, you know, I would just reference that the opposition by the plaintiffs really do not address this deficiency, which was a significant portion of the Court's very detailed order, and essentially ignores, you know, those prior rulings by realleging the same types of allegations without any material change.

No such -- there is a conclusory allegation in the Complaint that -- I'm sorry.  There is a conclusory allegation in the plaintiffs' opposition, not in the Complaint, that the plaintiffs make that supposedly it is unequivocally stated that the defendants had already integrated the xMatters' teams and already retained the key hires.  That's on the page 20 of the opposition brief.  But again, as I noted in our reply, no such allegations can be found or exist within the Complaint itself.  That argument is not an accurate characterization of what is actually pled in the Complaint.  And as I mentioned before, plaintiffs are not permitted to plead and rely upon new allegations made

for the first time in an opposition brief.

There's also a one-sentence, again, conclusory statement that's made in the opposition that other integration statements should not be protected because they discussed the current state of the integration.  And that argument, of course, the Court considered and rejected in its prior order when it recognized that integration is not instantaneous, and that statements regarding Everbridge's progress down the path of integration are protected by the safe harbor.

Also, the opposition claims that the company's cautionary language about integration efforts was inadequate because unnamed analysts supposedly had drawn conclusions that Everbridge was successfully integrating acquisitions and because those risks supposedly had already transpired. That's at pages 23 to 24 of the opposition brief.

But again, this is another argument where it's -- first of all, it's purely conclusory, and it's also not supported by any identification of any specific analyst's statements.  And the only supposed risk that the opposition identifies as having already transpired are the vague confidential witness allegations about the NC4 acquisition, all of which the confidential witness opinions are about the integration process, not about whether any risk had transpired.

In addition to the majority of the statements being subject to the safe harbor, Your Honor in his order also recognized that the bulk of the challenged statements, particularly those general statements concerning the progress that Everbridge was making in integrating acquired companies, are "inactionable puffery."  Similarly, the Court in it's earlier order made clear that the plaintiffs' allegations did not plausibly allege that any of the challenged statements were false when they were made.

The Second Amended Complaint does not address any of those issues identified in the Court's order regarding lack of particularity, and offers no new allegations that any challenged statements were false or misleading when they were made.  The only what can be characterized as new integration allegation in the Second Amended Complaint that's even remotely relating to falsity is that acquired companies kept their own separate sales teams for an unspecified period of time after the acquisitions.  But none of those challenged statements had anything to do with the sales teams, nor did the plaintiffs offer any explanation of when those sales teams supposedly were separate, for how long, and how that rendered any integration-related statements to be false when they were made.

So the Second Amended Complaint really just -- it repleads again the same claims that defendants supposedly

concealed an undisclosed shift in business strategy to buy revenue.  The Court considered that in its order, held that there was no plausible basis alleged for imposing such a requirement to disclose the split between organic and inorganic or acquired revenue between the companies.  And of course, in any event, it's clear, as the Court also noted in its order, that the company's Form 10-K annual filings disclosed the revenue that was attributable to all of the acquisitions.

Again, none of that is addressed I think in the plaintiffs' opposition, and the reason for that is because there are no new allegations regarding those statements contained in the Second Amended Complaint.

So, you know, with respect to scienter, we've talked about the confidential witnesses.  We've talked about Confidential Witness 1, so I won't cover that again.  I think with respect to Confidential Witness 2 and Confidential Witness 11 -- those are the two that are alleged to have worked on the xMatters acquisition -- the Court similarly held that the Complaint had failed to establish an adequate foundation to make any of the attributed statements.  And in particular, with respect to Confidential Witness 11, it was unclear why even if the xMatters acquisition was more complicated than expected -- why that acquisition itself was consummated for an improper

reason.

You know, with respect to these confidential witnesses, the opposition offers nothing to bolster or salvage the meager details that are offered regarding their statements.  They're really nothing more than adding job titles.  And, of course, adding of a job title without any explanation of their actual job responsibilities adds nothing to their lack of reliability and personal knowledge.  And of course, neither Confidential Witness 2 or 3 is alleged to have had any personal contact with any defendant.

Confidential Witnesses 4 through 10, no new allegations whatsoever, that they're just repled word for word, virtually identically to the Complaint.  So there's no reason to disturb the Court's prior ruling rejecting the reliability and personal knowledge of any of those.

With respect to the new confidential witnesses 12 to 16 -- so there are five additional confidential witnesses that are added, but again, all of these witnesses are just more of the same types of witnesses.  The law does not allow plaintiffs to avoid the important reliability, personal knowledge, and scienter probative pleading requirements for confidential witnesses by simply adding more witnesses, by increasing the number of witnesses.  If that were the case, that you could overcome those important pleading requirements by simply adding the number of witnesses, that

would of course make those requirements meaningless.

And as my colleague has mentioned, you know, the plaintiffs offered Confidential Witnesses 12 to 16 primarily to corroborate in their words their other allegations. But when one actually looks at those allegations, the most that they do is just address the speed at which the integration process happened, which the Court has already rejected as an actionable theory of fraud.

None of those Confidential Witnesses 12 to 16 are alleged to have had any personal or meaningful contact with any defendant, and all allegedly held low-level positions at the company. They're all described as sales team members, sales executives. One is a risk management operations employee.

You know, again, the opposition offers no substantive response to the clear lack of any details or allegations which are required to show that they would have the personal knowledge for any of these new confidential witnesses, and that's because there are none.

THE COURT: Okay. I'm going to move to the next question at this point. I'm going to turn back to plaintiff, and this has been touched on kind of by the defense thus far.

What statements of specific facts are plaintiffs contending defendants falsely made which they knew were

false at that time as alleged in the Second Amended Complaint?  So what specific statements?  Let's talk about just paragraphs.  Let's go through this.  Again, you don't have to talk about it.  You can just say paragraph three, this statement.  Paragraph six, this statement.  Going through that, the specific statements.

MR. ROGERS:  Before I do that, Your Honor --

THE COURT:  I'm sorry.  It sounds like you're about not to answer the Court's question, so is that what you're asking?  Are you asking for permission not to answer the Court's question?

MR. ROGERS:  No, I very much want to, but --

THE COURT:  Okay.  Then let's do that first.  If you'd like to do something after the Court's question, absolutely.  But again, this presentation is for the Court.  I'm the audience.  So although you may want to answer a different question, that question is not posed right now.  So that's a -- I don't want to have to do what I -- I'm not allowed to do it as the judge and say objection.  Nonresponsive.

So I'll repeat the question one more time.  What statements of specific facts are plaintiffs contending defendants falsely made which they knew were false at the time as alleged in the Second Amended Complaint?  And I'd like the citations to those.

MR. ROGERS:  All right.  I would begin with paragraph 236, which is Mr. Ellertson's statement on February 18, 2020.

THE COURT:  Okay.  You don't need to repeat it. I do have it.  You can just go by paragraph number and just tell me, you know, in summary form.

MR. ROGERS:  Well, if it's all right, if I may, Your Honor, Mr. Tu went far beyond the scope of Your Honor's question.

THE COURT:  All right.  So again, I think that you are going back to -- this is almost like a -- reluctantly, you don't want to answer my question.  Now you want to respond to him.

Let's stop and take a breath, okay.  If you'd like to be able to bring up other things later on, we'll talk about that, but I'm just asking you to answer my question right now.  If we need a second call on this matter, I can do that as well for you to collect your thoughts.  Again, the judge is the one who's going to control this proceeding. I'm not going to allow you to answer the questions the way you'd like to.  In fact, I think because of that, I'll take this on second call right now, and we'll get back up to speed.  You can both prepare for that question because that's kind of ending where the Court is.

Again, I want to remind the parties this is for

the Court, what the Court wants to hear, my questions because, again, I can rest on the papers on this.  These are surgical questions, so I'll allow you to prepare for those questions.  Perhaps that will make the process more efficient.

I appreciate everyone's time.  Thank you.  We'll put this on the second call, and we'll call the No. 2 matter.  Thank you, everyone.  Please collect your papers so we can put it on the second call.  Thank you.

(Recess)

THE COURT:  All right, we're going to recall No. 1 at this time.  This is Sylebra Capital Partners Master Fund, Ltd., et al, versus Everbridge, Inc., et al. 22-CV-02249-FWS, and we are on second call.

Counsel are all present and previously made their appearances.  Thank you so much.

We took a recess.  The Court had asked a question, and it appeared that plaintiff didn't want to answer that question, wanted to say something else, and the Court believed it was proper based on what it was seeing to allow the thoughts to kind of calm down and go back to the Court's question.

I'm going to ask the question again.  I'm going to let you know, counsel, that if it seems you don't want to answer the question, I will turn to your colleague.  I'm

looking for responsive answers.  I know you may want to answer something else.  That's fine, but that's not the time at this time.

Are we ready to proceed with the Court's question?

MR. ROGERS:  I'm ready to continue my answer, which was paragraph 236 --

THE COURT:  Oh, oh, wait.  Okay.  I'm just going to repeat it for the record for any reviewing court so they can make sure that this is the question that's being asked, okay?  So let's take this slowly again, okay?  It's starting to speed up quite a bit again.

What statements of specific facts are plaintiffs contending defendants falsely made which they knew were false at the time as alleged in the Second Amended Complaint?

MR. ROGERS:  Paragraph 236, which was Mr. Ellertson's statement on February 18, 2020.  Now, what I was doing earlier -- and if Your Honor wants me to stop, I will stop -- is I was going to put some discussion to why I believe that 236 is responsive to your question.  If Your Honor would prefer that I not go into details but merely cite to the record, I will answer the question --

THE COURT:  I think my question did say just cite to the record, so I appreciate wanting that clarification.  Please just cite to the record.

MR. ROGERS:  Okay.

THE COURT:  And I -- you know, I understand what your arguments are.  I do have your papers, and I understand what the arguments are.  I'm just doing kind of a foundational type question.  So sometimes the Court will tee up questions, and I know that perhaps the parties will anticipate where the Court is going with something, but there's always a chance that you don't know where I'm going with the question because the question is my question, so hopefully that helps.

You may think that I'm asking when I say what are you doing this summer -- you may assume that I'm talking about vacations, but I may be talking about work, so let's not assume.  Let's just go step by step.  It helps the Court's process.  I do appreciate counsel's preparation, but at the same time, I've been very clear on the methods that we're going through that are helpful to the Court.  I appreciate that.  So only the citation at this time.  Thank you.

MR. ROGERS:  I would also offer up paragraph 282, which is Mr. Meredith's statement on August 9, 2021, about the duration.

Paragraph 286, which is also on November 9, 2021, by Mr. Meredith.

Paragraph 287, November 9, 2021, by Mr. Brickley.

Paragraph 290, November 30, 2021, also by Mr. Brickley.

I would also add paragraph 260, which I think it's April 9, 2021, a press release.

And paragraph 269, May 10, 2021, also by Mr. Brickley.

Again, I'm prepared to go into as much detail as the Court would like to hear about that, and I would also request at some point that I could respond to the various arguments that Mr. Tu made that went a bit beyond the scope of the question that was posed.

THE COURT:  I do understand that.  I will grant that request for a limited amount of time, but again, that's a different request than answering the Court's question.  So the Court is always glad to hear and wants to make sure everyone has a chance to be heard, but if I'm asking Question A, that's not an invitation to talk about an answer to Question M.

Okay, thank you.  Anything else you'd like to add on the Court's specific question?

MR. ROGERS:  In response to that specific question, no, Your Honor.

THE COURT:  Thank you.  I'll turn to your colleague.

Your thoughts as to the Second Amended Complaint.

What do you believe is contained -- and I'd ask you to stay to the course here.  I'm only asking what you think are statements of specific facts containing defendant falsely made which they knew were false at the time as alleged in the Second Amended Complaint in response to the paragraphs that have been cited by your colleague, the plaintiff.

MR. TU:  I'm sorry.  I just wanted to clarify that last part of your question, Your Honor, when you say in response to the paragraphs that were cited.

THE COURT:  Yeah.  So, for example, your answer could be here are some, here are none, here are all.  And your response is saying -- because I'm going to go back to your colleague next and say -- to respond to you -- well, I believe actually 236, or the press release, or the statements made here are not.  That's all I'm looking for. I'm just trying to see what your thoughts are as to the specific statements that you think are in the record, and if you think there are none, then any response you have to the ones that have been proffered by your colleague, the plaintiff.

MR. TU:  Sure, sure.  So I'll make this very simple and quick.  I don't believe -- so my colleague has identified a number of paragraphs he alleges are such statements.  I wouldn't have any to add to that with respect to the Amended Complaint.

THE COURT:  All right.  Thank you.

Do you believe that they do satisfy the requirements?

MR. TU:  I absolutely do not.

THE COURT:  And why not, and only briefly in about a paragraph because, again, I have your papers, and I'm just trying to get an idea and get some clarification here?

MR. TU:  Yes, absolutely.  Thank you.

So by my writing down -- I believe he identified paragraphs 236, 282, 287, 290, 260, and 269.  Did I miss any?

MR. ROGERS:  It was 286 and 287.

THE COURT:  Yes, I have those as well.

MR. TU:  286 and 287, okay.  Got it.  So just briefly, again, in the interests of trying to keep this concise, on 236, I think it's clear that that statement is insufficient because, first of all, it's forward-looking when it says, quote:  "we've really integrated NC4 and Risk Center into our entire product offering."  That's a quintessential forward-looking statement.  It's also -- under the puffery case law, "really integrated" is a general profession of optimism regarding integration.  That's not actionable.  It's clearly pleading fraud by hindsight, and it is not a statement that was false when made.  There are no allegations that NC4 was not being integrated.

On paragraph 282, again, a forward-looking statement. It says: "We are integrating." "So we're integrating those teams." And it also says that "our overall guidance reflects our view of the consolidated view going forward." Again, quintessential forward-looking.

There's no reason that the Court should change its prior ruling on that with respect to forward-looking safe harbor. It's a statement of puffery. It's an optimistic statement regarding the process of integration, especially when they say "a tremendous team," for example. Fraud by hindsight, again, not permissible. And it wasn't false when it was made. There are no particularized allegations that Everbridge was not integrating xMatters. The process of integration, of course, as the Court has held, is not instantaneous.

With respect to 286 and 287, both of these, forward-looking: 286, "We're already doing integrations." 287, "So far, so good. We're integrating the technology." Also, they are both fraud by hindsight.

With respect to 286, it's not alleged to have been false when made. Again, no particularized allegation that these integrations did not happen or in the process of happening. And again, integrations are not instantaneous.

Also, with respect to 287, it's an optimistic statement of puffery regarding integrating the xMatters

platform being, quote/unquote:  "So far, so good."

In paragraph 290, an optimistic statement with respect to the term "key hires."  It's also attempting to plead fraud by hindsight again.  Later challenges with integrating acquired companies does not necessarily equal fraud, and there is no allegation that this statement was false when it was made.  Again, no particularized allegations as to who the key hires supposedly were, how many there were, or that they had not been retained.

Moving on to 260 -- and I apologize these aren't in chronological order.  I'm just taking them in the order they were listed by counsel.  Paragraph 260, another forward-looking statement protected by the safe harbor:  "It anticipates the partial year contribution."  That's a quintessential forward-looking statement again and not alleged to be false when made.  There is no particularized allegations that Everbridge did not have an expectation of the $9-11 million that's referenced in that paragraph.

And then paragraph 269 I believe was the last one.  So on this one, it specifically refers to, quote, "updated guidance," so clearly another forward-looking statement as the Court previously held with respect to not only this paragraph, but all of the other statements that we're talking about today.  And no particularized allegations have been made, again, that Everbridge did not have an

expectation of that guidance.

THE COURT:  Thank you.  I'll turn back to your colleague.

This is going to be your opportunity to not only respond to this question, but I'll also allow you to then just tell me when you're changing gears and responding to the previous because I've had my questions answered as to what I was trying to determine on this, but to allow everyone to be heard, I'll allow that.  If it starts going over ten minutes, I'm going to maybe start curtailing the time because, again, this was for the questions of the Court, but I do want to make sure that you have a chance to respond.

How would you like to go first?  Do you want to respond to the first question, or do you want to respond to the second question and then the first question, just so I can be ready?

MR. ROGERS:  I will respond to the second question and then segue back to the first.

THE COURT:  Thank you.  I'm ready.  Thank you so much.

MR. ROGERS:  In terms of paragraph 236, Mr. Tu labeled it as protected by the safe harbor and as puffery. In terms of puffery, the law in the Ninth Circuit is quite clear that certain statements that in of themselves may

appear to be not actual puffery.  If they're verifiably false and material to the investors, they are not puffery. You have a situation here where really the only thing that the analysts, who stand as a proxy for the investors, were asking about was integration and the status of the integration.

So we have him saying:  "We've really integrated NC4 and Risk Center into our entire product offering."  That is belied by the allegations in the Complaint.  Mr. Tu doesn't agree with that, and I understand that, but we -- again, I'm not going to go into all the details, Your Honor. We have them laid out in the Complaint of why various witnesses said that NC4 at that point had not been integrated in terms of the puffery aspect.

And then in terms of safe harbor, I'm frankly at a loss as to understanding how "We've really integrated" is forward-looking.  It's present tense, and it's present tense kind of leaning past, so that would be my response to that.

Going to paragraph 282:  "We acquired a tremendous team."  Again, the "tremendous team," Mr. Tu wants to say it's puffery.  In certain scenarios, it might be, but here we're talking consistently about defendants who are always saying over and over again we are integrating.  We are bringing these teams in.  We are bringing them in.  We're bringing the technology into our platform.  It says:  "So

33

we're integrating those teams."  They've already been integrated.  That is not forward-looking, and it's not puffery.

It's verifiably false because we have multiple witnesses who say that it had not been integrated, and it is not forward-looking because it is speaking in the past. Again, I'm frankly just at a loss as to how Mr. Tu in his papers and in front of the Court could argue that that's forward-looking since it is very clearly looking at a present and a past fact.

Moving on to paragraph 286:  "So we've got that integrated now."  That's not forward-looking.  "We've got it integrated."  That's not forward-looking.  It says, "integrated with our Visual Command Center."  Again, in response to the first question, I would explain how that factors in to scienter, but I'm just trying to respond to Your Honor's Question No. 2 and Mr. Tu's answer to it.

Paragraph 287:  "We've integrated the people. We've integrated the sales.  We've integrated the funds." Again, I am just -- I really do not understand how anyone could claim that that is forward-looking since it's an obvious statement of present and present looking back.  It's saying that today we have integrated because we've been integrated.  There's no continuity.  There's no sense that Mr. Tu keeps harping back to that it takes a long time.  It

may take a long time, but according to Mr. Brickley, on November 9, 2021, that long process was complete, and we have allegations of multiple witnesses that say it was never complete.

Paragraph 290: "We've locked up key hires." Again, it's not forward-looking. It's looking to the past.

Going to paragraph 260, this is one that I will concede is a mixed statement of future and present, and I'll explain why that matters and how it matters. In 260, the defendant said -- this is the part that I acknowledge may be forward-looking: "Everbridge anticipates the partial year contribution to be $9-11 million" -- and I'll get back to why the safe harbor doesn't apply even if that is forward-looking, but it's a mixed statement of fact going forward and backward -- "after considering the material impact of purchase accounting and the associated deferred revenue haircut."

They're referring to something that has already happened. They are making an assessment about their anticipation of the future. Again, I'm going to get back in a moment to explain, Your Honor, where that statement was knowingly false when made, material, and not accompanied by meaningful, cautionary language. So again, I'm going to get back to explain why that's actionable anyway.

And then to move quickly, on paragraph 269, they

simply double down on the same facts.  It's a month later. They've indicated they've now completed the acquisition. They've completed the analysis, and they didn't change anything.  There's nothing forward-looking about that whatsoever.

Now I'll step back to some of the comments that Mr. Tu made in response to the Court's first round of questions, and then I'll tie that into what I've just said a moment ago.  In terms of the safe harbor, for example -- and I'll take that one first because it's an easy segue.  Your Honor certainly knows that the safe harbor has exceptions. If the plaintiffs' allegation can satisfy three requirements, the safe harbor does not apply.

One is the statement needs to be material.  Even Mr. Tu is not going to argue that statements about the acquisition of a 280 -- what is it? -- billion dollar company was immaterial.  It's all the analysts talked about. It's all Mr. Brickley and Mr. Meredith ever talked about, so it's material.

Number two, is it knowingly made?  Here, we come back to one of the points earlier.  Mr. Tu wants to make it seem as if the Complaint can be measured in terms of how it changed by looking at a red line.  Mr. Tu wants to suggest that perhaps I've only added 16 allegations, or I've only added two paragraphs, or I've added three sentences, but

that's frankly irrelevant to the larger question.

The Court acknowledged in the May order that CW1 was -- I believe the words of Your Honor was the most relevant and the most germane to the case.  That's correct, which is why -- I'm not trying to hide the ball, Your Honor. I led off in paragraph one of our opposition with the fact that Your Honor dismissed the case in part because of CW1's lack of bona fides, and we've rehabilitated that.

Mr. Tu wants to gloss over a very, very important allegation.  It's probably the most important in the Complaint, which is that in addition to CW1 saying that the deal would actually be worth 20 to 25 million, and that she informed the C-suite that she thought that was improper, and that she sent models of the evaluations of that deal on various biweekly or even weekly times -- the allegation which the Court must take as true if the Court credits CW1 under Zucco prong one is that Meredith told her we are having the discrepancy between these numbers to serve as a buffer.

In his papers, Mr. Tu said we auspiciously quote it.  Indeed, we do.  It's a quotation that we believe is very important.  It's not some made up word.  It's basically Mr. Meredith told CW1 that we are changing these numbers and we publicly state so we can effectively buffer and hide that we are not growing organically, that this acquisition, this

purchase of revenue, is going to give the appearance of some kind of stability going forward, but that was very much not happening.

So going back to paragraphs 260 and 269, you have a statement that was false when made.  Again, I'm not going to read Your Honor all the rules from the different Ninth Circuit cases.  The Court certainly knows that if we peeked past the basic foundations of 9(b), the PSLRA, and Zucco, then the Court must take the allegations at face value. Discovery and trial are a different issue.  This is not a matter of proof.  This is a matter of allegations.

So the allegations in the Complaint are pretty straightforward.  Mr. Meredith told the public that the valuation of the xMatters was going to be $9-11 million, but we have evidence suggested in the Complaint that that was not true.  So, number one, it was material.  Number two, it was knowingly false when made.  Number three, there needs to be meaningful, cautionary language, but there was no meaningful, cautionary language.

The language basically said we may have issues with the valuation of the deal, but Ninth Circuit law -- I have a number of cases here.  I think it's actually Quality Systems, but it could be another one, which basically says that you can't have cautionary language about something that has already occurred.  Your Honor has probably seen it.

There's a very famous quotation which almost every circuit uses, which is you can't warn your travel companion to be careful that there may be a ditch when you know full well that the Grand Canyon lies one foot away. It's quoted in every circuit because it really tells the story.

So in this situation -- and then I'll move on, Your Honor. I'm not going to belabor it -- we have a material statement knowingly made, which is not accompanied by any meaningful cautionary language. Safe harbor offers no protection to that. And as I pointed out, it was a mixed statement of forward-looking and present as well.

A few other things that Mr. Tu pointed out, he wants the Court to see that CWs 12 through 16 are just corroborative. Once again, that's correct.

I will quote from the NVIDIA case, which both parties used quite a bit in their briefing. It says: "We -- "we" being the Ninth Circuit of course -- "We examined the level of detail provided by the former employees, the corroborative nature of other facts alleged, the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."

So the Court can and will come to its own conclusion, but Mr. Tu cannot explain to the Court that the Ninth Circuit doesn't look to corroboration or the number of witnesses when it most certainly does.

THE COURT:  And just for your information, we're about ten minutes, okay?

MR. ROGERS:  Can I finish one more thing and then sum up?

THE COURT:  Absolutely.  Just give me the timeframe.  How much longer would you need?

MR. ROGERS:  I think I'm just going to read a couple of quotations from the Glazer Capital case, and then I will --

THE COURT:  That's fine.  Also, you can just refer the Court because I have all the documents I believe that you are referring to.

MR. ROGERS:  Yes.  I would refer to pin cites 771 through 772, 63 F.4th 747.

I would just like to say that the adequacy of the Complaint does not depend on each CW possessing inside knowledge about corporate level trends.  Plaintiffs need only provide a basis for each CW's knowledge about the specific statements.  Though the CWs, as individuals, might not have known about corporate level trends, their statements combine to tell a plausible story.

That's where I'll end, that Your Honor knows under Tellabs, the Court needs to engage in a holistic analysis.  And Mr. Tu is doing what most defense lawyers I've faced have done.  Mr. Tu is not new to this rodeo and neither am

I.   We've faced each other.   It's very much in his favor to look at every allegation piecemeal.   Every single allegation piecemeal can be explained away.   But the holistic analysis, which includes 16 corroborative CWs, a suspicious departure, a core operations application, because all they ever talked about were these acquisitions and the integration process -- you put it together, and it tells a very plausible story where the most likely inference, as we explain in the papers, is that they were purchasing revenue and telling the market something that was not quite what was actually happening underneath.

I would love to continue, Your Honor.   If I'm allowed to, I will, but you've told me you want to stop at ten minutes, so I will obey the orders.

THE COURT:   All right.   Well, we've gone 12 minutes.   So for the record, again, the Court would always like to hear, but again, we're not here to argue the whole motion again.   This is not going to be where this is an unlimited hearing.   The Court has specific questions.   I've explained that I think on a couple of occasions now.   I do appreciate that, but I do have the papers, and the Court's questions have been answered.

I always appreciate and value oral argument.   I really do.   I remember as an attorney how much I valued it. At the same time, if the questions are not posed, I don't

want to have the motion just reiterated to me because I've read it.  Thank you so much for providing your perspectives.

It is the defense's motion, so I'll give them up to five minutes if you'd like to close with anything, but I don't have any further questions.  I'm ready to submit the matter at this time.

Again, the Court had its questions that were surgical in nature, but I do appreciate anything that the parties would like to provide to the Court that they feel is not included within their papers, or something they had to respond to to the other side that was for oral argument here today.

Thank you, Mr. Tu.  You may begin when ready.

MR. TU:  Thank you, Your Honor.  I promise I'll just keep this -- just respond to some of the specific issues that were raised by counsel in the oral argument. I'll try not to repeat anything, and I'll try to keep this as brief as possible.

There was a line of argument made that the alleged false and misleading statements were historical in nature, that they said that these acquisitions had already been integrated.  I would just invite the Court to look at in particular 282 and 287 I think were the paragraphs that were relied upon there.  If you look at those carefully, they're very clear that these are statements that are

42

forward-looking.  They're talking about an ongoing process of integration.  287 even has within its statement:  "So far, so good."  So I don't know how you can read that and not see that that is a statement of forward-looking intent with respect to a process that so far, so good, is continuing to happen.

With respect to the arguments on the safe harbor, I'll just respond to one point that counsel made, which was I believe he said something to the effect of I don't believe my opposing counsel would disagree on materiality of, you know, the issues here.  Just to be clear for the record, I don't agree that these statements are necessarily material.

I think the issue here, which was conflated a bit in my colleague's argument, is the issue isn't the materiality of any particular acquisition or transaction. The issue, of course, is whether any particular alleged false or misleading statement by itself was material.  I think when you look at that, it's clear that there are questions with respect to materiality across those statements.

There were some comments made suggesting that in the Ninth Circuit there is almost a permissive standard with respect to confidential witnesses.  The Court has previously considered and ruled upon that.  I'm not going to belabor the point other than just to note that, you know, it's

43

exactly because of the common practice in many of these types of shareholder lawsuits of relying on these types of unreliable, anonymous allegations by supposed confidential witnesses that the Ninth Circuit requires that at a minimum the Complaint must satisfy these strict and important hurdles at the pleading stage.

And as the Court has established in its order, each confidential witness must be described with sufficient particularity to establish their reliability and personal knowledge.  And, second, only if a particular confidential witness is described with that reliability and personal knowledge does the Court look to whether those alleged statements are themselves even indicative of scienter.

I'll just wrap it up with one final point.  My opposing counsel referred to the NVIDIA case as a case that they believe, you know, supports their case.  There's actually -- as I'm sure the Court is aware from the briefing, there are actually two cases involving NVIDIA that are briefed in the parties' papers.  I'm assuming he's referring to the Ninth Circuit case from 2023, 81 F.4th 918.

I would just, you know, say that in that case clearly it was a totally different type of situation.  The Court there found that two confidential witnesses were reliable because the Complaint not only described their job titles but their experience, how they obtained their

knowledge, that one of the confidential witnesses had prepared presentations about the very sales at issue regarding crypto and had frequent communications with high-ranking NVIDIA executives on that topic.  One of the confidential witnesses met with one of the individual defendants on a regular basis and reported to VPs who reported directly to one of those defendants, and they were meticulous managers who monitored detailed sales data.  I think that's a totally distinguishable case.

And, of course, there's another case, in re NVIDIA Corp. Securities litigation, also Ninth Circuit from 2014.  And, you know, that's been briefed, so I'm not going to go into that other than just to note that, you know, in that case, clearly the Court affirmed a finding of no scienter with respect to those allegations in that case.

THE COURT:  All right.

MR. TU:  Unless the Court has any questions, I'll wrap it up there.

THE COURT:  No, I don't have any further questions.  I really do appreciate the written product that's been provided in this matter.  The Court has familiarity from our last motion practice, so I don't have any further questions.

Is there anything else that I can do to help the parties before I take the matter under submission?  I

greatly appreciate the written as well as oral advocacy from the parties.

From the plaintiff, anything further?

MR. ROGERS:  No, Your Honor.

THE COURT:  Thank you so much, and thank you to your colleague for coming in today.

Anything further from the defense?

MR. TU:  No, sir.

THE COURT:  Thank you.

To all of you, I hope that you had a great New Year and a great holiday season.  I'm going to take the matter under submission.  Thank you again for your written and oral product.  We're in recess.  Thank you so much.

(Whereupon, the proceedings were concluded.)

*   *   *

CERTIFICATE


I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


Date:   January 9, 2024



/s/   Sharon A. Seffens  1/9/24
_____
SHARON A. SEFFENS, U.S. COURT REPORTER