**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
jgardner@labaton.com
Michael H. Rogers (*pro hac vice*)
mrogers@labaton.com
David J. Schwartz (*pro hac vice*)
dschwartz@labaton.com
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

*Counsel for Lead Plaintiff and Lead
Counsel for the Proposed Class*

[Additional counsel appears on
signature page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLEBRA CAPITAL PARTNERS MASTER FUND LTD, SYLEBRA CAPITAL PARC MASTER FUND, AND SYLEBRA CAPITAL MENLO MASTER FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>EVERBRIDGE, INC., DAVID MEREDITH, PATRICK BRICKLEY, and JAIME ELLERTSON,<br><br>               Defendants. | Case No.: 2:22-cv-02249-FWS-RAO<br><br>CLASS ACTION<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
New York

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION .................................................................................. 2

   A. Everbridge's Pre-Class Period ................................................................. 3

   B. Meredith Took Over as CEO and Everbridge Acquired Numerous Companies to Enhance Everbridge's CEM Suite ...................................... 4

   C. Defendants' Failure to Integrate the Acquisitions Undermined Everbridge's Long-Term Growth ................................................................ 4

   D. Defendants Purposefully Downplay Revenue Contribution from xMatters to Hide Slowing Organic Growth ........................................... 5

   E. Defendants Mislead Investors About the xMatters Integration .............. 6

   F. The Truth is Gradually Revealed ............................................................. 7

II. JURISDICTION AND VENUE ........................................................................... 9

III. PARTIES ............................................................................................................. 9

   A. Lead Plaintiff .......................................................................................... 9

   B. Defendants .............................................................................................. 10

   C. Relevant Third Parties ........................................................................... 11

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD .............................................. 12

   A. Overview of Everbridge's Business ....................................................... 12

   B. Everbridge Goes Public ......................................................................... 16

   C. Meredith Takes Over as CEO ................................................................ 17

   D. Defendants Engaged in a Series of Acquisitions .................................. 17

      1. Everbridge Acquires NC4, its Largest Acquisition to Date, and Misleads Investors About Integrating NC4 .................................. 18

      2. Defendants Acquire Five Companies in 2020 But Do Not Integrate them into Everbridge's CEM Suite ............................. 19

      3. Everbridge Acquires RedSky in January 2021 but Does Not Integrate it into Everbridge's CEM Suite .................................... 20

      4. Without Knowledge of the Integration Issues, the Market Believed that the Company Had Strengthened its CEM Suite .................. 20

      5. Everbridge Acquires xMatters, the Company's Largest Acquisition Ever .............................................................................. 21

a.     Defendants Purposefully Downplay the Revenue Contribution from xMatters in Order to Hide Increasingly Stagnant Organic Revenue Growth ................................. 21

b.     Defendants Mislead Investors About Significant Problems Integrating xMatters into Everbridge ...................... 27

E.     The Relevant Truth Regarding the Company's Slowing Organic Growth Slowly Emerges ........................................ 30

V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS .................................. 32

A.     February 18, 2020 Earnings Call ........................................ 33

B.     March 23, 2020 Corporate Analyst and Investor Meeting ................................. 33

C.     The April 6, 2021 xMatters Acquisition Press Release ........................ 34

D.     The May 10, 2021 Earnings Call ........................................ 35

E.     The August 9, 2021 Earnings Call ..................................... 36

F.     The November 9, 2021 Earnings Call ................................. 37

G.     The November 30, 2021 Credit Suisse Conference ................. 38

H.     The November 30, 2021 Press Release ............................... 39

VI.     THE TRUTH EMERGES ................................................. 39

A.     The Truth is Partially Revealed on December 9, 2021 When Defendants Disclose Meredith's Abrupt Departure and Lower Revenue Guidance, But Investors Still Question How the Two are Related ............................... 39

B.     The Full Truth is Fully Revealed on February 24, 2022 When Defendants Lower Revenue Guidance Even Further and Admit the Company had not Integrated its Acquisitions During Meredith's Tenure as CEO ............................... 42

VII.     LOSS CAUSATION ........................................................ 45

A.     December 9, 2021 – First Partial Corrective Disclosure/Materialization of the Risk ...................................... 47

B.     February 24, 2022 – Final Corrective Disclosure/Materialization of the Risk ........................................ 49

VIII.     ADDITIONAL INDICIA OF SCIENTER ........................ 52

A.     Core Operations Allegations: Everbridge's CEM Platform Was Critical to the Company's Growth Plan and Integrating the Acquired Companies was Necessary for CEM's Success ............................... 52

B.     The Abrupt Departure of Meredith Supports Scienter ........... 54

C.     Defendants' Statements Themselves Support Scienter ........... 55

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE No. 2:22-CV-02249-FWS-RAO

ii

D.    Meredith's Employment Agreement Further Supports Scienter............................ 55

E.    Statements by Former Everbridge Employees Corroborate that Defendants
Knowingly Downplayed the Revenue Contribution from xMatters to Mask
Slowing Organic Growth ....................................................................... 56

IX.    CONTROL PERSON ALLEGATIONS............................................................ 57

X.    CLASS ACTION ALLEGATIONS ............................................................... 58

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-
MARKET DOCTRINE................................................................................ 59

XII.    NO SAFE HARBOR .................................................................................. 61

XIII.    CAUSES OF ACTION ............................................................................... 62

COUNT I  For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Promulgated Thereunder Against Everbridge and the Individual Defendants ................. 62

COUNT II  For Violation of Section 20(a) of the Exchange Act Against the Individual
Defendants........................................................................................... 64

PRAYER FOR RELIEF................................................................................ 65

JURY DEMAND ...................................................................................... 65

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

iii

Court-appointed Lead Plaintiff Sylebra Capital Partners Master Fund Ltd, Sylebra Capital Parc Master Fund, and Sylebra Capital Menlo Master Fund ("Lead Plaintiff" or the "Sylebra Funds") individually and on behalf of all persons and entities who or which, during the period from February 18, 2020 through February 24, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of Everbridge, Inc. ("Everbridge" or the "Company") and were damaged thereby (the "Class"),[1] bring this Second Amended Class Action Complaint for Violations of the Federal Securities Laws against Defendants Everbridge and several of Everbridge's senior executives and officers—former Chief Executive Officer ("CEO") David Meredith ("Meredith"), current Chief Financial Officer ("CFO") Patrick Brickley ("Brickley"), and former CEO and current Chairman of Everbridge's Board of Directors Jaime Ellertson ("Ellertson" and together with Meredith and Brickley, the "Individual Defendants").

Lead Plaintiff's claims are brought upon personal knowledge as to its own acts, and upon information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Everbridge with the Securities and Exchange Commission ("SEC"); (2) reports issued by analysts covering or concerning Everbridge and its business; (3) press releases, news articles, transcripts, videos, and other public statements issued by or about Everbridge, its business, and the Individual Defendants; (4) an investigation conducted by Lead Plaintiff's attorneys, including interviews with former Everbridge employees; and (5) other publicly available information concerning Everbridge, its business, and the allegations contained herein. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein and will continue to be revealed after Lead Plaintiff has a reasonable opportunity for discovery.

---

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Everbridge during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Everbridge's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

I.     **NATURE OF THE ACTION**

1.     This case is about Defendants' fraudulent misrepresentations, material omissions, and course of conduct surrounding Everbridge's nine acquisitions between 2019 and 2021. Specifically, Defendants used the ***acquired revenue*** from a target company to create the false appearance of ***organic revenue*** growth in the minds of the investors comprising the Class.

2.     Moreover, throughout the Class Period, Everbridge and the Individual Defendants also consistently misled the investing public. In stark opposition to what Defendants knew (and in which they were actively engaging), however, they instead disseminated false and misleading statements and omissions of material fact in an attempt to cover up the significant problems Everbridge encountered as a result of Defendants' failure to integrate these acquisitions.

3.     Indeed, Defendants made materially false and misleading statements and omissions of material fact about the extent to which Everbridge was using and allocating the revenue obtained from an acquired company in order to disguise ***stagnating organic revenue***. During the Class Period, Defendants lied to investors about how much ***revenue Everbridge acquired*** from xMatters, a $242.6 million acquisition of an IT service platform that, ***if properly integrated***, would allow Everbridge more effectively to sell its single platform suite of products, which in turn, would enhance the Company's long-term growth.

4.     Although Defendants knew xMatters would contribute $20-25 million to Everbridge's 2021 revenue, they instead told investors that xMatters would contribute only $9-11 million. According to Confidential Witness ("CW") 1, who was a member of the finance team, Global Financial Planning and Analysis and who worked at Everbridge during the xMatters acquisition, ***the rationale Meredith provided was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue.*** Defendants' falsehoods led investors to believe that the Company's organic revenue was growing more than it actually was.

5.     As a result, investors remained completely unaware of the Company's slowing organic revenue until the truth was revealed. As a result, investors were left holding the bag to the tune of billions of dollars in losses when Defendants admitted that during the Class Period had been unsustainable and harmful to long term profitability.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

2

6.      Specifically, on December 9, 2021, the Company lowered 2022 revenue guidance to levels well below Everbridge's demonstrated and consistent 30% plus revenue growth, and also announced that Defendant Meredith abruptly resigned as CEO. On this news, Everbridge's share price plummeted more than **45%** in a single day. Even at that moment, however, Defendants continued their misleading narrative by claiming that Meredith's sudden departure was unrelated to the Company's financial position.

7.      On February 24, 2022, investors finally learned the full truth about Everbridge's slowing revenue growth, when Everbridge announced that it had determined that the flurry of acquisitions during the Class Period created obstacles to sales growth due to incomplete integrations and increased complexity of its offerings, and as a result, the Company was going to focus on integrating the acquired companies (which Defendants previously said they already did). On this news, Everbridge's common stock cratered an additional **34%**.

**A.      Everbridge's Pre-Class Period**

8.      Everbridge was founded in 2002. Initially, the Company had a single product, its Mass Notification software, which sent messages via telephone, text, and email to an entire defined population in the event of a threat or emergency. Though it was originally the Company's only product, Defendants understood that Everbridge needed to expand its offerings beyond Mass Notification to continue growing. As Defendant Brickley explained during the Company Conference on March 5, 2020 in his capacity as CFO, "we knew pre-IPO, that you can't really go public and sustain on just the mass notification opportunity" as it was "not growing super quickly."

9.      To generate long-term growth, the Company developed a Critical Event Management ("CEM") suite, which it described as a collection of various products that enable organizations to assess, manage, and respond to distinct threats and emergencies, ***all on a single platform***. The Company told investors this CEM suite would drive future growth, as the market for CEM was more than five times larger than the market for Mass Notification.

10.     And that early growth strategy translated well to earnings, as Everbridge reported 35% to 41% revenue growth every year between 2016 and 2018. Indeed, Everbridge's revenue growth from 2016 to 2018 was largely organic. Organic growth refers only to that which is achieved

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

3

entirely through a Company's own resources, in contrast to inorganic growth, which may be attributable to any number of external sources and activities such as mergers and acquisitions ("M&A"). Prior to the Class Period, then CEO Ellertson explained that since going public (in 2016), Everbridge's growth rate consisted of mid-30% organic growth, plus an additional 3% to 7% inorganic growth from acquisitions.

11.    Ellertson explained that the Company's acquisitions were "thoughtful product decision[s] that [are] strategic" and meant to "create new growth drivers or sustain current drivers."

### B.    Meredith Took Over as CEO and Everbridge Acquired Numerous Companies to Enhance Everbridge's CEM Suite

12.    From the beginning of the Class Period to its end, the Company engaged in a flurry of acquisitions, purchasing nine new companies.

13.    Throughout the Class Period, Defendants misled investors about the Company's organic revenue growth.

14.    In fact, Defendants made little or no effort whatsoever to integrate the vast majority of those companies into Everbridge's CEM suite at all.

15.    The Company also failed to integrate CNL Software and RedSky into its CEM suite. According to CW 3—former Everbridge Vice President, Business Development and employed by RedSky before and Everbridge after acquisition (in January 2021)—stated she believed RedSky would be incorporated into Everbridge's CEM, but Everbridge showed "no effort" in performing an integration.

16.    Additionally, as reported by multiple former Everbridge employees, Everbridge failed to adequately plan the integration of its acquired companies.

### C.    Defendants' Failure to Integrate the Acquisitions Undermined Everbridge's Long-Term Growth

17.    Everbridge's failure to integrate the acquired companies hampered its salespeople's ability to sell the CEM suite, as it was not truly the "singular, integrated product" Everbridge claimed it was.

18.    Defendants' failure to integrate the Class Period acquisitions overly complicated the Company's internal systems, which also hampered sales efforts. For example, according to CW 2,

after the xMatters acquisition in May 2021, Everbridge was now operating four different instances of Salesforce[2] used by all different sales representatives. CW 2 added that in addition to Salesforce, Everbridge was also using two instances of NetSuite[3] in addition to all their European systems. CW 2 explained that the convoluted nature of the systems "really slowed down sales."

### D. Defendants Purposefully Downplay Revenue Contribution from xMatters to Hide Slowing Organic Growth

19.     Because Everbridge's publicly available financial statements did not disclose the revenue contribution from each acquired company, investors had no transparency as to the precise extent (if at all, from their perspective) organic growth was lagging. Given this lack of transparency, analysts consistently asked Defendants to provide a revenue contribution from the acquired company, so analysts could determine how much revenue growth was organic and how much revenue was acquired. Despite these questions, Defendants misled investors about the extent to which the revenues it obtained from the acquired company were being used to mask increasingly stagnant revenue growth.

20.     On April 6, 2021, the Company announced it would acquire xMatters for $242.6 million, by far the Company's largest acquisition to date. For context, the Company's total revenue for the previous year (2020) was $271.1 million— only $27.8 million more than the Company paid for xMatters. Despite the size of the deal, Everbridge told investors that it expected xMatters to contribute only $9 million to $11 million in revenue for the rest of 2021.

21.     But this was false. In truth, the revenue contribution from xMatters for the rest of 2021 was actually $20-25 million—***more than double*** the $9-11 million figure Defendants presented to the public. According to CW 1, a former Everbridge employee who had knowledge about Everbridge's M&A process and transactions, the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021, however, realistically, the forecasts were presenting figures closer to $20 - $25 million. CW 1 stated that she

---

[2] Based on Lead Plaintiff's review of publicly available sources, Salesforce is a client relationship management ("CRM") database used for support, sales, and marketing activities. Salesforce allows businesses to track sales and customer activity, market to customers, and many other services.
[3] Based on Lead Plaintiff's review of publicly available information, NetSuite is a technology vendor with applications for customer relationship management (CRM), enterprise resource planning (ERP), financial management, and many others.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO                    5

raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley. CW 1 added that she expressed concerns *directly* to Meredith and Brickley as well, in the form of presentations and emails regarding the deal. According to CW 1, the rationale Meredith provided *was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue*.

22.    Indeed, by telling investors that xMatters would contribute only $9-11 million to Everbridge's 2021 revenue, when according to CW 1, the xMatters deal would actually contribute *$20-25 million* to 2021 revenue, Defendants effectively hid from the market an extra $11-16 million in "revenue" from xMatters that would be added to the Company's total revenue. In so doing, of course, Defendants created the false impression that Everbridge's revenue was growing organically more than it actually was. And because Everbridge's financial statements did not break out revenue from each acquired company, it was impossible for investors to figure out how much revenue came from xMatters and calculate organic revenue on their own. As a result of this misconduct, investors believed that the Company's organic revenue was continuing its strong momentum.

### E.    Defendants Mislead Investors About the xMatters Integration

23.    In addition to misleading investors about xMatters' revenue contribution and the Company's organic revenue growth, Defendants also falsely assured investors that the Company was successfully integrating xMatters without any hint of problems. This was not the case. As detailed by multiple former employees, the xMatters integration was a disaster and caused the departure of more than half of the xMatters sales staff after the acquisition. With less than half of xMatters' experienced sales staff remaining at Everbridge after the acquisition, Everbridge could not effectively sell xMatters' products, which caused a significant drop off in sales—and therefore, in organically-generated revenue—in the second and third quarters of 2021.

24.    Despite losing more than half of xMatters' sales staff, Defendants continuously touted the Company's integration efforts, making it appear as though Everbridge had integrated xMatters' technology into Everbridge's CEM and had integrated xMatters' employees into Everbridge. For example, Defendants described the integration as "*the seamless integration of the*

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

6

*Everbridge and xMatters*." Defendants also falsely assured investors that "*[w]e've locked up key hires, and we're retaining them*."

25.    This was nevertheless false. In stark contrast to what Defendants told the market and their investors, most of the xMatters sales staff, including the global sales leader, left the Company within three months of the acquisition. Because Everbridge, like all companies, depends on its salespeople to sell its products and grow its revenue, the loss of most of xMatters' sales staff caused a significant decline in sales midway through 2021.

26.    The poor integration of xMatters' sales staff caused a "dismal" third quarter for xMatters, as xMatters did not come close to achieving their targets. Despite this, Defendants falsely told investors that "based on our internal expectations, what we thought we'd do on sales, [] we're doing better." Defendants' misstatements led investors to believe that Everbridge had successfully integrated xMatters and was poised to continue its growth trajectory as it further strengthened its CEM suite. This was false, which investors first started learning on December 9, 2021.

**F.    The Truth is Gradually Revealed**

27.    On December 9, 2021, Defendants partially revealed the truth through a press release containing two announcements. First, Everbridge announced, out of nowhere, that Meredith had resigned as CEO and member of the Board of Directors, effective January 30, 2022. The Company immediately established an Office of the CEO and began transition leadership to Brickley and Chief Revenue Officer, Vernon Irvin, who would serve as Co-CEOs until the Company found a permanent replacement CEO. Second, Everbridge reduced revenue guidance for 2022 to 20-23%, well below the Company's historical forecasts of 30% plus revenue growth. Nevertheless, at the same time, Defendants continued misleading investors by claiming that the two announcements were unrelated, stating that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results."

28.    Investors were shocked by this news, as Everbridge's stock price plummeted *by more than 45%*, as investors slowly began to understand that the Company's revenue growth was likely not sustainable. However, analysts still questioned how Meredith's departure could be related to the revenue growth concerns. For example, in an analyst report on December 13, 2021, J.P.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION    7
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

Morgan asked "[w]hy is the CEO really leaving" and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?" For more than two months, no answers were forthcoming to those queries and concerns.

29.    On February 24, 2022, however, investors finally learned the full truth about the Company's lack of organic revenue growth. On that day, the Company issued a press release that, once again, lowered 2022 revenue guidance, this time to 15-17% growth—well below the historical 30% or more growth rate and a significant reduction from the initial forecast provided on December 9, 2021. The press release also explained that the Company was "taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."

30.    During the related earnings call, Co-CEO Vernon Irvin explained that following Meredith's departure, management reviewed the Company's strategy during the Class Period and concluded that the flurry of acquisitions created a "*barrier to upsell and cross-sell from increased complexity, and incomplete integrations*." Similarly, Brickley said that the acquisitions "created complexity for the business seen in the product, back office and go-to-market headwinds *that are obstacles to sales growth*." Brickley further explained that "we were well down a path of selling dozens of solutions that *were not always tightly integrated*. We were selling them to multiple buyers. And as [Irvin] said, *that was confusing to customers and to our sellers*."

31.    Investors were once again shocked by this revelation. On this news, Everbridge's stock price fell more than *33%*, closing at $30.61 per share on February 25, 2022, as investors finally learned the undisclosed facts about Everbridge under Meredith's leadership.

32.    For the first time, investors learned that the rapid pace of acquisitions and incomplete integrations caused a disjointed, confusing CEM suite—which was contrary to Defendants' repeated statements touting its CEM suite as the only fully integrated CEM solution—and led to a drop off of sales to such an extent that Defendants no longer could camouflage their inability to generate and sustain organic revenues from additional acquisitions.

33.    Less than a month later, on March 17, 2022, activist investor Ancora Holdings Group ("Ancora"), who beneficially owned approximately 4% of the Company's outstanding

common stock, issued a letter calling for the sale of Everbridge. Ancora stated, among other things, that "we are puzzled by why Everbridge is only now recognizing the need to integrate products after so many years, when a well-disciplined management team and Board would understand the advantages to executing on this as soon as possible." Ancora also recognized that because "Everbridge does not disclose contributions from M&A," it has "seemingly obscure[ed] that the Company has been paying higher prices to acquire growth."

## II. JURISDICTION AND VENUE

34. These claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

35. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

36. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Everbridge transacts business in California, including in this District, and the Company's West Coast headquarters are located within this District at 155 North Lake Avenue, Suite 900, Pasadena, California 91101. Further, Everbridge's securities trade on the NASDAQ stock market under the ticker symbol "EVBG." In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiff

37. Lead Plaintiff Sylebra Funds are hedge funds managed by Sylebra Capital Limited, an investment adviser that targets mid-sized technology, media, and telecommunications companies. Together, the Sylebra Funds have over $6.6 billion in assets under management. Lead Plaintiff purchased Everbridge common stock during the Class Period and was damaged as the result of Defendants' fraud.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

9

**B.    Defendants**

38.    Defendant Everbridge is a Delaware corporation, based in Burlington, Massachusetts with its West Coast headquarters located at 155 North Lake Avenue, Suite 900, Pasadena, California 91101. The Company's common stock is listed on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "EVBG."

39.    Defendant Meredith served as Everbridge's Chief Executive Officer ("CEO") as of July 15, 2019 and during all relevant times prior to December 9, 2021, on which date he unexpectedly and abruptly resigned from that post. In his role as CEO of Everbridge, Meredith participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the significant problems Everbridge was encountering as a result of its multiple acquisitions and the extent to which the revenues it obtained from the acquired company were being used to mask increasingly stagnant organic growth. Defendant Meredith also signed Everbridge's SEC Form 10-Qs filed on May 10, 2021 and August 9, 2021, which contained materially false and misleading facts as detailed below.

40.    As part of Meredith's employment agreement, the Company granted Meredith 100,000 performance stock units (the "PSU Grant"), with up to 62.5% of the PSU Grant becoming eligible to vest on September 30, 2021, based on the compound annual growth rate ("CAGR") achieved by the Company during the eight fiscal quarters preceding such date, and up to an additional 62.5% of the PSU Grant becoming eligible to vest on September 30, 2022, based on the CAGR achieved during the 12 fiscal quarters preceding such date. The vesting of the PSU Grant was subject to Meredith's continued service to the Company through each applicable vesting date or event.

41.    Defendant Brickley served as the Senior Vice President and Chief Financial Officer ("CFO") of Everbridge as of March 1, 2019, including during the Class Period. After December 9, 2021, he also served as interim Co-CEO. In his role as CFO of Everbridge, Brickley participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the significant problems Everbridge was encountering as a result of its multiple acquisitions and the extent to which the

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION    10
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

revenues it obtained from the acquired company were being used to mask increasingly stagnant organic growth. Defendant Brickley also signed Everbridge's SEC Form 10-Q for the quarter ended May 10, 2021 and August 9, 2021, which contained materially false and misleading facts.

42.    Defendant Ellertson preceded Meredith as the CEO of Everbridge, serving in that position from September 2011 to July 2019, when Meredith succeeded him as CEO. During the Class Period, Ellertson served as Executive Chairman of the Board of Directors of Everbridge during all relevant times. In his role as Executive Chairman, Ellertson participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact relating to the significant problems Everbridge was encountering as a result of its multiple acquisitions and the extent to which the revenues it obtained from the acquired company were being used to mask increasingly stagnant organic growth. Moreover, in his role as Executive Chairman, Ellertson was responsible for the Company's M&A. During the Class Period, an analyst asked Ellertson about his "day-to-day role in helping support David [Meredith], Patrick [Brickley] and the team," and Ellertson responded that his "day job is M&A" and that he is "just doing the M&A stuff."

43.    Defendants Meredith, Brickley, and Ellertson are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, by virtue of their high-level positions at Everbridge, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition, as alleged herein.

44.    Everbridge and the Individual Defendants are collectively referred to herein as "Defendants."

C.    **Relevant Third Parties**[4]

45.    CW 1 was employed by Everbridge from early 2019 until summer 2021. CW 1 was a member of the finance team, Global Financial Planning and Analysis ("FP&A"), holding various titles during her tenure at the Company, and her responsibilities included work related to

---

[4] All CWs are described in the feminine to protect their identity.

Everbridge's mergers and acquisition ("M&A") process. CW 1 reported to the Vice President of FP&A, who, according to CW 1, reported to Brickley, who reported to Meredith. In her role, CW 1 regularly communicated with Meredith and Brickley through presentations or email correspondence, particularly in the lead-up to an acquisition. With respect to the xMatters acquisition, CW 1 explained that she sent weekly or bi-weekly emails to Brickley and Meredith with modeling in the lead-up to the acquisition.

46.    CW 2 was employed in the Finance Group at xMatters from prior to the Class Period until May 2021, when Everbridge acquired xMatters. Following the acquisition, CW 2 stayed on at the Company in the same Finance role, from May 2021 until late 2021. CW 2 explained that she worked as part of the integration team during the xMatters acquisition, and primarily spoke with direct managers and Everbridge's "integration office," which was a group that pre-dated the xMatters acquisition. According to CW 2, the integration office include her Everbridge equivalent and was "heavily involved" in the process.

47.    CW 3 was a Business Development Manager at RedSky Technologies from July 2007 until the acquisition by Everbridge, at which point she was employed by Everbridge as the Vice President, Business Development from January 2021 until April 2021. CW 3 was involved in the vetting of RedSky during the Winter of 2020 (shortly before the acquisition) as a member of the executive team. During this process, CW 3 recalled Everbridge did a "deep dive" into all the departments at RedSky, but Everbridge still did not understand RedSky's go-to- market strategy.

## IV.    SUBSTANTIVE ALLEGATIONS OF FRAUD

### A.    Overview of Everbridge's Business

48.    Everbridge is incorporated in Delaware and maintains a West Coast headquarter in Pasadena, California. The Company is a global software company that provides enterprise software applications designed to automate and accelerate organizations' operational response to "critical events." Critical events include public safety threats such as severe weather conditions, active shooter situations, and terrorist attacks, as well as business events like Information Technology ("IT") outages, cyber-attacks, product recalls, or supply-chain interruptions.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION    12
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

49.    The Company was founded in 2002 in response to the September 11 terrorist attacks with the mission of helping keep people safe amid critical situations. The Company initially focused on one product—its Mass Notification software, which is designed to send messages via telephone, text, and email to an entire defined population in the event of a threat or emergency.

50.    Though the Company's first product was its Mass Notification software, Defendant Brickley stated at a March 5, 2020 Company conference presentation that "we knew pre-IPO, that you can't really go public and sustain on just the mass notification opportunity" as it was "not growing super quickly." As a result, the Company has since expanded its product offerings, using its Mass Notification platform to build adjacent applications.

51.    Throughout the Class Period and before, the Company's product offerings have been organized into three product segments: (i) Mass Notification applications designed to communicate to an entire defined population in the event of a threat or emergency; (ii) IT and IoT alerting; and (iii) Critical Event Management ("CEM"), which is a collection of the Company's applications designed to allow its customers to assess threats, locate impacted people and assets, and manage and respond to critical events, *all from one single platform*.

52.    Of these three categories, during the Class Period, the CEM segment had *by far* the largest Total Addressable Market ("TAM"). TAM is a term that is used to reference the revenue opportunity available for a product or service. Assessing the TAM is crucial for business because it helps prioritize business opportunities by serving as a metric of a given opportunity's underlying potential. According to a slide from the Company's Analyst Day 2020 meeting presentation on March 23, 2020, the TAM for CEM was $25.9 billion, whereas the TAM for Mass Notification was $4.8 billion and $10.4 billion for IT and IoT Alerting:



53.     Therefore, the CEM segment provided the greatest growth opportunity, and Everbridge understood that in order to continue growing, it needed to build out Everbridge's CEM suite and further penetrate the CEM market since it was much larger than the Mass Notification—i.e., population alerting—market.

54.     The Company consistently explained that its CEM platform was integral to the Company's growth plan. As explained in the Company's 2019 10- K, one of the "[k]ey elements of [its] growth strategy" was maintaining Everbridge's leadership in the CEM market since Everbridge was the only fully integrated CEM solution in the market. Specifically, the 2019 10-K stated:

> ***Maintain Our Technology and Thought Leadership***.[5] We will continue to invest in our core CEM platform and our applications to maintain our technology leadership position. For example, we believe that ***we are the only company today that provides a full, integrated CEM solution*** and that we provide the first solution to offer dynamic versus static location awareness integrated with analysis and communications for the0020employee safety and security marketplace. Further, we believe we have a competitive advantage through our commitment to innovation and thought leadership that has enabled us to take market share from our competitors and accelerate our growth.

---

[5] Emphasis in original.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

14

55. The investing public understood the importance of the CEM suite to Everbridge's future growth. For example, on June 19, 2019, SunTrust Robinson Humphrey issued an analyst report stating, "we believe the Critical Event Management (CEM) platform is important in sustaining high growth and supported by an estimated ~$26B TAM." SunTrust Robinson Humphrey further stated that they "anticipate CEM to represent one of the highest growth segments of the overall business." Given the importance of the CEM suite to the Company's future growth, investors were extremely interested in the Company's plans for building and growing its CEM platform.

56. In the years before the Class Period, the Company focused on growing organically with some consolidation of adjacent technologies via targeted and strategic "tuck-in" acquisitions. These helped develop the CEM platform into a singular, integrated product designed to assess threats, located impacted people and assets, and manage and respond to critical events.

57. This integrated response separated Everbridge from its competitors, as other solutions relied on fragmented, unintegrated tools from numerous vendors. The Company's 2019 10-K explained this competitive advantage as follows:

> Organizations today typically manage critical events across the organization in silos that use disparate data sources and unintegrated tools, making it difficult to achieve a common operational view of threats and of the status of response. Utilizing a common contact base, consistent rules engines, threat databases that are integrated with information on the location of an organization's people, assets and suppliers, and a common visualization platform, ***CEM solutions can provide a more integrated solution which can improve management control and visibility and lower costs. The ability to cohesively and rapidly share information and collaborate across the organization underlies creating a common operational approach***.

58. The Company established a dominant CEM platform that obviated the need for customers to contract with multiple point solution providers. Investors also responded favorably to this approach, as the Company consistently beat its financial guidance and reported 35% to 41% year-over-year revenue growth every year between 2016 and 2018 and Everbridge's share price increased by approximately 244% between its first day of trading and December 31, 2018.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

15

B. **Everbridge Goes Public**

59.     Since completing its Initial Public Offering ("IPO") in September 2016, the Company has repeatedly touted its revenue growth and ability to beat financial guidance every quarter. The Company's total revenue for full year 2017 was $104 million, an increase of 36% compared to 2016; its total revenue for full year 2018 was $147.1 million, an increase of 41% compared to 2017; and its total revenue for 2019 was $200.9 million, an increase of 37% compared to 2018.

60.     Everbridge maintained that this revenue growth was almost entirely organic. Organic revenue growth is the growth of a company by increasing output and enhancing sales internally through the Company's own resources. Organic growth stands in contrast to inorganic growth, which is growth related to activities outside a business's own operations, such as growth attributable to mergers and acquisitions. Organic growth is often seen as superior and a better indicator of a company's performance. While inorganic growth can provide a short-term boost, there are disadvantages in that implementation of technology or integration of new employees can be costly and time consuming. Therefore, the Company's organic growth numbers were extremely important to investors.

61.     Since going public, Defendants consistently explained that Everbridge's revenue growth was almost entirely organic, with a small percentage of revenue growth coming from acquisitions. Prior to the Class Period, when Defendant Ellertson was still CEO, he told investors that Everbridge "continue[s] to grow at kind of 30%, mid-30% numbers, which we have quoted continuously as our target since we went public, and then we add onto that anywhere from 3% to 7% with M&A in a given year." In other words, since going public, the Company was growing around 30% organically year-over-year, plus an additional 3-7% inorganic growth from acquisitions, for a total growth rate in mid to high 30% range.

62.     Prior to the Class Period, Everbridge acquired only six companies in the nearly three years between the Company's September 2016 IPO and Meredith's succession of Ellertson as CEO in July 2019.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO                    16

## C.    Meredith Takes Over as CEO

63.    On June 18, 2019, Everbridge announced that Meredith had been appointed as CEO and a member of the Board of Directors of the Company, to be effective July 15, 2019. Meredith succeeded Ellertson, who transitioned to the role of Executive Chairman of the Board of Directors.

64.    As part of Meredith's employment agreement, the Company granted Meredith 100,000 performance stock units (the "PSU Grant"), with up to 62.5% of the PSU Grant becoming eligible to vest on September 30, 2021, based on the compound annual growth rate ("CAGR") achieved by the Company during the eight fiscal quarters preceding such date, and up to an additional 62.5% of the PSU Grant becoming eligible to vest on September 30, 2022, based on the CAGR achieved during the 12 fiscal quarters preceding such date. The vesting of the PSU Grant was subject to Meredith's continued service to the Company through each applicable vesting date or event.

## D.    Defendants Engaged in a Series of Acquisitions

65.    Under Meredith's leadership, from the beginning of the Class Period to its end, Defendants engaged in a flurry of acquisitions, purchasing nine new companies.

66.    As explained below, starting with the acquisition of NC4 and continuing throughout the Class Period, Everbridge engaged in a buying spree, purchasing nine separate companies.

67.    However, Defendants misled investors about the Company's organic growth by downplaying the revenue contribution from the acquired company, making it appear that the Company's organic revenue was growing more than it actually was. Because Everbridge's publicly available financial statements did not break out revenue from each acquired company, there was a lack of transparency as to the extent to which organic growth was lagging.  Despite several analyst questions about the legitimacy of the Company's organic growth numbers, Defendants misled investors about the extent to which the revenues it obtained from the acquired company were being used to mask increasingly stagnant growth.

68.    Moreover, Defendants mislead investors when they were specifically asked whether in fact the Company was experiencing any integration problems with respect to its acquisition of numerous companies during the Class Period. For example, as to the xMatters acquisition,

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO                    17

Defendants claimed that Everbridge had "locked up key hires" and was "retaining" xMatters employees. But in fact, Everbridge was unable to effect complete integration of the acquired companies as their products required multiple, different systems, running on different internal databases, with dedicated legacy sales staffs trained and operating differently than those originally with Everbridge, leading many to leave the Company.

### 1. Everbridge Acquires NC4, its Largest Acquisition to Date, and Misleads Investors About Integrating NC4

69.    Shortly after Meredith took over as CEO, the Company made its largest acquisition ever to that point. On August 1, 2019, Everbridge entered into a purchase agreement with NC4 Inc., NC4 Public Sector LLC, and Celerium Group Inc., pursuant to which Everbridge purchased all the outstanding membership interests of NC4 Inc. and NC4 Public Sector LLC (collectively, "NC4") for total consideration of approximately $84.5 million. The Company paid approximately $51.7 million in cash at closing and paid the remaining purchase price with 320,998 newly issued shares of our common stock.

70.    NC4 offers threat intelligence solutions that empower businesses, government organizations, and communities to assess and disseminate risk data and information to manage and mitigate the impact of critical events. According to the Form 10-Q filed on November 8, 2019, the "Company's acquisition of NC4 was made primarily to expand the Company's customer base and to a lesser extent to complement some of the existing facets of NC4's business with the Company's existing products."

71.    Moreover, CW 1 stated that Everbridge was "struggling with attrition" and integration of its acquisitions. CW 1 explained that there were too many new people being integrated into Everbridge after numerous acquisitions beginning in 2019. CW 1 added that these employees were spread across all different time zones, which made it difficult to get everyone on the same page and then, once progress was being made, another company would be acquired and Everbridge would have to go through the process all over again. CW 1 also cited problems integrating the acquired companies themselves into Everbridge's business.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

18

72.    After the NC4 acquisition, the Company engaged in a flurry of acquisitions without fully integrating them into Everbridge. With each new acquisition, the integration problems intensified, leading to a boiling point after the xMatters acquisition.

### 2.    Defendants Acquire Five Companies in 2020 But Do Not Integrate them into Everbridge's CEM Suite

73.    The Company engaged in five acquisitions in the first eight months of 2020. The Company repeatedly claimed that their CEM suite was superior to competitors because Everbridge is "the only company today that provides a full, ***integrated CEM solution.***" Therefore, investors paid close attention to these acquisitions and how they were integrated into Everbridge's CEM solution.

74.    The first acquisition of 2020 occurred on February 7, 2020, when the Company entered into a Stock Purchase Agreement with Connexient, Inc. ("Connexient") pursuant to which the Company purchased all issued and outstanding shares of stock of Connexient for a base consideration of $20.2 million. The Company paid $11.5 million in cash at closing and paid the remaining purchase price with 96,611 newly issued shares of the Company's common stock.

75.    The second acquisition of 2020 took place on February 25, 2020, when Everbridge acquired CNL Software Limited ("CNL Software") for a base consideration of approximately $35.6 million. The Company paid approximately $19.6 million in cash at closing and paid the remaining purchase price with 153,217 newly issued shares of the Company's common stock.

76.    The third acquisition of 2020 occurred on March 19, 2020, when the Company acquired One2Many Group B.V. ("one2many") for a base consideration of $13.0 million. The Company paid $5.5 million in cash at closing, acquired purchase liabilities of $2.0 million, and paid the remaining purchase price with 52,113 newly issued shares of the Company's common stock. According to the Company's Form 10-Q filed on May 2, 2020, Everbridge "acquired one2many to expand the Company's customer base and for its cell broadcast technology to enhance the Company's public warning applications."

77.    The fifth and final acquisition of 2020 occurred on August 4, 2020, when Company acquired SnapComms Limited ("SnapComms") for a base consideration of $34.2 million.

Everbridge paid $13.2 million in cash and issued 121,858 newly issued shares of the Company's common stock at closing.

### 3.    Everbridge Acquires RedSky in January 2021 but Does Not Integrate it into Everbridge's CEM Suite

78.    On January 15, 2021, Everbridge acquired Red Sky Technologies Inc. ("RedSky") for a base consideration of $55.4 million, net of cash acquired. The Company paid $32.4 million in cash, net of cash acquired, and issued 162,820 newly issued shares of the Company's common stock at closing. The Company did not disclose historical financial statements or pro forma financial information about Red Sky, nor did it disclose expected revenue contribution from RedSky.

79.    CW 3 was employed by RedSky and then Everbridge after acquisition and was involved in the vetting of RedSky during the Winter of 2020 (shortly before the acquisition) as a member of the executive team. According to CW 3, she believed RedSky would be incorporated into Everbridge's CEM, but Everbridge showed "no effort" in performing an integration. According to CW 3, Everbridge just wanted RedSky's customers and revenue. Following the acquisition, CW 3 recalled colleagues saying to one another, "why did they buy us?" CW 3 stated that it appeared that Everbridge "did not know what [to] do with us [RedSky]." This, according to CW 3, contributed to the integration process being difficult.

### 4.    Without Knowledge of the Integration Issues, the Market Believed that the Company Had Strengthened its CEM Suite

80.    As explained in ¶¶ 69-79, Defendants did not integrate the above acquisitions into Everbridge's CEM suite.

81.    Defendants led investors to believe that Everbridge was poised to continue its growth trajectory as it penetrated the large and growing CEM market. For example, on February 19, 2021, Stephens issued an analyst report stating that improving the Company's CEM suite highlighted Everbridge's strong fourth quarter 2020. Specifically, Stephens stated that:

> Overall, a strong finish to 2020 for EVBG and we like the catalysts ahead as Everbridge capitalizes on the EU Directive opportunity and uses its top-down sales approach to win additional CEM deals.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

20

Additionally, we expect Everbridge to continue to execute on its long runway for Mass Notification wins, grow the CEM pipeline, and expand internationally.

82.    Also on February 19, 2021, William Blair issued an analyst report reiterating it's outperform rating on Everbridge stock and highlighting the Company's CEM opportunity. Specifically, William Blair noted that "Everbridge also saw continued strength in CEM customer additions and multiproduct deals." William Blair noted that "[w]hile we view this progress positively, we note that this result still represents very low penetration of the company's overall installed base and we continue to see a large up-sell opportunity ahead."

### 5.    Everbridge Acquires xMatters, the Company's Largest Acquisition Ever

83.    On April 6, 2021, Everbridge filed a Form 8-K announcing a definitive agreement for the acquisition of xMatters Holdings, Inc. ("xMatters") and the private placement of approximately $80.0 million in shares of Everbridge's common stock to certain stockholders of xMatters as partial consideration for the Acquisition. The closing of the xMatters acquisition took place on May 7, 2021. On that day, the Company filed an amendment to the Form 8-K to provide the total number of shares of common stock issued in connection with the acquisition. At closing, the Company acquired xMatters for a base consideration of $242.6 million, consisting of $178.1 million in cash and 555,332 newly issued shares of the Company's common stock.

84.    xMatters is an IT service reliability platform that helps rapidly deliver products at scale by automating workflows and ensuring digital infrastructure and applications are always working.

### a.    Defendants Purposefully Downplay the Revenue Contribution from xMatters in Order to Hide Increasingly Stagnant Organic Revenue Growth

85.    After the Company announced the xMatters acquisition, Defendants misled investors about how much revenue xMatters would contribute to Everbridge's overall revenue for the rest of 2021. The April 6, 2021 Form 8-K disclosed that the Company "anticipates *the partial year contribution to 2021 revenue will be approximately $9-11 million.*" Brickley confirmed this figure a month later, during the May 10, 2021 earnings call, when he said that "[o]ur expectations

for the financial contribution from xMatters for the remainder of the year **have not changed from the view we provided about a month ago**."

86.    These statements were false and misleading because xMatters was going to contribute much more than $9-11 million to the Company's 2021 revenue. The true revenue contribution from xMatters for the rest of 2021 was **$20-25 million—more than double** the $9-11 million figure Defendants presented to the public.

87.    As explained below, Defendants **knew** that the Company's internal forecasting models showed that xMatters would contribute **$20-25 million for the rest of 2021**, but Defendants nonetheless told investors that it would **contribute only $9-11 million**. Defendants did this so they would have an extra $11-16 million in "hidden," undisclosed revenue from xMatters to add to the Company's overall revenue, making it appear as though the Company's organic revenue was growing more than it actually was.

88.    CW 1, an Everbridge employee since before the Class Period who had knowledge of Everbridge's M&A process and transactions, recalled that the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021. According to CW 1, however, realistically, the forecasts were presenting figures closer to **$20 - $25 million**.

89.    CW 1 stated that she raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley. CW 1 added that she expressed concerns **directly** to Meredith and Brickley as well, in the form of presentations and emails regarding the deal. CW 1 explained that she sent Meredith and Brickley emails in the lead up to the acquisition. CW 1 added that she was not the only person to express concerns about the xMatters acquisition.

90.    According to CW 1, the rationale Meredith provided **was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue**. According to CW 1, the difference in revenue reported versus what was projected was to allow Everbridge to use the discrepancy to cover up for their overall performance.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO    22

91.    CW 1 added that based on the actual forecasts, it was "clear" that xMatters was not necessarily going to grow, which was contrary to what was being presented to the public.

92.    Defendants were able to mislead investors about revenue contributions from xMatters because Everbridge's financial statements do not break out revenue from its acquisitions. Thus, it was impossible for investors to determine how much revenue came from xMatters in the Company's annual and quarterly reports.

93.    Moreover, at the time of the acquisition, Everbridge did not disclose historical financial statements or pro forma financial information for xMatters because, according to the Company, the acquisition was "not material and neither the investment in the assets nor the results of operations of th[is] acquisition[] w[as] significant to the Company's consolidated financial position or results of operations." Thus, there was no transparency into xMatters' historical yearly revenue such that an investor could forecast xMatters' future revenue on their own.

94.    Given the size and importance of the acquisition to the Company's growth, several analysts tried to get an update on the revenue contribution. For example, during the Company's May 10, 2021 earnings call, an analyst from J.P. Morgan Chase & Co. asked for clarification, stating:

> Can you remind us more specifically, what was the expectation that you gave about a month ago for xMatters? Because if I take the beat and kind of add it to kind of the midpoint of what you had, it looks like you're including about $9 million for xMatters. Is that the right way to think about it? And that the guidance was really taking the beat, flowing it through to the full year and then adding xMatters to it?

95.    Brickley responded by avoiding the question and highlighting other parts of the business that Defendants were "excited" about. Specifically, Brickley's "answer" to the question was:

> So as David said, we did have a little bit of pull in. Our guidance for Q2 and for the full year, we're doing our usual, we're factoring in uncertainties that impact both revenue and profitability. And we were happy to see implementation success at certain Public Warning projects that results in some additional revenue in Q1. But really, the strength of Q1 and what we're excited about for the rest of the year reflects a reacceleration of non-COVID-related CEM and Public Warning activity, the increasing number of large deals that you saw.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

23

And in fact, subscription revenue grew more than 30%, both at Q end and on a trailing 12-month basis. And our current RPO grew 34%.

So these, on top of the existing backlog, which I referenced of signed-but-not-yet-invoiced contracts, which is still measured in the mid-teens of millions of dollars, and which we hope to recognize each revenue into upcoming quarters. These give us a lot of momentum as we look out towards the rest of the year. But as usual, when we're providing guidance as we've been doing for the past many quarters now, we're just – we're trying to provide a prudent outlook, and we hope to be able to continue our track record of outperforming expectations.

96.     Shortly after this cryptic response, a separate analyst followed up on the J.P. Morgan Chase analyst's question and tried to get a straight answer from Brickley regarding the revenue contribution from xMatters. Specifically, the analyst asked, "Could you just help parse out the impact from the acquisition and the deferred revenue haircut versus just increasing growth investments?"

97.     Brickley responded in vague terms again, stating that:

Well, it's hard to do. We just closed the deal last Friday. We're certainly giving ourselves a wide birth here in the first quarter post-acquisition on the bottom line. And – but you did see that for the full year, we raised a little bit. We do think that net-net, this acquisition is going to be accretive – squarely accretive to adjusted EBITDA in 2022.

So we just want to be prudent as we put the acquired company's financials through public accounting and—but we're optimistic that we're going to do this year what we said we were going to do, which is continue to make incremental improvements on the bottom line, whether that's adjusted EBITDA or non-GAAP net income or free cash flow. We anticipate gradual improvement versus last year, despite any purchase accounting impact to this acquisition.

98.     Similarly, at the Company's next earnings call, on August 9, 2021, one analyst asked about how the acquired revenue from xMatters would impact the Company's total revenue for 2021. Specifically, the analyst asked:

Got it. And just one follow-up, if I may. On the xMatters acquisition, is it possible to get the xMatters contribution to the revenue for the quarter? And really given the positive commentary throughout the call, I mean, I guess, *are you expecting much more than the $9 million to $11 million in total revenue that you guided for xMatters earlier this year*.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

24

99.    Meredith refused to directly answer the analyst's questions, thereby falsely maintaining the misimpression that the prior $9-11 million estimate remained intact, and instead touted the smooth integration of xMatters and the strong sales of its products:

> Yes, Koji, it's a great question. So let me just give an update on what's going on with xMatters. One is, we are probably ahead of schedule on getting them integrated with the organization and we acquired a really tremendous team. They understand our space and the strategic fit of digital plus physical is resonating well with customers. And so based on our internal expectations, what we thought we'd do on sales, like we're doing better. And so we certainly are going to try to continue that.
>
> **We are integrating**. We did have an ITA business previously. **So we're integrating those teams. <u>They've already been integrated</u>**. So it is interesting in terms of which deals were already in the funnel, would we have won them anyway, not won them. So we're really not – **and it's probably impossible to kind of break out going forward because we're putting the teams together**. But our overall guidance reflects our view of the consolidated view going forward. And overall, we're very bullish on the acquisition and the results exceeded what we thought prior to having gone through Sarbanes-Oxley and closing the deal and all that.

100.    The above statements were false and misleading because they failed to correct the prior material misstatement that revenue contribution from xMatters for the remainder of the year would be $9-11 million. *See* ¶¶ 85-91, *supra*. The statements about the xMatters integration were false and misleading because, unbeknownst to investors, Everbridge was experiencing significant integration problems in connection with the xMatters acquisition, including losing a "tremendous" number of xMatters legacy employees. *See* ¶¶ 115-123, *infra*.

101.    Under Meredith's leadership, Everbridge engaged in a flurry of acquisitions. According to CW 1, the xMatters deal was "forced through" to "boost" revenue figures.

102.    Armed with an additional $9-16 million in "hidden" revenue from xMatters, Defendants raised guidance for the full year 2021. Defendants had previously projected 2021 revenue at $342.1 million to 344.1 million. But after the xMatters acquisition, Defendants raised full year guidance to $358 million to $359.6 million, which would represent revenue growth of 32% to 33%. Thus, after the xMatters acquisition, the Company raised overall revenue guidance by approximately $15 million, of which they claimed only $9-11 million could be attributed to

xMatters, meaning the Company claimed it was projecting an additional $4-6 million in organic revenue after the xMatters acquisition.

103.   What investors did not know, however, is that xMatters was going to contribute $20-25 million in revenue—meaning *organic revenue actually was decreasing*, not increasing by $4-6 million. Had investors known the true xMatters revenue contribution number, they would have understood that the Company's organic revenue growth was decreasing, not increasing.

104.   But without this knowledge, analysts were comforted by Defendants' updated guidance, specifically its organic revenue guidance, and believed Everbridge's updated guidance reflected an increase in organic revenue. For example, on May 11, 2021, William Blair issued an analyst report which stated:

> Everbridge guided revenue for 2021 in the range of $358.0 million to $359.6 million, representing an increase of 32.3% year-over-year at the midpoint. The updated guidance was above the Street mean estimate of $345.0 million, or 27.2% growth, and represents a raise relative to management's prior outlook of $342.1 million to $344.1 million. *At the midpoint, this revised guidance reflects the upside generated in the first quarter as well as expected contribution from the recently closed xMatters acquisition, which is expected to generate between $9 million and $11 million in revenue in 2021. Excluding xMatters, the updated guidance implies roughly 29% organic growth at the midpoint compared to the midpoint of the company's prior outlook at 26.6% growth*.

105.   Analysts were also comforted by Defendants' false assurances regarding how well the xMatters acquisition was going. For example, on August 10, 2021, Stephens issued an analyst report titled "2Q Beat & Raise; Record CEM Winds Highlight Increasing Enterprise Momentum." The report reiterated Stephen's overweight rating—meaning Stephens expected the stock's total return to be greater than the total return of the company's industry sector, on a risk adjusted basis, over the next 12 months—based on "a strong 2Q beat across the board and increased 2021 guidance."

106.   Stephens explained that they "were encouraged to hear that *xMatters is exceeding expectations* and resonating well w[ith] customers. Looking ahead, *we expect CEM momentum to continue into [second half of 2021]/2022* and see potential upside from xMatters/Public Warning activity." As a result, Stephens increased their price target for Everbridge's stock from $165 to

$180 per share. Similarly, William Blair issued an analyst report on the same day stating that Everbridge's "strong revenue performance was driven by solid net adds, strong international performance, and *another quarter of records strength in CEM* and large deal wins."

107.    However, as explained in ¶¶ 115-23 *infra*, Everbridge was experiencing significant integration challenges that caused sales to drop off by mid- 2021.

**b.    Defendants Mislead Investors About Significant Problems Integrating xMatters into Everbridge**

108.    Defendants also misled investors about the Company's efforts to integrate xMatters into Everbridge. Despite significant integration challenges described below, Defendants continuously touted the Company's integration efforts, making it appear as though the Company had not experienced any issues when they had.

109.    During the Company's August 9, 2021 earnings call, Meredith provided more details on how well the xMatters integration was going:

> So let me just give an update on what's going on with xMatters. One is, we are probably ahead of schedule on getting them integrated into the organization and we acquired a really tremendous team. They understand our space and the strategic fit of digital plus physical is resonating well with customers. And so based on our internal expectations, what we thought we'd do on sales, like we're doing better. And so we certainly are going to try to continue that.
>
> *We are integrating*. We did have an ITA business previously. *So we're integrating those teams. They've already been integrated*.

110.    During the Company's November 9, 2021 earnings call, Meredith once again touted the xMatters integration, stating:

> Obviously, with the xMatters platform, it was many years of development, really nice system, interface, functionality use cases, digital operations. It's – it really adds a lot of capability to what we were doing with our IT Alerting. And we're already doing integrations, right? *So we've got that integrated now with our crisis management module, we've got it integrated with our employee communications module, integrated with our Visual Command Center*. So people are seeing the value of it coming together over time and giving us really positive feedback.

111.    Brickley also touted the xMatters integration during the November 9, 2021 earnings call. During the earnings call, Brickley reiterated that the xMatters integration went well, stating,

"it's performing as expected. *We've integrated the people. We've integrated the sales. We've integrated the funnels. We're integrating the technology*. So we don't break it out. But so far, so good."

112.    On November 30, 2021, Brickley attended the Credit Suisse Technology, Media & Telecom Conference. During the conference, Brickley responded to a question as to the status of the xMatters integration using similar language to what he had said during the November 9, 2021 Earnings Call, claiming that "[w]e've begun that technological integration. *We've locked up key hires, and we're retaining them. And so, so far, so good*."

113.    On November 30, 2021, the Company issued a press release "announc[ing] the launch of [Everbridge's] new Digital Operations Platform, helping organizations to save time and money, deliver continuous service uptime and maintain revenue streams. The new platform extends Everbridge's market- leading CEM for Digital solution to further support customers' digital transformation efforts." According to the press release, "Everbridge's new Digital Operations Platform represents *the seamless integration of the Everbridge and xMatters enterprise IT and cyber resilience solutions (following Everbridge's acquisition of xMatters in May 2021)*."

114.    Meredith and Brickley's statements about the xMatters integration were false and misleading because, unbeknownst to investors, Everbridge was experiencing significant integration problems in connection with the xMatters acquisition, including losing a "tremendous" number of xMatters' legacy employees. Moreover, because Defendants spoke about the xMatters integration, including the retention of xMatters' employees, they had a duty to disclose information about the Company's integration challenges and reasonable investors would find that losing most of xMatters sales' staff would significantly alter the mix of available information about the Company.

115.    A former employee described the xMatters integration as a disaster. CW 2—who worked at xMatters before the acquisition and remained at Everbridge after it, and who had knowledge of the integration team during the xMatters acquisition—described the integration of xMatters by Everbridge as a "[expletive] show."

116.    CW 2 further explained that xMatters was Everbridge's largest acquisition to date and Everbridge failed to account for or consider how sophisticated a company of xMatters' size

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

28

could be. CW 2 added that this contributed to the poor integration and redundant systems, [and] not only slowed down sales, but visibility became a "huge challenge," and it was necessary to manually consolidate reports.

117.    The xMatters integration was a disaster for several reasons. According to CW 1, the xMatters deal was "forced through" to "boost" revenue figures.

118.    Moreover, Defendants' failure to integrate xMatters, along with the other Class Period acquisitions, overly complicated the Company's internal operating systems. According to CW 2, after the xMatters acquisition, Everbridge was now operating four different instances of Salesforce used by all different sales representatives.  CW 2 added that in addition to Salesforce, Everbridge was also using two instances of NetSuite in addition to all their European systems.

119.    CW 2 explained that the convoluted nature of the systems "really slowed down sales."

120.    Another factor contributing to the Company's poor sales performance was the fact that Everbridge failed to integrate xMatters' teams and people—most importantly, xMatters' sales staff. Indeed, Everbridge made no effort to integrate xMatters' salespeople into Everbridge. CW 2 added that certain groups and teams at Everbridge were "not amenable" and did not care to observe best practices and elected to use a "my way or the highway" approach.

121.    As a result, most of xMatters' sales staff left after the acquisition. According to CW 2, who worked at both xMatters and Everbridge, Everbridge lost a "*tremendous*" number of legacy xMatters sales representatives, including the global sales leader.[6] CW 2 had heard that the legacy xMatters staff was treated "poorly" and that some of the conduct resulted in lawsuits. CW 2 continued to say that xMatters was a "very familial" organization, a sentiment that Everbridge did not share.

122.    According to CW 2, there was "attrition" from the xMatters side following the acquisition as a result, and the quarter ending in September 2021 was "dismal" from an xMatters perspective. CW 2 added that xMatters' "didn't come close" to achieving their targets that quarter.

---

[6] Based on Lead Plaintiff's investigation, this may refer to former Senior Vice President of Sales David Reardon, who departed in July 2021.

1    Because the attrition caused a dismal third quarter, the majority xMatters' sales staff had already

2    left Everbridge by September 30, 2021 (the last day of the third quarter).

3        123.    Although the xMatters integration issues were severe, Everbridge had been

4    experiencing similar integration challenges since the start of the Class Period. For example, CW 1

5    described Everbridge as "struggling with attrition" and integration of acquisitions. CW 1 explained

6    that there were too many new people being integrated into Everbridge after numerous acquisitions

7    beginning in 2019.

8    **E.    The Relevant Truth Regarding the Company's Slowing Organic Growth**
9    **Slowly Emerges**

10        124.    On December 9, 2021, Defendants partially revealed the true state of Everbridge

11    through a press release containing two equally unexpected announcements. First, Everbridge

12    announced that Defendant Meredith had resigned from his position as CEO and member of the

13    Board of Directors. Second, Everbridge reduced revenue guidance for 2022 to 20-23%, well below

14    the Company's history forecasts of 30% plus revenue growth.

15        125.    At the same time, however, Defendants insisted that the two announcements were

16    unrelated, stating that "Meredith's resignation *[wa]s not related to any matter regarding the*

17    *Company's financial condition* [or] reported financial results."

18        126.    On this news, Everbridge's stock price plummeted by more than ***45%***, as investors

19    began to understand the Company's revenue growth was unsustainable. Indeed, multiple analysts

20    subsequently downgraded their rating of Everbridge stock, with Northland Capital Markets, for

21    example, noting that the revenue guidance was "a ***notable change***" from "the company's historic

22    guidance . . . that they should grow ***30%+ organically***." Similarly, Barclays explained that they had

23    "less confidence in growth visibility ahead" and noted that "[i]nvestors ***will focus even more on***

24    ***organic growth going forward***, and are ***unlikely to give EVBG the benefit of the doubt on future***

25    ***acquisitions***."

26        127.    However, Defendants did not disclose the full truth, and investors were left to

27    wonder about Meredith's abrupt departure and its possible relation to the Company's slowing,

28    unexpected, and therefore worrisome organic revenue growth. For example, on December 13, 2021,

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
New York

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

30

J.P. Morgan issued an analyst report stating, "there remain a lot more questions than answers at the moment." Chief among those questions was "[w]hy is the CEO really leaving," and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?"

128.    After two more months of "more questions than answers," on February 24, 2022, investors finally learned the full truth about the Company's slowing revenue growth. On that date, Defendants issued a press release announcing Everbridge was lowering its full year 2022 guidance once again, this time to 15-17%, nearly half the usual 30% plus revenue growth.

129.    Moreover, the press release also explained that Defendants were "taking decisive actions to streamline, integrate and reduce complexity in [Everbridge's] key offerings, which we expect to drive sustainable growth in the years ahead."

130.    Co-CEO Vernon Irvin clarified this statement during the Company's earnings call on the same day, stating that "beginning in December," i.e., when the Company announced Meredith's abrupt departure as CEO, "our management team, together with the Board, conducted a comprehensive review of our strategy and operations" which looked at "the number of acquisitions completed in 2020 and 2021" and how those acquisitions were integrated into Everbridge.

131.    Indeed, according to Irvin, that comprehensive Everbridge management review concluded that "certain *acquired technologies*" created a "barrier to upsell and cross-sell *from increased complexity, and incomplete integrations*." He further stated that "the number of *acquisitions completed in 2020 and 2021*," along with their products and businesses, "created incremental product line *complexity that produce integration challenges* and have complicated our go- to-market efforts."

132.    Based on this incomplete integration, Irvin explained that it was "harder for . . . [Everbridge's] enterprise sales organization to execute on [its] land, adopt and expand sales strategies." Similarly, Brickley stated during the earnings call that the flurry of acquisitions "created complexity for the business seen in the product, back office and go-to-market headwinds *that are obstacles to sales growth*." Brickley further explained that "we were well down a path of selling

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

31

dozens of solutions that *were not always tightly integrated*. We were selling them to multiple buyers. And as [Irvin] said, *that was confusing to customers and to our sellers*."

133.    As a result, Irvin explained that the Company was taking immediate action to "paus[e] material new M&A and instead prioritiz[e] development efforts to *focus on accelerating product integrations across our existing acquired assets*."

134.    On this news, Everbridge's stock price fell more than *33%,* closing at $30.61 per share on February 25, 2022, as investors finally understood that, the Company failed to integrate them, causing a drop off of organic sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions.

135.    Shortly after the full truth was revealed, Barclays noted that "*some investors were holding out hope that the CEO departure was separate from growth concerns*." But this could no longer be denied. Indeed, as William Blair noted, the "*incomplete integrations* and the accumulated portfolio of somewhat disjointed point solutions that *resulted from this rapid pace of M&A* was creating difficulties in the company's land-and-expand motion from the perspective of both sellers and buyers."

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

136.    Lead Plaintiff alleges that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Everbridge's publicly trade common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

137.    Throughout the Class Period, Defendants made a series of false and misleading statements regarding: (i) the extent to which the revenues it obtained from those acquired companies were being used to hide increasingly lower organic revenue growth; and (ii) the significant problems Everbridge was facing as a result of Defendants' failure to integrate the acquired companies. At the same time, Defendants omitted material facts indicating that the

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION    32
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

Company's revenue growth was unsustainable and would be short-lived due to incomplete integrations and increased complexity.

### A.    February 18, 2020 Earnings Call

138.    On February 18, 2020, Everbridge held an earnings call to discuss the Company's fourth quarter and full year ended December 31, 2019 (the "Fourth Quarter and Full Year 2019 Earnings Call"). During that call, one analyst expressed uncertainty about the Company's organic revenue growth, asking Ellertson the following question:

> But if I look at your revenue guidance, it seems like you're guiding below the 30% mark organically, which will be below the commentary that Jaime spoke about earlier for sustainable 30% growth with M&A in addition to that. Are there any one- timers that we should be thinking about or just timing of revenue recognition that are impacting fiscal '20?

139.    Ellertson stated that the Company had already integrated NC4 into its product offering. Specifically, Ellertson stated:

> And as I said earlier, as we head into 2020, **we've _really integrated NC4 and Risk Center into our entire product offering._** And so it's difficult to break that out.

140.    Ellertson's statement about integrating NC4 into Everbridge's product offering was false and misleading because starting with NC4, during Meredith's tenure, Defendants' failure to integrate the acquisitions, caused significant integration challenges throughout the Class Period. For example, CW 1 explained that there were too many new people being integrated into Everbridge after numerous acquisitions beginning in 2019. CW 1 added that these employees were spread across all different time zones, which made it difficult to get everyone on the same page and then, once progress was being made, another company would be acquired and Everbridge would have to go through the process all over again. CW 1 also cited problems integrating the acquired companies themselves into Everbridge's business.

### B.    March 23, 2020 Corporate Analyst and Investor Meeting

141.    On March 23, 2020, Everbridge hosted its Corporate Analyst and Investor Meeting, which was attended by several Everbridge officers and employees, including the Individual

Defendants. During the conference, Meredith touted the growth of the Company's CEM platform with the addition of the recent Connexient and CNL Software acquisitions. Meredith stated:

> Secondly, we're continuing to innovate around Critical Event Management with significant new capabilities in CEM, specifically related to IoT. ***And if you look at the acquisitions that we have done with Connexient, one2many and others, we now have over 225 out-of-the-box integrations.*** So we ***now truly can be that <u>unified enterprise-wide operating system</u>*** to allow you to operate across your business, your organization globally, and that's very powerful and that's very sticky.

142.    Meredith's statement was false and misleading because it created an impression that the Company had integrated the acquired companies, including Connexient, into the Company's CEM platform when they had not.

143.    During the Class Period, Defendants engaged in a flurry of acquisition but failed to integrate these acquisitions. Thus, contrary to Meredith's statements, the recent acquisitions did not make Everbridge a "unified enterprise-wide operating system."

**C.    The April 6, 2021 xMatters Acquisition Press Release**

144.    On April 6, 2021, the Company issued a press release on Form 8-K announcing that Everbridge had acquired xMatters for a purchase price of approximately $240 million in cash and stock. The press release stated:

> ***Everbridge anticipates the partial year contribution to 2021 revenue will be approximately $9-11 million***, after considering the material impact of purchase accounting and the associated deferred revenue haircut. Everbridge expects that the xMatters acquisition will have minimal impact to the company's adjusted EBITDA in 2021 and will become accretive to the company's adjusted EBITDA in 2022. The company will provide an update to its full-year guidance on its next earnings call.

145.    This statement was false and misleading because the revenue contribution from xMatters for the rest of 2021 was actually $20-25 million—the high end of which was ***nearly triple*** the $9-11 million figure Defendants presented to the public. Defendants knew that xMatters would contribute $20-25 million for the rest of 2021, but purposefully downplayed the revenue contribution from xMatters to mask the Company's slowing organic revenue. By claiming xMatters would contribute $9-11 million, when it would actually contribute $20-25 million, Defendants had

an extra $11-16 million in "hidden," undisclosed revenue from xMatters that they could add to the Company's overall revenue, making it appear as though the Company's revenue was growing organically far more than it actually was.

146.    CW 1, who had knowledge of Everbridge's M&A process and transactions, stated that Everbridge ended up paying 4.0 – 4.5x the revenue for xMatters, in a deal that *was "forced through" to "boost" revenue figures*. Specifically, CW 1 recalled that the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021. According to CW 1, however, realistically, the forecasts were presenting figures closer to *$20 - $25 million*. CW 1 added that based on the actual forecasts, it was "clear" that xMatters was not necessarily going to grow, which was contrary to what was being presented to the public.

147.    CW 1 stated that she raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley. CW 1 added that she expressed concerns *directly* to Meredith and Brickley as well, in the form of presentations and emails regarding the deal. CW 1 explained that she sent Meredith and Brickley emails in the lead up to the acquisition. CW 1 added that she was not the only person to express concerns about the xMatters acquisition.

148.    According to CW 1, the rationale Meredith provided *was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue*. According to CW 1, the difference in revenue reported versus what was projected was to allow Everbridge to use the discrepancy to cover up for their overall performance.

**D.    The May 10, 2021 Earnings Call**

149.    On May 10, 2021, the Company filed its Form 10-Q for the quarterly period ended March 31, 2021 (the "2021 First Quarter Form 10-Q").

150.    During the May 10, 2021 Earnings Call, Brickley provided updated guidance for the rest of 2021 based on the recent xMatters acquisition. The updated guidance raised the Company's full year revenue estimate to represent growth of 32% to 33%. Specifically, Brickley explained:

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

35

Our updated guidance for 2021 considers the impact of our acquisition of xMatters. Having just completed the transaction on Friday, *Our* [*sic*] **expectations** *for the financial contribution from xMatters for the remainder of the year have not changed from the view we provided about a month ago*.

. . .

For the second quarter, we anticipate revenue of between $83.7 million and $84.1 million, representing growth of 28% to 29% .

. . .

"For the full year, we now expect revenue to be in the range of $358 million to $359.6 million, representing growth of 32% to 33%."

151. This statement was false and misleading because it failed to correct the prior material misstatement that revenue contribution from xMatters for the remainder of the year would be $9-11 million. *See* ¶¶ 144-148, *supra*.

152. Analysts were comforted by Defendants' updated guidance, specifically its organic revenue guidance, and believed that the Company could continue its strong trajectory. For example, on May 11, 2021, William Blair issued an analyst report reiterating its outperform rating on Everbridge's stock. In the report, William Blair noted that, "[e]xcluding xMatters, the updated guidance implies roughly 29% organic growth at the midpoint compared to the midpoint of the company's prior outlook at 26.6% growth." On June 3, 2021, William Blair issued another analyst report stating "[t]he Company has been putting up strong numbers post-pandemic and we believe this trajectory will continue in the coming quarters."

**E.    The August 9, 2021 Earnings Call**

153. On August 9, 2021, the Company held an earnings call discussing the Company's second quarter 2021 financial results (the "August 9, 2021 Earnings Call"). During the call, an analyst asked about the xMatters acquisition and how the acquired revenue would impact the Company's total revenue moving forward. Specifically, the analyst asked:

Got it. And just one follow-up, if I may. On the xMatters acquisition, is it possible to get the xMatters contribution to the revenue for the quarter? And really given the positive commentary throughout the call, I mean, I guess, are you expecting much more than the $9 million to $11 million in total revenue that you guided for xMatters earlier this year.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

36

154. In response, Meredith refused to give a revenue contribution number from xMatters, but instead touted the integration of xMatters and the strong sales of its products:

> Yes, Koji, it's a great question. So let me just give an update on what's going on with xMatters. One is, we are probably ahead of schedule on getting them integrated with the organization and *we acquired a really tremendous team*. They understand our space and the strategic fit of digital plus physical is resonating well with customers. And so based on our internal expectations, what we thought we'd do on sales, like we're doing better. And so we certainly are going to try to continue that.
>
> *We are integrating*. We did have an ITA business previously. *So we're integrating those teams. They've already been integrated.* So it is interesting in terms of which deals were already in the funnel, would we have won them anyway, not won them. So we're really not – and it's probably impossible to kind of break out going forward because we're putting the teams together. But our overall guidance reflects our view of the consolidated view going forward. And overall, we're very bullish on the acquisition and the results exceeded what we thought prior to having gone through Sarbanes-Oxley and closing the deal and all that.

155. The statements in ¶ 154 were false and misleading because they led investors to believe that the xMatters integration was going well and that Everbridge had already integrated xMatters' teams and employees, when in reality, the xMatters integration was not going well and Everbridge had lost a "tremendous" number of xMatters employees. Contrary to Meredith's statement that the xMatters teams had "already been integrated," most xMatters employees left Everbridge after the acquisition. According to CW 2, who worked at both xMatters and Everbridge, Everbridge lost a "*tremendous*" number of legacy xMatters sales representatives, including the global sales leader.

156. The statements in ¶ 154 were false and misleading for the additional reason that they led investors to believe that the Company was already integrating xMatters when they were not.

**F.    The November 9, 2021 Earnings Call**

157. On November 9, 2021, the Company held an earnings call discussing the Company's third quarter 2021 financial results (the "November 9, 2021 Earnings Call"). During the call, Meredith represented that, "[t]here's an increased awareness of the importance of CEM. And we're doing a better job of bundling together our different CEM capabilities into deals, and that's manifesting itself in the ASPs [average selling prices] and the large deals."

158.    Specifically addressing the xMatters acquisition, Meredith further represented:

> Obviously, with the xMatters platform, it was many years of development, really nice system, interface, functionality use cases, digital operations. It's – it really adds a lot of capability to what we were doing with our IT Alerting. And we're already doing integrations, right? ***So we've got that integrated now with our crisis management module, we've got it integrated with our employee communications module, integrated with our Visual Command Center***. So people are seeing the value of it coming together over time and giving us really positive feedback.

159.    During the November 9, 2021 Earnings Call, Brickley reiterated that the xMatters integration went well, stating, "it's performing as expected. ***We've integrated the people. We've integrated the sales. We've integrated the funnels. We're integrating the technology***. So we don't break it out. But so far, so good."

160.    Meredith and Brickley's statements in ¶¶ 158-59 about the xMatters integration were false and misleading because, unbeknownst to investors, Everbridge was experiencing significant integration problems in connection with the xMatters acquisition, including losing a "tremendous" number of xMatters legacy employees by August 2021. *See* ¶¶ 115-123, *supra*. Moreover, because Defendants spoke about the xMatters integration, including the retention of xMatters employees, they had a duty to disclose information about the Company's integration challenges and reasonable investors would find that losing most of xMatters' sales staff would significantly alter the mix of available information about the Company.

### G.    The November 30, 2021 Credit Suisse Conference

161.    On November 30, 2021, Brickley attended the Credit Suisse Technology, Media & Telecom Conference. During the conference, Brickley responded to a question as to the status of the xMatters integration using similar language to what he had said during the November 9, 2021 Earnings Call, claiming that "[w]e've begun that technological integration. ***We've locked up key hires, and we're retaining them.*** And so, so far, so good."

162.    This statement was false and misleading because for the reasons set forth in ¶¶ 155-56, 160, *supra*.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

38

### H.    The November 30, 2021 Press Release

163.    On November 30, 2021, the Company issued a press release "announc[ing] the launch of [Everbridge's] new Digital Operations Platform, helping organizations to save time and money, deliver continuous service uptime and maintain revenue streams. The new platform extends Everbridge's market-leading CEM for Digital solution to further support customers' digital transformation efforts." According to the press release, "Everbridge's new Digital Operations Platform represents *the seamless integration of the Everbridge and xMatters enterprise IT and cyber resilience solutions (following Everbridge's acquisition of xMatters in May 2021*)."

164.    This statement was false and misleading because the xMatters integration was not "seamless" as set forth in ¶¶ 155-56, 160, *supra*.

## VI.    THE TRUTH EMERGES

165.    The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized on December 9, 2021. However, the truth and foreseeable risks were not fully revealed and/or fully materialized until February 24, 2022.

### A.    The Truth is Partially Revealed on December 9, 2021 When Defendants Disclose Meredith's Abrupt Departure and Lower Revenue Guidance, But Investors Still Question How the Two are Related

166.    The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized after the markets closed on December 9, 2021, when Defendants issued a press release that contained two unexpected announcements.

167.    First, Everbridge announced that Meredith had resigned effective immediately from his position as CEO and member of the Board of Directors. However, the Company provided no explanation for his decision. The Company announced that it would immediately establish an Office of the CEO and begin to transition leadership to Defendant Brickley and Irvin, Everbridge's Executive Vice President and Chief Revenue Officer, as interim Co-CEOs pending the appointment of a permanent CEO.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO                39

168.    The second announcement from the same press release was Everbridge's reduction of revenue guidance for 2022 to 20%-23% growth, well below its historic forecasts of 30% plus revenue growth.

169.    As a direct and proximate result of this partial corrective disclosure, the price of Everbridge's common stock fell $52.37 per share, or more than 45.4%, to close at $63.00 per share on December 10, 2021.

170.    Indeed, analysts were shocked by Meredith's "abrupt" resignation. For example, on December 10, 2021, Bank of America Securities issued an analyst report stating: "We find the resignation of David Meredith as CEO and a board member as ***abrupt and unexpected***, particularly given the business is still working through the large and transformative acquisition of xMatters from earlier this year and the relatively good results in 2021 thus far." Similarly, on the same day, Northland Capital Markets issued an analyst report stating the resignation "was fairly abrupt and without a transition plan."

171.    Analysts were also shocked by the lower revenue guidance for 2022. For example, in their December 10, 2021 analyst report, Bank of America went on to say, "[m]ore concerning to us is the 2022 prelim[inary] revenue guidance ***that suggests a sharp revenue growth deceleration*** in 2022 from 2021 (+20-23% vs. our +36% 2021 forecast)." Northland Capital Markets commented that the revenue guidance was "a ***notable change***" from "the company's historic guidance . . . that they should grow 30%+ organically." Northland Capital Markets also stated that the lower revenue guidance "seems a little at odds with macro trends" that would be expected to benefit Everbridge, "such as a continued barrage of critical events, the uncertainty remaining around Covid, strong public safety investments in other areas, digital transformation plans, and the rise of the CSO within companies."

172.    However, the Company did not disclose the full truth regarding the Company's slowing revenue growth. The Company's December 9, 2021 press release misled investors by claiming that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results." This statement was false and misleading because it led investors to believe that Meredith's departure was not related to the Company's growth

deceleration in 2022. In reality, Meredith's resignation was directly related to the Company's slowing growth, as under Meredith's leadership, the Company had chased acquisitions to bolster its growth numbers but failed to integrate them, causing a drop off in sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions, leading to a significant growth deceleration in 2022.

173.    As a result of Defendants' false assurances that Meredith's departure was unrelated to lower revenue guidance, investors did not yet understand what caused Everbridge's slowing revenue growth. As Raymond James explained in their December 16, 2021 analyst report, "investors are still trying to dissect what's driving the organic deceleration in 2022." J.P. Morgan also questioned whether Meredith's abrupt departure was related to the Company's slowing revenue growth. On December 13, 2021, J.P. Morgan issued an analyst report stating, "there remain a lot more questions than answers at the moment." Most importantly, J.P. Morgan asked "[w]hy is the CEO really leaving" and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?"

174.    J.P. Morgan noted that Meredith's abrupt departure was at odds with the continued positive gloss that he and the other Defendants had put on Everbridge's growth potential throughout the Class Period. Moreover, by resigning as CEO, Meredith left on the table approximately 55% of the remaining unvested performance-based compensation. This performance-based compensation was tied to the Company's annual growth rate over the 12 quarters ended on September 30, 2022. Meredith's departure raises the question of whether he left the compensation on the table because he knew that revenue was declining dramatically and could no longer be propped up with further acquisitions, thereby diminishing the value of the performance-based compensation. JP Morgan made the cogent observation that, "[w]hat we found is that [Meredith] is leaving a decent amount on the table with his departure. If the decision was solely his to make, it does raise the question on whether he was lacking confidence in earning the remaining performance-based incentive." That Meredith later took the position of CEO of privately held Boomi, an intelligent connectivity and automation company, does not lessen the saliency of that question.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

41

**B.    The Full Truth is Fully Revealed on February 24, 2022 When Defendants Lower Revenue Guidance Even Further and Admit the Company had not Integrated its Acquisitions During Meredith's Tenure as CEO**

175.    Investors finally got answers to their questions on February 24, 2022, when the truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were fully revealed and/or fully materialized. After the market closed on that day, Everbridge revealed the full truth to investors about its slowing organic growth.

176.    On February 24, 2022, the Company issued a press release which once again lowered 2022 revenue guidance, this time forecasting full year revenue growth at 15% to 17%. The press release also contained a statement from Co-CEO Irvin, stating "[w]e are taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."

177.    On the same day, Everbridge held the February 24, 2022 Earnings Call, during which Everbridge officers further explained why these "decisive actions" were being taken, including disclosing for the first time material facts that were completely in opposition with Defendants' representations throughout the Class Period.

178.    Irvin began by saying that "beginning in December," i.e., when Meredith resigned as CEO, "our management team, together with the Board, conducted a comprehensive review of our strategy and operations." The review, however, was apparently focused on matters that, during the Class Period, Defendants had discussed extensively with investors and analysts, independently and in answer to questions posed to them, and as to which they were already intimately familiar. For example, the review looked at "the number of acquisitions completed in 2020 and 2021" and how those acquisitions were integrated into Everbridge.

179.    Irvin stated that this review resulted in the conclusion that "certain acquired technologies" had created a "***barrier to upsell and cross-sell from increased complexity, and incomplete integrations*** and pushed out demand for travel-related solutions, as well as smaller deal size for international public warning wins that are having adverse impacts on business, our go-to-market strategy and sales organization." He further stated that "the number of acquisitions completed in 2020 and 2021," along with their products and businesses "have created ***incremental***

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION        42
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

*product line complexity that produce integration challenges and have complicated our go-to-market efforts*." With incomplete integration, Irvin explained that it was "harder for . . . [Everbridge's] enterprise sales organization to execute on [its] land, adopt and expand sales strategies."

180.    Defendant Brickley expanded upon these revelations, stating that the acquisitions in 2020 and 2021 "have created complexity for the business seen in product, back office and go-to-market headwinds *that are obstacles to sales growth*. Removing these headwinds by accelerating integration work will be our focus in the first half of this year." He further elaborated on that complexity caused by the flurry of acquisitions in 2020 and 2021, explaining that "we were well down a path of selling dozens of solutions that *were not always tightly integrated*. We were selling them to multiple buyers. And as Vernon said, *that was confusing to customers and to our sellers*."

181.    As a result, Irvin explained that the Company was taking immediate action to "paus[e] material new M&A and instead prioritiz[e] development efforts to *focus on accelerating product integrations across our existing acquired assets*." In addition, Everbridge stated that it intends to "simplif[y] our product offerings, moving from several dozen individual product–point products to focus on 4 strategic CEM solutions." In particular, the Company will "deemphasize certain smaller, nonstrategic products that don't fit cleanly into our CEM and public warning focus areas. *While these products do deliver some stand-alone revenue, they are a distraction to our primary focus and negatively impact our sellers' overall productivity*."

182.    On this news, Everbridge's common stock price fell an additional $15.68 per share, or approximately 34%, to close at $30.61 per share on February 25, 2022.

183.    Analysts were once again shocked by Everbridge's lower guidance, which was substantially lower than the guidance provided on December 9, 2021. On February 25, 2022, William Blair published an analyst report stating that "Everbridge provided updated full year 2022 guidance, with lower-than-expected revenue" which William Blair explained was "below the Street mean estimate of ... 21.8% growth" and "*notably below* the initial outlook provided in December 2021." William Blair further explained that Everbridge's "*incomplete integrations and the accumulated portfolio of somewhat disjointed point solutions that resulted from this rapid pace*

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION        43
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

*of M&A was creating difficulties in the company's land-and-expand motion from the perspective of both sellers and buyers*."

184.    Moreover, investors finally understood that Meredith's departure was connected to the growth concerns. Barclays issued an analyst report on February 25, 2022, stating that Everbridge "guided FY22 revenues below expectations again, as we believe some investors were holding out hope that the CEO departure was separate from growth concerns." These investors could no longer hold out hope— it was clear that Meredith's departure was connected to the growth concerns. Barclays explained that "[w]e are disappointed these activities around past M&A have such a significant impact on revenues ($17 mil. of headwinds in FY22), and we believe xMatters in particular could be holding growth back."

185.    On March 17, 2022, activist investor Ancora, who beneficially owned approximately 4% of the Company's outstanding common stock, issued a letter calling for the sale of Everbridge. The Ancora letter explained that Ancora was first attracted to Everbridge because it is the market leader in CEM. Ancora praised the Company for its early vision and strategy, stating:

> Having pioneered the market for critical communications solutions, Everbridge should be commended for its early vision in helping protect people around the world by powering mass notification for both public sector and corporate entities. Building on this leadership position, Everbridge has successfully evolved from a single-product business into a diversified and robust platform selling a portfolio of solutions to address varied needs. In this context, the Company's early strategy of consolidating adjacent technologies via tuck-in acquisitions made enormous sense. Through this approach, Everbridge established a dominant CEM offering by creating a platform that obviates the need for customers to contract with multiple point solution providers. As the markets for managing response to risks converge, we believe Everbridge is in an excellent position to continue winning market share.

186.    Ancora also touched on how the Company had misled investors about its growth by failing to disclose revenue contributions from its acquisitions. Ancora explained, "Everbridge does not disclose contributions from M&A, *seemingly obscuring that the Company has been paying higher prices to acquire growth*."

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

44

187.    With respect to the Company's failure to integrate its acquisitions, Ancora questioned why the Company had not previously realized the need to integrate its acquisitions. Ancora stated:

> While Everbridge has invested in developing some products organically, ***the vast majority of product growth over the years has come through acquisitions.*** On the Company's Q4 2021 earnings call, Everbridge called out the need to focus on integrating its acquired technologies. While this initiative makes sense, ***we are puzzled by why Everbridge is only now recognizing the need to integrate products after so many years, when a well-disciplined management team and Board would understand the advantages to executing on this as soon as possible***.

188.    Ancora also explained how the Company's Board of Directors enriched Brickley and Irvin at the expense of shareholders:

> According to an 8-K filed on December 9, 2021, co-CEOs Brickley and Irvin were to receive $5 million worth of restricted stock units ("RSUs") "on or about January 1, 2022." Instead, the Board seemingly withheld these share grants for another 60 days, only issuing the grants on March 2, 2022. In our conversation with co-CEO Brickley, he explained this delay was due to the Company being restricted from issuing awards during a blackout period. However, this explanation appears suspicious, considering the Board was nonetheless able to issue RSUs to newly appointed director David Henshall in a Form 4 filing dated January 11, 2022. By delaying the co-CEO grants until after the Company issued disappointing results and guidance, it appears the Board only served to further dilute shareholders by requiring more share grants at lower prices. The optics of this information asymmetry are troubling and suggest the Board has chosen to prioritize enriching company executives at the expense of shareholders.

## VII.    LOSS CAUSATION

189.    During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Everbridge common stock and operated as a fraud or deceit on Class Period purchasers of Everbridge common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

190.    Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Everbridge common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiff

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO                45

and other Class members would not have purchased Everbridge stock at the artificially inflated prices at which it traded during the Class Period.

191.    The relevant truth regarding Defendants' fraud was revealed in two corrective disclosures and/or materializations of concealed risk that occurred on December 9, 2021 and February 24, 2022. During this period, Everbridge's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Everbridge's stock price. It was not until the final partial corrective disclosure and/or materialization of concealed risk on February 24, 2022, that the full truth was known to the market, such that there was no longer any artificial inflation in Everbridge's stock price attributable to the fraud.

192.    The declines in Everbridge's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Defendants' material misrepresentations or omissions.

193.    As a result of their purchases of Everbridge common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss (i.e., damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Everbridge common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $166.36 per share on August 30, 2021.

194.    By concealing from investors, the adverse facts detailed herein, Defendants presented a misleading picture of Everbridge's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Everbridge common stock fell significantly. These declines removed the inflation from the price of Everbridge common stock, causing real economic loss to investors who had purchased Everbridge common stock during the Class Period.

195.    Each decline in the price of Everbridge common stock, as detailed below, was a direct and proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
New York

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

46

196.    The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Everbridge common stock and the subsequent decline in the value of Everbridge common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

197.    The market for Everbridge common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 583,652 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Everbridge's common stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased Everbridge common stock relying upon the integrity of the market relating to Everbridge common stock and suffered economic losses as a result thereof.

198.    The declines in Everbridge's common stock price on December 10, 2021 and February 25, 2022 were a direct and foreseeable result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the market close on December 9, 2022 and February 24, 2022. The timing and magnitude of Everbridge's stock price declines evidence the impact of Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Lead Plaintiff and other Class members were caused by changed market conditions or macroeconomic, industry, or Company- specific facts unrelated to Defendants' fraudulent conduct.

A.    **December 9, 2021 – First Partial Corrective Disclosure/Materialization of the Risk**

199.    On December 9, 2021, Defendants partially revealed the true state of its business through a press release that contained two announcements.

200.    First, Everbridge announced that Meredith had resigned from his position as CEO and member of the Board of Directors. However, the Company provided no explanation for his decision. The Company announced that it would immediately establish an Office of the CEO and begin to transition leadership to Defendant Brickley and Irvin, Everbridge's Executive Vice President and Chief Revenue Officer, as interim Co-CEOs pending the appointment of a permanent CEO.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

47

201.    The second shocking announcement from the press release was the fact that Everbridge reduced revenue guidance for 2022 to 20%-23% growth, well below its historic forecasts of 30% plus revenue growth. However, the Company claimed that the two announcements were unrelated, stating that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results."

202.    As a direct and proximate result of this partial corrective disclosure, the price of Everbridge's common stock fell $52.37 per share, or more than 45.4%, to close at $63.00 per share on December 10, 2021.

203.    Analysts were shocked by Meredith's "abrupt" resignation. *See* ¶ 170, *supra*.

204.    Analysts were also shocked by the lower revenue guidance for 2022. *See* ¶ 171, *supra*.

205.    However, the Company did not disclose the full truth regarding the Company's slowing revenue growth. The Company's December 9, 2021 press release misled investors by claiming that "Meredith's resignation [wa]s not related to any matter regarding the Company's financial condition [or] reported financial results." This statement was false and misleading because it led investors to believe that Meredith's departure was not related to the Company's growth deceleration in 2022. In reality, Meredith's resignation was directly related to the Company's slowing growth, as under Meredith's leadership, the Company had failed to integrate acquired companies, causing a drop off in sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions, leading to a significant growth deceleration in 2022.

206.    Indeed, analysts questioned whether Meredith's abrupt departure was related to the Company's slowing revenue growth. *See* ¶¶ 173-74, *supra*. For example, J.P. Morgan asked "[w]hy is the CEO really leaving" and "does the timing of the CEO departure actually indicate concerns about growth potential over the next year?"

207.    As explained in ¶ 174, *supra*, J.P. Morgan noted that, "[w]hat we found is that [Meredith] is leaving a decent amount [of performance based compensation] on the table with his departure. If the decision was solely his to make, it does raise the question on whether he was lacking confidence in earning the remaining performance-based incentive."

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO          48

**B.    February 24, 2022 – Final Corrective Disclosure/Materialization of the Risk**

208.    On February 24, 2022, Everbridge revealed the full truth to investors about its slowing organic growth. On that date, the Company issued a press release which once again lowered 2022 revenue guidance, this time forecasting full year revenue growth at 15% to 17%. The press release also contained a statement from Co-CEO Irvin, stating "[w]e are taking decisive actions to streamline, integrate and reduce complexity in our key offerings, which we expect to drive sustainable growth in the years ahead."

209.    On the same day, Everbridge held the February 24, 2022 Earnings Call, during which Everbridge officers further explained why these "decisive actions" were being taken, including disclosing for the first time material facts that were completely in opposition with Defendants' representations throughout the Class Period.

210.    Irvin began by saying that "beginning in December," i.e., when Meredith resigned as CEO, "our management team, together with the Board, conducted a comprehensive review of our strategy and operations." The review, however, was apparently focused on matters that, during the Class Period, Defendants had discussed extensively with investors and analysts, independently and in answer to questions posed to them, and as to which they were already intimately familiar. For example, the review looked at "the number of acquisitions completed in 2020 and 2021" and how those acquisitions were integrated into Everbridge.

211.    Irvin stated that this review resulted in the conclusion that "certain acquired technologies" had created a "***barrier to upsell and cross-sell from increased complexity, and incomplete integrations*** and pushed out demand for travel-related solutions, as well as smaller deal size for international public warning wins that are having adverse impacts on business, our go-to-market strategy and sales organization." He further stated that "the number of acquisitions completed in 2020 and 2021," along with their products and businesses "have created ***incremental product line complexity that produce integration challenges and have complicated our go-to-market efforts***." With incomplete integration, Irvin explained that it was "harder for . . . [Everbridge's] enterprise sales organization to execute on [its] land, adopt and expand sales strategies."

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

49

212.    Defendant Brickley expanded upon these revelations, stating that the acquisitions in 2020 and 2021 "have created complexity for the business seen in product, back office and go-to-market headwinds *that are obstacles to sales growth*. Removing these headwinds by accelerating integration work will be our focus in the first half of this year." He further elaborated on that complexity caused by the flurry of acquisitions in 2020 and 2021, explaining that "we were well down a path of selling dozens of solutions that *were not always tightly integrated*. We were selling them to multiple buyers. And as Vernon said, *that was confusing to customers and to our sellers*."

213.    As a result, Irvin explained that the Company was taking immediate action to "paus[e] material new M&A and instead prioritiz[e] development efforts to *focus on accelerating product integrations across our existing acquired assets*." In addition, Everbridge stated that it intends to "simplif[y] our product offerings, moving from several dozen individual product–point products to focus on 4 strategic CEM solutions." In particular, the Company will "deemphasize certain smaller, nonstrategic products that don't fit cleanly into our CEM and public warning focus areas. *While these products do deliver some standalone revenue, they are a distraction to our primary focus and negatively impact our sellers' overall productivity*."

214.    On this news, Everbridge's common stock price fell an additional $15.68 per share, or approximately 34%, to close at $30.61 per share on February 25, 2022.

215.    Analysts were once again shocked by Everbridge's lower guidance, which was substantially lower than the guidance provided on December 9, 2021. *See* ¶ 183, *supra*.

216.    Moreover, investors finally understood that Meredith's departure was connected to the growth concerns. Barclays issued an analyst report on February 25, 2022, stating that Everbridge "guided FY22 revenues below expectations again, as we believe some investors were holding out hope that the CEO departure was separate from growth concerns." These investors could no longer hold out hope— it was clear that Meredith's departure was connected to the growth concerns. Barclays explained that "[w]e are disappointed these activities around past M&A have such a significant impact on revenues ($17 mil. of headwinds in FY22), and we believe xMatters in particular could be holding growth back."

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

50

217. On March 17, 2022, activist investor Ancora, who beneficially owned approximately 4% of the Company's outstanding common stock, issued a letter calling for the sale of Everbridge. The Ancora letter explained that Ancora was first attracted to Everbridge because it is the market leader in CEM. Ancora praised the Company for its early vision and strategy, stating:

> Having pioneered the market for critical communications solutions, Everbridge should be commended for its early vision in helping protect people around the world by powering mass notification for both public sector and corporate entities. Building on this leadership position, Everbridge has successfully evolved from a single-product business into a diversified and robust platform selling a portfolio of solutions to address varied needs. In this context, the Company's early strategy of consolidating adjacent technologies via tuck-in acquisitions made enormous sense. Through this approach, Everbridge established a dominant CEM offering by creating a platform that obviates the need for customers to contract with multiple point solution providers. As the markets for managing response to risks converge, we believe Everbridge is in an excellent position to continue winning market share.

218. Ancora also touched on how the Company had misled investors about its growth by failing to disclose revenue contributions from its acquisitions. Ancora explained, "Everbridge does not disclose contributions from M&A, *seemingly obscuring that the Company has been paying higher prices to acquire growth*."

219. With respect to the Company's failure to integrate its acquisitions, Ancora questioned why the Company had not previously realized the need to integrate its acquisitions. Ancora stated:

> While Everbridge has invested in developing some products organically, *the vast majority of product growth over the years has come through acquisitions.* On the Company's Q4 2021 earnings call, Everbridge called out the need to focus on integrating its acquired technologies. While this initiative makes sense, *we are puzzled by why Everbridge is only now recognizing the need to integrate products after so many years, when a well-disciplined management team and Board would understand the advantages to executing on this as soon as possible.*

220. Ancora also explained how the Company's Board of Directors enriched Brickley and Irvin at the expense of shareholders:

> According to an 8-K filed on December 9, 2021, co-CEOs Brickley and Irvin were to receive $5 million worth of restricted stock units ("RSUs") "on or about January 1, 2022." Instead, the Board

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

51

seemingly withheld these share grants for another 60 days, only issuing the grants on March 2, 2022. In our conversation with co-CEO Brickley, he explained this delay was due to the Company being restricted from issuing awards during a blackout period. However, this explanation appears suspicious, considering the Board was nonetheless able to issue RSUs to newly appointed director David Henshall in a Form 4 filing dated January 11, 2022. *By delaying the co-CEO grants until after the Company issued disappointing results and guidance, it appears the Board only served to further dilute shareholders by requiring more share grants at lower prices. The optics of this information asymmetry are troubling and suggest the Board has chosen to prioritize enriching company executives at the expense of shareholders*.

## VIII.    ADDITIONAL INDICIA OF SCIENTER

221.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing and reckless issuance and/or ultimate authority over Everbridge's and their materially false or misleading statements and omissions. The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements more specifically set forth in § V, *infra*, were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violator of the federal securities laws. In addition to the specific facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A.    Core Operations Allegations: Everbridge's CEM Platform Was Critical to the Company's Growth Plan and Integrating the Acquired Companies was Necessary for CEM's Success

222.    The Individual Defendants' knowledge of the integration problems can be inferred from the fact that the Company's CEM suite—which Defendants consistently touted as a market leader because it was the only "fully integrated" CEM—was critically important to the Company's growth strategy moving forward. *See* § IV.A, *supra*. During the Class Period, the Company claimed that its TAM was approximately $41 billion, and that CEM's TAM was approximately $25.9 billion, meaning CEM represented *63% of the Company's potential revenue and growth*. Because the CEM suite was so important to the Company's future growth, Defendants knew or were reckless in not knowing that they did not properly integrate the Class Period acquisitions into Everbridge's CEM suite.

223. Defendants also knew or were reckless in not knowing about the xMatters integration in particular problems because xMatters was Everbridge's largest acquisition ever and critical to the Company's CEM platform moving forward. The Company acquired xMatters' outstanding stock for a total consideration of $242.6 million. The previous year, 2020, the Company's total revenue was only $271.1 million. Thus, the xMatters acquisition cost the Company nearly as much as the Company's entire 2020 revenue.

224. The xMatters acquisition was also critical to the Company's CEM. Defendants claimed that Everbridge "acquired xMatters for its service reliability platforms *to enhance the Company's CEM suite of solutions* as well as market penetration and customer reach." Thus, Defendant knew or should have known about the challenges the Company faced in integrating xMatters into Everbridge's CEM suite. As described above in ¶¶ 115-123, multiple former employees described the integration a disaster and detailed integration problems.

225. Further evidence that Defendants knew of the significant integration problems is the fact that most of xMatters' salespeople left after the acquisition, which caused a "dismal" third quarter from an xMatters perspective. See ¶¶ 115-123, *supra*. Defendants knew or should have known about the "dismal" third quarter 2021 because they had access to the Company's Leadership Dashboard.

226. Defendants themselves admitted that they closely monitored the Company's upselling and cross-selling. For example, on January 14, 2021, Meredith and Brickley participated in the Needham Virtual Growth Conference (the "January 14, 2021 Conference"). During that conference, an analyst asked Meredith and Brickley about the average number of products customers buy from Everbridge. Brickley responded:

> No, we've been talking a lot about it internally. And with COVID, *we've really had an opportunity to focus on upsell with our customers because they've been using – our existing base has been using us more and more and more. They've been buying more products, more contacts, more usage.* And so we've been learning a lot during 2020. And as we look at our penetration of the Fortune 1000, and it's only about 35%, but half of that 35% is just mass notification.
>
> I mean we think of that as a huge opportunity. And so we'll have more intentional focus on that existing base to sell more products in.

It's a huge uplift per product for us. So that's going to be more and more intentional for us. ***And we'll be tracking internally, certainly, watching the products per customer go up.*** In particular, for that base. We have to – we want to grow efficiently. We can't spray and pray and try to do everything under the sun at once. But we've got these – we've got this penetration of the Fortune 1000. We think they should all be CEM customers.

227.    Similarly, on March 2, 2021, Meredith explained that "we have an internal metric around what we call growth bookings, which is basically cross sell, upsell. And we really consistently beat our internal growth target – growth bookings targets every quarter last year."

228.    Therefore, in 2021, both Meredith and Brickley monitored the Company's sales and thus knew or should have known of the dismal third quarter from an xMatters perspective, which was caused by significant loss of talented xMatters salespeople.

**B.    The Abrupt Departure of Meredith Supports Scienter**

229.    The timing and circumstances of the resignation of Meredith, the key executive responsible for overseeing the numerous acquisitions at issue in this case, is highly suspicious. The fact that this resignation is connected to the alleged corrective disclosures of the Company's fraud further supports that inference.

230.    Specifically, on December 9, 2021, the Company announced that Meredith had resigned as CEO ***without any succession plan in place***, prompting the Company to temporarily appoint Brickley and Irvin as Co-CEO while the Company searched for a replacement CEO. Adding to this suspicious departure is the fact that Meredith left on the table approximately one-third of the restricted stock units that were awarded to him that remained unvested, and approximately 55% of the remaining unvested performance-based compensation. As J.P. Morgan observed, "[i]f the decision was solely his to make, it does raise the question on whether he was lacking confidence in earning the remaining performance-based incentive."

231.    As discussed above, Meredith's departure, which was announced on the same day the Company reduced 2022 revenue guidance to a historically low figure, was highly suspicious and adds to a strong inference of scienter.

232.    This inference is even stronger based on the final corrective disclosure on February 24, 2022, when the Company revealed that after Meredith's departure, management conducted a

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

54

1   thorough review of the Company's strategy under Meredith, and concluded the numerous

2   acquisitions created integration challenges and created obstacles to the Company's sales growth.

3   As a result, the Company was pausing all new M&A to focus on integrating the previously acquired

4   technologies. At this point, it was clear that Meredith's departure was connected to the Company's

5   growth concerns, which further adds to a strong inference of scienter.

6          **C.**    **Defendants' Statements Themselves Support Scienter**

7         233.    As discussed above, the Individual Defendants continuously touted the Company's

8   revenue growth throughout the Class Period, claiming it was mostly organic and the result of

9   legitimate and lawful factors such as "continued strong performance."

10       234.    Similarly, Defendants continuously dispelled investor concerns about the revenue

11   contribution from xMatters. For example, during the Company's May 10, 2021 earnings call,

12   multiple analysts asked Brickley for an update on the xMatters revenue contribution numbers.

13   However, Brickley refused to provide an update. *See* ¶¶ 94-97, *supra*. Similarly, during the

14   Company's August 9, 2021 earnings call, an analyst asked for an update on the $9-11 million in

15   revenue that Defendants previously guided for xMatters, but Meredith refused to give an update

16   and instead touted the integration of xMatters and the Company's strong sales. *See* ¶¶ 98-99. *supra*.

17   Meredith's refusal to provide an update, despite several questions from analysts, further supports a

18   strong inference of scienter.

19       235.    By dispelling investor concerns about the Company's organic revenue growth,

20   Defendants either: (1) knew that the Company was using acquired revenue to hide slowing organic

21   revenue growth, and that this strategy was unsustainable as it relied on acquiring companies without

22   properly integrating them into Everbridge; or (2) were reckless in not knowing that this was the

23   case. Under either scenario, there is a strong inference that Defendants made these statements with

24   scienter.

25          **D.**    **Meredith's Employment Agreement Further Supports Scienter**

26       236.    The structure of Meredith's employment agreement further supports a strong

27   inference of scienter. As part of Meredith's employment agreement, the Company granted Meredith

28   100,000 performance stock units (the "PSU Grant"), with up to 62.5% of the PSU Grant becoming

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
New York

eligible to vest on September 30, 2021, based on the compound annual growth rate ("CAGR") achieved by the Company during the eight fiscal quarters preceding such date, and up to an additional 62.5% of the PSU Grant becoming eligible to vest on September 30, 2022, based on the CAGR achieved during the 12 fiscal quarters preceding such date. The vesting of the PSU Grant was subject to Meredith's continued service to the Company through each applicable vesting date or event.

237.    Therefore, Meredith's employment agreement included bonuses based on the Company's growth rate.

**E.    Statements by Former Everbridge Employees Corroborate that Defendants Knowingly Downplayed the Revenue Contribution from xMatters to Mask Slowing Organic Growth**

238.    The CWs make clear that it was not simply a mistake, or a reasonable estimate based on available data, but that the Defendants knew that xMatters would contribute much more than $9-11 million in revenue for the rest of 2021 and purposefully downplayed xMatters' revenue contribution to mask the Company's slowing organic growth and cover up for its overall performance.

239.    Both Meredith and Brickley were made aware of the discrepancy in xMatters' revenue contribution numbers. Specifically, CW 1 recalled that the projected revenue figures relayed to Wall Street for xMatters were an additional approximately $11 million for Everbridge in 2021. According to CW 1, however, realistically, the forecasts were presenting figures closer to *$20 - $25 million*. CW 1 added that based on the actual forecasts, it was "clear" that xMatters was not necessarily going to grow, which was contrary to what was being presented to the public. According to CW 1, she raised concerns regarding these discrepancies to her immediate superior, which were then passed on to Meredith and Brickley. CW 1 continued to say that she expressed concerns *directly* to Meredith and Brickley as well, in the form of presentations and e-mails regarding the deal. CW 1 explained that she sent e-mails with Meredith and Brickley in the lead up to the acquisition. CW 1 added that she was not the only person to express concerns about the xMatters acquisition. According to CW 1, the rationale Meredith provided was that the discrepancy in figures was to "buffer" the declines in Everbridge's organic revenue.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

56

## IX.    CONTROL PERSON ALLEGATIONS

240.    The Individual Defendants, by virtue of their high-level and controlling positions at Everbridge, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

241.    Defendants Meredith, Brickley, and Ellertson, as senior executives and directors of Everbridge—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Everbridge's publicly traded common stock would be based on accurate information. Each of the Individual Defendants violated these requirements and obligations during the Class Period.

242.    Defendants Meredith, Brickley, and Ellertson because of their positions of control and authority as senior executive officers and directors of Everbridge, were able to and did control the content of Everbridge's SEC filings, press releases, and other public statements issued by or on behalf of Everbridge during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for the accuracy of the public statements alleged herein.

243.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Everbridge common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Everbridge's business, operations, and management, and the intrinsic value of Everbridge's common stock, and caused

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO                57

Lead Plaintiff and members of the Class to purchase Everbridge common stock at artificially inflated prices.

## X.    CLASS ACTION ALLEGATIONS

244.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Everbridge during the Class Period and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of Everbridge during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) Everbridge's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

245.    The members of the Class are so numerous that joinder of all members is impracticable. According to public reports file with the SEC, during the Class Period, Everbridge had over 34 million shares of common stock and was actively trade on the NASDAQ under the ticker symbol "EVBG." While the exact number of Class members is unknown to Lead Plaintiff at this time, and such number can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class has thousands of members and is widely dispersed geographically. Record owners and other members of the Class may be identified from records maintained by Everbridge and/or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

246.    Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

247.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

58

248.    Common questions of law and fact exist as to all members of the Class and predominate over questions solely affecting individual members of the Class. The questions of law and fact common to the Class include, but are not necessarily limited to, the following:

(a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

(b)    Whether the statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)    Whether, and to what extent, the market price of Everbridge common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    Whether Defendants acted with the requisite level of scienter;

(e)    Whether the Individual Defendants were controlling persons of Everbridge; and

(f)    Whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

249.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

250.    To the extent that Lead Plaintiff alleges that Defendants made affirmative misstatements, Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

1       (b)     The omission and misrepresentations were material;

2       (c)     The Company's securities traded in an efficient market;

3       (d)     The misrepresentations alleged would tend to induce a reasonable investor

4 misjudge the value of the Company's securities;

5       (e)     Lead Plaintiff and other members of the Class purchased Everbridge's

6 securities between the time Defendants misrepresented or failed to disclose material facts and the

7 time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

8       (f)     Everbridge's common stock met the requirements for listing and was listed

9 and actively traded on the NASDAQ, a highly efficient and automated market;

10      (g)     As a regulated issuer, Everbridge filed periodic public reports with the SEC

11 and NASDAQ;

12      (h)     Everbridge regularly communicated with public investors via established

13 market mechanisms, including regular dissemination of press releases on the national circuits of

14 major newswire services and other wide-ranging public disclosures, such as communications with

15 the financial press and other similar reporting services; and

16      (i)     Everbridge was followed by numerous securities analysts employed by

17 major brokerage firms including, but not limited to, William Blair & Co., Bank of America Global

18 Research, Wells Fargo Securities, LLC, Stephens Inc., Truist Securities, Cannaccord Genuity, and

19 Barclays, all of which wrote reports that were distributed to the sales force and certain customers

20 of their respective brokerage firm(s) and that were publicly available and entered the public

21 marketplace.

22     251.    As a result of the foregoing, the market for Everbridge common stock promptly

23 digested current information regarding Everbridge from publicly available sources and reflected

24 such information in Everbridge's common stock price(s). Under these circumstances, all purchasers

25 of Everbridge common stock during the Class Period suffered similar injury through their purchase

26 of Everbridge common stock at artificially inflated prices and the presumption of reliance applies.

27     252.    The material misrepresentations and omissions alleged herein would induce a

28 reasonable investor to misjudge the value of Everbridge's common stock.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO    60

253.    Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of Everbridge common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

254.    To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Everbridge's business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII.    NO SAFE HARBOR

255.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward- looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

256.    To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

257.    In addition, the PSLRA imposes an additional burden on oral forward- looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii).  Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

258.    Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

61

from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Defendants did not properly integrate them into Everbridge, thus leading to a drop off in sales to such an extent that it could no longer be camouflaged with the revenues from additional acquisitions.

259.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward- looking statement was authorized or approved by an executive officer of Everbridge who knew that the statement was false when made.

## XIII.  CAUSES OF ACTION

### COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Everbridge and the Individual Defendants

260.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

261.    As alleged herein, throughout the Class Period, Everbridge and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Everbridge and the Individual Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the price of Everbridge common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase Everbridge common stock at artificially inflated prices.

262.    The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

263.    As set forth above, Everbridge and the Individual Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased Everbridge common stock during the Class Period.

264.    In ignorance of the false and misleading nature of Everbridge's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Everbridge common stock, Lead Plaintiff and other members of the Class purchased Everbridge common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased Everbridge common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of Everbridge common stock declined precipitously, and Lead Plaintiff and members of the Class were damaged and harmed as a direct and proximate result of their purchases of Everbridge common stock at artificially inflated priced and the subsequent decline in the price of that security when the truth was disclosed.

265.    By virtue of the foregoing, Everbridge and the Individual Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

63

# COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

266.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

267.    This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Defendants.

268.    The Individual Defendants had control over Everbridge and made the materially false and misleading statements and omissions on behalf of Everbridge within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

269.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

270.    By virtue of such wrongful conduct, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

64

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Lead Counsel for the Class;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees, and reasonable costs, including attorneys' fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: June 30, 2023

Respectfully submitted,

**LABATON SUCHAROW LLP**

*/s/ Michael H. Rogers*
Jonathan Gardner (*pro hac vice*)
jgardner@labaton.com
Michael H. Rogers (*pro hac vice*)
mrogers@labaton.com
David J. Schwartz (*pro hac vice*)
dschwartz@labaton.com
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**

Ryan A. Llorens (225196)
ryanl@rgrdlaw.com

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

65

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Danielle S. Myers (259916)
dmyers@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
*Liaison Counsel for the Class*

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

1

**CERTIFICATE OF SERVICE**

2         I HEREBY CERTIFY that on June 30, 2023, I electronically filed the foregoing with the

3    Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all

4    counsel of record.

5                                             */s/ Michael H. Rogers*
                                             Michael H. Rogers (admitted *pro hac vice*)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LABATON KELLER
SUCHAROW LLP
ATTORNEYS AT LAW
NEW YORK

SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS – CASE NO. 2:22-CV-02249-FWS-RAO

67